## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| **IN RE SKANSKA USA CIVIL SOUTHEAST INC. AND SKANSKA USA, INC. AS OWNERS OF THE BARGE KS 5531, PRAYING FOR EXONERATION FROM OR LIMITATION OF LIABILITY** | **ADMIRALTY RULE 9(H)**<br><br>**CIVIL ACTION NO. 3:20-CV-05980 – RV / MJF** |
| **CLAIM OF CITY OF PENSACOLA, a Florida Municipal Corporation** | **SENIOR DISTRICT JUDGE ROGER VINSON** |
| **CLAIMANT.** | |

**THIS PLEADING RELATES TO**
**CIVIL ACTION NOS:**
3:20-CV-05980-RV / MJF
3:20-CV-05981-RV / MJF
3:20-CV-05982-RV / MJF
3:20-CV-05983-RV / MJF
3:21-CV-00526-RV / HTC

## CLAIM OF CITY OF PENSACOLA WITH RESERVATION OF RIGHTS TO PROCEED IN STATE COURT

COMES NOW, Claimant who specifically reserves all defenses asserted herein and rights to pursue all available claims in state court, pursuant to the Savings to Suitors Clause, 28 U.S.C. §1333, and/or all state law remedies for resolution of any and all issues beyond the exclusive jurisdiction of this Honorable Court in Admiralty, and for its Claims against Construction Barges KS 5531, 46007, CBR

758, KS 6011 and 450020.[1] along with the alleged owner of the purported vessels, Skanska USA Civil Southeast, Inc., and Skanska USA, Inc., hereinafter ( "Skanska") and avers:

### Introduction

1.      This Claim is filed by the CITY OF PENSACOLA, (hereafter "City of Pensacola" or "Claimant") that has suffered and/or continues to suffer damages as a result of the Pensacola Bay Bridge's closure after the bridge sustained massive, crippling damage caused by impacts from Skanska's un-crewed and unpowered construction barges, KS 5531, 46007, CBR 758, KS 6011 and 450020.

2.      These construction barges, owned and used by Skanska for the sole purpose of constructing the new Pensacola Bay Bridge, were allowed to remain in close proximity to the bridge, exposed to a slow moving but strong hurricane that made landfall on September 16, 2020, despite Skanska's obligation to secure or remove its construction barges during storms.  Of the 55 total un-crewed and unpowered construction barges staged around this construction site, at least 27 broke free and 23 were pushed by the forces of wind and waves to all points around the compass from the bridge construction sites and either struck structures, such as the

---

[1] Skanska asserts that these five construction barges (KS 5531, 46007, CBR 758, KS 6011, and 450020) impacted the Pensacola Bay Bridge.  Claimant incorporates any additional construction barges that impacted the Pensacola Bay Bridge and contributed to its closure that may come to light in the future.

Pensacola Bay Bridge, or ultimately ran aground in the Pensacola and Escambia Bay area.[2]

3.    Claimant seeks compensation from Skanska for the foreseeable losses suffered by claimant whose revenue sustained significant disruption and substantial losses due to Skanska's failure to secure its construction barges, which caused damage to the Pensacola Bay Bridge, requiring the indefinite closure of the Pensacola Bay Bridge. The bridge has been closed since September 16, 2020, and the current estimated date for reopening or partial reopening is no earlier than May 31, 2021. This date is a revised date, as repairs were initially expected to be completed by March 2021, and may be revised further, prolonging the economic hardship to the Claimant.

4.    Skanska seeks to avoid or limit its liability by taking refuge in a provision of Admiralty law that would exonerate its clear liability or limit the claimant's recovery despite its negligence and knowing failure to follow its hurricane plan. Claimant asserts that Skanska was directly involved in the negligence, and in fact consciously and knowingly disregarded readily available information and its own policies. Because Skanska's inaction when it had a duty to act caused Claimant's damage, Skanska is not entitled to the exoneration and

---

[2] See [Doc. 60-2] Emergency Field Authorization, Field Authorization Number: 0324977-014-EE/17, October 20, 2020.

limitation it seeks and Skanska must wholly compensate Claimant for the damages it has suffered.

5.     The Pensacola area has been battered by tropical weather since its founding.  On September 19, 1559, just weeks after Don Tristan de Luna y Arellano established Pensacola as the first European settlement in the continental United States, a hurricane decimated his settlement.  Since the advent of named tropical storms and hurricanes, Pensacola has found itself within or affected by the following storms: Baker, Florence, Flossy, Debbie, Irene, Hilda, Ethel, Eloise, Frederic, Elena, Juan, Alberto, Erin, Opal, Danny, Helene, Barry, Hanna, Ivan, Arlene, Dennis, Ida, Cindy, Nate, Gordon, Michael, and Cristobal.  Don Tristan de Luna did not have access to modern weather forecasting; Skanska did, yet it chose to ignore it.  461 years after the hurricane that destroyed de Luna's settlement, and exactly 16 years after Hurricane Ivan, Hurricane Sally brought yet another wave of destruction to Pensacola. However, this time, the destructive forces of the September 16, 2020, Hurricane Sally were exacerbated by the negligence and gross negligence of Skanska. Now Skanska seeks exoneration from the consequences of, and limitation to its own liability and the damages associated with its own corporate negligence and gross negligence.  Claimant opposes Skanska's attempts and makes these claims to recover the full measure of its own economic damages.



Figure 2.2    Historical Hurricanes Paths Passing within 65 nmi of Pensacola, FL (1850 – 2011) (www.csc.noaa.gov)

6.     Claimant sets forth specific information about its losses due to the closure of the Pensacola Bay Bridge, including, but not limited to, recovery for all damages recoverable under applicable law, including economic damages, such as loss of revenue and income (such as the Tourist Development and sales taxes) and increased expenses that each would not have otherwise incurred but for Skanska's conduct described herein.

7.     The City of Pensacola is a Florida municipal corporation formally incorporated in 1821 and located within Escambia County, Florida.   The City of Pensacola's office headquarters is located at 222 W. Main Street, Pensacola, Florida 32502.

8.     Skanska USA Civil Southeast Inc. ("Skanska Southeast") has its headquarters at 295 Bendix Rd., Suite 400, Virginia Beach, VA 23452, with its

principal place of business located at 2600 Maitland Center Parkway, Suite 250, Maitland, Florida 32751. It is registered to do business in the State of Florida, and it is registered agent is located at Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

9.     Skanska USA, Inc., owns 100% of the stock of Skanska USA Civil, Inc., Skanska USA Civil Inc., owns 100% of the stock of Skanska USA Civil Southeast Inc. (collectively "Skanska").

10.    At the time of the incident, Skanska was engaged in the construction of the Pensacola Bay Bridge. The construction barges that caused the Pensacola Bay Bridge's closure were owned by Skanska and were being used by Skanska in connection with the construction of the Pensacola Bay Bridge.

11.    Skanska regularly conducts business within Florida, and is engaged in substantial activity within Florida, including the design and construction of the Pensacola Bay Bridge.

## The Construction Barges

12.    Skanska owns multiple, unpowered, and un-crewed construction barges used solely (or repurposed) as work platforms for construction-related purposes on the Pensacola Bay Bridge Project, including the construction barges KS 5531, 46007, CBR 758, KS 6011 and 450020. Skanska used these construction barges to

stage construction equipment and to support construction tasks on the bridge project. These construction barges were not "vessels" as that term applies to 46 USC § 30505 of the Limitation of Shipowners' Liability Act and Supplemental Rule F.

13.     Skanska, as the owner, has identified, through the filing of several Complaints for Exoneration from or Limitation of Liability, 23 construction barges that were used in the Pensacola Bay Bridge construction project and that impacted and damaged the Pensacola Bay Bridge, Pensacola Bay Fishing Pier, Garcon Point Bridge, and surrounding public, private and Federal properties.

### The Construction Project to Replace the Pensacola Bay Bridge

14.     United States Route 98 (US 98), the longest US road in Florida, is an east-west United States highway that was originally established in 1933 as a route between Pensacola and Apalachicola, Florida.  Since 1933 it has been extended significantly.  At the time of these events, US 98 extended from Meadville, Mississippi in the west, to Palm Beach, Florida in the east.  The overwhelming majority of the 964-mile-long US 98 is built on dry land.

15.     Approximately 3 miles of US 98 (concurrently known as State Road 289) traverses Pensacola Bay between Bayfront Parkway in Pensacola, Florida (Escambia County) and Fairpoint Peninsula in Gulf Breeze, Florida (Santa Rosa County).  US 98 is the sole, direct connection for traffic between the cities of Pensacola and Gulf Breeze.

16.    Before 1931 there was no bridge connecting Pensacola and Gulf Breeze.  The original three-mile Thomas A. Johnson Bridge, a narrow, two lane structure, was opened on June 13, 1931.  This bridge was replaced by the Sen. Phillip D. Beall, Sr., Bridge, a single, wider, four lane structure on October 31, 1960, which carried four lanes of US 98 motor vehicle traffic across Pensacola Bay for six decades.

17.    At the time of these events, Skanska was engaged in a construction project to replace this three-mile bridge. The bridge replacement project was undertaken in a manner that would maintain the free flow of motor vehicle, pedestrian and bicycle traffic between Pensacola (Escambia County) and Gulf Breeze (Santa Rosa County) throughout the construction of the new bridge.  At the time of Hurricane Sally, Skanska had opened a new, single span containing 4 lanes of two-way motor vehicle traffic and one pedestrian/bicycle path, and had undertaken the demolition of the sixty-year-old Beall bridge. Therefore, all direct traffic between Pensacola and Gulf Breeze became dependent upon this newly built span.

18.    Skanska used construction barges to support the construction and demolition activities required by the bridge replacement construction project and the use of these construction barges bears no relationship to traditional maritime activity. When referring to Skanska's loose construction barges, an FDOT engineer

explained:

> This would have been the result of barges from an active construction
> project.  I'm copying the construction project team so they can address
> with the citizen.

*See* Sept. 17, 2020 Email from FDOT to Project CEI, ex. 1 to Claimant's Reply in

Support of Motion to Dismiss. [Doc. 51-1, pg. 2-3]

### **Claim Synopsis**

19.    Claimant claims damages for past and future damages as a result of

Skanska's negligence.  Because the Pensacola Bay Bridge has not yet been repaired,

City of Pensacola's economic losses are continuing and will continue in the future

beyond the claim deadline until such time as the Pensacola Bay Bridge is repaired

and fully operational at the pre-Hurricane Sally level of traffic flow.  Importantly,

the value of this claim exceeds the aggregate value of all barges that Skanska alleges

struck the Pensacola Bay Bridge.  During the March 18, 2021 status and scheduling

conference, the Court expressed a preference to completing discovery in two

separate phases.  Specifically, the first phase of discovery would focus on issues

relevant to jurisdiction and the limitation of liability actions.  Thereafter, following

a trial on these limited issues, the parties would turn to discovery relating to

claimants' damages.  To the extent that claimant's damages are continuing, the

calculations and underlying documentation will be the subject of the damages phase

of this litigation.

20.     As the design-build general contractor that chose to bid on FDOT's contract for the replacement of the Pensacola Bay Bridge, Skanska necessarily understood the importance of the Pensacola Bay Bridge to City of Pensacola, which is reliant upon revenue generated by taxing the transactions of residents and visitors to the City of Pensacola.  Skanska understood that the City of Pensacola's revenue would fall significantly if the region's central economic artery were severed.

21.     Claimant seeks recovery for all damages recoverable under applicable law, including but not limited to economic damages, consisting of, but not limited to, loss of revenue and income, and increased expenses that each would not have otherwise incurred but for Skanska's conduct described herein.  Claimant also seek attorney's fees and costs.

22.     Skanska's negligence in failing to remove and/or secure its construction barges prior to the arrival of the storm conditions associated with Hurricane Sally caused this damage. At all material times, Skanska knew or should have known that failing to secure or move its construction barges from the Pensacola Bay Bridge construction site before Hurricane Sally approached the local coastline and ultimately made landfall on September 16, 2020 posed an unreasonable risk of damage and destruction to the surrounding communities, governments and citizens of Pensacola, Florida along with Escambia and Santa Rosa Counties, Florida.

23.     Florida law applies to this case. Under Florida's "significant

relationship test," courts apply the tort law of the state that has the most significant relationship to the cause of action. In this case, the cause of action arose in, and Skanska, the Petitioner, is a citizen of the State of Florida.  Skanska's conduct at the center of Claimant's cause of action relates to the construction of a new bridge and the destruction of an existing bridge comprising the central transportation artery and hurricane route for the Pensacola, Florida region that was built pursuant to a contract between a Florida-based construction firm and a State of Florida agency.

## COMMON FACTUAL ALLEGATIONS

### The Construction Project and Skanska's Duty

24.    The Florida Department of Transportation, FDOT, oversees, among other things, the construction of roads and bridges in the State of Florida.

25.    On July 29, 2016, Skanska was awarded the construction contract by FDOT to build and design the new bridge over Pensacola Bay. The project consists of two separate bridge spans standing side by side.

26.    Skanska began construction on the bridge project on or about September 19, 2016.  The project site was not limited to the portion of the Pensacola Bay Bridge over the bay.  In fact, the project site traversed over land across portions of Gregory Street, Bayfront Parkway, and 17th Avenue in Pensacola as well as Gulf Breeze Parkway in Gulf Breeze.

27.    FDOT entrusted Skanska with every aspect of this project. As set forth

in the Design Build Specifications, published on March 8, 2016, pg. 74-75, Skanska, as the contractor, agreed to take charge and custody of the work, and take every necessary precaution against damage to the work, by the action of the elements or from any other cause whatsoever, until the Department's final acceptance of the work.  Skanska expressly agreed to rebuild, repair, restore, and make good, all damage to any portion of the work occasioned by any of the above causes before final acceptance of the Contract.

28.    Skanska also expressly agreed to:

> . . . provide all safeguards, safety devices, and protective equipment and take any other needed actions as it determines, or as the contracting officer may determine, to be reasonably necessary to protect the life and health of employees on the job and the safety of the public and to protect property in connection with the performance of the work covered by the contract.

*See* Executed FDOT Contract at pg. 76, ex. 4 to Claimant's Reply in Support of Motion to Dismiss, [Doc. 51-5, p. 77].  By expressly agreeing to these provisions, Skanska acknowledged that it owed a duty to the public, including Claimant.

29.    In or around September 2019, Skanska completed the western ("southbound") segment of the bridge project and two lanes of traffic were able to freely move across the bridge heading both north and south by sharing this segment.

30.    Upon completion and activation of the western segment in a temporary two-way configuration, Skanska began demolishing the existing, and up until that instant, operational, Pensacola Bay Bridge in order to build the new eastern

("northbound") segment.

31.     To facilitate demolishing the old bridge and building the eastern ("northbound") segment of the bridge, Skanska utilized approximately 55 floating work platforms to hold equipment and materials for construction.  These included the Skanska owned construction barges KS 5531, 46007, CBR 758, KS 6011, and 450020.

32.     The Final Request for Proposal, at p. 63, from FDOT required the Design-Build Firm, here Skanska, to submit an Incident Management Plan that included "emergency preparedness and recovery plans as well as traffic management and evacuation due to hurricanes, tropical storms, fires, winter/ice system and other events."  Skanska prepared an incident management plan required by FDOT that was specific to tropical weather systems, like the one that became Hurricane Sally, which Skanska titled "Hurricane Preparedness Work Plan." [Doc. 16-1, pp. 2-16]

33.     The Hurricane Preparedness Work Plan included provisions for the construction barges that Skanska was using as floating work platforms from which Skanska and its employees and/or contract workers conducted construction activities. The Plan required Skanska personnel to secure the project site that includes the Pensacola Bay Bridge, and secure all marine based equipment, including the construction barges, to safe harbor.  The Plan applied project-wide, including to portions of the worksite over land.

34.     Under the Plan, there were four conditions that required different actions to be taken by Skanska personnel in the event of a tropical weather system. As Hurricane Sally approached ahead of its September 16, 2020 landfall, Condition Three became the applicable condition. Under Condition Three (which is specified as sustained winds of 50 knots or 58 mph or greater expected within 72 hours/3 days), Skanska was to cease all routine activities which might interfere with securing operations, commence securing and stow all gear and portable equipment, begin to secure any cranes on site, and move all construction barge mounted cranes and material barges to the East Bay.  No part of the Plan called for the construction barges to be secured near the construction site. As Hurricane Sally approached Pensacola, Skanska failed to follow this Plan, choosing instead to continue working as late as Monday, September 14, 2020.

35.     Despite clear warnings about the coming storm, Skanska kept its construction barges on site during this time to allow it to continue the bridge construction work. Skanska made the decision <u>not</u> to navigate these construction barges upon the navigable waters of Pensacola and Escambia Bay to a safe site for securing despite the requirements of the Hurricane Preparedness Plan to do so.

**<u>Claimant's Damages Are the Foreseeable Result of a Bridge Outage</u>**

36.     Any reasonable design-build firm in Skanska's position would have

foreseen the consequences of a Pensacola Bay Bridge outage if the Hurricane Preparedness Plan was not followed.

37.     Design-build general contractors, including Skanska, must rely on data relating to the region's economic and anticipated growth in order to design and build a roadway project that will accommodate present and future needs. To this end, FDOT commissioned numerous studies, such as Project Development and Environmental (PD&E) studies, to provide the design-build firm guidance to improve traffic safety, emergency evacuation efficiency, accommodate future traffic density while minimizing impact on the surrounding environment. Skanska relied on these studies when designing and building the Pensacola Bay Bridge.

38.     Design-build firms, such as Skanska, must rely upon historical and projected traffic density and volume data in order to prepare for and construct a roadway sufficient for the surrounding community's needs. This includes the annual average daily traffic (AADT) for the Pensacola Bay Bridge, which, as of 2011, was approximately 55,000 vehicles. FLORIDA DEP'T OF TRANSP., PENSACOLA BAY BRIDGE REPLACEMENT PD&E STUDY, at 3-1 (July 18, 2011), https://www.santarosa.fl.gov/DocumentCenter/View/268/Pensacola-Bay-Bridge---Project-Development-and-Environment-PDE-PDF. Skanska relied upon this data set when designing and building the bridge.

39.     Skanska, as a design-build firm, relies on diverse data sets beyond

traffic data to design and build a bridge that fits a community's needs.  FDOT also provided Skanska with "socioeconomic data, historical population data, and local sources such as the Chambers of Commerce or Economic Development Council Information," which included:

- Historical Escambia Population Data

- Historical Santa Rosa Population Data

- Pensacola Bay Bridge Historical Traffic Data

- US 98 east of Gulf Breeze Historical Traffic Data.

FDOT also provided Skanska with "Socioeconomic (SE) Data Development" to identify the "Pensacola Bay Bridge area of influence" within the Pensacola Bay Bridge PD&E Report, which accounts not only for population growth but also employment growth.  *Id*. at 4-6 (graphic provided below).  Skanska relied upon this data set as well when designing and building the bridge.



Figure 4-3  Area of Influence

40.     Skanska further understood that the project was undertaken because the existing bridge, recognized as a "critical link for commuters and freight transportation," was deemed structurally deficient and in need of replacement. Pensacola Bay Bridge PD&E Study at 4.  Skanska knew early on that should the bridge become unavailable, "the nearest detour route around the bridge would add approximately 27 miles to the trip length." *Id*.  Skanska's negligence has forced Claimant and Claimant's citizens to use this detour due to the bridge outage.

41.     Skanska understood that the closure of the Pensacola Bay Bridge would have separated employers from employees and business owners from customers. Skanska also understood that the City of Pensacola is uniquely vulnerable to the closure of the region's central commerce artery.  The Pensacola Bay Bridge closure not only restricts Santa Rosa County based customers from easily reaching

17

Pensacola businesses, but also restricts Pensacola customers from easily reaching Santa Rosa based businesses.  Skanska understood that the City of Pensacola's economy was uniquely dependent on regular two-way traffic on US 98 through Gulf Breeze to Pensacola, Pensacola Beach, Navarre, and points beyond.  Skanska further understood that such disruption would necessarily result in the City of Pensacola losing revenue as well as incurring additional expenses.

42.    FDOT underscored to Skanska the importance of the bridge to the region by including a $35,000 a day penalty in the design-build contract to apply upon the closure of any one of the bridge's four lanes.  *See* [DOC. 38-4] ex. D to Claimant's Motion to Dismiss, Letter from FDOT to Skanska (Oct. 22, 2020).

43.    A reasonable design-build firm would also understand the region's history, including that on January 14, 1989 a tug-driven barge knocked out a center span column of the bridge it was contracted to replace, prompting a bridge outage and economic disruption.  Bill Kaczor, "Barge Knocks Three-Mile Bridge Out of Commission,"        AP,        January        14,        1989        at https://apnews.com/article/5ace2bcffd3bdcd9c8376fedb32d1bca.        Skanska understood or should have known that an outage in 2020 would carry far worse economic devastation in light of the region's growth over the past 30 years.

44.    Finally, the bridge's closure following its September 2020 destruction came many years after Skanska began work alongside the previous bridge as well as

18

the southbound span that was fully open prior to Hurricane Sally.  For every day since 2016, Skanska was a literal first-hand witness to the traffic that traversed the Bay in either direction.  Skanska itself used the bridge to travel between the Pensacola and Gulf Breeze landmasses.

45.    Skanska fully understood the disruption that would follow an outage severing the central artery connecting Pensacola with Gulf Breeze and Pensacola Beach.  Understanding the stakes, Skanska repeatedly asked FDOT to limit its liability across five separate bid questions.  *See* ex. 4 to Claimant's Reply in Support of Motion to Dismiss, Doc. 51-4 at SKAN-PBB-0000070 (Question 13428), SKAN-PBB-0000072 (Question 13434), SKAN-PBB-0000077 (Question 13867), SKAN-PBB-0000085 (Question 14229), and SKAN-PBB-0000086 (Question 14230). FDOT denied each request.  *See, e.g., id.* at SKAN-PBB-0000072 (Question 13434) ("Please place a cap on liquidated damages and overall liability."   "No."). Claimant's damages were necessarily foreseeable to Skanska: Skanska had foreseen them enough to try to escape future liability due to any bridge closure.  When the state did not agree to limit liability, rather than forego the near $400-million-dollar construction contract, Skanska agreed to the state's terms with full awareness of what consequences would apply should the bridge close due to its negligence.

## The Evolution of Tropical Storm and Hurricane Sally

46.     A tropical wave/disturbance organized into Tropical Depression Nineteen over the extreme northwest Bahamas about 80 miles east-southeast of Miami during the late afternoon of Friday, September 11, 2020.  The system then crossed the extreme southern end of the Florida Peninsula Friday night (across the Everglades) emerging into the Gulf of Mexico around Marco Island, FL early Saturday morning September 12, 2020. By 2:00 PM EDT that afternoon the depression was upgraded to Tropical Storm Sally. Computer models were already indicating Sally would intensify into a significant hurricane and pose a major threat to the northern Gulf of Mexico.  A Hurricane Watch was issued at 5:00 PM Saturday by the National Hurricane Center (NHC) for a swath of the Gulf Coast from southeast Louisiana to the Florida Panhandle.[3]

47.     Upon discovering a tropical depression or tropical storm, the NHC issues public advisories *every three hours* throughout each 24-hour period.

48.     On the afternoon of Friday, September 11th, the NHC published a model of potential paths then-Tropical Depression Nineteen could take. Nearly every potential path would have subjected Pensacola to at least some level of tropical-storm winds.

---

[3] The weather forecast information contained in this and subsequent paragraphs was obtained from the National Hurricane Center with the National Oceanic and Atmospheric Administration ("NOAA"), located at https://www.nhc.noaa.gov/archive/2020/SALLY.shtml.

49.    At or around 11:00 p.m. on Friday, September 11th, the NHC issued a storm track projection showing that Tropical Depression Nineteen could impact a portion of the Florida Panhandle. Skanska knew or should have known of this forecast.

50.    As of 2:00 p.m. on Saturday, September 12th, Tropical Depression Nineteen had strengthened into Tropical Storm Sally—the eighteenth named storm of the 2020 hurricane season. At that time, Tropical Storm Sally was located approximately 35 miles southeast of Naples, Florida.

51.    As of 5:00 p.m. on Saturday, September 12th, a tropical storm watch was extended westward from the Okaloosa/Walton county line to the Alabama/Florida border.

52.    As of 2:00 p.m. on Sunday, September 13th, Skanska had knowledge of the likelihood of hurricane-force winds that would impact the northern Gulf Coast region, including the Florida Panhandle. Skanska took no action to secure its construction barges, and it even continued working on the Pensacola Bay Bridge.

53.    At or around 10:08 p.m. on Sunday, September 13th, the NHC released a model showing the projected path Tropical Storm Sally was likely to take. This model showed Pensacola, Florida within the cone of uncertainty.

54.    As Tropical Storm Sally moved westward across the very warm waters of the Gulf of Mexico it slowly gathered additional organization and intensity

21

Saturday and Sunday, becoming Hurricane Sally at 11:00 AM the morning of Monday, September 14th about 175 miles southwest of Pensacola. It then meandered erratically over the next 24 hours in the Gulf waters southeast of the mouth of the Mississippi River (south of Mobile, AL) before settling on a track to the northeast heading toward the coastline between Mobile Bay and Pensacola. Computer models had anticipated this turn to the right and a Hurricane Warning was issued for the Pensacola area, including all of Pensacola Bay, at 4:00 PM CDT Monday afternoon.

55.     Hurricane Sally intensified to Category Two status with peak sustained winds of 100 MPH at 4:00 PM Monday. The storm fluctuated in intensity (dropping back to Category One strength at 1:00 AM Tuesday morning September 15 and weakening down to 80 MPH peak sustained winds by the afternoon) while meandering erratically (moving at 3 MPH or less) Monday evening and through the morning of Tuesday September 15th before making a final turn to the right in the early afternoon and settling on a very slow (2 MPH) northeasterly track toward the coast by 4:00 PM on Tuesday afternoon. In spite of the erratic movement, computer model forecast guidance remained consistent in predicting landfall just west of Pensacola and NHC kept Pensacola within the Hurricane Warning zone the entire time.

56.     As of 4:00 p.m. on Monday, September 14th, the NHC issued a public advisory notification, stating that Hurricane Sally had strengthened, and that life-

22

threatening storm surge, hurricane-force winds, and flash flooding was likely along portions of the northern Gulf Coast starting Monday evening and continuing Tuesday.

**Skanska's Senior Executives Failed to Appropriately Respond to the Danger**

57.    Notwithstanding these warnings, and in direct violation of the guidance and direction set forth in the Hurricane Preparedness Work Plan, on Sunday, September 13th Skanska continued to work on the bridge from 7:30 a.m. to 2:49 p.m.

58.    As of 2:00 p.m. on Sunday, September 13th, Tropical Storm Sally had traveled north, and the NHC advised that life-threatening storm surge, hurricane-force winds, and heavy rainfall was expected along portions of the northern Gulf Coast starting on Monday.  The next day, on September 14, 2020, Skanska Project Executive, Thomas J. DeMarco, wrote in a letter [Doc. 16-2, p. 2] to Brett Pielstick, P.E. of Eisman & Russo, that on September 13th, 2020, the National Weather Service issued a Tropical Storm Warning for the project area due to potential Tropical Storm Sally.  The Skanska Project Executive's letter was sent in order to serve as Skanska's preliminary request for an extension of Contract Time and additional compensation for additional costs incurred due to the expected delay that was sure to result from the anticipated impact of the storm.  Despite acknowledging, in this letter, Skanska's

23

duty to engage in advanced preparation to secure material and equipment any time the Project is within the potential path of a tropical storm, Skanska failed to take the necessary and mandated actions necessary to secure its materials and equipment. By Skanska's own Project Executive's account, written before the storm, the responsibility, duty, and subsequent failure, to secure the bridge construction equipment always fell within Skanska's knowledge and privity.  In other words, while Skanska's leadership found the time to request additional money and construction time, in light of the Hurricane Sally forecast, it failed to undertake the necessary preparations to secure the work site.

59.    The decisions not to move the construction barges and to not comply with its own Hurricane Preparedness Plan was made by Skanska's shoreside senior executives.

60.    FDOT instructed Skanska to shut down and prepare for Hurricane Sally more than three days before the storm made landfall, an instruction that Skanska failed to adhere to adequately or at all.

61.    Throughout the weekend beginning on Friday, September 11th and up to the morning of Monday, September 14th, Skanska conducted business-as-usual construction operations on the Pensacola Bay Bridge instead of preparing for the storm. Despite its Hurricane Preparedness Plan, Skanska had not initiated the action necessary to relocate any of its 55 construction barges from the construction site.

24

These un-crewed and unpowered construction barges were left in place as Hurricane Sally crawled westward, deeper into the Gulf of Mexico and toward Pensacola.

## **Skanska Knew or Reasonably Should Have Known of the Danger**

62.     Skanska's own Hurricane Preparedness Work Plan [Doc. 16-1, p. 3] provided a recitation of general hurricane information including: "Beyond the eye, counterclockwise winds bring destruction to coastlines and islands in their erratic path. The position of the storm given by the National Hurricane Center is always the eye of the storm.  High winds and heavy rain may extend up to 200 miles from the eye. Hazardous conditions may arrive 6-10 hours before the eye makes landfall."

63.     Skanska's own Hurricane Preparedness Work Plan [Doc. 16-1, p. 7] expressly addressed "Cranes Barges / Material Barges and Heavy Weather Mooring."   This plan addressed the "time needed to move major barges" and emphasized that "30 hours at a minimum needs to be dedicated to moving the material barges and crane barges to the hurricane location in the East Bay" and provided a chart that described the number of tugboats and time needed to move specific types of construction barges.  The facts establish that there was more than enough time to move these construction barges as required under the Plan.

64.     In terms of track, Sally was a very well forecast hurricane. As early as Saturday afternoon September 12th, 84 hours prior to landfall, the Pensacola area

was either directly adjacent to or within a Hurricane Watch area. By Monday morning at 10:00 AM, 43 hours prior to landfall, the Watch was upgraded to a Hurricane Warning. Forecasters watching the weather system consistently predicted that the Sally weather system would, at some point in its westward travel, make a turn to the north. As the storm approached the central Gulf Coast, its movement slowed to a crawl and became erratic for a time and nearly stalled southeast of the mouth of the Mississippi River. On Monday and early Tuesday, NHC Forecasters were confident that computer model guidance showing a turn to the right would occur, moving the storm toward the Alabama coast just west of Pensacola. The very slow movement of Sally, less than 3 MPH for the three days prior to landfall, provided additional time for residents of the Florida Panhandle to prepare. This same preparation time reprieve was afforded Skanska, but Skanska's senior leadership chose to ignore the looming threat in favor of continued work and pursuit of profits.

65.     Rather than implement the Hurricane Preparedness Work Plan mandate to "secure all marine based equipment to safe harbor [Doc. 16-1, p. 3]," Skanska's senior leadership deliberately chose to leave its construction equipment—including 55 construction barges—in the vicinity of the Pensacola Bay Bridge prior to and during Hurricane Sally. Consequently, Skanska's construction equipment, including construction barges, crashed into and damaged Pensacola Bay Bridge.

66.     Skanska failed to secure its construction barges used in construction of the Pensacola Bay Bridge and 27 of Skanska's 55 work platforms broke free.  All 27 of the loose construction barges (nearly half the number Skanska employed for the entire project) were uncontrolled, unpowered, and propelled by the vagaries of wind and waves throughout Pensacola Bay and its environs.  The shifting wind direction associated with the counterclockwise spin of Hurricane Sally is evident from the aftermath.  Skanska's unpowered construction barges were quite literally cast in all directions and struck shorelines from Naval Air Station Pensacola, to Warrington, to downtown Pensacola, to Milton, to Bagdad and to Gulf Breeze.

67.     FDOT has confirmed that Skanska "failed to take adequate precautions to prevent the damage that resulted from Hurricane Sally." [Doc 16-3, p. 2] In fact, FDOT stated that Skanska "had advance knowledge of an approaching hurricane . . . but did not comply with its own Hurricane Preparedness Plan."

68.     Skanska's failures occurred at the corporate level.  Skanska's Hurricane Preparedness Work Plan is an emergency response plan submitted by Skanska to FDOT as required in the contract between Skanska Southeast and FDOT.  The decision of Skanska to implement or activate the Hurricane Preparedness Plan is made by an officer with responsibility over the project whose position is no lower than vice-president level.  The Hurricane Preparedness Plan is applied project-wide to protect the entire Skanska operation including facilities at the base of operations,

miles from the bridge, regardless of whether any portion of the site is on or around navigable waterways.

69.    Skanska, despite having the opportunity to do so, deliberately chose not to adequately secure, let alone move, its construction barges positioned near the bridge project.

70.    Skanska had previously moved its construction barges in preparation for storm threats. As it had done previously, Skanska could have moved each of its construction barges before Hurricane Sally made landfall. Skanska knew of possible tropical storm-force winds (at minimum) beginning, at the earliest, on September 11th, yet it chose to do nothing. Skanska's Hurricane Preparedness Plan provides that "each [work platform] only takes two hours to move." [Doc 16-3, p. 2] Skanska had ample notice and time to move all of its work platforms to safe harbor.

71.    Skanska's own Hurricane Preparedness Work Plan contained plans that, if followed, would have avoided the destruction that required the closure of the Pensacola Bay Bridge, including securing "loose materials and equipment prior to the hurricane" and "all marine based equipment to safe harbor." [Doc. 16-1, p. 3].

72.    Under the plan, there were four "conditions" that required different actions to be taken by Skanska personnel in the event of a tropical weather system. As Hurricane Sally approached, Condition Three became the applicable condition. Under Condition Three (which is specified as "[s]ustained winds of 50 knots or 58

mph or greater [winds] expected within 72 hours/3 days"), Skanska was to "[c]ease all routine activities which might interfere with securing operations," "[c]ommence securing and stow all gear and portable equipment," "[b]egin to secure any cranes on site," and for "barge mounted cranes and material barges," they "will be moved to the East Bay." [Doc. 16-1, p. 7] No part of the Plan called for the construction barges to be secured near the construction site.

73.    As Hurricane Sally approached Pensacola, Skanska failed to follow this plan.  In fact, according to an October 22, 2020 Letter sent from FDOT to Skanska, the Department stated:

> Despite Skanska's assertions to the contrary, Skanska failed to take adequate precautions to prevent the damage that resulted from Hurricane Sally, Skanska had advance knowledge of an approaching hurricane, but did not comply with its own Hurricane Preparedness Plan.  The plan provides that each barge only takes 2 hours to move, but not all barges were moved or taken to safe harbor after Skanska became aware of imminent 58 MPH or greater wind speeds.  Records from the jobsite show that Skanska was performing work in the area, i.e., driving pilings, on Sunday, September 13, 2020 from 7:30 A.M. to 2:49 P.M. CDT, despite a tropical storm warning being issued that morning at 4:00 A.M.  Records from the following day show that Skanska was finishing work on a footer on State Road 30. [Doc 16-3, p. 1]

74.    In the same October 22, 2020 FDOT letter quoted above, the Department also set forth its own account of Skanska's activities that "undermines Skanska's assertion that 58 MPH or greater winds were not predicted until 11:11pm on Tuesday," [Doc. 16-3, p. 3] adding:

A review of the advisories show that a tropical storm warning was first declared Sunday at 4:00 A.M., with maximum sustained winds of 60 MPH reported at 10:00 A.M.   Instead of moving the barges, Skanska chose to continue driving piles and even worked the following day in finishing work on a footer on State Road 30.

By the time the first barge broke loose Tuesday at 6:00 P.M., fifty-six (56) hours had elapsed from the first report of maximum sustained winds of 60 MPH; thirty-two (32) hours had elapsed from the declaration of a hurricane warning 10 miles west of the bridge; and twenty-six (26) hours had elapsed from the bridge being included in the hurricane warning.  Skanska had ample time to properly safe harbor the barges.  Its own plan reflected a total of 48 hours to move all the barges, which would have been accomplished if the barges were moved upon the first report of sustained maximum winds of 60 MPH. [Doc. 16-3, p. 3-4]

75.    The timeline of event reflects that Skanska decided to continue construction rather than secure its construction equipment, in blatant disregard of its Hurricane Preparedness Work Plan.

76.    In doing so, Skanska made a conscious and deliberate decision to prioritize avoiding liquidated damage penalties from construction delays over and instead of ensuring the safety of surrounding property.   In fact, Skanska spent preparation time seeking additional compensation and contract time in anticipation of the very storm for which it failed to remove and secure its construction barges.

77.    Skanska knew or should have known of the crucial need to remove and secure Skanska construction barges so as to not jeopardize the bridge itself and surrounding property.

78.    This was not Skanska's first encounter with bad weather, including

hurricane conditions, while constructing bridges, and Skanska knew of the risk and accepted the duty and the need to take appropriate precautions.

79.     Three years prior to Hurricane Sally, on September 10, 2017, Hurricane Irma pounded South Florida, making landfall in the Florida Keys as a category 4 hurricane. Although Hurricane Irma was not projected to impact Northwest Florida, Skanska made the decision to move its construction barges, cranes, and other equipment from the Pensacola Bay Bridge construction site to "safe haven" locations along Bayou Chico and East Bay on September 7, 2017—three days before Hurricane Irma was projected to make landfall roughly 733 miles away from Pensacola, Florida.

80.     On October 10, 2018, Hurricane Michael made landfall near Panama City Beach and Mexico Beach, Florida as a category five hurricane. Skanska made the decision to move its equipment from the Pensacola Bay Bridge construction site on October 8, 2018 (two days before Hurricane Michael made landfall), despite the fact that Pensacola, Florida was not projected to receive a direct hit.

81.     These are just two examples of Skanska taking appropriate precautions after being notified of a potential threat of tropical storm-force or hurricane-force winds and life-threatening storm surges.  These instances demonstrate that Skanska understood the danger and was more than capable of implementing a hurricane preparedness plan that would have preserved the project asset, the Pensacola Bay

Bridge, as well as other surrounding properties.

82.    In stark contrast, during Hurricane Sally, Skanska disregarded its own hurricane preparedness plan and disregarded the widely known and reported probability that Hurricane Sally would, at the very least, deliver tropical-storm force winds, if not stronger, to the Florida Panhandle.   After all, as early as Friday, September 11th, five days before Hurricane Sally was expected to make landfall, Skanska had adequate information to make the decision to move its work platforms to a "safe-haven," as it had done in the past. Instead, the bridge was damaged to the extent that it had to be closed to traffic for a period of at least 8 months, as a result of Skanska's negligence, willful inaction and deliberate conduct to not follow its own hurricane preparedness plan.

83.    These facts leave no doubt that Skanska's lack of compliance with FDOT's mandate to protect the project site and surrounding properties boils down not to a lack of notice, capability, resources, or opportunity, but rather to the exercise of will and decision making.

84.    Skanska's decision to not act came from the highest levels of the company and demonstrate that Skanska's shoreside executives, exercising its authority with respect to these Skanska-owned construction barges, failed to act reasonably in the face of a clear and present danger, and, instead, acted in willful disregard of its own hurricane preparedness plan.

85.     On September 11, 2020, FDOT denied Skanska's request for additional construction contract time and compensation in connection to a prior Hurricane, Marco.  FDOT had also denied several previous requests for additional contract time and compensation for past storms due to Skanska's "failure to submit proper notice," including Sub-Tropical Storm Alberto and Tropical Storm Gordon. Skanska's similar requests relating to Hurricane Dorian, and Tropical Storms Nestor, Olga, and Cristobal remained pending for months, if not over a year.

86.     Despite the fact that Skanska's own failures to submit proper notice caused the past delay and/or rejection of its requests for additional money and contract time after past storm-related delays, Skanska faced Hurricane Sally with the mindset that it would not allow any more storm-related delays to impact its business. Therefore, Skanska made a conscious decision to forego its hurricane preparedness plan.  Skanska gambled that Hurricane Sally would not significantly impact the region or the project site.  If the gamble paid off, Skanska would have minimal, if any, expenses, and no time lost to preparations, whereas if it took proper care, the cost to Skanska in time and money might have been denied by FDOT anyway. Skanska's gamble left the Pensacola Bay Bridge, and surrounding property owners, individuals and business unprotected from the massive construction barges, cranes and equipment left un-crewed at the project site.

87.     On Monday, September 14th, 2020, amid worsening weather, Skanska

33

finally began moving some of its construction barges from the vicinity of the bridge, demonstrating that Skanska understood the severity of the coming storm, and refuting its public claims that it did not have enough notice to properly safe harbor the construction barges. However, at least 27 barges were left behind to cause destruction to the bridge and surrounding areas.

### Skanska's Failure to Act Directly Caused Claimant's Damages

88.    On Tuesday, September 15th, at approximately 6:30 a.m., a Skanska construction barge that was being used in the construction of the Pensacola Bay Bridge broke free from its moorings and struck the Escambia County Fishing Pier adjacent to the Pensacola Bay Bridge.  A second construction barge broke free shortly after.

89.    The same day at approximately 7:30 a.m., a third construction barge struck the bridge and became lodged beneath the structure.  The impact caused visible damage to the concrete beams that support the bridge, leading to the bridge's closure to all traffic.  At approximately 4:00 p.m., a fourth construction barge floated free and through the bridge.  A few hours later, at approximately 6:00 pm, another construction barge broke free and became lodged beneath the bridge.  Eventually the span struck by this platform was lost and fell into the bay.

90.    As of 8:00 p.m. on Tuesday, September 15th, 2020, Hurricane Sally

was located approximately 70 miles southwest of Pensacola, Florida, and it was moving at a pace of approximately 2 mph.

91.    At 8:15 p.m. on September 15, Ed Hudec, a Construction Engineer with the FDOT, emailed the following message to several Skanska and FDOT Officials, including Don Fusco, Skanska USA Civil, President & CEO; Thomas Fulton, Vice President of Operations at Skanska and Project Director for the Pensacola Bay Bridge Replacement Project; along with Jason Peters, FDOT Director of Transportation Operations; Phillip Gainer, FDOT District 3 Secretary; and Kevin Russell, Program Manager, FDOT District 3:

> As I'm sure you [sic] aware the bridge has been struck twice today and the fishing pier once due to Skanska barges that have broken loose of their moorings/spuds.
>
> US 98 has been closed since early this AM due to the first barge hit. The extent of damage is as of yet undetermined.  We need to provide answers to the State Secretary's Office and the Governor's Office as to when the bridge can be reopened to traffic.
>
> As of this minute FDOT has received no assistance from the Skanska Team to help determine the structural adequacy of the bridge. **The problem arose due to Skanska's inability to properly secure barges or move them to a safe haven. The first barge that hit the bridge occurred when the local airport registered winds of 29 mph, not exactly tropical force winds.**
>
> **This is totally unacceptable!**
>
> **FDOT has now paid Skanska for a new bridge but due to poor management decisions on Skanska's part, has a bridge with unknown structural deficiencies.**

> I am asking Skanska to assist in providing answers to the extent of damage, repair procedures and most importantly the structural integrity of the damaged structure.
>
> An expedient answer is of the utmost importance. [Doc. 16-5, p. 2]

92.     Later, after 11:00 p.m., a construction barge with a pile driving rig struck both the replacement bridge and the Escambia County Fishing Pier.

93.     On Wednesday, September 16th at 4:45 a.m., Hurricane Sally made landfall near Gulf Shores, Alabama as a Category 2 hurricane with maximum sustained winds of 105 mph.

94.     As the center of the storm moved inland across the state line into northern Escambia County, passing directly north of Pensacola, then moving again into southern Alabama around Flomaton then Brewton, winds over Pensacola Bay veered from an east-southeasterly then southeasterly direction before dawn, to southerly at landfall and finally to a southwesterly direction.

95.     Each of the construction barges that destroyed portions of the Pensacola Bay Bridge were outfitted with the same equipment that civil contractors, like Skanska, commonly employ during inland civil construction projects, such as highway construction.

96.     Span 92, for example, was critically damaged upon its impact with a crane boom that came to rest across all four lanes.  This crane is the same type used

for inland construction projects.

97.    Pier 62 was damaged upon impact with not only a construction barge, but the Genie S-85 HF man lift upon it.  Like the crane, this man lift is used for inland construction projects.

98.    Another bridge span was damaged when a pile-driving boom on a construction barge crashed onto the bridge, contributing to its closure.  Pile-driving is just as commonly used for driving piles into dry land and driving piles into water.

99.    Additional bridge spans were damaged when struck by other Skanska construction barges, such as those intended to hold its construction debris.

100.    The resulting damage to the Pensacola Bay Bridge was catastrophic. The damaged spans could not be repaired, but need to be replaced. Skanska is now undertaking partial or full demolition and replacement of 25 spans (each weighing approximately 2 million pounds), removal and replacement of 14 half-million pound "trophy pieces" holding bridge spans, and casting 84 new piles measuring between 80 to 120' in length and weighing up to 180,000 pounds to be driven to a depth of 60' to 100'.  As a result, the bridge remains closed to all traffic.

101.    The Pensacola Bay Bridge closure is akin to severing the artery feeding the region's economy.  Again, the region's businesses are now separated from their customers.  Employees are separated from its employers.

102.    It is hard to imagine a worse time for the bridge to close as Governor

DeSantis' re-opening plan enabled Claimant to recover from the COVID-generated economic slowdown that peaked in the spring of 2020.

103.   As a result of the Pensacola Bay Bridge closures, the City of Pensacola has experienced decreased revenue and increased expenses.  In particular, the City of Pensacola's tax revenue streams have fallen off as a result of the closure.  The City of Pensacola has also incurred additional expenses that would not have been incurred, but for the bridge closure.

104.   The City of Pensacola claims damages for past and future economic losses as a result of Skanska's negligence. The past economic losses sustained by claimant are approximate and quantified from September 16, 2020 until the date of the claim deadline. Because the Pensacola Bay Bridge has not yet been completely repaired and reopened, the economic losses are continuing and will continue in the future beyond the claim deadline until such time as the bridge is repaired and fully operational at the pre-Hurricane Sally level of traffic flow. The value of claims for past and future economic losses likely exceeds the value of any specific barge or the aggregate value of all of the barges that struck the bridge.

**Skanska's Failures Continued Even After the Passing of the Storm**

105.   On October 19, 2020, Skanska Vice President, Thomas J. Fulton, executed an Emergency Field Authorization ("EFA").  The EFA was necessary

because "Hurricane Sally ran 23 construction barges aground in the Pensacola and Escambia Bay area."   That EFA addressed those areas impacted by Skanska's wayward construction barges and specifically authorized Skanska as follows: "The vessels may be recovered, and the impacted areas shall be restored to their previous conditions and configurations." The EFA further addressed the potential need to rebuild impacted structures: "Any structure(s) rebuilt pursuant to this Emergency Field Authorization must comply with all applicable local, state, and federal building standards, and the requirements of the Federal Emergency Management Act (FEMA)."  The EFA also contemplated the need for "shoreline stabilization" and set forth the specifications for "rip rap" and "filter cloth."  Finally, the EFA attached a table listing the 23 construction barges and its locations as well as color pictures of each of the construction barges at the location they were discovered after the passage of Hurricane Sally.

106.   While Skanska has now recovered its construction barges, Skanska has abandoned its EFA obligations and, other than its work on the bridge, have made no attempt to restore impacted areas to its previous conditions and configurations, rebuild any structures or even conduct necessary and vital shoreline stabilization.

107.   Skanska's indifference towards meeting its EFA obligations and its responsibility to restore private and public property reflects the same indifference it continues to show The City of Pensacola whose substantial losses are an undeniable

result of Skanska's deliberate refusal to secure its construction equipment that directly led to the Pensacola Bay Bridge's closure.  Indeed, Skanska's agreement to terms of the EFA comprise an implied contract that Skanska has breached by its failure to meet the obligations it agreed to within the EFA.

108.   Skanska's pattern of conscious, deliberate indifference continues even with respect to its obligation to prevent its construction equipment from causing further devastation to the Pensacola and Gulf Breeze regions.  On the evening of December 19, 2020, KS 6010, a construction barge that is the subject of a Skanska limitation action (3:20-cv-05984) and that comprises material evidence in this matter, broke free from its mooring again before impacting a portion of Gulf Breeze's Baybridge Condominium's boardwalk that is approximately 1,500 feet from the Gulf Breeze side landing of the Pensacola Bay Bridge.  Had the winds blown differently that evening, yet another Skanska construction barge would have caused even more destruction to the Pensacola Bay Bridge or Gulf Breeze itself.

## COUNT I

### Claim for the Negligence of
### Skanska Within Its Privity and/or Knowledge

109.   Claimant hereby adopt and realleges paragraphs 1 - 108 of this Claim as if fully set forth herein.

110.   Skanska's negligence in failing to abide by its Hurricane Preparedness

Plan, including a failure to its construction barges from Pensacola Bay to the designated "safe harbor."  This requirement was provided for in Skanska's own Hurricane Preparedness Plan—upon being informed of Hurricane Sally's likely path directly and proximately caused the City of Pensacola's damages described herein.

111.   Specifically, Skanska negligently failed to secure or remove construction barges before Hurricane Sally made landfall.

112.   At all relevant times, Skanska was under a duty to the City of Pensacola, to act with reasonable care in maintaining safe and proper construction operations and ensuring the security of all equipment.

113.   Skanska breached this duty by:

  a.   Failing to reasonably heed meteorological warnings related to Tropical Depression Nineteen, Tropical Storm Sally, and Hurricane Sally;

  b.   failing to properly secure its construction barges upon learning of Tropical Depression Nineteen, Tropical Storm Sally and Hurricane Sally's projected path;

  c.   placing its own corporate profits over safety and directing its employees and agents to continue construction well beyond the time required for initiation of the Hurricane Preparedness Plan's timeline for evacuation;

  d.   instructing its employees and agents to continue construction of the bridge well past the reasonable time for initiation of the Hurricane

Preparedness Plan;

e.   failing to have sufficient corporate resources to accomplish the safe and timely activation and completion of the Hurricane Preparedness Plan;

f.   failing to devote adequate corporate resources to the safe and timely activation of the Hurricane Preparedness Plan;

g.   negligent hiring managers and officers who placed corporate profits over safety;

h.   negligent supervision of its managers and officers;

i.   termination of crucial subcontractors, including but not limited to Atlantic Meridian Contractors, who would have otherwise been employed to secure these construction barges;

j.   negligent retaining managers and officers who placed corporate profits over safety;

k.   failing to remove its construction barges, including the construction barges that struck the Pensacola Bay Bridge, from Pensacola Bay upon learning of the projected path of Tropical Storm Nineteen/ Tropical Storm Sally/ Hurricane Sally;

l.   failing to adequately account for the unsecured construction barges, including the construction barges that struck the Pensacola Bay Bridge, or provide any guidance for how to secure them before causing damage,

m. failing to employ any mitigating efforts after its construction barges, including the construction barges that struck the Pensacola Bay Bridge, became unsecured;

n. failing to prevent foreseeable and preventable damage to the Pensacola Bay Bridge;

o. failing to create, implement, or enforce reasonable policies, procedures, or practices for securing, moving, or repositioning of its construction barges, including the construction barges that struck the Pensacola Bay Bridge, before, during, or after dangerous weather conditions;

p. failing to have reasonably sufficient personnel and equipment to properly secure, move, or reposition its construction barges, including the construction barges that struck the Pensacola Bay Bridge; and

q. failing to warn third parties, including the City of Pensacola, of the dangers of the unsecured construction barges, including the construction barges that struck Pensacola Bay Bridge.

114. Skanska, by and through its officers, managers, and supervising employees, implemented, condoned, ratified, participated in, and perpetuated these negligent acts and omissions.

115. At all relevant times, Skanska's construction barges, including the construction barges that struck the Pensacola Bay Bridge, did not qualify as

"seagoing vessels."

116.   Skanska was engaged in a highway construction project, and not in traditional maritime activities;

117.   Maritime and/or admiralty law does not apply to this action.

118.   Skanska's negligence directly caused the City of Pensacola's damages. But for Skanska's negligence in failing to secure or remove its construction barges, including the construction barges that struck the Pensacola Bay Bridge, the City of Pensacola would not have sustained damages, and would not be subjected to this unplanned financial burden.

119.   Skanska's negligence proximately caused the City of Pensacola's damages, as the damages were reasonably foreseeable.

120.   As a direct and proximate result of Skanska's negligence, the City of Pensacola suffered, and continues to suffer, economic damage including but not limited to loss of revenue and income, loss of use, costs associated with mitigation, costs of temporary measures to prevent further damage, associated incidental expenses and delay costs, diminution of value, and other incidental expenses Claimant otherwise would not have incurred.

121.   The aforesaid acts of negligence occurred or were occasioned within the privity and knowledge of Skanska and its agents, servants, and/or employees.

122.   the City of Pensacola demands that after due proceedings are had that:

a.  The Complaint seeking Exoneration from or Limitation of Liability be dismissed and the injunction or restraining order granted in this matter be dissolved;

b.  There be judgment rendered herein in favor of the City of Pensacola, and against both Skanska petitioners, both jointly and severally, for all damages as are reasonable, together with the maximum legal interest thereon from the date of the destruction of the bridge paid and for all costs of this proceeding;

c.  the City of Pensacola be allowed to proceed and prosecute its claim without prepayment of costs; and,

d.  For all such other and further relief to which the City of Pensacola may be entitled under law and in equity.

WHEREFORE, the City of Pensacola prays for judgment against Skanska for compensatory damages, attorney's fees, and costs, and for any other relief as this Court deems necessary and appropriate under the applicable law.

## COUNT 2
## Gross Negligence

123.   Claimant hereby adopt and realleges the above paragraphs as if fully set forth herein.

124.   Skanska acted grossly negligent by blatantly, intentionally, and knowingly jeopardizing the Pensacola Bay Bridge and surrounding property, by

making the deliberate and intentional decision to take no action to properly secure or remove its construction barges.

125.   Skanska acted grossly negligent when it intentionally, deliberately, and knowingly failed to properly prepare for Hurricane Sally by securing its construction barges or moving them from Pensacola Bay. Skanska knew or should have known that its failure to undertake reasonable and prudent measures would probably and most likely would result in damage to persons, property, and economic interests.

126.   Skanska chose profits over safety by gambling that Hurricane Sally would not impact the Pensacola Bay Bridge Site and by choosing to continue to engage in construction activities and failing to move and secure its construction barges.

127.   Skanska knew or reasonably should have known that the approach of Tropical Storm and then Hurricane Sally represented circumstances constituting an imminent or clear and present danger amounting to more than normal or usual peril.

128.   Skanska's failure to act evidenced a conscious disregard of the consequences.

129.   As a direct and proximate result of Skanska's gross negligence, the City of Pensacola suffered, and continue to suffer, economic damage including but not limited to loss of revenue and income, costs associated with mitigation, costs of temporary measures to prevent further damage, associated incidental expenses and

delay costs, diminution of value, and other incidental expenses the City of Pensacola otherwise would not have incurred.

130.   The aforesaid acts of gross negligence occurred or were occasioned within the privity and knowledge of Petitioners and its agents, servants, and/or employees.

WHEREFORE, the City of Pensacola prays for judgment against Skanska for compensatory and punitive damages, attorney's fees, and costs, and for any other relief as this Court deems necessary and appropriate under applicable law.

## RESERVATION OF RIGHT TO JURY TRIAL

Claimant hereby expressly reserves its right to proceed to a trial before a jury in a state court action.

DATE: May 3, 2021

Respectfully submitted,

*/s/ E. Samuel Geisler*
BRYAN F. AYLSTOCK, FL Bar # 78263
E. SAMUEL GEISLER, FL Bar # 83817
Aylstock, Witkin, Kreis & Overholtz, PLLC
17 East Main Street, Second floor
Pensacola, Florida 32502
Office: (850) 202-1010
Fax: (850) 916-7449
Email Service: sgeisler@awkolaw.com
                        baylstock@awkolaw.com
                        sallyteam@awkolaw.com

and

/s/ Thomas F. Gonzalez
THOMAS F. GONZALEZ
FL Bar #173878
tfg@beggslane.com
J. NIXON DANIEL, III
FL Bar # 228761
jnd@beggslane.com
Beggs & Lane, RLLP
501 Commendencia Street
Pensacola, Florida 32502
Office: (850) 432-2451

and

/s/ Brian H. Barr
Brian H. Barr FL Bar 493041
Emmanuella J. Paulos FL Bar 99010
Levin Papantonio Rafferty Proctor
Buchanan O'Brien Barr & Mougey, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Tel.: (850) 435-7000
bbarr@levinlaw.com
epaulos@levinlaw.com

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY** CERTIFY that on this 3d day of May 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all attorneys of record.

/s/ E. Samuel Geisler