## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

| | |
|---|---|
| **IN RE SKANSKA USA CIVIL SOUTHEAST INC. AND SKANSKA USA, INC. AS OWNERS OF THE BARGE KS 5531, PRAYING FOR EXONERATION FROM OR LIMITATION OF LIABILITY** | **ADMIRALTY RULE 9(H)**<br><br>**CIVIL ACTION NO.**<br>**3:20-CV-05980 – RV / MJF** |
| **FIRST AMENDED MASTER CLAIM OF DIRECT PROPERTY DAMAGE** | **SENIOR DISTRICT JUDGE LACEY COLLIER** |
| **CLAIMANTS.** | |

## FIRST AMENDED MASTER CLAIM OF DIRECT PROPERTY DAMAGE WITH RESERVATION OF RIGHTS TO PROCEED IN STATE COURT

COME NOW, Claimants who specifically reserve all rights to pursue all available claims in state court for resolution of any and all issues beyond the exclusive jurisdiction of this Honorable Court in admiralty, and for their Claims against a Construction Barge[1] or Barges and the alleged owner of the purported

---

[1] The specific barge or barges that impacted Claimants' property is/are identified in each subsequently filed Claimant's Short Form Joinder. Paragraph 10, below, lists those construction barges identified by Skanska. This First Amended Master Claim contains an amended table which adds those barges that were made the subject of Skanska's March 26, 2021 filings in 3:21-CV-0521, 3:21-CV-0523, 3:21-CV-0524, 3:21-CV-0525, 3:21-CV-0526 and 3:21-CV-0527.

vessels, Skanska USA Civil Southeast, Inc., and Skanska USA, Inc., hereinafter ("Skanska") and aver:

## FIRST AMENDED MASTER CLAIM

**AND NOW**, specifically reserving all defenses asserted herein, including, without limitation, Claimants' rights to pursue their claims in state court pursuant to the Savings to Suitors Clause, 28 U.S.C. §1333, and/or all state law remedies, Claimants file these Claims in the Consolidated action for Exoneration from and/or Limitation of Liability, and states the following:

## Introduction

1.     This is a First Amended Master Claim that incorporates by reference the individual Short Form Joinder filings made by each Claimant or Claimants. Those details set forth in the Short Form Joinder are incorporated herein by reference as if set forth in full in this First Amended Master Claim.  This First Amended Master Claim, because it will be joined by multiple Claimants, will refer to Claimants, plural, even where the Short Form Joinder may be filed by a single Claimant.  This First Amended Master Claim adopts and incorporates all those short form joinder forms filed on behalf of direct property damage claimants.

2.     This Claim is filed by property owners whose property was impacted and damaged by Skanska's un-crewed and unpowered construction barges.  These construction barges, owned and used by Skanska for the sole purpose of constructing

the new Pensacola Bay Bridge, were allowed to remain exposed to a slow moving but strong hurricane despite Skanska's obligation to secure its construction barges. Of the 55 total un-crewed and unpowered construction barges staged around this construction site, at least 28 broke free and 23 were pushed by the forces of wind and waves to all points around the compass from the bridge construction sites and either struck structures or ultimately ran aground in the Pensacola and Escambia Bay area[2]. Six barges were not identified originally as having been involved in any claim, however, since the consolidation of this matter under the lead case, 3:20-CV-5980, Skanska has identified additional barges that were driven from where they were located before the storm. These additional barges, M8030, M8015, KS1451, M8034, 450020 and  471206, were made the subject of six additional complaints filed as made the subject of Skanska's March 26, 2021 filings in 3:21-CV-0521, 3:21-CV-0523,   3:21-CV-0524,   3:21-CV-0525,   3:21-CV-0526   and   3:21-CV-0527 respectively.  Although Skanska has not made any assertion that these barges left the vicinity of the bridge or the fishing pier these are incorporated in this First Amended Master Complaint in the event that later revealed facts establish a direct property damage connection. Of the total 28 barges, one or more of these construction barges, rammed into and damaged the claimants' property. Claimants seek compensation

---

[2] [Doc 59-2] Emergency Field Authorization, Field Authorization Number: 0324977-014-EE/17, October 20, 2020.

from Skanska for that damage. Skanska seeks to avoid or limit their liability by taking refuge in a provision of Admiralty law that would exonerate their clear liability or limit the claimants' recovery. Claimants assert that Skanska was so directly involved in the negligence and conscious disregard and inaction that caused Claimants' damage that Skanska is not entitled to the exoneration and limitation they seek and Skanska must wholly compensate Claimants for the damages they have suffered.

3.     The Pensacola area has been battered by tropical weather since its founding.  On September 19, 1559, just weeks after Don Tristan de Luna y Arellano established Pensacola as the first European settlement in the continental United States, a hurricane decimated his settlement.  Since the advent of named tropical storms and hurricanes, Pensacola has found itself within or affected by the following storms: Baker, Florence, Flossy, Debbie, Irene, Hilda, Ethel, Eloise, Frederic, Elena, Juan, Alberto, Erin, Opal, Danny, Helene, Barry, Hanna, Ivan, Arlene, Dennis, Ida, Cindy, Nate, Gordon, Michael, and Cristobal.  Don Tristan de Luna did not have access to modern weather forecasting; Skanska did, yet they chose to ignore it.  461 years after the hurricane that destroyed de Luna's settlement, and exactly 16 years after Hurricane Ivan, Hurricane Sally brought yet another wave of destruction to Pensacola. However, this time, the destructive forces of the September 16, 2020, Hurricane Sally were exacerbated by the negligence and gross negligence of

Skanska. Now Skanska seeks exoneration from the consequences of, and limitation to their own liability and the damages associated with their own corporate negligence and gross negligence.  The Claimants oppose Skanska's attempts and make these claims to recover the full measure of their own economic damages.

4.     Claimants own  property located on Pensacola Bay, Escambia Bay, or surrounding waters.  This property is located at the address or coordinates described and set forth in the Short Form Joinder filed by each Claimant. These claimants have suffered direct injury to their property and the improvements thereon.  This injury has caused them to suffer economic damages including but not limited to, repair costs, loss of use, diminution in value and other related consequential damages. Claimants have submitted short form joinders into the Court's master docket (3:20-CV-05980 – RV / MJF), wherein each claimant sets forth specific information about their respective losses due to the impact on Claimant's property of Skanska's runaway construction barge and associated equipment.

5.     Skanska USA Civil Southeast Inc. ("Skanska Southeast") has its headquarters at 295 Bendix Rd., Suite 400, Virginia Beach, VA 23452, with its principal place of business located at 2600 Maitland Center Parkway, Suite 250, Maitland, Florida 32751. It is registered to do business in the state of Florida, and its registered agent is located at Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

6.     Skanska USA, Inc., owns 100% of the stock of Skanska USA Civil, Inc., Skanska USA Civil Inc., owns 100% of the stock of Skanska USA Civil Southeast Inc. (collectively "Skanska").

7.     At the time of the incident, Skanska was engaged in the construction of the Pensacola Bay Bridge. The construction barges that caused the damage to Claimants' Property were owned by Skanska and were being used by Skanska in connection with the construction of the Pensacola Bay Bridge.

8.     Skanska regularly conducts business within Florida, and is engaged in substantial activity within Florida, including the design and construction of the Pensacola Bay Bridge.

## The Construction Barges

9.     Skanska owns multiple, unpowered and un-crewed construction barges used solely or repurposed as work platforms used for construction-related purposes on the Pensacola Bay Bridge Project, including the construction barges that damaged the Claimants' property. Skanska used these construction barges as work platforms to stage construction equipment and to support construction tasks on the bridge project.  These construction barge work platforms were not "vessels" as that term applies to 46 USC § 30505 of the Limitation of Shipowners' Liability Act and Supplemental Rule F.

10.     Skanska, as the owner, has identified, through the filing of several

Complaints for Exoneration from or Limitation of Liability, 28 construction barges that were used in the Pensacola Bay Bridge construction project and that were then involved in allisions with the Pensacola Bay Bridge, Escambia County Fishing Pier and surrounding public, private and Federal property. These construction barges and their associated original Skanska Exoneration and Limitation filing are listed below:

| Type of Claim | Barge # | Case |
|---|---|---|
| Bridge | KS 5531 | 3:20-cv-5980 |
| Bridge | 460007 | 3:20-CV-5981 |
| Bridge | CBR 758 | 3:20-RV-5982 |
| Bridge | KS 6011 | 3:20-CV-5983 |
| Unknown[3] | 450020 | 3:21-CV-00526 |
| Direct | KS 6010 | 3:20-CV-5984 |
| Direct | 470037 | 3:21-CV-0044 |
| Direct | M 8026 | 3:21-CV-0045 |
| Direct | KS 1453 | 3:21-CV-0047 |
| Direct | KS 4004 | 3:21-CV-0048 |
| Direct | KS 4015 | 3:21-CV-0050 |
| Direct | KS 5533 | 3:21-CV-0051 |
| Direct | 460005 | 3:21-CV-0052 |
| Direct | 470027 | 3:21-CV-0053 |
| Direct | KS 6013 | 3:21-CV-0054 |
| Direct | 471205 | 3:21-CV-0055 |

[3] The March 26, 2021 Exoneration and Limitation Complaints by Skanska [Cases 521-527] were not originally consolidated under the lead case, 3:21-CV-5980, pursuant to this Court's Order consolidating all claims. This First Amended Master Claim of Direct Property Damage is filed, in part, to incorporate the claims of any claimants who may assert a claim based on damage arising from those barges listed in those subsequently filed complaints. Upon information and belief these barges are believed to have caused damage to the fishing pier and the bridge. However, Skanska has not identified any specific point of impact, notice or claimants.

| Direct | M8002 | 3:21-CV-0056[4] |
| Direct | M 8021 | 3:21-CV-0057[5] |
| Direct | U 1511 | 3:21-CV-0058 |
| Direct | U 1506 | 3:21-CV-0060 |
| Direct | U 1505 | 3:21-CV-0061 |
| Direct | M 8033 | 3:21-CV-0062[6] |
| Direct | MCD 360 | 3:21-CV-0063 |
| Unknown | M8030 | 3:21-CV-0521 |
| Unknown | M8015 | 3:21-CV-0523 |
| Unknown | KS 1451 | 3:21-CV-0524 |
| Unknown | M8034 | 3:21-CV-0525 |
| Unknown | 471206 | 3:21-CV-0527 |

## The Construction Project to Replace the Pensacola Bay Bridge

11.     United States Route 98 (US 98), the longest US road in Florida, is an east-west United States highway that was originally established in 1933 as a route between Pensacola and Apalachicola, Florida.  Since 1933 it has been extended significantly.  At the time of these events, US 98 extended from Meadville, Mississippi in the west, to Palm Beach, Florida in the east.  The overwhelming majority of the 964-mile-long US 98 is built on dry land.

---

[4] The Skanska Exoneration and Limitation Complaint at 3:21-CV-00056 [Doc. 1] lists Barge KS 6013, however, the three attachments [Doc. 1-1, 1-2 and 1-3] concern Barge M 8002.

[5] The Skanska Exoneration and Limitation Complaint at 3:21-CV-00057 omits Brown and Adams as potential claimants impacted by Barge M 8021, however, it is believed the Brown and Adams claimants were impacted by Barge M8021.

[6] The Skanska Exoneration and Limitation Complaint at 3:21-CV-00062 includes Brown and Adams as potential claimants impacted by Barge M 8033, however, it is believed the Brown and Adams claimants were impacted by Barge M8021.

12.     Approximately 3 miles of US 98 (concurrently known as State Road 289) traverses Pensacola Bay between Bayfront Parkway in Pensacola, Florida and FairPoint Peninsula in Gulf Breeze, Florida.  US 98 is the sole, direct connection for traffic between the cities of Pensacola and Gulf Breeze.

13.     Before 1931 there was no bridge connecting Pensacola and Gulf Breeze.  The original three-mile Thomas A Johnson Bridge, a narrow, two lane structure, was opened on June 13, 1931.  This bridge was replaced by the Sen. Phillip D. Beall, Sr., Bridge, a single, wider, four lane structure on October 31, 1960.  This bridge carried four lanes of US 98 motor vehicle traffic across Pensacola Bay for six decades.

14.     At the time of these events, Skanska was engaged in a construction project to replace this three-mile bridge and had, in fact, opened a new, single span containing 4 lanes of two-way motor vehicle traffic and one pedestrian/bicycle path. Skanska then began the demolition of the sixty-year-old Beall bridge and all direct traffic between Pensacola and Gulf Breeze became dependent upon this newly built span.

15.     This bridge replacement project was undertaken to maintain the free flow of motor vehicle, pedestrian and bicycle traffic between Pensacola and Gulf Breeze.   Skanska used construction barges to support the construction and demolition activities required by the bridge replacement construction project and the

use of these construction barges bears no relationship to traditional maritime activity.

When referring to Skanska's loose construction barges impacting private property,

FDOT's engineer explained:

> This would have been the result of barges from an active construction project. I'm copying the construction project team so they can address with the citizen.

*See* Sept. 17, 2020 Email from FDOT to Project CEI, ex. 1 to Claimants' Reply in

Support of Motion to Dismiss. [Doc. 51-1, pg. 2-3]

## **Claim Synopsis**

16.    Claimants suffered direct property damage after Claimants' property

was struck by one or more of Skanska's unpowered construction barges. Skanska's

negligence in failing to remove and/or secure its construction barges prior to the

arrival of the storm conditions associated with Hurricane Sally caused this injury. At

all material times, Skanska knew or should have known that failing to secure or

move its construction barges from the Pensacola Bay Bridge construction site before

Hurricane Sally approached the local coastline and ultimately made landfall on

September 16, 2020 posed an unreasonable risk of damage and destruction to the

surrounding communities, governments and citizens of Escambia and Santa Rosa

County, Florida, and the United States of America including Claimants.

17.    Claimants seek recovery for all damages recoverable under applicable

law, including but not limited to repair costs, loss of use, diminution in value and

other related consequential damage and incidental expenses they otherwise would not have incurred. Claimants also seek attorney's fees and costs.

18.  Florida law applies to this case. Under Florida's "significant relationship test," courts apply the tort law of the state that has the most significant relationship to the cause of action. In this case, the cause of action arose in, and Claimants are citizens of, the state of Florida.  Skanska's conduct at the center of Claimants' cause of action relates to the construction of a new bridge and the destruction of an existing bridge comprising the central transportation artery and hurricane route for the Pensacola, Florida region that was built pursuant to a contract between a Florida-based construction firm and a Florida agency.

## COMMON FACTUAL ALLEGATIONS

### The Construction Project and Skanska's Duty

19.  The Florida Department of Transportation, FDOT, oversees, among other things, the construction of roads and bridges in the state of Florida.

20.  On July 29, 2016, Skanska was awarded the construction contract by FDOT to build and design the new bridge over Pensacola Bay. The project consists of two separate bridge spans standing side by side.

21.  Skanska began construction on the bridge project on or about September 19, 2016.  The project site was not limited to the portion of the Pensacola Bay Bridge over the bay.  In fact, the project site traversed over land across portions

of Gregory Street, Bayfront Parkway, and 17th Avenue in Pensacola as well as Gulf Breeze Parkway in Gulf Breeze.

22.     FDOT entrusted Skanska with every aspect of this project. As set forth in the Design Build Specifications, published on March 8, 2016, pg. 74-75, Skanska, as the contractor, agreed to take charge and custody of the work, and take every necessary precaution against damage to the work, by the action of the elements or from any other cause whatsoever, until the Department's final acceptance of the work.  Skanska contracted to rebuild, repair, restore, and make good, all damage to any portion of the work occasioned by any of the above causes before final acceptance of the Contract.

23.     Skanska agreed to:

. . . provide all safeguards, safety devises, and protective equipment and take any other needed actions as it determines, or as the contracting officer may determine, to be reasonably necessary to protect the life and health of employees on the job and the safety of the public and to protect property in connection with the performance of the work covered by the contract.

*See* Executed FDOT Contract at pg. 76, ex. 4 to Claimants' Reply in Support of Motion to Dismiss, [Doc. 51-5, p. 77]

24.     In or around September 2019, Skanska completed the western ("southbound") segment of the bridge project and two lanes of traffic were able to move across the bridge heading both north and south by sharing this segment.

25.     Upon completion and activation of the western segment in a temporary

two-way configuration, Skanska began demolishing the existing, and up until that instant, operational, Pensacola Bay Bridge in order to build the new eastern ("northbound") segment.

26.    To facilitate demolishing the old bridge and building the eastern ("northbound") segment of the bridge, Skanska utilized approximately 55 floating work platforms to hold equipment and materials for construction.  These included the Skanska owned construction barge or barges listed in Paragraph 10 above and that are separately set forth in Claimant's Short Form Joinder.

27.    The Final Request for Proposal, at p. 63, from FDOT required the Design-Build Firm, here Skanska, to submit an Incident Management Plan that included "emergency preparedness and recovery plans as well as traffic management and evacuation due to hurricanes, tropical storms, fires, winter/ice system and other events."  Skanska prepared an incident management plan required by FDOT that was specific to tropical weather systems, like the one that became Hurricane Sally, which Skanska titled "Hurricane Preparedness Work Plan." [Doc. 16-1, pp. 2-16]

28.    The Hurricane Preparedness Work Plan included the construction barges that Skanska was using as floating work platforms from which Skanska and its employees and/or contract workers conducted construction activities. The Plan required Skanska personnel to secure the project site that is, the Pensacola Bay Bridge, and secure all marine based equipment, including the construction barges,

to safe harbor.

29.     Under the Plan, there were four conditions that required different actions to be taken by Skanska personnel in the event of a tropical weather system. As Hurricane Sally approached, Condition Three became the applicable condition. Under Condition Three (which is specified as sustained winds of 50 knots or 58 mph or greater expected within 72 hours/3 days), Skanska was to cease all routine activities which might interfere with securing operations, commence securing and stow all gear and portable equipment, begin to secure any cranes on site, and move all construction barge mounted cranes and material barges to the East Bay. No part of the Plan called for the construction barges to be secured near the construction site. As Hurricane Sally approached Pensacola, Skanska failed to follow this Plan, choosing instead to continue working as late as Monday, September 14, 2020.

30.     Skanska kept its construction barges on site during this time to allow it to continue the bridge construction work. Skanska made the decision not to navigate these construction barges upon the navigable waters of Pensacola and Escambia Bay to a safe site for securing despite the requirements of the Hurricane Preparedness Plan.

## The Evolution of Tropical Storm and Hurricane Sally

31.     A tropical wave/disturbance organized into Tropical Depression 19 over the extreme northwest Bahamas about 80 miles east-southeast of Miami during

the late afternoon of Friday, September 11th, 2020.  The system then crossed the extreme southern end of the Florida Peninsula Friday night (across the Everglades) emerging into the Gulf of Mexico around Marco Island, FL early Saturday morning September 12, 2020. By 2:00 PM EDT that afternoon the depression was upgraded to Tropical Storm Sally. Computer models were already indicating Sally would intensify into a significant hurricane and pose a major threat to the northern Gulf of Mexico.  A Hurricane Watch was issued at 5:00 PM Saturday by the National Hurricane Center (NHC) for a swath of the Gulf Coast from southeast Louisiana to the Florida Panhandle.[7]

32.    Upon discovering a tropical depression or tropical storm, the NHC issues public advisories *every three hours* throughout each 24-hour period.

33.    On the afternoon of Friday, September 11th, the NHC published a model of potential paths then-Tropical Depression Nineteen could take. Nearly every potential path would have subjected Pensacola to at least some level of tropical-storm winds.

34.    At or around 11:00 p.m. on Friday, September 11th, the NHC issued a storm track projection showing that Tropical Depression Nineteen could impact a

---

[7] The weather forecast information contained in this and subsequent paragraphs was obtained from the National Hurricane Center with the National Oceanic and Atmospheric        Administration        ("NOAA"),        located        at https://www.nhc.noaa.gov/archive/2020/SALLY.shtml.

portion of the Florida Panhandle. Skanska knew or should have known of this forecast.

35.    As of 2:00 p.m. on Saturday, September 12th, Tropical Depression Nineteen had strengthened into Tropical Storm Sally—the eighteenth named storm of the 2020 hurricane season. At that time, Tropical Storm Sally was located approximately 35 miles southeast of Naples, Florida.

36.    As of 5:00 p.m. on Saturday, September 12th, a tropical storm watch was extended westward from the Okaloosa/Walton County Line to the Alabama/Florida Border.

37.    As of 2:00 p.m. on Sunday, September 13th, Skanska had knowledge of the likelihood of hurricane-force winds that would impact the northern Gulf Coast region, including the Florida Panhandle. Skanska took no action to secure its construction barges, and it even continued working on the Pensacola Bay Bridge.

38.    At or around 10:08 p.m. on Sunday, September 13th, the NHC released a model showing the projected path Tropical Storm Sally was likely to take. This model showed Pensacola, Florida within the cone of uncertainty.

39.    As Tropical Storm Sally moved westward across the very warm waters of the Gulf of Mexico it slowly gathered additional organization and intensity Saturday and Sunday, becoming Hurricane Sally at 11:00 AM the morning of Monday, September 14th about 175 miles southwest of Pensacola. It then meandered

erratically over the next 24 hours in the Gulf waters southeast of the mouth of the Mississippi River (south of Mobile, AL) before settling on a track to the northeast heading toward the coastline between Mobile Bay and Pensacola. Computer models had anticipated this turn to the right and a Hurricane Warning was issued for the Pensacola area, including all of Pensacola Bay, at 4:00 PM CDT Monday afternoon.

40.     Hurricane Sally intensified to Category Two status with peak sustained winds of 100 MPH at 4:00 PM Monday. The storm fluctuated in intensity (dropping back to Cat 1 strength at 1:00 AM Tuesday morning September 15 and weakening down to 80 MPH peak sustained winds by the afternoon) while meandering erratically (moving at 3 MPH or less) Monday evening and through the morning of Tuesday September 15th before making a final turn to the right in the early afternoon and settling on a very slow (2 MPH) northeasterly track toward the coast by 4:00 PM on Tuesday afternoon. In spite of the erratic movement, computer model forecast guidance remained consistent in predicting landfall just west of Pensacola and NHC kept Pensacola within the Hurricane Warning the entire time.

41.     As of 4:00 p.m. on Monday, September 14th, the NHC issued a public advisory notification, stating that Hurricane Sally had strengthened, and that life-threatening storm surge, hurricane-force winds, and flash flooding was likely along portions of the northern Gulf Coast starting Monday evening and continuing Tuesday.

**Skanska's Senior Executives Failed to Appropriately Respond to the Danger**

42.     Notwithstanding these warnings, and in direct violation of the guidance and direction set forth in the Hurricane Preparedness Work Plan, on Sunday, September 13th Skanska continued to work on the bridge from 7:30 a.m. to 2:49 p.m.

43.     As of 2:00 p.m. on Sunday, September 13th, Tropical Storm Sally had traveled north, and the NHC advised that life-threatening storm surge, hurricane-force winds, and heavy rainfall [was] expected along portions of the northern Gulf Coast starting on Monday.  The next day, on September 14, 2020, Skanska Project Executive, Thomas J. DeMarco, wrote in a letter [Doc. 16-2, p. 2] to Brett Pielstick, P.E. of Eisman & Russo, that on September 13th, 2020, the National Weather Service issued a Tropical Storm Warning for the project area due to potential Tropical Storm Sally.  The Skanska Project Executive's letter was sent in order to serve as Skanska's preliminary request for an extension of Contract Time and additional compensation for additional costs incurred due to the expected delay that was sure to result from the anticipated impact of the storm.  Despite acknowledging in this letter that any time the Project is within the potential path of a tropical storm, advance preparations are required in order to secure material and equipment, Skanska failed to take the necessary and mandated actions necessary to secure that same material and equipment. By Skanska's own Project Executive's account, written before the storm,

the responsibility, duty, and subsequent failure, to secure the bridge construction equipment always fell within Skanska's knowledge and privity.  In other words, while Skanska's leadership found the time to request additional money and time to prepare for Hurricane Sally, they failed to undertake that necessary preparation.

44.    The decision not to move the construction barges was made by Skanska's shoreside senior executives.

45.    FDOT instructed Skanska to shut down and prepare for Hurricane Sally more than three days before the storm made landfall, an instruction that Skanska failed to adhere to adequately or at all.

46.    Throughout the weekend of Friday, September 12th and up to the morning of Monday, September 14[th,] Skanska conducted business as usual construction operations on the Pensacola Bay Bridge. Despite its Hurricane Preparedness Plan, Skanska had not initiated the action necessary to relocate any of its 55 construction barges from the construction site.  These un-crewed and unpowered construction barges were left in place as Hurricane Sally crawled westward, deeper into the Gulf of Mexico and toward Pensacola.

### Skanska Knew or Reasonably Should Have Known of the Danger

47.    Skanska's own Hurricane Preparedness Work Plan [Doc. 16-1, p. 3] provided a recitation of general hurricane information including: "Beyond the eye, counterclockwise winds bring destruction to coastlines and islands in their erratic

path. The position of the storm given by the National Hurricane Center is always the eye of the storm.  High winds and heavy rain may extend up to 200 miles from the eye. Hazardous conditions may arrive 6-10 hours before the eye makes landfall."

48.    Skanska's own Hurricane Preparedness Work Plan [Doc. 16-1, p. 7] expressly addressed "Cranes Barges / Material Barges and Heavy Weather Mooring."  This plan addressed the "time needed to move major barges" and emphasized that "30 hours at a minimum needs to be dedicated to moving the material barges and crane barges to the hurricane location in the East Bay" and provided a chart that described the number of tugboats and time needed to move specific types of construction barges.

49.    In terms of track, Sally was a very well forecast hurricane. As early as Saturday afternoon September 12th, 84 hours prior to landfall, the Pensacola area was either directly adjacent to or within a Tropical Storm Watch or Hurricane Watch area. By Monday morning at 10:00 AM, 43 hours prior to landfall, the Watch was upgraded to a Hurricane Warning.  Forecasters watching the weather system consistently predicted that the Sally weather system would, at some point in its westward travel, make a turn to the north.  As the storm approached the central Gulf Coast, its movement slowed to a crawl and became erratic for a time and nearly stalled southeast of the mouth of the Mississippi River. On Monday and early Tuesday, NHC Forecasters were confident that computer model guidance showing

a turn to the right would occur, moving the storm toward the Alabama coast just west of Pensacola. The very slow movement of Sally, less than 3 MPH, for the three days prior to landfall provided additional time for residents of the Florida Panhandle to prepare. This same preparation time reprieve was afforded Skanska, but Skanska's senior leadership chose to ignore the looming threat in favor of continued work and pursuit of profits.

50.     Rather than implement the Hurricane Preparedness Work Plan mandate to "secure all marine based equipment to safe harbor [Doc. 16-1, p. 3]," Skanska's senior leadership deliberately chose to leave its construction equipment—including 55 construction barges—in the vicinity of the Pensacola Bay Bridge prior to and during Hurricane Sally. Consequently, Skanska's construction equipment, including construction barges, allided with and damaged the Claimant's property.

51.     Skanska failed to secure its construction barges used in construction of the Bay Bridge and 28 of Skanska's 55 work platforms broke free. All 28 of the loose construction barges (over half the number Skanska employed for the project) were uncontrolled, unpowered, and propelled by the vagaries of wind and waves throughout Pensacola Bay and its environs. The shifting wind direction associated with the counterclockwise spin of Hurricane Sally is evident from the aftermath. Skanska's unpowered construction barges were quite literally cast in all directions and struck shorelines from Naval Air Station Pensacola, to Warrington, to downtown

Pensacola, to Milton, to Bagdad and to Gulf Breeze.

52.     FDOT has confirmed that Skanska "failed to take adequate precautions to prevent the damage that resulted from Hurricane Sally." [Doc 16-3, p. 2] In fact, FDOT stated that Skanska "had advance knowledge of an approaching hurricane . . . but did not comply with its own Hurricane Preparedness Plan."

53.     Skanska's failures occurred at the corporate level.  Skanska's Hurricane Preparedness Work Plan is an emergency response plan submitted by Skanska Southeast to FDOT as required in the contract between Skanska Southeast and FDOT.   The decision of Skanska to implement or activate the Hurricane Preparedness Plan is made by an officer with responsibility over the project whose position is no lower than vice-president level.  The Hurricane Preparedness Plan is applied project-wide to protect the entire Skanska operation including facilities at the base of operations, miles from the bridge, regardless of whether any portion of the site is on or around navigable waterways.

54.     Skanska, despite having the opportunity to do so, deliberately chose not to adequately secure, let alone move, its construction barges positioned near the bridge project.

55.     Skanska had previously moved its construction barges in preparation for storm threats. As it had done previously, Skanska could have moved each of its construction barges before Hurricane Sally made landfall. Skanska knew of possible

tropical storm-force winds (at minimum) beginning, at the earliest, on September 11th, yet it chose to do nothing. Skanska's Hurricane Preparedness Plan provides that "each [work platform] only takes two hours to move." [Doc 16-3, p. 2] Skanska had ample notice and time to move all of its work platforms to safe harbor.

56.    Skanska's own Hurricane Preparedness Work Plan contained plans that, if followed, should have avoided the destruction of claimant's property, including securing "loose materials and equipment prior to the hurricane" and "all marine based equipment to safe harbor." [Doc. 16-1, p. 3].

57.    Under the Plan, there were four "conditions" that required different actions to be taken by Skanska personnel in the event of a tropical weather system. As Hurricane Sally approached, Condition Three became the applicable condition. Under Condition Three (which is specified as "[s]ustained winds of 50 knots or 58 mph or greater [winds] expected within 72 hours/3 days"), Skanska was to "[c]ease all routine activities which might interfere with securing operations," "[c]ommence securing and stow all gear and portable equipment," "[b]egin to secure any cranes on site," and for "barge mounted cranes and material barges," they "will be moved to the East Bay." [Doc. 16-1, p. 7] No part of the Plan called for the construction barges to be secured near the construction site.

58.    As Hurricane Sally approached Pensacola, Skanska failed to follow this Plan.  In fact, according to an October 22, 2020 Letter sent from FDOT to Skanska,

the Department stated:

> Despite Skanska's assertions to the contrary, Skanska failed to take adequate precautions to prevent the damage that resulted from Hurricane Sally, Skanska had advance knowledge of an approaching hurricane, but did not comply with its own Hurricane Preparedness Plan.  The plan provides that each barge only takes 2 hours to move, but not all barges were moved or taken to safe harbor after Skanska became aware of imminent 58 MPH or greater wind speeds.  Records from the jobsite show that Skanska was performing work in the area, i.e., driving pilings, on Sunday, September 13, 2020 from 7:30 A.M. to 2:49 P.M. CDT, despite a tropical storm warning being issued that morning at 4:00 A.M.  Records from the following day show that Skanska was finishing work on a footer on State Road 30. [Doc 16-3, p. 1]

59.    In the same October 22, 2020 FDOT letter quoted above, the Department also set forth its own account of Skanska's activities that "undermines Skanska's assertion that 58 MPH or greater winds were not predicted until 11:11pm on Tuesday," [Doc. 16-3, p. 3] adding:

> A review of the advisories show that a tropical storm warning was first declared Sunday at 4:00 A.M., with maximum sustained winds of 60 MPH reported at 10:00 A.M.   Instead of moving the barges, Skanska chose to continue driving piles and even worked the following day in finishing work on a footer on State Road 30.

> By the time the first barge broke loose Tuesday at 6:00 P.M., fifty-six (56) hours had elapsed from the first report of maximum sustained winds of 60 MPH; thirty-two (32) hours had elapsed from the declaration of a hurricane warning 10 miles west of the bridge; and twenty-six (26) hours had elapsed from the bridge being included in the hurricane warning.  Skanska had ample time to properly safe harbor the barges.  Its own plan reflected a total of 48 hours to move all the barges, which would have been accomplished if the barges were moved upon the first report of sustained maximum winds of 60 MPH. [Doc. 16-3, p. 3-4]

60.    The timeline of event reflects that Skanska decided to continue construction rather than secure their construction equipment, in blatant disregard of their Hurricane Preparedness Work Plan.

61.    In doing so, Skanska made a conscious and deliberate decision to prioritize avoiding liquidated damage penalties from construction delays well above ensuring the safety of surrounding property.  In fact, Skanska spent preparation time seeking additional compensation and time as a result of the very storm for which they failed to prepare.

62.    Skanska knew or should have known of the crucial need to secure Skanska construction barges so as to not jeopardize the bridge itself and surrounding property.

63.    This is not Skanska's first encounter with bad weather while constructing bridges, let alone a hurricane, and Skanska knew of and accepted the duty and need to take appropriate precautions.

64.    On September 10, 2017, Hurricane Irma pounded South Florida as it made landfall in the Florida Keys as a category 4 hurricane. Although not projected to impact Northwest Florida, Skanska made the decision to move its construction barges, cranes, and other equipment from the Pensacola Bay Bridge construction site to "safe haven" locations along Bayou Chico and East Bay on September 7, 2017—three days before Hurricane Irma was projected to make landfall roughly 733 miles

away from Pensacola, Florida.

65.     On October 10, 2018, Hurricane Michael made landfall near Panama City Beach and Mexico Beach, Florida as a category 5 hurricane. Skanska again made the decision to move its equipment from the Pensacola Bay Bridge construction site on October 8, 2018 (two days before Hurricane Michael made landfall), even despite the fact that Pensacola, Florida was not projected to receive a direct hit.

66.     These are just two examples of Skanska taking appropriate precautions after being notified of a potential threat of tropical storm-force or hurricane-force winds and life-threatening storm surges.  These instances demonstrate that Skanska understood the danger and was more than capable of implementing a hurricane preparedness plan that preserves the project asset as well as surrounding properties.

67.     In stark contrast, during Hurricane Sally, Skanska disregarded their own hurricane preparedness plan and disregarded the widely known and reported probability that Hurricane Sally would, at the very least, deliver tropical-storm force winds, if not stronger, to the Florida Panhandle.  After all, as early as Friday, September 11th, five days before Hurricane Sally was expected to make landfall, Skanska had adequate information to make the decision to move its work platforms to a "safe-haven," as it had done in the past. Instead, as a result of Skanska's negligence, intentional willful inaction, and deliberate conduct, Claimants' property

has been damaged.

68.     These instances leave no doubt that Skanska's compliance with FDOT's mandate to protect the project site and surrounding properties boils down not to capability or opportunity, but the exercise of will.

69.     Skanska's failure to act came from the highest levels of the company and demonstrate that Skanska's shoreside executives, exercising their authority with respect to these Skanska-owned construction barges, failed to act reasonably in the face of a clear and present danger.

70.     On September 11, 2020, FDOT denied Skanska's request for additional contract time and compensation relative to Hurricane Marco.  FDOT had denied several previous requests for additional contract time and compensation for past storms due to Skanska's "failure to submit proper notice," including Sub-Tropical Storm Alberto and Tropical Storm Gordon.  Skanska's similar requests relating to Hurricane Dorian, and Tropical Storms Nestor, Olga, and Cristobal remained pending for months, if not over a year.

71.     Despite the fact that Skanska's own failures to submit proper notice caused the past rejection and delay of its requests for money and time due to past storm-related delays, Skanska faced Hurricane Sally with the mindset that it would not allow any more storm-related delays to impact its business.  Therefore, Skanska made a conscious decision to forego their hurricane preparedness plan.  Skanska

gambled that Hurricane Sally would not significantly impact the region or the project site.  If the gamble paid off, Skanska would have minimal, if any, expenses, and no time lost to preparation that may get denied by FDOT anyway. Skanska's gamble left the bridge, fishing pier, and surrounding property owners, individuals and business unprotected from the massive construction barges, cranes and equipment left un-crewed at the project site.

72.    On Monday September 14th, Skanska finally began moving some of its construction barges from the vicinity of the bridge demonstrating that Skanska understood, unfortunately too late, the severity of the storm and refuting its claims that it did not have enough notice to properly safe harbor the construction barges. By this time, due in large part to the limited number of tugboats and crews needed to move each unpowered and un-crewed construction barge from the construction site, along with the worsening weather, this measure was too little, too late.

### Skanska's Failure to Act Directly Caused Claimants' Injuries

73.    On Tuesday, September 15th, at approximately 6:30 a.m., a construction barge that was being used in the construction of the Pensacola Bay Bridge broke free from its moorings and struck a fishing pier adjacent to the bridge.  A second construction barge broke free shortly after.

74.    The same day at approximately 7:30 a.m., a third construction barge struck the bridge and became lodged beneath the structure.  The impact caused

visible damage to the concrete beams that support the bridge, leading to the bridge's closure to all traffic.  At approximately 4:00 p.m., a fourth construction barge floated free and through the bridge.  A few hours later, at approximately 6:00 pm, a construction barge broke free and became lodged beneath the bridge.  Eventually the span struck by this platform was lost and fell into the bay.

75.    As of 8:00 p.m. on Tuesday, September 15th, Hurricane Sally was located approximately 70 miles southwest of Pensacola, Florida, and it was moving at a pace of approximately 2 mph.

76.    Shortly later, at 8:15 p.m., Ed Hudec, a Construction Engineer with the FDOT, emailed the following message to several Skanska and FDOT Officials, including Don Fusco, Skanska USA Civil, President & CEO; Thomas Fulton, Vice President of Operations at Skanska and Project Director for the Pensacola Bay Bridge Replacement Project; along with Jason Peters, FDOT Director of Transportation Operations; Phillip Gainer, FDOT District 3 Secretary; and Kevin Russell, Program Manager, FDOT District 3:

> As I'm sure you [sic] aware the bridge has been struck twice today and the fishing pier once due to Skanska barges that have broken loose of their moorings/spuds.
>
> US 98 has been closed since early this AM due to the first barge hit. The extent of damage is as of yet undetermined.  We need to provide answers to the State Secretary's Office and the Governor's Office as to when the bridge can be reopened to traffic.

As of this minute FDOT has received no assistance from the Skanska Team-to help determine the structural adequacy of the bridge. **The problem arose due to Skanska's inability to properly secure barges or move them to a safe haven. The first barge that hit the bridge occurred when the local airport registered winds of 29 mph, not exactly tropical force winds.**

**This is totally unacceptable!**

**FDOT has now paid Skanska for a new bridge but due to poor management decisions on Skanska's part, has a bridge with unknown structural deficiencies.**

I am asking Skanska to assist in providing answers to the extent of damage, repair procedures and most importantly the structural integrity of the damaged structure.

An expedient answer is of the utmost importance. [Doc. 16-5, p. 2]

77.     Later, after 11:00 p.m., a construction barge with a pile driving rig struck both the replacement bridge and the Escambia County Fishing Pier.

78.     On Wednesday, September 16th at 4:45 a.m., Hurricane Sally made landfall near Gulf Shores, Alabama as a Category 2 hurricane with maximum sustained winds of 105 mph.

79.     As the center of the storm moved inland across the state line into northern Escambia County, passing directly north of Pensacola, then moving again into southern Alabama around Flomaton then Brewton, winds over Pensacola Bay veered from an east-southeasterly then southeasterly direction before dawn, to southerly at landfall and finally to a southwesterly direction.

80.    At some point during this time, additional construction barges broke free from their moorings near the project site and were pushed by the forces of Hurricane Sally until they came to strike the Claimants' property.

81.    The Claimants' property suffered tremendous damage as a direct consequence of Skanska's negligent decision-making in the days before Hurricane Sally made landfall.

82.    The damage to the property was extensive. The specific nature of the individual Claimant's property damage as well as the monetary damages flowing from that property damage is set forth in Claimants' Short Form Joinder.

### Skanska's Failures Continued Even After the Passing of the Storm

83.    On October 19, 2020, Skanska Vice President, Thomas J. Fulton, executed an Emergency Field Authorization ("EFA").  The EFA was necessary because "Hurricane Sally ran 23 construction barges aground in the Pensacola and Escambia Bay area."  That EFA, issued the next day, addressed those areas impacted by Skanska's wayward construction barges and specifically authorized Skanska as follows: "The vessels may be recovered, and the impacted areas shall be restored to their previous conditions and configurations."[8]  It further addressed the potential need to rebuild impacted structures: "Any structure(s) rebuilt pursuant to this

---

[8] [Doc 59-2] Emergency Field Authorization, Field Authorization Number: 0324977-014-EE/17, October 20, 2020.

Emergency Field Authorization must comply with all applicable local, state, and federal building standards, and the requirements of the Federal Emergency Management Act (FEMA)." The EFA also contemplated the need for "shoreline stabilization" and set forth the specifications for "rip rap" and "filter cloth." Finally, the EFA attached a table listing 23 construction barges and their locations as well as color pictures of each of the construction barges at the location they were discovered after the passage of Hurricane Sally.

84. While Skanska has recovered their construction barges, they have abandoned their EFA obligation and made no attempt to restore claimant's impacted areas to their previous conditions and configurations, rebuild any structures or even conduct necessary and vital shoreline stabilization.

## COUNT I

### <u>Claim for the Negligence of</u>
### <u>Skanska Within Their Privity and/or Knowledge</u>

85. Claimants hereby adopt and reallege paragraphs 1-84 of this Claim as if fully set forth herein.

86. Skanska's negligence in failing to properly secure or move its construction barges from Pensacola Bay to the designated "safe harbor"—as provided for in Skanska's own Hurricane Preparedness Plan—upon being informed of Hurricane Sally's likely path directly and proximately caused Claimants' injuries.

87.     Specifically, Skanska negligently failed to secure or remove construction barges before Hurricane Sally made landfall.

88.     At all relevant times, Skanska was under a duty to the surrounding property owners, including Claimants, to act with reasonable care in maintaining safe and proper construction operations and ensuring the security of all equipment.

89.     Skanska breached this duty by:

a.   Failing to reasonably heed meteorological warnings related to Tropical Depression Nineteen, Tropical Storm Sally, and Hurricane Sally;

b.   failing to properly secure its construction barges upon learning of Tropical Depression 19, Tropical Storm Sally and Hurricane Sally's projected path;

c.   placing their own corporate profits over safety and directing its employees and agents to continue construction well beyond the time required for initiation of the Hurricane Preparedness Plan's timeline for evacuation;

d.   instructing their employees and agents to continue construction of the bridge well past the reasonable time for initiation of the Hurricane Preparedness Plan;

e.   failing to have sufficient corporate resources to accomplish the safe and timely activation and completion of the Hurricane Preparedness Plan;

f.   failing to devote adequate corporate resources to the safe and timely activation of the Hurricane Preparedness Plan;

g.   negligent hiring of managers and officers who placed corporate profits over safety;

h.   negligent supervision of their managers and officers;

i.   termination of crucial subcontractors, including but not limited to Atlantic Meridian Contractors, who would have otherwise been employed to secure these construction barges;

j.   negligent retention of managers and officers who placed corporate profits over safety;

k.   failing to remove its construction barges, including the construction barges that struck Claimants' property, from Pensacola Bay upon learning of Tropical Storm Nineteen's, Tropical Storm Sally's and Hurricane Sally's projected path;

l.   failing to adequately account for the unsecured construction barges, including the construction barges that struck Claimants' property, or provide any guidance for how to secure them before causing damage,

m.  failing to employ any mitigating efforts after its construction barges, including the construction barges that struck Claimants' property, became unsecured;

n.   failing to prevent foreseeable and preventable damage to the claimant's property;

o.   failure to create, implement, or enforce reasonable policies, procedures, or practices for securing, moving, or repositioning of its construction barges, including the construction barges that struck Claimants' property, before, during, or after dangerous weather conditions;

p.   failing to have reasonably sufficient personnel and equipment to properly secure, move, or reposition its construction barges, including the construction barges that struck Claimants' property; and

q.   failing to warn third parties, including Claimant, of the dangers of the unsecured construction barges, including the construction barges that struck Claimants' property.

90.   Skanska, by and through their officers, managers, and supervising employees, implemented, condoned, ratified, participated in, and perpetuated these negligent acts and omissions.

91.   At all relevant times, Skanska's construction barges, including the construction barges that struck Claimants' property, did not qualify as "seagoing vessels."

92.   Maritime and/or admiralty law does not apply to this action.

93.   Skanska's negligence directly caused Claimants' injuries. But for

Skanska's negligence in failing to secure or remove their construction barges, including the construction barges that struck Claimants' property, Claimant's property would not have been damaged, and Claimants would not be subjected to this unplanned financial burden.

94.    Skanska's negligence proximately caused Claimants' damages, as the damages were reasonably foreseeable.

95.    As a direct and proximate result of Skanska's negligence, Claimants suffered, and continue to suffer, economic damage including but not limited to loss of use, repair costs, costs associated with mitigation, costs of temporary measures to prevent further damage, associated incidental expenses and delay costs, diminution of value, lost property, and other incidental expenses Claimants otherwise would not have incurred.

96.    The aforesaid acts of negligence occurred or were occasioned within the privity and knowledge of Skanska and their agents, servants, and/or employees.

97.    Claimants prays that after due proceedings are had that:

a.  The Complaint seeking Exoneration from or Limitation of Liability be dismissed and the injunction or restraining order granted in this matter be dissolved;

b.  There be judgment rendered herein in favor of Claimants, and against Skanska, both jointly and severally, for all damages as are reasonable in

the premises, together with the maximum legal interest thereon from the

date of the accident until paid and for all costs of this proceeding;

c.  Claimants  be  allowed  to  proceed  and  prosecute  its  claim  without

prepayment of costs; and,

d.  For all such other and further relief to which Claimants may be entitled

under law and in equity.

WHEREFORE,  Claimants  pray  for  judgment  against  Skanska  for  compensatory

damages,  attorney's  fees,  and  costs,  and  for  any  other  relief  as  this  Court  deems

necessary and appropriate under Florida law.

## COUNT 2

## <u>Gross Negligence</u>

98.     Claimants hereby adopt and reallege paragraphs 1-84 of this Complaint

as if fully set forth herein.

99.     Skanska acted grossly negligent by blatantly jeopardizing the bridge

and surrounding property by making the conscious decision to take no action to

properly secure or remove their construction barges.

100.   Skanska acted grossly negligent when they failed to properly prepare

for Hurricane Sally by securing their construction barges or moving them from

Pensacola Bay. Skanska's knew or should have known that their failure to undertake

reasonable and prudent measures would probably and most likely result in injury to

persons and property.

101.   Skanska chose profits over safety by gambling that Hurricane Sally would not impact the Pensacola Bay Bridge Site and by choosing to continue to engage in construction activities and failing to secure its construction barges.

102.   Skanska knew or reasonably should have known that the approach of Tropical Storm and then Hurricane Sally represented circumstances constituting an imminent or clear and present danger amounting to more than normal or usual peril.

103.   Skanska's failure to act evidenced a conscious disregard of the consequences.

104.   As a direct and proximate result of Skanska's gross negligence, Claimants suffered physical property damage which resulted in loss of use, repair costs, costs associated with mitigation, costs of temporary measures to prevent further damage, associated incidental expenses and delay costs, diminution of value, lost property, and other incidental expenses Claimants otherwise would not have incurred.

105.   The aforesaid acts of gross negligence occurred or were occasioned within the privity and knowledge of Petitioners and their agents, servants, and/or employees.

WHEREFORE, Claimants pray for judgment against Skanska for punitive damages, attorney's fees, and costs, and for any other relief as this Court deems

necessary and appropriate under Florida law.

## **RESERVATION OF RIGHT TO JURY TRIAL**

Claimants hereby expressly reserve their right to proceed to a trial before a jury in a state court action.

*/s/ Thomas F. Gonzalez*
THOMAS F. GONZALEZ
FL Bar #173878
tfg@beggslane.com
J. NIXON DANIEL, III
FL Bar # 228761
jnd@beggslane.com
Beggs & Lane, RLLP
501 Commendencia Street
Pensacola, Florida 32502
Office: (850) 432-2451

and

*/s/ E. Samuel Geisler*
BRYAN F. AYLSTOCK, FL Bar # 78263
E. SAMUEL GEISLER, FL Bar # 83817
Aylstock, Witkin, Kreis & Overholtz, PLLC
17 East Main Street, Second floor
Pensacola, Florida 32502
Office: (850) 202-1010
Fax: (850) 916-7449
Email Service: sgeisler@awkolaw.com
               baylstock@awkolaw.com
               sallyteam@awkolaw.com

and

*/s/ Brian H. Barr*
Brian H. Barr FL Bar 493041
Emmanuella J. Paulos FL Bar 99010
Levin Papantonio Rafferty Proctor

Buchanan O'Brien Barr & Mougey, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Tel.: (850) 435-7000
bbarr@levinlaw.com
epaulos@levinlaw.com


## **CERTIFICATE OF SERVICE**

**I HEREBY** CERTIFY that on this 18th day of May 2021, I electronically

filed the foregoing with the Clerk of Court by using the CM/ECF system which will

send a notice of electronic filing to all attorneys of record.


/s/ Thomas F. Gonzalez