IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

IN IN RE SKANSKA USA
CIVIL SOUTHEAST INC. AND
SKANSKA USA, INC., AS
OWNERS OF THE BARGE KS          ADMIRALTY RULE 9(H)
5531 PRAYING FOR
EXONERATION FROM OR             Case No.: 3:20cv5980/LAC/HTC
LIMITATION OF LIABILITY

_____ /

## ORDER

This cause is before the court on a Motion to Dismiss (Doc. 38) filed by

several Claimants in this action and an Amended Motion to Dismiss (Doc. 1144)

filed by Skanska USA Civil Southeast Inc., and Skanska USA, Inc. (collectively,

"Skanska").  Skanska commenced this admiralty action by filing a complaint

under the Limitation of Vessel Owner's Liability Act, 46 U.S.C. § 30501 *et seq.*

(the "Limitation Act").[1]

---

[1] Twenty-seven related cases have been filed in this court and have been consolidated into the instant case.  See doc. 9.

## I.  Factual Background

This maritime action stems from damage caused to the Pensacola Bay

Bridge as well as to properties along Pensacola Bay when Hurricane Sally struck

the greater Pensacola area on or about September 16, 2020.  The Pensacola Bay

Bridge provides a major transportation link between the cities of Pensacola and

Gulf Breeze, Florida, and between Escambia and Santa Rosa counties.  Skanska

was under contract with the Florida Department of Transportation ("FDOT") to

build two new spans for the Bridge while demolishing the old one.

Because Skanska's construction of the bridge was carried out from the

waters of Pensacola Bay, its use of a fleet of barges was essential to the

operation.  Barges were used to transport workers and materials to and from the

work site, and cranes and man-lifts were stationed on the barges to aid in the

construction.  Skanska used as many as 55 barges during the project.

The contract between Skanska and FDOT contained a Hurricane

Preparedness Plan detailing how Skanska should respond in the event of an

approaching tropical storm or hurricane.  Doc. 38-3.  The Plan outlined five

categories of weather intensity and four conditions regarding the imminence of

a storm threat, which required different courses of action depending on the

severity and proximity of the threat.  Claimants allege that, as Sally approached the Pensacola area and strengthened from a tropical storm into a hurricane, Skanska did not abide by the Plan, which among other things required Skanska to remove its barges from the bridge area and relocate them in East Bay, a separate area several miles away.

While Skanska states that it moored the barges at the construction site, 23 barges apparently broke free during the storm.  Of these, five struck the bridge, while the others were taken by the wind and/or current into other parts of the bay area, where they either struck other structures or ran aground.  At the time the storm was approaching the area, one of the new spans of the bridge was open to two-way traffic, while the other span and the old bridge were closed to traffic. The damage caused to the bridge was significant, forcing its total closure to traffic for months thereafter.

In response to civil lawsuits being filed against it, Skanska filed the instant action, under the court's admiralty or maritime jurisdiction, seeking to limit its liability as it pertains to any damages caused by its barges.  The Limitation Act limits a vessel owner's liability for damages arising from a maritime tort to the value of the vessel and its freight, so long as the accident occurred without the

owner's privity or knowledge.  *See* 46 U.S.C. § 30505.  In answer to the complaint, damage claims were filed by two different groups of Claimants: 1) property owners whose properties were physically damaged by Skanska's vessels and 2) business owners and other entities who suffered economic damages as a result of the bridge's closure.

## II.  Claimants' Motion to Dismiss

### A.  Subject Matter Jurisdiction

In their motion, Claimants first seek dismissal of Skanska's complaint for lack of maritime or admiralty jurisdiction.  A federal court's authority to hear cases in admiralty flows initially from Article III, Section 2 of the Constitution, which confers federal judicial authority over all cases under admiralty and maritime jurisdiction.  *See Alderman v. Pac. N. Victor, Inc.*, 95 F.3d 1061, 1063 (11th Cir. 1996).  Federal courts hold exclusive jurisdiction over matters concerning limitation of liability for vessel owners under maritime law.  *See Beiswenger Enterprises Corp. v. Carletta*, 86 F.3d 1032, 1036–37 (11th Cir. 1996) (citing *Ex Parte Green*, 286 U.S. 437, 439–40, 52 S.Ct. 602, 603, 76 L.Ed. 1212 (1932) and *Langnes v. Green*, 282 U.S. 531, 539–40, 51 S.Ct. 243,

246, 75 L.Ed. 520 (1931)).  Such cases are adjudicated in the admiralty court, which sits without a jury.

Historically, admiralty tort jurisdiction was held to exist simply if the tort occurred on navigable waters, and, with the passage of the Extension of Admiralty Jurisdiction Act, jurisdiction was extended to cases where the injury was caused on land by a vessel on navigable water.  *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531–32, 115 S. Ct. 1043, 1047, 130 L. Ed. 2d 1024 (1995).  "The purpose of the Act was to end concern over the sometimes confusing line between land and water, by investing admiralty with jurisdiction over 'all cases' where the injury was caused by a ship or other vessel on navigable water, even if such injury occurred on land." Id. at 532, 115 S. Ct. at 1047–48.

This jurisdictional rule was progressively modified by four subsequent decisions of the Supreme Court, the first one being *Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249, 260, 93 S.Ct. 493, 500–501, 34 L.Ed.2d 454 (1972), which involved the crash of an airplane into navigable waters.  Admiralty jurisdiction was denied in that case because, even though the accident disrupted maritime activity in the affected waterway for a time, the general nature of the

activity involved, air travel, bore no "significant relationship to traditional maritime activity." *Id.,* at 268, 93 S.Ct., at 504. The Supreme Court then decided *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), in which two noncommercial boats collided in a navigable river. The Court found maritime jurisdiction to exist in that case because, even though pleasure boats were involved, an accident on navigable waters carries with it the potential for a disruptive impact on commercial navigation, with which admiralty law is always concerned. *Id*. at 675, 102 S.Ct., at 2658. Third, in *Sisson v. Ruby*, 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990), the Court affirmed maritime jurisdiction where a fire was caused by an appliance aboard a boat that was docked at a marina, and the fire spread to other docked boats. Reasoning that the marina was located on navigable waters and a fire was the type of accident that could potentially disrupt maritime commercial activity, the Court also found "a 'substantial relationship' with 'traditional maritime activity' in the kind of activity from which the incident arose, 'the storage and maintenance of a vessel ... on navigable waters.'" *Id*. at 365–367, 110 S.Ct. at 2897–2898 (as quoted in *Grubart*, 513 U.S. at 533–34, 115 S. Ct. at 1048).

Finally, the Court decided *Grubart*, in which it summed up the requirements for maritime jurisdiction:

> [A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity. A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. The connection test raises two issues. A court, first, must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.

513 U.S. at 534, 115 S. Ct. at 1048.

*Grubart* involved a project undertaken along the Chicago River to replace wooden pilings that served to keep ships from bumping into bridges that were built over the river. To accomplish this task, the repair company used a crane which was housed on a barge. Months after the project was finished, flooding occurred in a freight tunnel underneath the river as well as in basements of surrounding buildings, which was evidently caused by the company's use of spuds, or long metal legs, that anchored the barge to the river bottom. *Grubart*, 513 U.S. at 530, 115 S. Ct. at 1046–47.

In finding the connection test to be met, the *Grubart* Court defined the general character of the activity at hand as "repair or maintenance work on a navigable waterway performed from a vessel." *Id*. at 540, 115 S. Ct. at 1051. The Court then found there to be "no question" that the repair activity was substantially related to traditional maritime activity, "for barges and similar vessels have traditionally been engaged in repair work similar to what [the company] contracted to perform here." *Id.*

In the challenge to jurisdiction that is before this court, Claimants concede that the first prong of the jurisdictional test, the "location test" which asks whether the tort occurred on navigable water, is met because Skanska's barges were put to use on the navigable waterways of Pensacola Bay as part of their construction efforts. Claimants also do not appear to take issue with the first part of the "connection test" for jurisdiction, which asks whether the incident in question, here the storm and its effect on the barges, carried the potential to disrupt maritime commerce. As stated in *Grubart*, the incident should be identified "at an intermediate level of possible generality," with reference to "whether the incident could be seen within a class of incidents that posed more than a fanciful risk to commercial shipping." *Id*. at 538–39, 115 S. Ct. at 1051.

In the case before it, the Court described the incident as "damage by a vessel in navigable water to an underwater structure," and it readily found that the incident was one that could potentially interfere with maritime commerce. *Id.* at 539, 115 S. Ct. at 1051.  Likewise, in the case at bar this court describes the main incident as damage to the bridge and to waterfront properties caused by Skanska's vessels while in navigable waters.  Accordingly, this part of the "connection test" is met.

Claimants do take issue with the second part of the "connection test," which focuses on whether the general activity giving rise to the incident was substantially related to traditional maritime activity.  Here, "the relevant 'activity' is defined not by the particular circumstances of the incident, but by the general conduct from which the incident arose." *Sisson*, 497 U.S. at 365, 110 S. Ct. at 2897.  The question then becomes whether that activity "on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand." *Grubart*, 513 U.S. at 539–40, 115 S. Ct. at 1051.

In resolving this issue, this court again turns to the particular findings in *Grubart*, as it is particularly noteworthy that, as described above, the Supreme

Court found no difficulty in concluding that the repair work done by the barges in that case was substantially related to traditional maritime activity.  In so holding, the Court drew similarities between the facts of its case and those of numerous other cases involving barges or other vessels performing repair work – be it to a bridge, a pier, a wave suppressing barrier, or other such structure. *Id*. at 540, 115 S. Ct. at 1051.[2]  The Court identified these repair jobs as "traditional" maritime tasks; the instant case before this court is no different.

Claimants argue a few points to assert that the connection test is not satisfied, none of which are persuasive.  First, they contend that Skanska's job activity should be identified simply as "constructing a bridge" because that is

---

[2]  The Supreme Court cited these other cases using the following parenthetical notations: *See, e.g.*, *Shea v. Rev–Lyn Contracting Co.*, 868 F.2d 515, 518 (CA1 1989) (bridge repair by crane-carrying barge); *Nelson v. United States*, 639 F.2d 469, 472 (CA9 1980) (Kennedy, J.) (repair of wave suppressor from a barge); *In re New York Dock Co.*, 61 F.2d 777 (CA2 1932) (pile driving from crane-carrying barge in connection with the building of a dock); *In re P. Sanford Ross, Inc.*, 196 F. 921, 923–924 (EDNY 1912) (pile driving from crane-carrying barge close to water's edge), *rev'd on other grounds*, 204 F. 248 (CA2 1913); *cf. In re The V–14813*, 65 F.2d 789, 790 (CA5 1933) ("There are many cases holding that a dredge, or a barge with a pile driver, employed on navigable waters, is subject to maritime jurisdiction ... § 7.54"); *Lawrence v. Flatboat*, 84 F. 200 (SD Ala.1897) (pile driving from crane-carrying barge in connection with the erection of bulkheads), *aff'd sub nom. Southern Log Cart & Supply Co. v. Lawrence*, 86 F. 907 (CA5 1898).
*Id*. at 540, 115 S. Ct. at 1051.

essentially the nature of their work.  This descriptive phrase of course has the effect of removing any reference to the fact that Skanska's work involved the use of barges or that the construction was performed while those barges were situated on the navigable waterway.  Claimants thus generalize Skanska's activity in such a manner as to remove any reference to its maritime character – which is unfair when the goal of the evaluation is to actually determine the maritime nature of the endeavor.

Once again, the *Grubart* Court spoke directly to this type of issue in the case before it:

> Petitioners also argue that we might get a different result simply by characterizing the "activity" in question at a different level of generality, perhaps as "repair and maintenance," or as "pile driving near a bridge." The city is, of course, correct that a tortfeasor's activity can be described at a sufficiently high level of generality to eliminate any hint of maritime connection, and if that were properly done *Sisson* would bar assertion of admiralty jurisdiction. But to suggest that such hypergeneralization ought to be the rule would convert *Sisson* into a vehicle for eliminating admiralty jurisdiction. Although there is inevitably some play in the joints in selecting the right level of generality when applying the *Sisson* test, the inevitable imprecision is not an excuse for whimsy. The test turns on the comparison of traditional maritime activity to the arguably maritime character of the tortfeasor's activity in a given case; the comparison would merely be frustrated by eliminating the maritime aspect of the tortfeasor's activity from consideration.

*Grubart*, 513 U.S. at 541–42, 115 S. Ct. at 1052 (footnote omitted).

Accordingly, this court declines Claimants' suggestion that Skanska's endeavor be characterized simply as building a bridge. Rather, the court follows the lead established in *Grubart* and describes Skanska's activity as "bridge construction and repair performed from vessels on a navigable waterway." This description suffices to align it with the many cases identified by *Grubart* as being substantially connected to traditional maritime activity.[3]

Next, Claimants contend that *Grubart* imposes a further requirement for admiralty jurisdiction, that repair work performed from a barge must be done for

---

[3] As for Skanska, it provides a description much like the court's, but it also offers a more particularized description of its activity: "the mooring of vessels in navigable waters." This description seems patterned after the holding in *Sisson*, where storage of a vessel at a marina on navigable waters was the activity in question. 497 U.S. at 365, 110 S. Ct. at 2897. Though this description seems closer to the mark than the one Claimants provide (and would undoubtedly result in satisfaction of the connection test), the court nonetheless refrains from using it. As *Sisson* points out, if courts focus too specifically on the activity that brought about the harm, "they would have to decide to some extent the merits of the causation issue to answer the legally and analytically antecedent jurisdictional question." *Id.* In *Sisson* the storage of the vessel was itself not pivotal to the causation issue; instead, activity on the boat while in storage (the operation of an onboard washer/dryer unit) was what set off the chain reaction of damage inside the marina. By contrast, in this case it was the very act of storing the barges, that is, the manner in which Skanska did so, that is the fulcrum issue. Thus, using Skanska's suggested description of activity might cause the court to delve into the causation issue in order to resolve the jurisdictional one – which *Sisson* warned against. And, to bring that abstract point into reality, it now occurs to the court, as it reflects on its just-made statement that Skanska's manner of storing its barges is the fulcrum issue here, that either of the parties may not entirely agree with that statement.

the benefit of maritime activity.[4]  In support, Claimants quote from the facts of *Grubart*, which indeed described repair efforts to replace pilings in order to "keep ships from bumping into the piers [of bridges] and so protect both." *Id.* at 530; 115 S. Ct. at 1036.[5]  Claimants thus suggest that the test for jurisdiction includes a requirement that the project be for the betterment of marine transportation or some other improvement in  maritime activity.  However, improvement of the waterway might have been a goal of the project under the facts before *Grubart*, but that does not mean that the *Grubart* Court transformed that goal into a jurisdictional requirement.  *Grubart* does not expressly announce any such requirement.

Claimants also interpret the text of the descriptive phrase that fulfilled the connection test in *Grubart*, "repair or maintenance work on a navigable

---

[4]  This requirement apparently would be reserved exclusively for questions of maritime jurisdiction involving construction work performed by vessels on waterways, for Claimants draw no particular support for their proposition from *Sisson*, *Foremost*, or any other precedential case, and indeed those cases involved no discernable maritime improvements.  Of course, those cases and legions of others involved navigation, or *use* of the waterways, where conferring a benefit onto those waterways would ordinarily not be a conceivable objective.  That said, it should be noted that Skanska asserts that its barges were used to transport workers and materials back and forth from the construction site, as well as to manoeuver around the site as tasks required.  In this light, the crux of the operation could well be described as *use* of the waterways to perform construction on a bridge.

[5]  The meaning of the term "pier" as used in *Grubart* is not the commonly known one but rather a more technical term having to do with structures that provide support to bridges.

waterway," as further indication that the work must have been designed to improve that waterway in order to pass the test. Claimants again stretch the point too far with this suggestion, for that descriptive statement alone is hardly a basis for finding that *Grubart* made improving the waterway a requirement, especially when there is nothing else expressed in the opinion to support it. Moreover, in this regard the description suffers from ambiguous meaning, for it is entirely plausible that the Court's use of the word "on" does not denote work *performed upon* the waterway but rather work that was performed from a *location on* the waterway. Absent a more express statement from the Supreme Court on the matter, this court would be hard-pressed to graft onto the *Grubart* decision a requirement that repair or construction work of this nature must result in some improvement to maritime activity. This court's position is further reinforced by the fact that, as discussed above, *Grubart* cited to other exemplar cases finding maritime jurisdiction when barges and other vessels performed repair work, and many of these cases do not even suggest that betterment of

maritime traffic or other such improvements were involved.  See supra, p. 10 and fn 2.[6]

Claimants also cite to *Texaco Expl. & Prod., Inc. v. AmClyde Engineered Prod. Co.*, 448 F.3d 760 (5th Cir. 2006), a case where a mishap during construction of an oil platform/tower was deemed not to be connected to traditional maritime activity.  The platform was permanently affixed to the Outer Continental Shelf in the Gulf of Mexico, and the mishap involved a section of the onboard deck which, due to the failure of a crane that was operating from a barge, fell into the Gulf while being affixed to the deck.  *Id.* at 765–66.  In finding against jurisdiction, the court distinguished its facts from those in *Grubart* as it pertained to the connection test:

> The distinction between *Grubart* and the instant suit hinges upon the core factors relevant to the determination of maritime law's application.  In *Grubart*, the damage was inextricably tied to the navigable waterway: the transportation and use of materials on water were directly connected to the repair and maintenance of a

---

[6] It bears noting that, in response to Claimants' arguments, Skanska points out that the design of the project was intended not only to improve vehicular traffic on the bridge but also to improve maritime traffic underneath the bridge by widening the aperture of the center span both vertically and horizontally.  Claimants acknowledge this but counter that the maritime improvement is merely secondary to the main objective of improving vehicular transportation, thus suggesting that a maritime interest that is secondary is insufficient.  Having already found that the connection test does not require that the activity benefit maritime interests, this court is even less inclined to find that the benefit must be a primary objective.

navigable waterway. *Id.* Texaco's complaint, on the other hand, arises not from traditionally maritime activities but from the development of the resources of the Outer Continental Shelf, and Texaco's complaint would not exist but for the construction of the Petronius compliant tower, an activity undeniably covered by [the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1331]. To the extent that maritime activities surround the construction work underlying the complaint, any connection to maritime law is eclipsed by the construction's connection to the development of the Outer Continental Shelf.

*Id.* at 771.

As a Fifth Circuit opinion, *Texaco* is not binding upon this court, and its otherwise persuasive value is diminished by the fact that there is little beneficial comparison to be made with the case at bar. First, *Texaco* found that an alternate source of jurisdiction under OCSLA "eclipsed" the consideration of maritime jurisdiction, suggesting that maritime jurisdiction may not have been absent in the case so much as subservient to OCSLA jurisdiction. *Id.* And, as the court noted, Texaco's complaint had primarily pled OCSLA jurisdiction and only asserted maritime jurisdiction in the alternative. *Id.* at 770.

Second, the *Texaco* court seemed to interpret *Grubart* as requiring that the damage be "inextricably tied to the navigable waterway," *id.* at 771, which seems a stricter measure than the "substantially related" language used in

*Grubart* and the other cases. Third, *Texaco* emphasized the fact that its accident occurred on a permanently fixed platform after all the construction materials had been transported to the site in the Gulf, as opposed to *Grubart* (and the instant case) where materials and workers were regularly being transported to and from the site. *See id.* at 769, 771. In sum, this court finds little import from the *Texaco* decision to influence its own analysis.

Finally, while Claimants assert in their motion that the barges used by Skanska do not constitute vessels, they expressly do so only as that term is used in relation to whether the complaint states a viable claim under the Limitation of Liability Act, not as it might apply to the matter of jurisdiction. *See* doc. 38, p8 & n.16. Nonetheless, the court notes that Skanska details the specifications and usages of their barges in order to show that they were used as vessels during the work project. *See* docs. 46 at 2–6; 46-1; 46-2.

## B. Limitation of Liability Claim

Claimants also seek dismissal of Skanska's complaint on grounds that Skanska cannot meet the legal standards necessary for demonstrating that it is entitled to exoneration or limitation of liability under the Limitation Act. Here,

Claimants essentially seek dismissal in the nature of a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure on grounds that the complaint fails to state a claim upon which relief may be granted.

On review of a motion to dismissals for failure to state a claim, the allegations of the complaint are taken as true and are construed in the light most favorable to the nonmoving party. *Davis v. Monroe County Bd. of Educ.*, 120 F.3d 1390, 1393 (11th Cir. 1997). To survive such a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quotation and citation omitted). A claim is plausible on its face where sufficient factual content is presented to allow the court to reasonably infer that the complaint states a valid claim for relief. *Id.*

In a proceeding under the Limitation Act, maritime torts are reviewed under a two-step analysis. First, as is relevant here, the court determines what acts of negligence might have caused the accident. *Beiswenger Enterprises*, 86 F.3d at 1036 (citing *Hercules Carriers, Inc. v. Claimant State of Florida*, 768 F.2d 1558, 1563–64 (11th Cir.1985)). Liability is established only where the vessel owner's negligent acts were "a contributory and proximate cause of the

accident." *Hercules Carriers*, 768 F.2d at 1566 (citing *Board of Commissioners of the Port of New Orleans v. M/V Farmsum*, 574 F.2d 289, 297 (5th Cir.1978)). If the shipowner is free from any contributory fault, he is exonerated from all liability.  *See American Dredging Co. v. Lambert*, 81 F.3d 127, 129 (11th Cir. 1996).  If negligence was at least partly what produced the accident, the court proceeds to the second step and determines whether the vessel owner had knowledge of or was in privity with the acts of negligence.  *Beiswenger Enterprises*, 86 F.3d at 1036.  In this analysis, the initial burden of proof is on the damaged claimants to establish that the vessel owner is liable, and if successful, the burden then shifts to the vessel owner to establish a lack of privity or knowledge.

A vessel owner who is unsuccessful in meeting this burden is not entitled to limit liability under the Limitation Act.  But, if the vessel owner is successful in showing a lack of privity or knowledge, he remains liable but is able to limit that liability to the value of the vessels involved in the accident.  *Id.*   In that event, the available funds are then equitably distributed among the damage claimants.

As is amply apparent from the motion and responses themselves, in order for the court to grant relief on the merits, it would have to make what appear to be numerous evidentiary findings.  More specifically, the court would have to make factual findings that contravene the allegations of the complaint, which would violate the requirement under a motion to dismiss that the court take the allegations of the complaint as true.  Consequently, Claimants motion must fail on this basis.  Of course, this does not mean that the proofs set out in the motion are without merit; it simply means that the issues in this case are too fact intensive to resolve at this stage of the litigation.  *See Suzuki of Orange Park, Inc. v. Shubert*, 86 F.3d 1060, 1065–66 (11th Cir. 1996) (citing *In re M/V SUNSHINE, II*, 808 F.2d 762, 765 (11th Cir. 1987)); *Hercules Carriers*, 768 F.2d at 1565.  Such resolution should be reserved for trial, where all parties will have the opportunity to present evidence to prove their side of the case.

As previously mentioned, Claimants assert that they do not challenge whether Skanska's barges constitute vessels for purposes of determining maritime jurisdiction.  However, they do make this challenge as it relates to the Limitation Act.  Claimants assert that the barges were in reality used only as platforms in the water from which they performed construction on the bridge.

In support, Claimants cite *Hurst v. Pilings & Structures, Inc.*, 896 F.2d 504 (11th Cir. 1990), an Eleventh Circuit case that found a barge not to be a vessel because its primary purpose was to remain in a fixed position as a platform while performing repair work, and its transportation function was "merely incidental" to that primary purpose. *Id.* at 506. The court also noted that the barge was secured as a platform at the time of the accident. *Id.*

Skanska, however, provides descriptions of its barges to show that in fact they were commonly used for transportation purposes, some on a daily basis to and from the worksite, and others to move around the bridge area as a necessary part of the construction operation. Furthermore, Skanska points out that, subsequent to the *Hurst* decision, the Supreme Court decided *Stewart v. Dutra Const. Co.*, which provided that, to qualify as a vessel, a barge need not be primarily used for transportation and generally need only be *capable* of being used as a means of transportation, whether it was being used in that capacity at the time of the accident or not. 543 U.S. 481, 495–96, 125 S. Ct. 1118, 1127-28, 160 L. Ed. 2d 932 (2005). The Court indicated that a barge might lose its status as a vessel only if rendered incapable of transportation, such as by being withdrawn from the water, for an extended duration of time. *Id.* at 496,

125 S. Ct. at 1128.  Thus, *Stewart* effectively overrode much of the legal standards articulated in the *Hurst* decision.[7]  Accordingly, the court follows *Stewart* and rejects Claimants' contention that Skanska's barges fail to qualify as vessels under the Limitation Act.

## III.  Skanska's Motion to Dismiss

Skanska seeks dismissal of all claims filed against it that are based on economic losses suffered as a result of the closure of the bridge.  This motion would most directly affect those business owners, identified as "bridge

---

[7]  It should be noted that the *Hurst* case was brought under the Jones Act, 46 U.S.C. § 30104 (formerly 46 U.S.C. § 688), which provides a cause of action for seamen who are injured during the course of maritime employment.  At the time of the *Hurst* decision, the Jones Act required that the injury occur while the seaman was on a "vessel in navigation." *Hurst*, 896 F.2d at 505 (quoting 46 U.S.C. § 688 (West Supp. 1989).  Although this statutory term would appear to require heightened navigational qualities of a given craft, in *Stewart*, also a Jones Act case, the Supreme Court appeared to dispel the notion that the "in navigation" language raised the bar on what qualifies as a vessel. *See* 543 U.S. at 496–97, 125 S. Ct. at 1128–29.  Similarly, the additional language might indicate a requirement that the craft be active on the waterway at the time of the injury, but that notion was also defeated by *Stewart*.

While *Hurst* itself did not emphasize the "in navigation" language in its opinion, it cited to three precedential opinions from the former Fifth Circuit, all of which made particular note of the term in rendering their decisions which formed the basis of the standards set out in *Hurst*. *See Watkins v. Pentzien, Inc.*, 660 F.2d 604 (5th Cir. 1981); *Leonard v. Exxon Corp.*, 581 F.2d 522, 524 (5th Cir. 1978); *Cook v. Belden Concrete Prod., Inc.*, 472 F.2d 999, 1002 (5th Cir. 1973).  It therefore appears to this court that *Hurst* relied on old statutory language that is no longer present in the current version of the statute, *see* 46 U.S.C. § 30104, and in doing so appeared to have imposed stricter criteria for what constitutes a vessel – criteria which the Supreme Court in *Stewart* would subsequently disavow.  Thus, as for the case at bar where no Jones Act claims are involved, Claimants' reliance on *Hurst* is all the more unavailing.

claimants" in this litigation, whose prayers for damages derive exclusively from loss of business experienced on account of the bridge's closure to vehicular traffic.

In brief, Skanska asserts that, pursuant to the Supreme Court decision in *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), a claim for economic loss that is not associated with any physical damage to property in which the claimant has a proprietary interest is barred under maritime law. Though the rule in *Robins Dry Dock* specifically applies to maritime cases, it is a species of what is commonly identified as the "economic loss rule." As Claimants assert, the economic loss rule under Florida law provides for different legal standards than under federal maritime law.

In response to the motion, Claimants request that the court defer ruling on the motion until after the matter of liability under the Limitation Act, the core issue of this litigation, is resolved. The court agrees that this is the appropriate course under the circumstances. The court views the economic loss rule as a matter of damages, to be determined after its ruling on liability, and were Skanska not to succeed in its claim for limitation of liability, there would be no cause for the court to determine whether Skanska could avail itself of the

economic loss rule.  Seen this way, to rule on the motion before resolving the limitation of liability matter would be to render a decision that is prospective in nature.

The court has the general discretion to determine the most efficient manner in which it resolves the pending matters in this case.  *See Newton v. Shipman*, 718 F.2d 959, 963–64 (9th Cir. 1983); *but Cf. Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 448, 121 S. Ct. 993, 1001, 148 L. Ed. 2d 931 (2001) ("The court determines whether the vessel owner is liable and whether the owner may limit liability. *The court then determines the validity of the claims*, and if liability is limited, distributes the limited fund among the claimants.") (emphasis added).  And, by choosing to defer ruling on the motion, the court better preserves the rights of Claimants under the "saving to suitors" clause, 28 U.S.C. § 1333, to choose whichever common law forum would be available to them should Skanska be unable to limit its liability in this federal maritime forum.  *See Beiswenger Enterprises*, 86 F.3d at 1037; *Lake Tankers Corp. v. Henn*, 354 U.S. 147, 152, 77 S.Ct. 1269, 1272, 1 L.Ed.2d 1246, 1251 (1957). Thus, while the court recognizes Skanska's interest in obtaining a determination as to whether the bridge claimants have a cognizable claim for any damage

award that might be forthcoming, that interest is outweighed, as a matter of sequencing, by the considerations discussed above.

Accordingly, it is **ORDERED**:

1.    Claimants' Motion to Dismiss (Doc. 38, 43) is **DENIED**.

2.    Ruling on Skanska's Amended Motion to Dismiss (Doc. 1144) is **DEFERRED** as provided in this Order.

**ORDERED** on this 28th day of July, 2021.


_____
s/*L. A. Collier*
Lacey A. Collier
Senior United States District Judge