## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION – IN ADMIRALTY

| | | |
|---|---|---|
| **IN RE SKANSKA USA CIVIL SOUTHEAST INC. AND SKANSKA USA, INC., AS OWNERS OF THE BARGE M8030 PRAYING FOR EXONERATION FROM OR FOR LIMITATION OF LIABILITY** | § § § § § § § § § § § § | **ADMIRALTY RULE 9(H)**<br><br>**CIVIL ACTION NO. 3:20-CV-05980 – RV/MJF**<br><br>**SENIOR DISTRICT JUDGE LACEY A. COLLIER**<br><br>**MAGISTRATE JUDGE HOPE THAI CANNON** |

---

## CLAIMANTS' SPOLIATION AND RULE 37 MOTION FOR SANCTIONS

COMES NOW, Claimants, by and through undersigned counsel, who move this Court, pursuant to Rule 37 of the Federal Rules of Civil Procedure and the common law doctrine of spoliation of evidence, for an award of sanctions against Defendants for violation of the discovery process by the destruction of and/or failure to preserve or make available requested documents during discovery.

1

## CLAIMANTS' MEMORANDUM IN SUPPORT OF
## <u>SPOLIATION AND RULE 37 MOTION FOR SANCTIONS</u>

## I.   INTRODUCTION

The issues at play in the instant motion are best articulated by J. Schendlin in *Zubulake IV*:

> 'Documents create a paper reality we call proof.'  The absence of such documentary proof may stymie the search for the truth.  If documents are lost or destroyed when they should have been preserved because a litigation was threatened or pending, a party may be prejudiced.  The questions presented here are how to determine an appropriate penalty for the party that caused the loss and-the flip side-how to determine an appropriate remedy for the party injured by the loss.

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 214 (S.D.N.Y. 2003) ("*Zubulake IV*") (citation omitted).

Text messages—***the most important evidence of the most important events in this litigation***—have been destroyed for over half of Skanska's ***self-selected*** custodians in this litigation, despite Skanska having actual knowledge of its duty to preserve such evidence.  These witnesses each played a critical role in preparing for Hurricane Sally, including development of the Hurricane Preparedness Plan, the decision ***not*** to implement the Hurricane Preparedness Plan in preparation for Hurricane Sally, implementation of the plan that it instituted ***instead*** of the Hurricane Preparedness Plan, efforts following Hurricane Sally to determine what Skanska did or did not do to result in 22 barges to become unmoored leaving damage and

destruction in their wake, and efforts to revise the Hurricane Preparedness Plan following Hurricane Sally. Despite legal holds and anticipation of litigation, Skanska allowed for these crucial witnesses' cell phone data to be forever destroyed.

Each witness's cell phone data was destroyed *after* a verbal legal hold was issued, *after* a written legal hold was issued, and *after* litigation had been filed against Skanska for destruction of the Pensacola Bay Bridge.[1] The cell phone data of two witnesses was destroyed *after* discovery was served.[2] Perhaps most egregious, Skanska proposed three witnesses as key custodians in this litigation when their cell phone data had *already been destroyed*.[3] There is no legitimate good faith explanation for this conduct.

Compounding the spoliation and providing further evidence of bad faith intent to deprive Claimants of relevant evidence is Skanska's repeated material misrepresentations concerning the destruction, availability, and recoverability of such evidence.[4] These misrepresentations, and the resulting delay in producing discoverable evidence, have imposed significant costs and prejudice to Claimants, not the least of which is their loss of the most important evidence of the most

---

[1] *See* Ex. 1, Skanska Spoliation Timeline.
[2] Pat McGlynn and Eduardo Rubio. *See id.*
[3] Sarah Stephens, Will Bender, and Nicholas Johnson. *See id.*
[4] Skanska's serial inconsistent representations are so convoluted that a timeline is attached as Exhibit 1 ("Skanska Spoliation Timeline") for assistance in following the chronology of the misrepresentations and spoliation.

important events in this litigation.  Meaningful restoration of such critical evidence is impossible, and the resulting prejudice of Skanska's spoliation is extraordinary. Claimants submit that such egregious misconduct warrants dismissal of Skanska's Limitation of Liability Action, cost-shifting,[5] fees, and a fine.  Yet, if this Court finds that dismissal is not warranted, Claimants request an adverse inference or presumption that the spoliated evidence was unfavorable to Skanska.

## II.   FACTS

### A. Text Messages of the Most Critical Witnesses in this Litigation Have Been Destroyed.

Skanska *chose* to produce documents from thirteen custodians who they contend were the employees "most likely to have generated or maintained the most critical, discoverable ESI"[6] regarding Skanska's negligence in failing to secure its construction barges leading up to Hurricane Sally.

Months after litigation was initiated and discovery had been served, Claimants learned that cell phone data had been destroyed for five of those custodians, and Skanska represented that a sixth did not have a cell phone.  Claimants later uncovered evidence that the sixth individual, Robert Hill, did in fact have a personal cell phone that he used to send and receive text messages regarding the Pensacola

---

[5] Should this Court find an award of costs is appropriate, Claimants will submit a bill of costs.

[6] Ex. 1-J, May 4, 2021 Skanska Proposed Revisions to ESI Order at 12-13.

Bay Bridge project, proving false Skanska's repeated representations to the contrary.[7] These witnesses played a critical role in the actions that are subject to this litigation.

      **Skanska Field Engineer, <u>Sarah Stephens</u>**, compiled the data for the 2019 and 2020 Hurricane Preparedness Work Plans,[8] and was listed as the preparer and a plan reviewer on its front page.[9]  Consistent with Skanska's policies and practices, ***Ms. Stephens' iPhone* was *reset by Skanska Business Manager*** in her presence upon her last day at Skanska on November 11, 2020, deleting all content.[10]  Ms. Stephens' iPhone data was not backed up or preserved.[11]

      **Skanska Superintendent, <u>William Bender</u>**, was described by Thomas DeMarco, Skanska's Project Executive and Construction Manager, as a discipline

---

[7] Skanska's representations concerning Rob Hill's cell phone are subject to a separate motion for sanctions for discovery misconduct.  *See* Ex. 2, July 21, 2021 Discovery Conference Transcript at 38:19-48:22 (Claimants' Oral Motion); ECF No. 1210 ("Order to Show Cause"); ECF No. 1214 ("Skanska's Response"); ECF No. 1220 ("Claimants' Reply").  Only after Claimants moved for sanctions did Skanska agree to produce a subset of text messages from Mr. Hill's phone. Skanska's concession amounts to "too little, too late." As set forth below, Mr. Hill has already been deposed without the benefit of such evidence and admitted that he did not back up his phone and that it is possible that he deleted relevant text messages.  Based on this testimony, Claimants assert spoliation claims for Mr. Hill's cell phone as well.

[8] Ex. 3, June 18, 2021 DeMarco Deposition Transcript ("Demarco Deposition Transcript") at 104:3-9.

[9] Ex. 4, SKANSKA_00000001.

[10] Ex. 1, Skanska Spoliation Timeline at 2.

[11] Ex. 5, June 22, 2021 Discovery Conference Transcript at 85:25-86:2.

superintendent with a supervisory role with respect to preparing the site in advance of Hurricane Sally.[12]  He was responsible for use of marine equipment in advance of Hurricane Sally, [13] which included actually being on the tug boats and securing equipment.[14]  Consistent with Skanska's policies and practices, Mr. Bender reset his iPhone "as a matter of practice" upon his last day at Skanska on December 24, 2020, deleting all content.[15]  Mr. Bender's iPhone data was not backed up or preserved.[16]

   **Skanska General Superintendent, <u>Eduardo Rubio</u>**, according to Mr. DeMarco, was among the three Skanska General Superintendents whose roles and responsibility involved the application of nautical skill.[17]  He was present and involved in the meetings on Sept. 13, 2020 about the implementation of the Hurricane Preparedness Plan.[18]  Mr. Rubio allegedly accidentally lost his phone aboard a barge on May 23, 2021, and Skanska personnel was informed the same day.[19]  Mr. Rubio's iPhone data was not backed up or preserved.[20]

---

[12] June 18, 2021 DeMarco Deposition Transcript ("Demarco Deposition Transcript") at 137:4-15.
[13] *Id.* at 152: 14-23
[14] *Id.* at 161: 25-162:3.
[15] Skanska Spoliation Timeline at 2.
[16] June 22, 2021 Discovery Conference Transcript at 85:25-86:2.
[17] DeMarco Deposition Transcript at 51:14-52:14.
[18] *Id.* at 171:16-24.
[19] Skanska Spoliation Timeline at 4.
[20] Ex. 1-E, "Francis 30b6 Transcript" at 264:11-13.

**Skanska Superintendent, <u>Nick Johnson</u>** had responsibility for use of marine equipment in advance of Hurricane Sally,[21] which included actually being on the tug boats and securing equipment.[22]  During the daytime, he provided Skanska tugboat captains with tasking, as their immediate supervisor.[23]  Mr. Johnson left his phone behind April 15, 2021, his last day at Skanska.  At some point, Mr. Johnson's phone became "disabled."[24]  According to Counsel, Mr. Johnson's phone was "disabled in the process of trying to reset it on his last day" because he was "not very tech savvy."[25]  Mr. Johnson testified that he left his phone on his desk and did not delete or reset his phone.[26]  He was never informed that his phone was "disabled," did not personally disable his phone, and was never asked for a password to his phone.[27]  Mr. Johnson's iPhone data was not backed up or preserved.[28]

**Skanska General Superintendent (Bridge), <u>Patrick McGlynn</u>** was involved with planning and preparations ahead of Hurricane Sally[29] and was responsible for use of marine equipment in advance of Hurricane Sally.[30]  He

---

[21] Ex. 3, DeMarco Deposition Transcript at 152: 14-23.

[22] *Id.* at 161: 25-162:3.

[23] Ex. 6, July 29, 2021 Deposition of Rob Hill ("Hill Deposition Transcript") at 54:14-22.

[24] Ex. 1, Skanska Spoliation Timeline at 3.

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] Ex. 1-H, Johnson Deposition Transcript – Rough at 23:11-20.

[29] Ex. 3, DeMarco Deposition Transcript at 77:19-22.

[30] *Id.* at 152: 14-23.

provided Skanska tugboat captains with tasking for the evenings.[31]   Captain Hill referred to Mr. McGlynn as "second in command" with Ronnie Benton.[32]   Mr. McGlynn was a reviewer for the 2020 Hurricane Preparedness Plan.[33]   Mr. McGlynn was terminated from his employment with Skanska on May 4, 2021 and was required to contemporaneously turn over his phone.[34]   All text messages are deleted from Mr. McGlynn's cell phone.[35]   Skanska failed to back up or preserve Mr. McGlynn's cell phone during his employment.[36]

**Skanska Tug Boat Captain, <u>Rob Hill</u>.**   Rob Hill "runs all of [Skanska's] tugboats.[37]   Rob Hill was called by Skanska Superintendent Nick Johnson on Sunday, September 13, 2020 and arrived on site by noon.[38]   On Tuesday, September 15, 2020, Captain Hill moved a free floating, fully loaded slide barge to Butcherpen Cove.[39]   Skanska, for months, allowed Claimants to labor under the false impression that Mr. Hill had no cell phone, when in fact he did have a cell phone that he used to communicate on the Pensacola Bay Bridge Project, and that Skanska listed as a point of contact in the Hurricane Preparedness Plan.   Mr. Hill testified that it is

---

[31] Ex. 6, Hill Deposition Transcript at 54:14-22.
[32] *Id.* at 64:17-18.
[33] Ex. 4, SKANSKA_00000001.
[34] Ex. 1, Skanska Spoliation Timeline at 4.
[35] *Id.*
[36] Ex. 1-E, Francis 30b6 Transcript at 258:12-260:1.
[37] Ex. 6, Hill Deposition Transcript at 7:24-8:4.
[38] *Id.* at 175:15-2; 259:19-260:16.
[39] *Id.* at 162:1-168:24.

possible he deleted text messages from his phone since Hurricane Sally,[40] and that he has never backed up his phone.[41]

### B. Skanska Has Withheld and Misrepresented the Extent of the Spoliation from Claimants and this Court.

Skanska has made a variety of inconsistent representations—not always voluntarily—which has culminated in confirming widespread spoliation. Notably:

- Skanska represented that it "has complied, and will continue to comply, with its discovery and evidentiary obligations including 'legal hold' and preservation of evidence" on June 1, 2021.[42] *At that time, the cell phone data of the five custodians had been destroyed.*

- Skanska represented to this Court for the first time on June 2, 2021 that there were "issues with a minority number of cell phones" but that "we do have cell phone data for the 13 custodians."[43] *Skanska did not have cell phone data for all 13 custodians.*

- Skanska represented on June 10, 2021 that "[n]o documentation relating to Skanska's storm preparations or efforts has been deleted or destroyed."[44] *At that time, the cell phone data for all five custodians had been destroyed.*

---

[40] *Id.* at 28:18-25.
[41] *Id*. at 27:24-28:17; 32:3-5
[42] Ex. 1, Skanska Spoliation Timeline at 4.
[43] *Id.* at 5. Claimants contend that Skanska knew and should have disclosed the full extent of the "issues" with the cell phones at this time.
[44] *Id.* at 6.

Skanska knew or should have known that the cell phone data had been destroyed, as full images of all available cell phones had submitted between Skanska's ESI vendors for processing on June 7 and 8, 2021,[45] and Counsel represented on June 2, 2021 to this Court that there were "issues" with some of the cell phones.[46] .

- Skanska continued to represent on June 18, 2021 that "all of Skanska's electronic information, documents, things, and other submissions related to the PBB Replacement Project were preserved from September 16, 2020, to the present," but noted "the status of certain cell phone data is being investigated."[47] Skanska represented that it was "unaware of any document intentionally discarded or destroyed."[48] ***Both statements were demonstrably false***.

Skanska further misrepresented to this Court not only that Mr. Hill did not have a cell phone, but also the extent to which the destroyed cell phone data for the remaining five custodians could be recovered from other custodial productions.[49]

---

[45] *Id.* at 5.

[46] *Id.*

[47] *Id.* at 8.

[48] *Id.*

[49] These representations are subject to a pending motion for sanctions for discovery misconduct. *See* Ex. 2, Claimants' Oral Motion at 38:19-48:22; ECF No. 1220 (Claimants' Reply).

Taken together, this conduct evidences intent to deprive Claimants of discoverable evidence and bad faith on the part of Skanska.

## III.    ARGUMENT

### A. The Court's Authority

"The authority to sanction litigants for spoliation arises jointly under the Federal Rules of Civil Procedure and the court's own inherent powers." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("*Zubulake IV*"). This Court may impose sanctions for spoliation under F.R.C.P. 37 or through its "'inherent power to manage [its] own affairs and to achieve the orderly and expeditious disposition of cases,' which provides broad discretion to sanction a party for spoliation." *AXIS Ins. Co. v. Terry*, 2018 WL 9943825, at *4 (N.D. Ala. Apr. 23, 2018) (quoting *Oil Equip. Co. Inc. v. Modern Welding Co. Inc.*, 661 F. App'x 646, 652 (11th Cir. 2016)); *Alabama Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 739 (N.D. Ala. 2017) (citing *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005)).[50]    In the Eleventh Circuit, when determining whether sanctions should be imposed pursuant to inherent authority, courts have considered the following factors:

---

[50] The Eleventh Circuit has "not yet had the opportunity to determine whether, given the [2015] amendment, the multi-factor test relied upon in *Flury* is still applicable when a party seeks sanctions based on the spoliation of electronically stored evidence." *AXIS Ins. Co.*, 2018 WL 9943825, at *4 (quoting *ML Healthcare Servs., LLC v. Publix Super Markets, Inc.*, 881 F.3d 1293, 1308 (11th Cir. 2018)).

> (1) whether the [party seeking sanctions] was prejudiced as a result of the destruction of evidence; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; (4) whether the [spoliating party] acted in good or bad faith; and (5) the potential for abuse [if the evidence is] not excluded.

*AXIS Ins. Co*., 2018 WL 9943825, at *11 (quoting *McLeod v. Wal-Mart Stores, Inc*., 515 F. App'x 806, 808 (11th Cir. 2013) and citing *Flury*., 427 F.3d at 945).

## B. Skanska Spoliated Discoverable Evidence.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Graff v. Baja Marine Corp*., 310 F. App'x 298, 301 (11th Cir. 2009); *see Zubulake IV*, 220 F.R.D. at 216.  A party requesting sanctions under Rule 37(e) must establish that:

> (1) the information sought constitutes ESI;[51] (2) the ESI should have been preserved in anticipation of litigation; (3) the ESI is lost because a party failed to take reasonable steps to preserve it; and (4) the ESI cannot be restored or replaced through additional discovery."

*Easterwood v. Carnival Corp.*, No. 19-CV-22932, 2020 WL 6781742, at *4 (S.D. Fla. Nov. 18, 2020).   Skanska both failed to preserve evidence, and actually destroyed evidence, and should be properly sanctioned for spoliation.

### i. Skanska Had a Duty to Preserve Discoverable Evidence.

---

[51] It is not disputed that the cell phone data constitutes ESI. *See* ECF No. 1153 (ESI Protocol) at 19.

In determining whether a party has a duty to preserve evidence, "the test is whether litigation was 'pending or reasonably foreseeable' when the spoliation occurred." *Alabama Aircraft*, 319 F.R.D. at 740 (quoting *Graff*, 310 F. App'x 298, 301 (11th Cir. 2009)). Skanska represented that its Assistant General Counsel Steve Lunsford "was immediately managing the fallout as a result of Hurricane Sally and specifically directing the preservation of evidence" as early as September 15.[52] Skanska also represented that it began preparing for litigation "before the winds died down:"

> MR. REMINGTON: We started preparing for this litigation before the winds started dying down. And claimants were coming forward and lawyers were signing up claimants before the winds died down.[53]

Skanska additionally informed outside counsel of the destruction caused by its barges as early as September 17, 2020.[54] Yet Skanska waited until October 14, 2020 to issue a legal hold.[55] On November 4, 2020, the first lawsuit was filed against Skanska for damages caused by the destruction of the Pensacola Bay Bridge.[56] Cell phone data for each of the custodians at issue were destroyed after November 4, 2020.

---

[52] Ex. 1, Skanska Spoliation Timeline at 1.

[53] *Id.*; *see also* Ex. 7, May 26, 2021 Discovery Conference Transcript at 54:19-22.

[54] *See* Skanska Spoliation Timeline at 1.

[55] *Id.* at 2.

[56] *Id.*

An obligation to preserve evidence arises when a party "has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Zubulake IV*, 220 F.R.D. at 16 (citation omitted).  When the cell phone data was destroyed, Skanska knew or should have known that the text messages on these custodians' phones were relevant to pending litigation.  Skanska's knowledge is further supported by fact that Skanska *unilaterally* identified these custodians as the individuals those "*expected to have generated or maintained the most critical, discoverable ESI*."[57]  This is undeniable evidence of bad faith.

### ii. Skanska Failed to Take Reasonable Steps to Preserve Evidence.

"The 'duty to preserve evidence extends to those [persons] likely to have relevant information – the key players in the case, and applies to unique, relevant evidence that might be useful to the adversary.'"  *Paisley Park Enterprises, Inc. v. Boxill*, 330 F.R.D. 226, 233 (D. Minn. 2019) (quotation omitted); *Steves and Sons, Inc. v. JELD-WEN, Inc*., 327 F.R.D. 96, 108 (E.D. Va. 2018)) ("The principles of the 'standard reasonableness framework' require a party to 'suspend its routine document retention/destruction policy and put in place a "litigation hold" to ensure the preservation of relevant documents.'").  Here, Skanska failed to take reasonable

---

[57] *Id.* at 4.

steps to ensure the preservation of relevant evidence for the "key players" in the litigation.

> **1. Skanska Failed to Take Affirmative Steps to Monitor Compliance with the Legal Hold.**

Despite Skanska anticipating litigation as early as September 15, 2020, Skanska did not issue a legal hold to Pensacola Bay Bridge employees until October 14, 2020.[58] But Skanska's duty to preserve does not end with issuance of the legal hold:

> A party's discovery obligations do not end with the implementation of a "litigation hold"—to the contrary, that's only the beginning. Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents.

> *Zubulake v. UBS Warburg L.L.C.*, 229 F.R.D. 422, 432 (S.D.N.Y 2004)

("*Zubulake V*"). "In short, it is *not* sufficient to notify all employees of a litigation hold and expect that [they] will then retain and produce all relevant information." *Id.* (emphasis in original). Rather, Counsel must "take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched." *In re Seroquel Prod. Liab. Litig.*, 244 F.R.D. 650, 663 (M.D. Fla. 2007).

Here, Skanska effectively took ***no action*** to oversee compliance with the legal hold despite its obligations to do so not only under the relevant law, but also under its internal policies. Skanska's Project Records Management Policy states that when

---

[58] *See* Ex. 1, Skanska Spoliation Timeline at 2.

a legal hold is issued, employees must "acknowledge receipt of and abide by the

Legal Department's directives":[59]

> **"Legal Hold" Notice**
> Whenever a new Litigation is initiated or becomes reasonably anticipated, the Corporate Legal Department will issue a Legal Hold Notice to appropriate personnel advising that all potentially relevant Project Records relating to the Litigation must be preserved until further notice. The Corporate Legal Department may in its discretion issue a Legal Hold Notice where other triggers may arise such as statutory or regulatory directives. Employees will acknowledge receipt of and abide by the Legal Department's directives.

Skanska's corporate representative Daniel Francis confirmed that Skanska

policy required employees to acknowledge receipt of legal holds,[60] but he admitted

that Skanska did not implement a process for employees to acknowledge receipt of

the legal hold that issued on October 14, 2020:

> Q Were there any processes in place to monitor whether employees, in fact, read and acknowledged the legal hold notice?
>
> MR. REMINGTON: Object to the form.
>
> A I don't believe -- I don't -- I don't know if there was any response, other than their presence and -- and discussion about it, you know. *As far as formal communication back to someone, I'm not aware of -- of that.* But I – I  know that it was discussed at multiple meetings and it -- we were -- people were aware of it. So...[61]

---

[59] Ex. 8, Francis Ex. 18, Pensacola Bay Bridge Project Operations Manual at 52;
*see also* Ex. 9, Francis Ex. 13, Skanska Project Records Management Policy at 4.
[60] Ex. 1-E, Francis 30b6 Transcript at 150:20-25.
[61] *Id.* at 132:2-15.

Q At any time did Skanska employees who received this legal hold notice have to acknowledge that they received and read the notice?

A That's kind of like your last question about -- *there was no written document that I am aware of that -- formal communication back to managers or legal to -- to -- to acknowledge that*, other than being in the meetings and discussing it and, you know, face-to-face.[62]

Q Mr. Lunsford did not send any additional emails to the Pensacola Bay Bridge project email Listserv concerning the need for continued preservation after this October 14th email; correct?

A *I don't recall one*. But I know that it was discussed at the meeting. So I -- I don't -- as far as a formal -- a formal document, I don't know of any other document.[63]

Claimants have had the opportunity to depose Mr. Johnson and Mr. Hill. Both confirmed Skanska failed to follow up on the legal hold or to preserve their documents and communications. Mr. Johnson testified that he did not recall ever receiving any instructions to preserve documents and communications relating to the project.[64] He did not recall any verbal instructions to preserve evidence on September 16-18, 2020[65] or ever seeing the October 14, 2020 legal hold letter.[66] Mr. Johnson testified that Skanska never backed up his iPhone, instructed him to back up his iPhone, or instructed him not to delete text messages.[67]

---

[62] *Id.* at 135:1-10.

[63] *Id.* at 145:8-16.

[64] Ex. 1-H, Johnson Deposition Transcript – Rough at 29:8-17.

[65] *Id.* at 28:9-29:7

[66] *Id.* at 30:18-31:4.

[67] *Id.* at 32:6-23.

Mr. Hill testified that he did not recall ever being instructed to preserve documents and communications or not to delete text messages.[68]  Mr. Hill similarly did not recall ever seeing the October 14, 2020 legal hold letter, whether in email or hardcopy.[69]  Mr. Hill testified that Skanska never took affirmative steps to ensure his emails or text messages were preserved and not deleted,[70] and Skanska never instructed Mr. Hill to back up his phone.[71]

Furthermore, Mr. Francis confirmed that Skanska does not have a policy— and did not initiate a policy—for automatically requiring employee cell phone backup during a legal hold.[72]  Skanska also did not have a system for recovery of text messages that are deleted during a legal hold.[73]  Mr. Francis testified that the only way to recover deleted text messages is potentially by using a forensic expert, but even forensic experts could not recover the data from these phones, as no backups were available.[74]

Skanska was required to take affirmative steps to monitor compliance with its legal hold under the relevant law and under its own policies and procedures but utterly failed to do so.

---

[68] Ex. 6, Hill Deposition Transcript at 20:21-21:4.
[69] *Id.* at 21:15-21; 24:5-9; 25:15-25.
[70] *Id.* at 26:18-25.
[71] *Id.* at 30:25-31:4.
[72] Ex. 1-E, Francis Deposition Transcript at 54:24-55:3.
[73] Id. at 56:19-57:4.
[74] *See* id. at 58:21-60:3.

## 2. Skanska Failed to Suspended Routine Document Destruction Policies.

"Once a party reasonably anticipates litigation, it must ***suspend its routine document retention/destruction policy*** and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Zubulake IV*, 220 F.R.D. at 216 (emphasis added).    Skanska was obligated to suspend its routine document retention and destruction policies not only under relevant law, but also under its internal policies, which provide that Skanska's procedures relating to destruction of records "shall NOT apply when any litigation … is pending or when Litigation relating to a particular claim or issue is reasonably anticipated" and states that "**NO POTENTIALLY RELEVANT PAPER OR ELECTRONIC RECORD MAY BE DESTROYED OR DISPOSED OF ON ANY CLAIM OR ISSUE THAT IS SUBJECT TO PENDING OR REASONABLY ANTICIPATED LITIGATION**":[75]

---

[75] Ex. 8, Francis Ex. 18 at 51-52 (emphasis in original); *see also* Ex. 9, Francis Ex. 13 at 4.

**Exceptions To The Records Policy**
The record management procedures relating to destruction of Project
Records set forth in this Records Policy shall NOT apply when any
litigation, arbitration, investigation and/or audit (referred to
collectively hereinafter as "Litigation") is pending or when Litigation
relating to a particular claim or issue is reasonably anticipated. In
such cases, all potentially relevant paper and electronic records
relating to the particular project will be preserved pursuant to specific
directives which will be issued in those circumstances. **NO
POTENTIALLY RELEVANT PAPER OR ELECTRONIC RECORD MAY
BE DESTROYED OR DISPOSED OF ON ANY CLAIM OR ISSUE THAT
IS SUBJECT TO PENDING OR REASONABLY ANTICIPATED
LITIGATION.**

Skanska should have suspended two relevant policies: (1) Skanska's policy ***not*** to back up or archive employee cell phone data, and (2) Skanska's policy to delete all cell phone data from employee phones when an individual leaves the company. Skanska suspended neither of these policies despite ongoing litigation and issuance of a litigation hold.

Mr. Francis confirmed it was Skanska's policy ***not*** to back up or archive employee cell phone data, and ***not*** to require employees to back up their own cell phone data.[76] On top of this, Skanska does ***not*** have any policies forbidding employees from deleting text messages on company-issued or personal cell phones.[77] In light of these policies, and the fact that a legal hold letter was not issued

---

[76] Ex. 1-E, Francis 30b6 Transcript at 53:9-20; 155:3-6.
[77] *Id.* at 52:8-12; 64:24-65:23.

until nearly a month after litigation was anticipated, Skanska was under a heightened obligation to ensure that employee phones were backed up and text messages were not deleted going forward.  Skanska, knowing its obligation, permitted the cell phone data for every custodian at issue to be permanently and irretrievably destroyed.

Mr. Francis also confirmed that it is Skanska's policy to "reset" company-issued phones when an employee leaves.[78]  Resetting an iPhone ***necessarily*** requires that all content and data be deleted from those phones.[79]  If the data is not backed up—as was the case with all the iPhones at issue—it is permanently destroyed.[80]  ***Allowing this policy to remain in place assured destruction of evidence.***  Skanska should have, but failed to, suspend its policies of wiping employee cell phones upon departure from the company, resulting in the destruction of at least Mr. Bender and Ms. Stephens' cell phone data.  In fact, ***Ms. Stephens' cell phone was actually reset by Skanska's business manager***.

---

[78] *Id.* at 226:19-227:13.

[79] "Resetting" or "restoring" a phone to factory settings "***erases the information and settings***" on the device and asks the individual resetting the phone, "Are you sure you want to restore the iPhone . . . ***All of your media and other data will be erased***."  https://support.apple.com/en-us/HT201252, published March 1, 2020; last accessed Aug. 1, 2021.  If an individual resets the phone from the phone itself, and not a computer, it requires the user to select "***Erase All Content and Settings***." https://support.apple.com/en-us/HT201274, published June 7, 2019, last accessed Aug. 1, 2021.

[80] *See* Ex. 1-E, Francis 30b6 Transcript at 154:13-155:1.

### 3. Skanska Failed to Take Affirmative Steps to Ensure Preservation of Documents and Communications from Key Players.

Skanska's duty to preserve evidence extended to "any documents or tangible things" made by individuals "likely to have discoverable information that the disclosing party may use to support its claims or defenses." *Zubulake IV*, 220 F.R.D. at 218 (quoting Fed.R.Civ.P. 26(a)(1)(A)). Skanska self-identified the "key custodians" in this litigation as "those expected to have generated or maintained the most critical, discoverable ESI."[81]

Skanska was obligated to "communicat[e] with the 'key players' in the litigation, in order to understand how they stored information." *Id.* "Unless counsel interviews each employee, it is impossible to determine whether all potential sources of information have been inspected." *Id.* "Although this sounds burdensome, it need not be;" the extent to which such interviews are feasible depends on the size of the company or the scope of the lawsuit. *See Id.* Here, it was certainly within reason to interview thirteen individuals serving as custodians in a litigation with hundreds of Claimants. Skanska should have taken steps to communicate with these "key players" but failed to do so.

---

[81] Ex. 1-J, May 4, 2021 Skanska Proposed Revisions to ESI Order at 12-13.

Mr. Johnson testified that he was not aware that Skanska agreed to produce his cell phone data until July 29, 2021, ***the day before his deposition***.[82]  Nobody asked him for the password to access his phone, and he was not aware that his phone ever became disabled.[83]  At no point between Hurricane Sally and the day before Mr. Johnson's deposition did Skanska or its counsel inform Mr. Johnson of the obligation to preserve evidence, ask him to back up his cell phone, or ask whether his cell phone data was backed up.

Similarly, Mr. Hill was not aware that Skanska would be producing his documents and communications or that Claimants had requested his cell phone data.[84]  Mr. Hill was never instructed not to delete communications relating to the Pensacola Bay Bridge project.[85]  In fact, Mr. Hill was never even asked whether he used a personal cell phone on the job until ***Mr. Francis called him in preparation for his 30(b)(6) deposition on July 23, 2021***.[86]

As Judge Sheindlin explained in *Zubulake V*, 229 F.R.D. at 432:

Proper communication between a party and her lawyer will ensure (1) that all relevant information (or at least all sources of relevant information) is discovered, (2) that relevant information is retained on a continuing basis; and (3) that relevant non-privileged material is produced to the opposing party....

---

[82] Ex. 1-H, Johnson Deposition Transcript – Rough at 18:12-16.
[83] *Id.* at 22:18-23:5.
[84] Ex. 6, Hill Deposition Transcript at 22:25-23:9.
[85] *Id.* at 23:10-14.
[86] *Id.* at 30:10-31:7.

Skanska clearly failed to have the most basic conversations with its "key custodians"—conversations that likely would have prevented the destruction of critical, discoverable evidence or, at the minimum, would have alerted Claimants to the document destruction issues early on.

In *Zubulake V*, documents were destroyed despite explicit instructions not to so on multiple occasions from both in-house and outside counsel, and counsel interviewed certain "key players." *Id.* at 434-35. Notwithstanding, the Court concluded that Defendant "failed to preserve plainly relevant e-mails" and "acted willfully in destroying potentially relevant information." *Id.* Moreover, because the spoliation was found to be willful, the lost information was presumed relevant. *Id.*

The facts here are even *more* egregious than those described in *Zubulake V*: Skanska issued a single litigation hold, did not monitor compliance with the legal hold, did not enact policies to back up employee phones or retrieve deleted messages, did not suspend its document destruction policies, actually deleted a custodian's cell phone data, and never spoke to its self-chosen custodians regarding their cell phone data. As such, this Court should find that Skanska spoliated evidence willfully and in bad faith, with an intent to deprive Claimants of relevant evidence.

### iii.  The Destroyed Evidence Cannot Be Restored or Replaced Through Additional Discovery.

The final prerequisite to a spoliation finding is that the information "cannot be restored or replaced through additional discovery." Fed.R.Civ.P. 37(e); *Alabama*

*Aircraft Indus.*, 319 F.R.D. at 742.  "[C]ourts must not hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence because doing so allows the spoliators to profit from the destruction of evidence." *Id.* (citing *Southeastern Mechanical Services, Inc. v. Brody*, 657 F.Supp.2d 1293, 1300 (M.D. Fla. 2009); *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998)).

The Court in *Alabama Aircraft* found that the spoliated evidence could not be "restored or replaced through additional discovery" and was "essentially lost forever" where Defendant did not index the information, could not identify with any specificity what ESI was destroyed, did not search and produce documents from key personnel with whom the custodian with missing ESI had communicated, and did not preserve the ESI of other key personnel.  *Id.*  Similarly, here, Defendants have no backups of the destroyed text messages and cannot identify who each custodian sent text messages to during the relevant time period.  The prejudice of the spoliation is compounded by the fact that ***multiple custodians*** are missing text messages, so any text messages between or among those custodians are not recoverable.

The fact that certain missing text messages ***might*** be found in other custodial sources is not dispositive of whether the text messages may be restored:

> The fact that the information contained in the missing text messages might also be cumulative to e-mails that [Defendants] already produced is insufficient to restore or replace the text messages.  First, it will never be known whether such information would or would not have been cumulative because ***it is impossible to know what it was or to whom it may have been communicated***.

Second, even when the information lost is "cumulative to some extent," the loss of the information still has an impact because *Plaintiffs "cannot present the overwhelming quantity of evidence [they] otherwise would have to support [their] case*."

At most, *Plaintiffs now can obtain only "scattershot texts and [e-mails]," rather than "a complete record of defendants' written communications from defendants themselves*." The Court therefore finds that the missing text messages cannot be replaced or restored by other sources.

*Boxill*, 330 F.R.D. at 235 (emphasis added) (internal citations omitted).

It will never be known the full extent of the communications that have been lost, but one thing is clear: the most critical evidence in this case has been permanently destroyed.

## C. <u>Remedies</u>

Under Rule 37 and the Court's inherent powers, the range of available sanctions for spoliation include further discovery, cost-shifting, fines, adverse inference presumptions or instructions, preclusion, and the entry of default judgment or dismissal. *See Tesoriero v. Carnival Corp*., 965 F.3d 1170, 1184 (11th Cir. 2020) (quoting *Flury*, 427 F.3d at 945); *Morrison v. Veale*, No. 3:14-cv-1020-TFM, 2017 WL 372980, at *5 (M.D. Ala. Jan. 25, 2017); *Easterwood*, 2020 WL 6781742, at *2. The appropriateness of sanctions depends on whether the spoliation party "acted with the intent to provide another party" of the evidence or, if not, whether the moving party was prejudiced from loss of the evidence. F.R.C.P. 37(e).

### i. Claimants have been Prejudiced by Skanska's Spoliation.

"Determining the content of lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that did not lose the information may be unfair."   Fed. R. Civ. P. 37(e), 2015 Notes of Advisory Committee.  Rather, "the rule leaves judges with discretion to determine how best to assess prejudice in particular cases."  *Id.*; *see also Alabama Aircraft*, 319 F.R.D. at ("While the burden of establishing prejudice generally falls on the party seeking sanctions, the court is cognizant that [Plaintiff] will likely never be able to prove what was contained in the destroyed evidence. In such a situation, only the party that engaged in the destruction knows how much prejudice has been caused (or potentially caused) by the destruction.").

In a similar case, the court in *Boxill* found "no doubt that Plaintiffs [were] prejudiced by the loss of text messages":

> Neither the Court nor Plaintiffs can know what ESI has been lost or how significant that ESI was to this litigation. The RMA Defendants' claim that no prejudice has occurred is "wholly unconvincing," given that "it is impossible to determine precisely what the destroyed documents contained or how severely the unavailability of these documents might have prejudiced [Plaintiffs'] ability to prove the claims set forth in [their] Complaint."

330 F.R.D. at 236.

Here, Claimants have been indisputably prejudiced by the fact that text messages—some of the most important evidence of the most important events in this

litigation—have been destroyed for at least five of the thirteen individuals Skanska identified as custodians.  Text messages were used more readily on the construction site than email, and cell phones were issued to Skanska employees as a tool to be used on site:

> MR BRANNING: [T]hese phones are another tool that Skanska gives to its employees similar to, you know, a safety jacket and a hammer.[87]

> MR REMINGTON: This is a construction site. People don't use e-mail as a tool. They use boats, and they use welders. They're going to get text messages, absolutely.[88]

Instead of treating these cell phones as what they are—sophisticated electronic devices that stored some of the most important discoverable evidence in this litigation—Skanska allowed for the text messages and documents for five key custodians to be irrevocably destroyed.

### ii. Skanska Destroyed Evidence with the Intent to Deprive Claimants of that Evidence.

If the Court finds that a spoliation party acted with "intent to deprive" the opposing party of evidence, it may order more severe sanctions, including dismissal or a presumption the lost information was unfavorable.  Fed. R. Civ. P. 37(e)(2).[89]

---

[87] Ex. 1-M, June 16, 2021 Discovery Conference Transcript at 34:7-10.

[88] Ex. 10, June 22, 2021 Discovery Conference Transcript at 74:6-9.

[89] The adverse inference instruction may apply to bench trials as well.  Fed. R. Civ. P. 37(e), 2015 Notes of Advisory Committee ("This finding may be made by the court when ruling on a pretrial motion, when presiding at a bench trial, or when deciding whether to give an adverse inference instruction at trial.").

It is also presumed that such evidence would have been relevant, and its destruction is prejudicial to Claimants.[90]

"The spoliation of evidence germane 'to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction.'" *Zubulake IV*, 220 F.R.D. at 216 (citation omitted). Here, it is undisputed that destroyed evidence at issue is germane to the issues at trial; Skanska admitted that these "key custodians" were "expected to have generated or maintained the most critical, discoverable ESI" in this litigation.[91]

"At least one court has suggested that "the "intent to deprive" standard in Rule 37(e)(2) may very well be harmonious with the 'bad faith' standard ... established by the Eleventh Circuit [with respect to (e)(1)]." *Alabama Aircraft*, 319 F.R.D. at 746 (quoting *Living Color Enterprises, Inc. v. New Era Aquaculture, Ltd*., 2016 WL 1105297, at *6 (S.D. Fla. Mar. 22, 2016)); *see also AXIS Ins. Co.*, 2018 WL 9943825, at *12 (quoting *Mann v. Taser Int'l, Inc*., 588 F.3d 1291, 1310 (11th Cir.

---

[90] Fed. R. Civ. P. 37(e), 2015 Notes of Advisory Committee ("Subdivision (e)(2) does not include a requirement that the court find prejudice to the party deprived of the information. This is because the finding of intent required by the subdivision can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position. Subdivision (e)(2) does not require any further finding of prejudice").

[91] Ex 1-J, May 4, 2021 Skanska Proposed Revisions to ESI Order.

2009).  Direct proof of bad faith is not required, and courts in this Circuit have held that following constitutes circumstantial evidence of bad faith:

> (1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator.

*Alabama Aircraft*, 319 F.R.D. 730, 746 (N.D. Ala. 2017) (quoting *Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*, 736 F.Supp.2d 1317, 1323 (S.D. Fla. 2010)).

Even so, direct proof of bad faith exists here.  Skanska knew these text messages would be material to the claims at issue.  Skanska engaged in affirmative acts, including physically resetting an employee's phone, and maintaining its regular policies regarding cell phone backup, resulting in spoliation of evidence, despite actual knowledge of its duty to preserve evidence.  Skanska's affirmative acts resulting in spoliation cannot be, and has not been, credibly explained by Skanska.

In *Alabama Aircraft*, the Court found "sufficient circumstantial evidence" to find an intent to destroy ESI where Defendant anticipated litigation, the parties had agreed to an ESI protocol, Defendant instituted a firewall plan, and the ESI was intentionally destroyed by an affirmative act that had not been credibly explained. The facts are nearly identical to the instant case.  The Court held:

> ***This type of unexplained, blatantly irresponsible behavior leads the
> court to conclude that Boeing acted with the intent to deprive*** Pemco
> of the use of this information in connection with its claims against
> Boeing. And, because the information is irretrievably lost, AAI (not to
> mention this court) is left to speculate as to why the data was destroyed.
>
> For all of these reasons, the court believes ***firm measures, such as those
> discussed in subdivision (e)(2), are appropriate to remedy the wrong
> that has occurred in this case.*** Specifically, the giving of an adverse
> inference jury instruction, such as the one outlined in Rule 37(e)(2)(B),
> is a proper sanction.  If this case goes to trial, the court will instruct the
> jury that it may presume that the lost information contained in Blake's
> Pemco-related ESI was unfavorable to Boeing. The court also finds it
> appropriate for Boeing (not Boeing's counsel) to pay AAI's reasonable
> attorney's fees and costs in prosecuting this motion.

*Id.* at 746–47 (emphasis added).

The Court in *Boxill* similarly held that Defendants acted with an intent to deprive
Plaintiffs of text message evidence where Defendants failed to disengage auto-delete
functions on cell phones "when they anticipated litigation" and Defendants "wiped
and discarded their phones ... after Plaintiffs filed suit."  330 F.R.D. at 237.  The
Court found "from these circumstances alone" that Defendants "intentionally
destroyed evidence."  *Id.*  The court found that "wiping" the phones was "egregious"
evidence of Defendants' intent to deprive Plaintiff of evidence:

> The wiping and destruction of Wilson's phone for a second time are
> perhaps the most egregious or unkindest acts of all. Wilson got rid of
> his phone in May 2018, after: (1) litigation had commenced; (2)
> Plaintiffs served discovery; (3) Plaintiffs expressly informed the RMA
> Defendants that they intended to seek discovery regarding Wilson and
> Staley's text messages; and (4) the Court ordered the parties to preserve
> all relevant electronically stored information in its pretrial scheduling
> order. Any one of these events should have been sufficient to put the

> RMA Defendants on notice that they needed to preserve their text
> messages and ***phones. The Court can draw only one conclusion from
> this set of circumstances: that they acted with the intent to deprive
> Plaintiffs from using this information***. Rule 37(e)(2) sanctions are
> particularly appropriate as to Wilson, RMA, and Deliverance for this
> reason as well.

330 F.R.D. at 237 (emphasis added).

All the cell phone data at issue was destroyed after litigation had commenced, after Claimants had served discovery, and after a legal hold was in place. This occurred both from affirmative acts of Skanska and by Skanska's failure to act to preserve evidence. The only conclusion that can be drawn from Skanska's unexplained, blatantly irresponsible behavior is that Skanska intended to deprive Claimants of that evidence.

"Intent rarely is proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors." *Boxill*, 330 F.R.D. at 236 (quoting *Morris v. Union Pacific R.R.*, 373 F.3d 896, 901 (8th Cir. 2004)). "There need not be a 'smoking gun' to prove intent[,] [b]ut there must be evidence of 'a serious and specific sort of culpability' regarding the loss of the relevant ESI." *Id*. (quoting A*uer v. City of Minot*, 896 F.3d 854, 858 (8th Cir. 2018)).

Skanska's serial misrepresentations to Claimants and to this Court evince not only a lack of credibility and candor, but also a "serious and specific sort of culpability" that cannot be explained by anything other than bad faith. Skanska

32

improperly withheld documents as "work product" that this Court were "simply internal communications about what Skanska believes may be necessary to bolster its reputation with state and local public officials in light of the events surrounding Hurricane Sally."[92]  Skanska falsely represented that Mr. Hill did not have a cell phone.  Skanska misrepresented the extent to which destroyed cell phone data could be recovered by looking to other custodial productions.  And Skanska misrepresented the extent of the destruction of the cell phones at issue.[93]  Skanska's blatant disregard for its discovery obligations in this litigation is astounding and cannot be explained by anything other than a bad faith intent to deprive Claimants of relevant evidence.

Not only has Skanska spoliated evidence; it has also been "purposely sluggish" in production despite a looming trial date and aggressive discovery schedule.  Skanska's actions beg the question of whether it has allowed for discovery issues to mount in an effort to get a continuance of the trial date.  In *Seroquel*, the Court noted:

> Given the Court's mandate of a tight schedule in this case, AZ's various decisions and problems that resulted in this sluggishness appears to have benefitted AZ by limiting the time available to Plaintiffs to review information and to follow up."  ***Courts have inferred prejudice and imposed sanctions in the fact of such "purposeful sluggishness"***.  *Id.* at 664-665.

---

[92] ECF No. 1212.
[93] *See* Skanska Spoliation Timeline.

244 F.R.D. 650, 661 (M.D. Fla. 2007).

Skanska's purposeful sluggishness, improper withholding of documents as work product, varied discovery misrepresentations, and spoliation of relevant evidence has resulted in Claimants moving forward with depositions, expert reports, and eventually cross-examination in trial without the benefit of such evidence.[94]  The spoliation of critical evidence, and resulting prejudice, is further compounded by Skanska's purposeful sluggishness.

## IV.   This Court Should Dismiss Skanska's Limitation of Liability Action or, in the Alternative, Impose Sanctions Including Cost-Shifting, Fees, and a Fine.

Skanska's conduct far exceeds a display of indifference to this Court's authority and the rule of law; it evidences utter contempt for a system of justice and fundamental fairness to advance its own interests, whatever the costs.  Skanska's spoliation of critical evidence has not only resulted in material prejudice to claimants; it constitutes abuse of the judicial process and a breach of Skanska's duty to this Court to preserve relevant evidence.

Such egregious misconduct warrants dismissal of Skanska's Limitation of Liability Action, cost-shifting, fees, and fines.   An expeditious resolution of

---

[94] At this time, Skanska still has not produced cell phone data from Mr. Hill's phone, and the parties are awaiting this Court's further in camera review of additional documents Claimants contend Skanska has improperly withheld.

Skanska's limitation petitions must not come at the high cost of Claimants' right to fairly oppose each. Dismissal ensures Skanska will not profit from its misconduct or otherwise enjoy a limitation trial on its own terms, denying from the Court and Claimants evidence crucial to understanding the truth.

WHEREFORE, Claimants respectfully pray the Court grants the relief requested and award sanctions against the Defendants and any other relief the Court deems appropriate under the circumstances.


Dated: August 2, 2021                Respectfully Submitted,

                                     */s/ D. Nicole Guntner*
                                     D. NICOLE GUNTNER, FBN 1028925
                                     E. SAMUEL GEISLER, FBN 83817
                                     BRYAN F. AYLSTOCK, FBN 78263
                                     Aylstock, Witkin, Kreis & Overholtz, PLLC
                                     17 East Main Street, Second floor
                                     Pensacola, Florida 32502
                                     Office: (850) 202-1010
                                     Fax: (850) 916-7449
                                     nguntner@awkolaw.com
                                     sgeisler@awkolaw.com
                                     baylstock@awkolaw.com
                                     sallyteam@awkolaw.com

*/s/ Thomas F. Gonzalez*
THOMAS F. GONZALEZ, FL Bar #173878
J. NIXON DANIEL, III, FL Bar # 228761
Beggs & Lane, RLLP
501 Commendencia Street
Pensacola, Florida 32502
Office: (850) 432-2451
tfg@beggslane.com
jnd@beggslane.com

*/s/ Brian H. Barr*
BRIAN H. BARR, FL Bar 493041
EMMANUELLA J. PAULOS, FL Bar 99010
Levin Papantonio Rafferty Proctor
Buchanan O'Brien Barr & Mougey, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Office: (850) 435-7000
bbarr@levinlaw.com
epaulos@levinlaw.com

**Attorneys for Claimants**

## <u>CERTIFICATE OF COMPLIANCE WITH COURT'S WORD LIMIT</u>

I hereby certify that the foregoing contains 7780 words and complies with Local Rule 7.1(F) and 56.1(B) that any memorandum of law in support of a motion not exceed 8,000 words.

*/s/ D. Nicole Guntner*
D. Nicole Guntner
Aylstock Witkin Kreis & Overholtz, PLLC

## <u>CERTIFICATE OF COUNSEL CONFERENCE</u>

I hereby certify that Counsel for Claimants have conferred with Counsel for Petitioners prior to filing this motion, pursuant to Local Rule 7.1(B), and have not been able to resolve the issues raised.

*/s/ D. Nicole Guntner*
D. Nicole Guntner
Aylstock Witkin Kreis & Overholtz, PLLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify, on this 2nd day of August 2021, that the foregoing Motion, Memorandum and Proposed Order for Spoliation and Rule 37 Sanctions was filed via the Court's CM/ECF system, which will automatically serve and send notification of such filing to all registered attorneys of record.

*/s/ D. Nicole Guntner*
D. Nicole Guntner
Aylstock Witkin Kreis & Overholtz, PLLC
