# EXHIBIT 1-M

In Re: Skanska USA Civil Southeast, Inc.

Hearing before:

JUDGE HOPE CANNON

June 16, 2021



*Raising the Bar!*

Judge Hope Cannon
June 16, 2021

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CASE NO.:   3:20-cv-5980-LC-HTC

IN RE:

SKANSKA USA CIVIL SOUTHEAST, INC.
and SKANSKA USA, INC., AS OWNERS
OF THE BARGE KS 5531, PRAYING
FOR EXONERATION FROM LIMITATION
OF LIABILITY
_____/

TRANSCRIPT OF PROCEEDINGS

STATUS CONFERENCE

VOLUME 1 (Pages 1 - 95)

DATE TAKEN:  June 16, 2021
TIME:        10:00 a.m.
PLACE:       United States District Courthouse
             One North Palafox Street
             Pensacola, Florida 32502
BEFORE:      Hope Thai Cannon, United States
             Magistrate Judge

     This cause came on to be heard at the time and place
aforesaid, when and where the following proceedings were
stenographically reported by:

             Connie L. Morse, Stenographic Reporter

Job No.:  192485

Judge Hope Cannon
June 16, 2021

Page 2

```
 1    APPEARANCES:

 2

 3    On behalf of Skanska:

 4         Clark Partington
           125 East Intendencia Street
 5         Pensacola, Florida 32502

 6         BY:  JEREMY C. BRANNING, ESQ.
           jbranning@clarkpartington.com
 7
           BY:  SCOTT A. REMINGTON, ESQ.
 8         sremington@clarkpartington.com

 9

10         Chaffe McCall
           2300 Energy Centre
11         1100 Poydras Street
           New Orleans, Louisiana 70163
12
           BY:  CHARLES P. BLANCHARD, ESQ.
13         (Via Telephone)
           blanchard@chaffe.com
14

15    On behalf of Claimants:
16
           Aylstock, Witkin, Kreis & Overholtz
17         17 East Main Street
           Suite 200
18         Pensacola, Florida 32502

19         BY:  E. SAMUEL GEISLER, ESQ.
           sgeisler@awkolaw.com
20
           BY:  D. NICOLE GUNTNER, ESQ.
21         nguntner@awkolaw.com

22         BY:  STEPHEN H. ECHSNER, ESQ.
           sechsner@awkolaw.com
23

24

25
```

Judge Hope Cannon
June 16, 2021

Page 3

```
 1          Levin Papantonio Rafferty
            316 South Baylen Street
 2          Pensacola, Florida 32502

 3          BY:  BRIAN BARR, ESQ.
            bbarr@levinlaw.com
 4


 5
            Beggs & Lane
 6          501 Commendencia Street
            Pensacola, Florida 32502
 7
            BY:  THOMAS F. GONZALEZ, ESQ.
 8          tfg@beggslane.com

 9


10          Vernis & Bowling
            315 South Palafox Street
11          Pensacola, Florida 32502

12          BY:  JEFFREY P. GILL, ESQ.
            jgill@florida-law.com
13


14
            U.S. Department of Justice
15          P.O. Box 14271
            Washington, DC 20044
16
            BY:  ROBB HYDE, ESQ.
17          (Via Telephone)
            robb.hyde@usdoj.gov
18

19          BY:  TOM BRIGHT, ESQ.
            (Via Telephone)
20


21     Also Present:

22           Christine Moore

23


24

25     Certificate of Reporter      Page 95
```

Judge Hope Cannon
June 16, 2021

Page 4

 1   Proceedings began at 10:00 a.m.:

 2              COURT SECURITY OFFICER:  All rise.  United

 3   States District Court for the Northern District of

 4   Florida is now in session, the Honorable Hope Cannon

 5   presiding.  Be seated, please.

 6              THE COURT:  Good morning, everyone.  So I

 7   understand we've got some folks on the phone as

 8   well, so I just want to make sure that you guys can

 9   hear me.  I think we have Mr. Blanchard on the

10   phone; is that correct?

11              MR. BLANCHARD:  Yes, Your Honor.  I can

12   hear you.

13              THE COURT:  Wow, we might want to turn that

14   down.  And then we have Mr. Hyde on the phone from

15   the government.

16              MR. HYDE:  Yes, Your Honor.  I hear you

17   fine.

18              THE COURT:  Okay.  And then we have a new

19   counsel appearing for the government as well, Mr.

20   Bright?

21              MR. BRIGHT:  Good morning, Your Honor.  I

22   hear you.  Thank you.

23              THE COURT:  Okay.  And is that all the

24   folks that we've got on the phone?  All right.

25   Sounds like it.  Okay.  So I know we've got a lot to

Judge Hope Cannon
June 16, 2021

```
 1   actually go over today.  Seems like the issues are

 2   getting more rather than less.  Let's see.  What I

 3   thought I would do first is just kind of go over

 4   some of what we -- you know, kind of the things that

 5   we left open from last week, kind of see where the

 6   status is of those.  And then I know we also need to

 7   address some outstanding issues, and then at the end

 8   we can go over anything that we haven't covered.

 9           But from my notes from last -- let's see,

10   when were we here?  From the 9th, right?  Yeah.  So

11   it looks like I got from Mr. Barr yesterday the meet

12   and confer results for the discovery to the

13   claimants, so we'll go over that a little bit later.

14   Looks like y'all have met and narrowed at least some

15   of the issues, but there still remains some

16   interrogatories and requests for production that

17   there are issues about.

18           And then I also got from Ms. Guntner where

19   you guys are on -- I guess the issue outstanding

20   there is going to be what ESI, the claimants should

21   get after September 30th.  That's still in

22   disagreement, right, Ms. Guntner?

23           MS. GUNTNER:  Yes, Your Honor, that and the

24   ESI protocol for claimants.

25           THE COURT:  Okay.  And then we -- I guess
```

Judge Hope Cannon
June 16, 2021

Page 6

1    from Ms. Billhimer -- I know she's not here today.

2    I thought she was going to be on the phone.  She

3    ended up not being -- I know she's got some personal

4    conflicts.

5              MR. REMINGTON:  If she can break away,

6    she's going to break away, but if she's not on -- we

7    just don't know her situation, Your Honor.  Sorry.

8              THE COURT:  I guess the first update we

9    need is to figure out where we are on the cell phone

10   data production.  Mr. Branning or Mr. Remington?

11             MR. BRANNING:  Your Honor, I believe Mr.

12   Blanchard is prepared to speak to that issue, if

13   that's permissible.

14             THE COURT:  Yes, of course.  Mr. Blanchard.

15             MR. BLANCHARD:  Yes.  Good morning, Your

16   Honor.  Yesterday we produced 726 photos, which is

17   the first documentation made available to us from

18   Servient from the cell phone data.  We have been in

19   contact with Servient continuously since last week's

20   hearing to update the status of the cell phone

21   collection and when it will be available --

22   additional documents will be available for us to

23   review.

24             We've been told by Servient that the

25   process for the cell phone data is more complicated

Judge Hope Cannon
June 16, 2021

1    than it was for the e-mails, and it's been a

2    two-step process.  There's an entity called Exact

3    which locally obtained the cell phones that we have

4    and extracted the data from those cell phones,

5    photos and texts.  The data was so voluminous that

6    they could not remotely transmit that.  They had to

7    put it on a device and overnight it to Servient.

8           When Servient obtained the information,

9    they discovered a few things.  The first item is on

10   the photos.  Apparently these phones, these Skanska

11   phones have a system called live photos.  I don't

12   quite understand the full extent of that, but it has

13   something to do with when you look at a photo or you

14   try to capture a photo, the phone actually has a

15   preceding image and a subsequent image as well.

16          That is not something that Servient can

17   process.  So Servient has had to convert all of

18   these photos to a different process called MP4, and

19   they have actively been in that process.  For the

20   texts it's somewhat similar, Your Honor.  Exact has

21   extracted those texts.  They shipped them to

22   Servient.  Servient has to change the processing a

23   bit so that they can be searchable and we can apply

24   the agreed-upon search terms.

25          Again, we've been pushing Servient very

Judge Hope Cannon
June 16, 2021

Page 8

1   hard on the cell phone data.  They have informed us
2   that by Friday all the remaining cell phone data
3   should be available for us to review.  We will then
4   immediately assign reviewers to that cell phone
5   data, the photos and the text messages.  So the text
6   messages, again, we will apply the agreed-upon
7   search terms and start that review, again, as soon
8   as possible.
9           But even while we're waiting for that, Your
10  Honor, we have not stopped reviewing documents.
11  Late last week we agreed with claimants to some, as
12  I'll say, prior hurricane search terms.  It created
13  5,300 hits, 5,300 documents.  We have been actively
14  reviewing those documents, and we're about 80
15  percent through that set and hope to get that out
16  early next week.  So the plan moving forward is
17  finish that set.  As soon as the cell data comes in,
18  we'll immediately go to that set of documents as
19  well and start getting those productions out.
20          Now, Your Honor, there's one other issue
21  that I need to address, and that has to do with some
22  of these cell phones.  We have seven cell phones
23  that were transmitted to Servient.  One of the
24  custodians, Rob Hill, was a tug captain, he didn't
25  have a cell phone.  But we have some issues with

Judge Hope Cannon
June 16, 2021

1    certain other cell phones which we are working on.

2    The first is Eduardo Rubio, one of the custodians.

3    He reports that he lost his phone overboard sometime

4    after Sally, so he doesn't have data from that

5    period.  We are investigating whether he had a

6    separate laptop and maybe he saved some of the data

7    to his laptop.  But at this point I don't have any

8    cell phone data from him to transfer to Servient to

9    process, but we're investigating that.

10         We have a second custodian, Patrick

11    McGlynn.  McGlynn is no longer with Skanska.  He had

12    a Skanska cell phone.  We have it.  We believe all

13    the data is on it, but it's password protected.  Mr.

14    McGlynn has not yet provided us the password.  We

15    have asked for it.  We're going to ask for it again.

16    If he doesn't give it to us, we may have to explore

17    other options, possibly even a subpoena to him to

18    try to get that information to access the data.  But

19    we do believe it's there, and we're actively trying

20    to get it.

21         The third custodian is Nick Johnson.  We

22    have his cell phone.  A similar issue; we're having

23    trouble accessing the data, as far as I'm told,

24    simply opening the phone.  We are getting Exact or

25    Servient or some other entity to look at the phone

Judge Hope Cannon
June 16, 2021

1   and see whether we can somehow access that data, and

2   if we can we will certainly transfer it to Servient

3   as soon as possible for processing.

4           Then there are two other custodians,

5   William Bender and Sarah Stephens.  These were

6   Skanska people who left sometime after Sally.  They

7   had Skanska phones.  It's Skanska's ordinary course

8   of business and practice that when an individual

9   leaves, his phone is gathered locally.  His or her

10  data is removed from that phone, and it's repurposed

11  to another user.  And that's what happened with

12  William Bender and Sarah Stephens.

13          We're investigating the circumstances

14  involving that.  We're also going to try and collect

15  the phones and see if there's some way we can access

16  that data at this point.  We're also investigating

17  whether they had laptops that maybe haven't been

18  cleaned.  If they haven't, maybe they were saved to

19  the laptops and we can access the data that way.

20  But I cannot represent that we'll be able to get

21  that data.  I just don't know.  We're working on it.

22          So our plan moving forward, the cell data

23  is as referenced.  As soon as Servient makes it

24  available to us, we will begin our review and

25  production.  And we continue to attempt to access

Judge Hope Cannon
June 16, 2021

Page 11

1    the data from these five phones that I just

2    mentioned.

3              THE COURT:  Okay.  So, Mr. Blanchard, as of

4    right now, just to make sure I'm clear, you've

5    produced 726 photos from the custodians that you've

6    been able to -- that Servient has downloaded?

7              MR. BLANCHARD:  Yes.  These are just some

8    of the photos.  My understanding is that there are

9    more.  These were photos from a few of the phones.

10   I believe it's Alvaro Salamanca, Ronnie Benton and

11   Danny Francis.  But there are more photos that are

12   going to be made available to us once this

13   conversion to this MP4 is completed, along with

14   their processing of the texts that, again, we will

15   then apply the search terms to and produce

16   responsive documents.

17             THE COURT:  And then you've got -- Friday

18   they're supposed to have some additional cell phone

19   data and text messages available for your team to

20   begin searching?

21             MR. BLANCHARD:  That is what we have been

22   informed, yes, Your Honor.

23             THE COURT:  Do they have an estimate about

24   how long, other than the ones that you've mentioned

25   who either don't have a cell phone, whose cell

Judge Hope Cannon
June 16, 2021

Page 12

1    phones are locked or who you're still looking for,

2    for the custodians that have been downloaded, how

3    long will it take Servient to get all that data into

4    a form that can be reviewed?

5              MR. BLANCHARD:  My understanding for the

6    seven custodians whose phones we have and Servient

7    has the data, that those texts will be available

8    starting Friday for, again, applying the search

9    terms and then review.

10             THE COURT:  Right.  I know you said

11   starting Friday.  I want to know how long it will

12   take for all of that data to be in a review format.

13             MR. BLANCHARD:  We're informed that all of

14   it will be available then.

15             THE COURT:  Okay.  And when it's available,

16   then your team is going to start reviewing those

17   using the same criteria that you have been, and so

18   it sounds to me like by our next status conference

19   you'll have -- you would have produced that cell

20   phone data to the claimants?

21             MR. BLANCHARD:  Well, Your Honor, we will

22   move as quickly as possible.  I don't know the

23   universe of texts.  My understanding is that the

24   universe may be over 10,000.  Now, when you apply

25   the search terms, that might be quite a bit less.

Judge Hope Cannon
June 16, 2021

Page 13

1    The photos, I understand, are also extensive.  So

2    we're going to work as quickly as possible.  If we

3    get this early Friday, I think that is potentially

4    doable.  We do have to give our E-vendor some

5    notice.  After we review the documents, they need --

6    generally 48 hours is their practice for turning

7    this around.  We can try to shorten that.  But we

8    will work -- we have a team ready to work as quickly

9    as possible to get this out.

10           THE COURT:  Okay.  And then I'm sure the

11   claimants may have some additional questions about

12   that, but let me go through the other stuff, and

13   then we'll go back to it, Ms. Guntner.

14           MS. GUNTNER:  Yes, Your Honor.

15           THE COURT:  I also have in my notes that I

16   think there were some things, Mr. Branning, that you

17   were going to provide that I will categorize as

18   documents responsive to the request for production

19   that may or may not be outside the ESI database.  I

20   think that included a company-wide policy that you

21   were going to produce in electronic form and that

22   you were going to try to ensure that we now have

23   provided everything to the claimants that fall into

24   that bucket.

25           MR. BRANNING:  And that has been

Judge Hope Cannon
June 16, 2021

Page 14

 1    accomplished, Your Honor.  All known responsive data

 2    has been produced since the last hearing.

 3              THE COURT:  Okay.

 4              MR. BRANNING:  Your Honor, I want to say it

 5    was produced last Thursday, but it could have

 6    been -- Your Honor, confirmed, the balance of known

 7    responsive data that's outside of the database,

 8    including the company policy manual, was produced

 9    after last week's status conference.

10              THE COURT:  Okay.  And I think you were

11    looking at that -- or you had reported that there

12    were some handwritten notes for prior storms from

13    Robert Rodgers and I think one other custodian.  Has

14    that also been produced?

15              MR. BRANNING:  It has not, Your Honor.  In

16    fact, they are still looking for those notes.

17              THE COURT:  Okay.

18              MR. BRANNING:  And I will keep -- if the

19    Court wants me to keep the Court updated on that,

20    I'm glad to do that.  I will certainly keep

21    claimants' counsel informed of the status.

22              THE COURT:  Okay.  And who was the other

23    custodian for that?

24              MR. BRANNING:  It was Mr. Alvaro Salamanca.

25              THE COURT:  Okay.  And then I think we had

Judge Hope Cannon
June 16, 2021

Page 15

 1    talked about Skanska updating or revising, amending

 2    its responses to the requests for production of

 3    documents to identify responsive documents by Bates

 4    label where possible and also, you know, to identify

 5    what documents have been produced or not produced to

 6    a specific request.  Has that been done?

 7                MR. BRANNING:  No, Your Honor.  We are

 8    working to accomplish that as fast as we can.

 9                THE COURT:  Okay.  When do we think that

10    could be done?

11                MR. BRANNING:  Frankly, Your Honor, I need

12    Ms. Billhimer's input on that.  May I have a day,

13    and then I could report to the Court the answer to

14    that question?

15                THE COURT:  Okay.  And then were there some

16    additional supplemental interrogatory responses that

17    were going to be provided as well?

18                MR. BRANNING:  Yes, Your Honor, following

19    the discussion we had last week concerning the

20    litigation hold directive.

21                THE COURT:  Right.  I think No. 22 and 23?

22                MR. BRANNING:  Yes, Your Honor.  We are,

23    including myself, the past couple of days finalizing

24    the amendment to that.  We interviewed additional

25    people yesterday.  Interrogatory No. 23, the

Judge Hope Cannon
June 16, 2021

Page 16

1   claimants' counsel asked for an amendment.  We will

2   be in a position to provide that amended answer by

3   no later than Friday.

4           THE COURT:  Okay.

5           MR. BRANNING:  In addition to responding

6   to, at a minimum, the last three requests for

7   admissions the claimants served.  And it's possible

8   we may just serve a response to all of the RFAs by

9   no later than Friday.  However, we will certainly

10  respond to the last three by no later than Friday.

11          THE COURT:  Okay.  And this may be also for

12  Ms. Billhimer.  I don't know, Mr. Remington or Mr.

13  Blanchard, if y'all know.  Do we have any issues

14  with what was being withheld from the step 1 and

15  step 2 review on basis of something other than

16  privilege?  I think Ms. Billhimer said there had

17  been a handful of documents that were withheld, and

18  she was going to get us that number.  I don't know

19  if that's been provided to Ms. Guntner.  I don't

20  know.  Mr. Remington or Mr. Branning?

21          MR. REMINGTON:  That would be Mr. Blanchard

22  or Ms. Billhimer, Your Honor.

23          MR. BRANNING:  Your Honor, may I introduce

24  Christine Moore?

25          THE COURT:  Yes.

Judge Hope Cannon
June 16, 2021

Page 17

1          MR. BRANNING:  Ms. Moore is a certified

2    electronic discovery specialist who's worked at our

3    firm for a long time, and I mean employed by our

4    firm, not a contractor, but Ms. Moore has worked

5    with us for a long time.

6          THE COURT:  She's with Clark Partington?

7          MR. BRANNING:  Yes, Your Honor.  She has

8    been a vital part of our team for managing

9    compliance with the ESI order and assisting with the

10   processing and production of data.  So I may be able

11   to answer the Court's question concerning the last

12   piece.

13         THE COURT:  Ms. Guntner, I know you've had

14   some discussions with Ms. Billhimer, so have y'all

15   addressed that, the documents that were withheld

16   based on something other than privilege?

17         MS. GUNTNER:  No, Your Honor, that has not

18   been discussed yet.

19         THE COURT:  Okay.

20         MS. GUNTNER:  Your Honor, along the same

21   lines of your question, I will note that Skanska

22   produced a privilege log for production No. 3.

23   There were only three documents on that log.

24   Understanding the metrics of how many documents were

25   looked at, how many were produced versus logged as

Judge Hope Cannon
June 16, 2021

Page 18

1    privileged and then what was withheld after that,

2    that's going to be important for us to know.

3           THE COURT:  Okay.  So that would be three

4    documents on the privilege log, which would be for

5    the step 1 and step 2 production from September 10th

6    to September 30th for the project-specific terms,

7    I'm guessing?

8           MS. GUNTNER:  I think so, but, again,

9    that's something we'll need to discuss with probably

10   Ms. Billhimer or whoever is more familiar with that.

11   All I know is that I was told that went along with

12   production No. 3, which they wrote to us yesterday

13   was an ESI production, not known responsive

14   materials.

15          THE COURT:  Okay.  So, Ms. Moore, do you

16   have anything to add with regard to what documents

17   were withheld based on something other than

18   privilege for the step 1 and step 2 review?

19          MS. MOORE:  There were actually some

20   documents that were actually outside of the date

21   range, and that was just a matter of searching the

22   search method.

23          THE COURT:  So outside the September 10th

24   through 30th date range?

25          MS. MOORE:  Correct.

Judge Hope Cannon
June 16, 2021

Page 19

 1            THE COURT:  So those documents were

 2   withheld?

 3            MS. MOORE:  Correct.

 4            THE COURT:  And how many documents were

 5   there?

 6            MS. MOORE:  496.  Production 3 included

 7   level 1, a large portion of level 1, anything that

 8   wasn't believed to have anything that could have

 9   been privileged or have any kind of work product in

10   there as well.  So that's why that initial set only

11   had three documents on the privilege log.  The next

12   privilege log isn't due until this Friday, and

13   that's when we plan to serve that privilege log.  So

14   Friday is the deadline, and we plan to supplement

15   that privilege log with the remainder of the data

16   from level 2, a portion of level 1 and then all of

17   level 2.

18            THE COURT:  And, Mr. Branning, it sounds

19   like there were no documents withheld on the basis

20   of privilege as far as known responsive documents to

21   the request for production; is that correct?

22            MR. BRANNING:  Correct, Your Honor.

23            THE COURT:  Other than outside the date

24   range, Ms. Moore, were there any documents that were

25   withheld from the step 2 review?

Judge Hope Cannon
June 16, 2021

Page 20

1              MS. MOORE:  There were some based on

2    privilege but otherwise just date ranges.

3              THE COURT:  Okay.  And then before I -- go

4    ahead, Ms. Guntner.

5              MS. GUNTNER:  Your Honor, I guess we do

6    have one question or concern.  If 496 documents were

7    withheld because they were outside of the date

8    range, I don't really see how that could be because

9    I believe step 1 -- the initial process before we

10   even began pulling search terms was pulled by date.

11   So that is not really consistent with the

12   methodology as I understood it.

13             MS. MOORE:  That's actually based on the

14   method of how it was searched, so using -- initially

15   we had used the date sent, date last modified and

16   date created field instead of using family date.  In

17   the second set we have used family date, which is

18   what we identified in the searches, including the

19   reports that we have circulated.  But it's just a

20   difference in how the systems -- the system with

21   Servient actually runs.

22             As an example, if you have a document that

23   was created during the time frame and then it was

24   attached to an earlier e-mail -- or like a later

25   e-mail, I'm sorry, then it was pulling those in,

Judge Hope Cannon
June 16, 2021

Page 21

1    whereas that same document would have been also

2    included on the project server as well.  So the

3    document exists outside of just that e-mail as well.

4    So the e-mails were pulling in documents that had

5    been created or modified with --

6            THE COURT:  Because you were using a family

7    date?

8            MS. MOORE:  Yes.  Going forward, as

9    disclosed, we used the family date to avoid that

10   confusion and the mix-up that occurs with having

11   extra documents that are outside of that date range.

12           THE COURT:  But there aren't any documents

13   in your example, Ms. Moore, that if it was a

14   document that was created within that date range but

15   just happened to be attached to an e-mail outside

16   the date range, the underlying document would have

17   still been produced because it would have still been

18   captured?

19           MS. MOORE:  We had the entire project

20   server as well included in that date or the whole

21   set, so it was capturing both sets, so it would

22   include any loose electronic files plus the e-mails.

23   And so usually they were -- my understanding is that

24   they would attach a copy of a document that existed

25   on the server to an e-mail, so it should all be

Judge Hope Cannon
June 16, 2021

Page 22

```
 1    included.  It was just a matter of having the

 2    separate loose electronic document plus the e-mail.

 3    So it should all be included as well with the

 4    project server as long as it was hitting on those

 5    dates, which those are the date ranges, so it was

 6    certainly searched with the project server as well

 7    as the e-mail using those parameters.

 8            Going forward the family date seems like

 9    it's definitely the better option just so it

10    captures everything within that time frame,

11    including the project server data, but it would

12    avoid those mix-ups like where it has an e-mail

13    that's outside of the date range plus the

14    attachment, but the attachment would still be

15    included from the project server.

16            THE COURT:  Okay.  I don't know if that

17    answers your question, Ms. Guntner.  It sounds like

18    it does.  There may be some issues -- I'm guessing

19    they didn't go through the 496 and make sure that

20    every underlying document was produced, but those

21    documents are still going to be held.  So I know we

22    still have this issue about going outside the date

23    range.  So at some point some of those may be

24    responsive, but that sounds like why they were

25    capturing things outside that date range.
```

Judge Hope Cannon
June 16, 2021

Page 23

1           MS. GUNTNER:  Yes, and we'll have to get

2    with our vendor and explain the situation and get

3    their sort of view on that.  I think one potential

4    concern could be if the document attached in the

5    e-mail was not actually in the project server, had

6    been deleted from the project server and for some

7    reason was not produced.  Again, this is something

8    we'll probably need to talk with our vendor about

9    and have their -- have them kind of explain to us

10   and give us a better understanding of whether that

11   is actually going to present an issue.

12           THE COURT:  Right.  And then where are the

13   claimants on their review of this data?  I don't

14   think we've gotten an update since y'all did your

15   training.

16           MS. GUNTNER:  Yes, Your Honor.  So we have

17   11,210 Skanska-specific documents, so, you know,

18   that does not include their public record request

19   documents or their -- like our FDOT documents that

20   we obtained.  So of the Skanska 11,000, we have

21   reviewed 2,775 as of last night.  In terms of the

22   total corpus of documents, which includes the public

23   record request documents, FDOT documents,

24   everything, we have 21,655 documents loaded up at

25   this point and have reviewed 8,398 of those.  The

Judge Hope Cannon
June 16, 2021

Page 24

1    Skanska docs came a little bit later than the FDOT
2    ones, so we began our review with FDOT, so we're
3    catching up on the Skanska right now.
4            THE COURT:  Okay.  And then I guess
5    before -- I know we still need to go through some
6    discovery issues, but before I forget, did y'all
7    decide about the hearing, Mr. Barr?  I know you've
8    got your two -- you know, the two motions, the
9    Robins motion and then just the motion to dismiss.
10           MR. BARR:  We've conferred with the other
11   side, and I think we've agreed to just have 30
12   minutes per side for each motion.  So we would get
13   30 minutes on the jurisdictional; they'll get 30
14   minutes on the jurisdictional and then vice versa on
15   the Robins.
16           THE COURT:  I'm sorry.  I was reading
17   something.  Go ahead.
18           MR. BARR:  Just 30 minutes per side on each
19   motion.
20           THE COURT:  And then how much for any
21   rebuttal time?
22           MR. BARR:  We can reserve.
23           THE COURT:  You're going to reserve some
24   out of that 30?
25           MR. BARR:  Yes, Your Honor.

Judge Hope Cannon
June 16, 2021

Page 25

1          MR. BRANNING:  Yes, Your Honor.  That would

2     be inclusive of any rebuttal.  If it's permissible

3     to Judge Collier, the parties would just request

4     Your Honor to give a few minutes to hold in

5     rebuttal.

6          THE COURT:  Okay.  And 30 minutes for each

7     motion?

8          MR. BARR:  Yes.

9          MR. BRANNING:  Yes, Your Honor.

10         THE COURT:  So Mr. West then will be

11    speaking for about an hour?

12         MR. BRANNING:  For both motions.

13         THE COURT:  Right.

14         MR. BRANNING:  Yes, Your Honor.

15         THE COURT:  Okay.  I don't know if y'all

16    know -- and this is, again, just for logistics for

17    the planning purposes for the courtroom space.  Are

18    y'all expecting any of your claimants to actually

19    come, or have y'all discussed how many attorneys may

20    be present?  We just need to make sure we've got

21    enough space set up for everybody in the courtroom.

22         MR. BARR:  I mean, I suspect some claimants

23    will want to come.  I don't know that.  Nobody has

24    specifically said I'm coming to me.  I also suspect

25    it may be of interest to people locally.  I mean,

Judge Hope Cannon
June 16, 2021

Page 26

1    there's a chance there would be people that want to

2    watch.

3            MR. GEISLER:  I know of at least one,

4    perhaps a couple other claimants and then also a

5    handful of law partners that have expressed interest

6    to attend personally.

7            THE COURT:  Okay.  All right.  So that

8    takes care of the hearing.  So I think that what

9    we've got then is -- I don't know what y'all want to

10   go over first.  Ms. Guntner, do you want to do the

11   issues that you have outstanding first, or do y'all

12   want to talk about the discovery to the claimants?

13           MS. GUNTNER:  Whatever your preference is.

14   We're here to talk about either one.

15           THE COURT:  Since you're standing, I'll let

16   you go.

17           MR. BARR:  ESI is fresh on the mind.  Let's

18   go there.

19           MS. GUNTNER:  So first, since cell phone

20   data was raised, I would like to talk about that

21   initially.

22           THE COURT:  Okay.

23           MS. GUNTNER:  It is very concerning that

24   today we're 57 days after serving the

25   interrogatories and requests for production, and we

Judge Hope Cannon
June 16, 2021

Page 27

1    just learned today that Rob Hill has no phone; Rubio

2    lost his phone overboard; McGlynn is no longer with

3    Skanska, and they can't get his password; they can't

4    get into Johnson's phone; Bender and Stephens left

5    after Sally, and their phones went to another user.

6    Your Honor, these requests have been out for over --

7    for nearly two months now.

8            So, you know, this raises some real

9    concerns that, number one, this is the first day

10   that we're hearing of this; and, number two, that

11   indicates those text messages, pictures, everything

12   on those phones were not preserved.  So, Your Honor,

13   if we're going to -- I know I raised in my letter

14   the issue of document preservation.  We're going to

15   need to seek a 30(b)(6) on that issue probably after

16   receiving the response.

17           THE COURT:  That's one of the questions I

18   was going to ask y'all.  I know y'all have a

19   30(b)(6), I guess of Mr. DeMarco, right?  And I

20   don't know, Mr. Branning, if y'all ended up picking

21   somebody else.  You said y'all might have an

22   additional person.

23           MR. BRANNING:  It is going to be just Mr.

24   DeMarco, and we have notified claimants' counsel it

25   will be one witness.

Judge Hope Cannon
June 16, 2021

Page 28

1          THE COURT:  That's still scheduled for the

2    18th?

3          MS. GUNTNER:  Yes.

4          THE COURT:  Are y'all planning to do a

5    separate ESI?

6          MR. GUNTNER:  Right.  This is only to

7    really cover the hurricane preparedness plan, its

8    inception and its application, roles and

9    responsibilities with respect to hurricane prep.  So

10   we will need a separate 30(b)(6) on these particular

11   issues.

12         THE COURT:  Yeah.  So it sounds to me --

13   and I know you've got some concerns because, I

14   guess, Ms. Guntner, you indicate there were about

15   924 e-mails, somewhere around that number that you

16   identified during that time range or communications

17   during that time range.  I know we've got the issues

18   with when the preservation hold was put in place,

19   whether it was October as indicated in the letter,

20   which are kind of different issues.

21         I mean, there's one issue, which is

22   anticipation of litigation based on your response to

23   No. 2, which sounds like it started September 16th,

24   and that might go to Mr. Geisler's concern about

25   what we log and what we don't log for the privilege

Judge Hope Cannon
June 16, 2021

 1   log, which is a separate issue, I think, from the

 2   litigation hold.  Obviously, if you anticipated

 3   litigation by the 16th but you don't do a litigation

 4   hold by October 13th, then there may be an issue,

 5   and they may have a concern about preservation, and

 6   that's going to just be a separate, I think, motion

 7   that y'all are going to have to file on that if you

 8   find that out through ESI.

 9           But I don't think for the moment that

10   there's anything that we can do about it because

11   until you go through the world of documents, and

12   you've only gone through 2,000 of the 11,000, then

13   you've still got some additional reviewing that

14   y'all need to do on your end, and then we'll see

15   what their amended discovery responses are.  But,

16   obviously, from Skanska's viewpoint, I think you can

17   kind of see the issue that you will probably have

18   down the road here with when you actually did your

19   litigation hold.

20           I know that the last time we were here,

21   they did mention -- I don't remember who it was.  It

22   may have been -- I don't know if it was Ms.

23   Billhimer maybe, that the tugboat operator's

24   phone -- he did not have a phone.  So they did

25   mention that at the last status conference, but this

Page 30

1  is the first time about these other additional

2  custodians.  We'll just kind of have to see where

3  they are.  I think that you guys understand the

4  importance of the cell phone data and the priorities

5  that need to be placed on those.  So we're going to

6  need some finality on that probably the next time we

7  meet on some of those, where we are on that and what

8  we can do with some of these cell phones that no

9  longer exist and where that data is in getting those

10  passwords and getting them opened.

11           MR. GEISLER:  Sure.  Your Honor, if I may.

12           THE COURT:  Uh-huh.

13           MR. GEISLER:  I just want to add, these are

14  really crucial individuals.  Sarah Stephens was the

15  author of the hurricane plan.  Pat McGlynn, general

16  superintendent, bridge, very active, very involved

17  during the lead-up to Hurricane Sally.  Eduardo

18  Rubio, general superintendent for the bridge.  He

19  has apparently lost his phone.  Will Bender, another

20  superintendent.

21           These are really important, crucial

22  witnesses whose communication, obviously, in the

23  lead-up to the storm -- they weren't working on

24  their laptop.  They were communicating necessarily

25  using their cell phones.  So we're quite concerned

Page 31

1    about that, and we'll certainly prepare a 30(b)(6)

2    directed to document preservation.

3            THE COURT:  I think, Mr. Branning, when we

4    meet next what I'd like to know -- and Mr. Blanchard

5    may need to speak to this.  But with regard to -- I

6    get it for Mr. McGlynn.  I think y'all need to be

7    able to let us know whether or not there is some

8    other way to get to his phone if he doesn't provide

9    the password.  I would assume this was a company

10   phone, and there's got to be some agreements where

11   he has to provide that information to you if it's

12   the company's phone.

13            But as to the other two, Sarah Stephens and

14   William Bender, I know that -- I think we need to be

15   able to know by next week what -- because they're

16   not there, but it sounds like from Mr. Blanchard

17   that the data was stored centrally before the phones

18   were repurposed.  So why that data can't be assessed

19   we're going to need to get some responses on.  Ms.

20   Moore, do you have something to say on that?

21            MS. MOORE:  It wasn't company policy, I

22   don't believe, to actually back up cell phones just

23   as a normal course of business, but some of them did

24   have iTunes backups, so we're going to check into

25   that method.  That's what I think Mr. Blanchard was

Judge Hope Cannon
June 16, 2021

Page 32

1    actually referring to with saying we're going to

2    check additional sources with the backup from the

3    laptop.

4              THE COURT:  So for William Bender and Sarah

5    Stephens, are you saying that when they were no

6    longer with the company, was any information off

7    their phones, whatever might have been, whether they

8    backed up or not, was that downloaded somewhere

9    before those phones were repurposed?

10             MR. BRANNING:  Your Honor, I can speak to

11   that, if I may.

12             THE COURT:  Uh-huh.

13             MR. BRANNING:  In speaking with a Skanska

14   representative yesterday, I was informed of a couple

15   of important data points.  One, both phones were

16   turned in in the ordinary course of business.  The

17   clerk who received those two phones, unfortunately,

18   operated by normal protocols and by all accounts

19   wiped the phones and reissued them.  We have only

20   just discovered this, and we are trying to find

21   alternate sources to access that data, including any

22   information that the carrier may have, the cell

23   phone carrier may have in the way of any data that

24   we can obtain and provide.

25             Additionally, just by way of background,

Judge Hope Cannon
June 16, 2021

Page 33

1   Ms. Stephens and Mr. Bender worked in different

2   disciplines within Skanska and likely had very

3   little reason to communicate with one another, and

4   so there is also a potential path to obtain their

5   communications, particularly if they were

6   communicating with other custodians.  However, what

7   I'm informed of is that because they were in

8   different disciplines, it's unlikely that there are

9   a lot of communications just between those two

10  individuals.  And so it is likely that we can

11  capture their respective communications, just right

12  now not with each other.

13          THE COURT:  From other folks' phones?

14          MR. BRANNING:  Yes, Your Honor.

15          THE COURT:  When were their phones wiped

16  clean?

17          MR. BRANNING:  I don't know, Your Honor.

18          THE COURT:  When were they no longer with

19  the company?

20          MR. BRANNING:  I don't know when either of

21  them resigned.  All I know is post Sally.

22          THE COURT:  Okay.  So I guess maybe I

23  misunderstood what Mr. Blanchard was saying.  I

24  thought he said that it was pulled off and then

25  maintained centrally and that they were trying to

Judge Hope Cannon
June 16, 2021

Page 34

1    now access that data.  It sounds like unless there's
2    a backup somewhere, any communications on those
3    phones are gone.
4             MR. BRANNING:  Your Honor, it was
5    described -- yes is the direct answer.
6             THE COURT:  Okay.
7             MR. BRANNING:  It was described to us as
8    these phones are another tool that Skanska gives to
9    its employees similar to, you know, a safety jacket
10   and a hammer and whatever they operated within their
11   discipline.  And these two, unfortunately, got
12   treated in the ordinary course of business as
13   opposed to complying with the lit hold.
14            THE COURT:  So if we could get when those
15   phones were wiped and when they were terminated.
16   And then what is the issue with opening Mr.
17   Johnson's phone?
18            MR. BRANNING:  Your Honor, I'm sorry.  I
19   apologize.  I was making a note.
20            THE COURT:  I was asking about Mr.
21   Johnson's phone.  I know Mr. Blanchard just
22   indicated there was a problem opening the phone.
23   What is that?
24            MR. BRANNING:  It's my understanding, also
25   from the same Skanska representative, that there is

Judge Hope Cannon
June 16, 2021

Page 35

1   an indication that the phone has perhaps a

2   malfunction or a problem with it.  I think they're

3   having a hard time booting it up.  However, he said

4   he believes that there might be a SIM card in the

5   phone that should have all the data.  That phone has

6   not been compromised in any way, certainly not since

7   Mr. Johnson turned it back in.  Skanska hasn't been

8   able to access it since he turned it back in.  It

9   appears to be due to a malfunction or an issue with

10   the phone, not that he's withholding the password or

11   anything.

12          THE COURT:  Okay.  Do we know when Mr.

13   Rubio's phone went overboard?

14          MR. BRANNING:  I don't right now, Your

15   Honor.

16          THE COURT:  Okay.  Ms. Guntner, did you

17   have anything else about the cell phone data?

18          MS. GUNTNER:  No, Your Honor, except for

19   what I've already said, that this presents an issue

20   of document preservation that we're going to have to

21   address.

22          THE COURT:  So I would suggest that you

23   guys try to do that ESI representative depo sooner

24   rather than later because if there are some

25   preservation issues or some other documents that

Judge Hope Cannon
June 16, 2021

 1    need to be obtained, we're going to need to know

 2    that, you know, pretty soon here because we're going

 3    to be hitting September before we know it, so if

 4    y'all can get that.  And it sounds like at least

 5    after the supplemental responses come in on the

 6    RFAs, you guys should be pretty good to go on that.

 7            MS. GUNTNER:  Yes, Your Honor.

 8            THE COURT:  I think we at this point kind

 9    of know the world of data that they have.

10            MS. GUNTNER:  Yes, Your Honor.  One more

11    thing with respect to the cell phones.  I know

12    Skanska has represented that the text messages

13    should be ready to get put into the queue for review

14    on Friday.

15            THE COURT:  Yeah, Friday.

16            MS. GUNTNER:  Right.  So if there's going

17    to continue to be a delay with production of these

18    text messages, we'd ask to have them sort of explain

19    the issues to us because I think maybe cutting out

20    that middleman and have them explain what exactly

21    the holdup is, that might need to be something we

22    have done down the line.

23            THE COURT:  We talked about that a little

24    bit last week, and I did let Ms. Billhimer know that

25    that would be my expectation is that somebody from

Judge Hope Cannon
June 16, 2021

Page 37

1    Servient be available to provide firm deadlines and

2    to explain what needs to be done.  So I think we

3    have to wait until Friday.  And then I would say,

4    you know, for both of y'all, if there is not a

5    significant production of that cell phone data, you

6    know, by Tuesday, then somebody from Servient is

7    going to need to be available to give us some

8    information about how much longer that's going to

9    take and what any hold-ups might be.  Yes, Mr.

10   Remington.

11          MR. REMINGTON:  Can we request maybe an

12   order to that effect, Your Honor?

13          THE COURT:  You want me to enter an order

14   indicating -- okay.

15          MR. REMINGTON:  Yes, Your Honor.  I think

16   that will be more helpful in us getting the

17   attention of Servient rather than if we have to wait

18   on a transcript or transfer a transcript.  A simple

19   order directing that we provide information on the

20   cell phones by X date or have a Servient rep here or

21   on the phone next Wednesday, whatever the Court

22   prefers, that would be helpful.

23          THE COURT:  Okay.  I will do that.

24          MR. REMINGTON:  Thank you.

25          THE COURT:  Okay.  Anything else on the --

Judge Hope Cannon
June 16, 2021

Page 38

1    what else do we have, Ms. Guntner, on the ESI

2    issues?

3            MS. GUNTNER:  Your Honor, I would like to

4    talk about the proposed claimants' ESI protocol.

5            THE COURT:  Yes.

6            MS. GUNTNER:  So we received last week --

7    you know, consistent with your guidance, we sent

8    over a proposal on Friday.

9            THE COURT:  You're still waiting, right,

10    when you sent me the letter?

11            MS. GUNTNER:  So last night we received

12    Skanska's red line, and honestly -- and I don't say

13    this lightly.  We were shocked with what we saw.

14            THE COURT:  Okay.

15            MS. GUNTNER:  Among all of us at the

16    claimants' bench, we have collective significant

17    experience in mass torts and cases of this nature,

18    and we have never seen a proposal for a claimant's

19    protocol that is this burdensome.  So Skanska has

20    added in everything else back from the ESI protocol

21    plus more.  And I am happy to go through each of the

22    issues we have one by one.  But, Your Honor, when

23    drafting an ESI protocol, you know, you have to take

24    into consideration, number one, what is the purpose

25    of that protocol and that production.  And the

Judge Hope Cannon
June 16, 2021

Page 39

1    protocol should be designed to elicit documents that

2    are relevant and responsive to the litigation.  And

3    here the litigation is limited to Skanska's

4    liability, and it is just not at all proportional to

5    the litigation.

6              THE COURT:  What I was going to say -- I

7    don't mean to cut you off, Ms. Guntner -- is maybe

8    we hold on the ESI because I agree with you.  I

9    think what that protocol looks like -- again, we had

10   talked about this last time -- is who the claimants

11   are going to be that are really at issue.

12             And I know some of these involve the United

13   States, and I think Mr. Kelly represented at least

14   last time that at least one of those agencies, the

15   Navy, doesn't have a problem following the ESI

16   protocol that's already in place, but also trying to

17   figure out what it is that is actually going to be

18   required to be produced from the claimants because,

19   as you indicated, that would then play a role into

20   what form these documents may take place and

21   whether, you know, an onerous ESI protocol makes

22   sense.

23             So if you want to table that and let me see

24   what Mr. Barr and, is it -- Mr. Remington, are you

25   going to do this arguing?

Judge Hope Cannon
June 16, 2021

 1              MR. REMINGTON:  Yes, Your Honor.

 2              THE COURT:  I know you sent me some cases.

 3    I know you're going to be making the arguments on

 4    how y'all want to do it.  It looked like from the

 5    letter I got from Mr. Barr, there are still several

 6    interrogatories and requests for production that are

 7    at issue.  And then, Ms. Guntner, we'll go back to

 8    the post-September 30th and July 2016 time periods

 9    and then your additional contract terms, and we'll

10    go back to that.

11              MS. GUNTNER:  Thank you, Your Honor.

12              THE COURT:  If I forget, just remind me.

13              MS. GUNTNER:  I will.

14              THE COURT:  Mr. Barr.

15              MR. BARR:  Your Honor, we had a fairly

16    productive meet and confer.  There were issues of it

17    that were more contentious than I would have liked.

18    But we have identified at least one issue that we

19    believe cuts across most of the objections.  I think

20    we're still going to have to go through these

21    individually.  But that issue deals with the

22    preparation conduct of claimants.  There's this

23    issue of whether or not that's relevant.

24              It's our position that our claimants'

25    conduct is not relevant to what Skanska did to

1   prepare for a hurricane.  They are taking the

2   position that our claimants' conduct helps shape

3   what's reasonable.  For that reason they want to

4   obtain information from all 900 claimants on what

5   they did to prepare for Hurricane Sally.  That's one

6   of the requests.

7            Another request is -- and I can't remember

8   honestly if this was directed at only direct damage

9   claimants or all.  I think it's directed to all

10  claimants, is what they did to prepare for all

11  storms for the past five years.  And there's simply

12  nothing relevant about what the McGuire's restaurant

13  or any of these pier owners or oyster farmers,

14  there's nothing relevant about what they did to

15  prepare for Sally that helps address the question of

16  was Skanska negligent.

17           Their conduct does not set the standard of

18  care for Skanska.  Skanska is a construction company

19  building a bridge.  The good-cause standard is a

20  company similar to that, not some other company

21  that's in a completely different business or some

22  individual who just had a dock or had a seawall.

23  There's nothing about what they did to prepare for

24  Sally that's relevant here.

25           And then to the extent -- I mean, they sent

Judge Hope Cannon
June 16, 2021

Page 42

1    over a bunch of cases.  Frankly, Your Honor, I've

2    read these before.  I didn't study them this

3    morning.

4              THE COURT:  I think a lot of them are ones

5    that are part of your various motions and responses.

6              MR. BARR:  But there was no discussion of

7    any of these in the meet and confer.  I asked this

8    morning what's the authority, what's the point

9    you're making with these?  I didn't get much.  So I

10   don't really know.  I mean, I've read them.  And,

11   you know, certainly they talk about the Louisiana

12   rule and the burdenship being with an allision and

13   forces of nature, all that kind of stuff.  I

14   understand that.  But I don't see how these apply to

15   whether or not, you know, X claimant prepared for

16   Sally and how they prepared for Sally, how that

17   informs what Skanska did is reasonable.  It doesn't

18   make sense.  It's not relevant, and it's completely

19   not proportional.

20             When you look at the Rule 26 standard is

21   relevant and proportional.  The relevance is

22   nonexistent or minimal.  And then when you look at

23   the burden it would cause for all of these people to

24   have to describe everything they did to prepare for

25   not just Sally but every storm in the past five

Judge Hope Cannon
June 16, 2021

Page 43

 1   years, it doesn't make any sense for the claimants

 2   to have to do that, particularly when you're looking

 3   at a trial in three months.

 4           I'm beginning to become terrified that

 5   we're not going to make that date.  We're now

 6   finding about e-mails that are getting destroyed.

 7   We're still waiting on the vast majority of the

 8   documents to be produced.  I mean, we're starting to

 9   have discussions on expert deadlines.  But we are

10   three months from trial, and we're still having

11   these discussions.  Now they want to embark on this

12   adventure to go out and find out what every claimant

13   did.

14           One of the things that was said in the meet

15   and confer that was very troubling to me was they're

16   asking us to do that because we asked them to do

17   that.  So it's not really that, you know, we really

18   need this information.  It's, well, you made us do

19   it, so you need to go do it.  And that's not how

20   litigation works, Your Honor.  They need to be able

21   to show how this is relevant, and they can't do it.

22           THE COURT:  Okay.  And I agree.  I was

23   looking back -- and when I say I agree, Mr.

24   Remington, I'm not saying I agree with everything

25   that Mr. Barr said.  What I meant is that I went

Judge Hope Cannon
June 16, 2021

Page 44

1    back and looked at and read the transcript.  I think

2    one of y'all attached it to one of the filings

3    recently that y'all had with Judge Vinson when he

4    set kind of this bifurcated trial.  I think my

5    takeaway from reading that transcript was that the

6    parties at that time as well as Judge Vinson really

7    agreed that what was happening in September was

8    going to be pretty narrow.

9            In fact, I think the claimants have

10   described the negligence here as really failing to

11   adhere to the hurricane preparedness plan, that I

12   think maybe you guys used that as that's the crux or

13   the core of what the negligence claim is going to

14   be.

15           I did notice a lot of damages questions in

16   some of the interrogatories and requests for

17   production, so Mr. Barr may talk about that next.

18   That seemed to me to be phase 2 if y'all get there.

19   And I think even Judge Vinson in that transcript

20   said the reason he was setting a September trial

21   date was because the issues are very narrow.  And

22   y'all know from Judge Collier that he sees this as

23   well as being a very narrow issue.

24           So just looking at the cases and looking at

25   the law on this, it sounds to me like you want to

Judge Hope Cannon
June 16, 2021

Page 45

1    show, Mr. Remington, that -- use what they did to

2    try to argue that what y'all did was reasonable.  Is

3    that --

4            MR. REMINGTON:  If I may.  Partially, Your

5    Honor.

6            THE COURT:  Okay.

7            MR. REMINGTON:  The specific request -- and

8    I would frame the issue different than Mr. Barr

9    frames it.  Mr. Barr says that he didn't get much

10   out of me this morning, but what I did say to him

11   this morning and what we talked about at the meet

12   and confer was, these issues and the questions we're

13   asking go to the reasonableness of the preparations

14   of Skanska, which are directly relevant to our

15   exoneration, not necessarily the negligence, but we

16   sued for exoneration from damages.

17           THE COURT:  But exoneration from damages,

18   that's -- the first step, right, is the negligence

19   piece, and then the second piece to that, is it not,

20   that then the burden shifts, and you have to show

21   that you didn't have privity and knowledge?

22           MR. REMINGTON:  Your Honor, I disagree.  I

23   think the roadmap for exoneration is in the Bunge

24   case.  I think Judge Collier's finding and facts and

25   conclusions of law really accurately state the

Page 46

1    roadmap for what has to be proven for a person in

2    Skanska's position to obtain exoneration.  Your

3    Honor, what that case says -- and that's one of the

4    cases the findings of fact I submitted at page 6.

5              MR. BARR:  You're on Judge Collier's order?

6              MR. REMINGTON:  Judge Collier's order.  On

7    page 6, Your Honor, the Court notes, freedom from

8    fault is generally determined by the reasonableness

9    of the precautions taken under the circumstances as

10   known or reasonably to be anticipated.  And the

11   standard of reasonableness is that of a prudent

12   person familiar with the ways and vagaries of the

13   sea.

14             And that is the issue, Your Honor.  We

15   haven't asked all 900 claimants what they did.  We

16   limited to people -- to the Navy, to governments who

17   are familiar with the ways and vagaries of the sea

18   and people with waterfront property and boats.  I

19   think that's borne out in the request because those

20   people are prudent people familiar with the ways and

21   vagaries of the sea.  And their conduct in preparing

22   for Sally on the known or reasonably to be expected

23   weather circumstances is relevant in informing what

24   the reasonable standard was in Skanska.

25             And if you read the cases, Your Honor, they

Page 47

1    support this contention.  Specifically, and for the

2    proposition that the Court can look to the actions

3    of other parties to inform reasonableness, we would

4    direct the Court to the Neraida decision, 11th

5    Circuit decision from 2007.  And in Neraida the

6    Court quotes the Louisiana case.  And the Louisiana

7    case from 1866 is certainly a seminal case and a

8    critical case for the Court in this matter.

9             And in quoting -- I'm quoting from Neraida,

10   and this is on page 594 of the decision, the last

11   paragraph of headnote 8.  The Louisiana Court found

12   that the allision was caused by the crew's, quote,

13   want of judgment, end quote, as evidenced in part by

14   the fact that, quote, other persons of nautical

15   skill found no difficulty in securing vessels at the

16   same place and under similar circumstances.  In

17   short, the Louisiana Court concluded the crew was

18   obviously negligent.

19             So if the question of negligence -- if the

20   Louisiana Court can say, no other boats broke loose,

21   you're the only boat that broke loose so that's

22   evidence of negligence, we are entitled to inquire,

23   did no other boats break loose in Sally?  That's

24   evidence.

25             THE COURT:  But I guess where I'm

Judge Hope Cannon
June 16, 2021

Page 48

1    struggling to -- and I get the argument, but I'm

2    not -- how is an individual boat owner similarly

3    situated -- let's just use that term; I know that's

4    not necessarily the right term here -- to a

5    construction company working on a bridge that has

6    these barges?  I mean, what individual -- you know,

7    maybe -- and I'll let Mr. Hyde talk about from the

8    Navy perspective.  I do know there were a lot of

9    requests to the Navy about what they did and what

10   they knew and what their plan was.

11          But here you've got Skanska that had a

12   hurricane preparedness plan.  One issue is going to

13   obviously be whether Skanska followed that hurricane

14   preparedness plan.  The other issue is going to be

15   what privity and knowledge they had prior to

16   Hurricane Sally of what they needed to do.  But the

17   fact that a mooring line broke on a barge carrying a

18   crane or whatever is not going to be similar to what

19   an individual homeowner or even maybe these oyster

20   boats have to do.

21          MR. REMINGTON:  Your Honor, where we differ

22   there, the standard in Neraida -- and Neraida was a

23   pleasure boat that broke loose.  And the 11th

24   Circuit has said that the standard in hurricanes is

25   what a prudent person familiar with the ways and

Page 49

1    vagaries of the sea did under known or reasonably

2    anticipated circumstances.  So there's two parts to

3    that:  what we did to secure, and was it reasonable

4    under the known or reasonably anticipated

5    circumstances.

6            This storm was a complete surprise, an act

7    of God.  The evidence will show, we believe, that

8    boat owners throughout the area were caught

9    unprepared.  The U.S. Navy was caught unprepared.

10   The U.S. Navy did not follow its own plan for a

11   category 2 storm impact on the base.  And those

12   facts -- the fact that everybody acted in the

13   area -- everybody can't be unreasonable.  If the

14   standard of reasonableness for those people in this

15   area with knowledge of the ways and vagaries of the

16   sea, if everybody was surprised and everybody's boat

17   broke loose, that's relevant to what Skanska's

18   preparations were and whether or not Skanska's

19   preparations were reasonable in the face of what

20   they knew or reasonably anticipated.

21           MR. BARR:  Your Honor, if I could follow

22   up.

23           MR. HYDE:  Your Honor, this is Robb Hyde on

24   the cell phone.  May I be heard?

25           THE COURT:  Yes, Mr. Hyde.  Go ahead.

Judge Hope Cannon
June 16, 2021

Page 50

```
 1              MR. HYDE:  Whether or not the Navy was
 2    negligent in preparation for Hurricane Sally neither
 3    proves nor disproves that Skanska was negligent.
 4    Number two, just talking about the various
 5    facilities that comprise NAS Pensacola, there are 80
 6    tenant commands, all of them land based.  We have
 7    virtually no waterborne asset other than two Coast
 8    Guard cutters that are moored at or near the base.
 9    We have Army, Air Force, Marines, Coast Guard, even
10    German Air Force.  They're all inland.
11              I would submit to the Court that whether
12    and when the Navy sorties an F-18 Super Hornet has
13    no basis on whether or not Skanska followed a
14    prudent standard of care in mooring its vessels.
15              MR. REMINGTON:  Your Honor, if I can
16    respond.
17              THE COURT:  Go ahead, Mr. Remington.
18              MR. REMINGTON:  I agree with Mr. Hyde that
19    whether or not the Navy was negligent doesn't
20    reflect whether or not Skanska was negligent.  But
21    whether or not the Navy acted reasonably under the
22    known or anticipated conditions informs whether
23    Skanska acted reasonably.  Skanska is not held to a
24    standard of perfection.  Skanska is held to a
25    standard of reasonableness.  We have to have acted
```

Page 51

 1    reasonably based on what we knew or reasonably

 2    anticipated.

 3            When we look at significant marine actors

 4    in the area, how they acted with the same weather

 5    data, in the case of the Navy, more accurate weather

 6    data, informs the reasonableness of Skanska's

 7    preparations, which we have to prove to show

 8    exoneration.

 9            THE COURT:  And, Mr. Remington, the

10    reasonableness that you're arguing, is that part and

11    parcel or something separate from the negligence

12    argument?

13            MR. REMINGTON:  Your Honor, I think it's

14    separate from the negligence argument.  I think it

15    exonerates us of any negligence.

16            THE COURT:  Because you acted reasonably,

17    you can't be negligent; is that --

18            MR. REMINGTON:  We can't be held liable.

19            THE COURT:  So you're saying there could be

20    a determination that you were negligent in failing

21    to follow your hurricane preparedness plan, let's

22    just say, but that what you did is reasonable based

23    on the prudent -- the known and unknown conditions;

24    and, therefore, you can still escape liability; is

25    that --

Judge Hope Cannon
June 16, 2021

Page 52

1           MR. REMINGTON:  Your Honor, that's not what

2    I'm saying.  That's what the 11th Circuit is saying.

3           THE COURT:  That's your argument?

4           MR. REMINGTON:  That's what Neraida says.

5    That's what the Hurricane Betsy case Joseph Lykes

6    says.

7           MR. BARR:  There's no law to support that,

8    Your Honor.  If you were negligent, you by

9    definition weren't reasonable.  You can't be

10   negligent and reasonable.  It doesn't work that way.

11   If they're negligent, they're negligent.  It means

12   they weren't reasonable.  They didn't meet the

13   standard of care.  That's what negligence is.  But

14   we have to keep in mind here this is an allision, so

15   they are presumed to be at fault.

16          THE COURT:  Right.  That's what Judge

17   Collier's case is about.

18          MR. BARR:  But it's, frankly, absurd to

19   believe that a company that owns 55 barges and is

20   building a bridge can compare their conduct to a

21   person that owned a seawall and didn't even have a

22   boat.  That's absurd.

23          MR. REMINGTON:  We --

24          MR. BARR:  I didn't cut you off.  Let me

25   finish.  The interrogatory that they propounded that

Judge Hope Cannon
June 16, 2021

Page 53

1    asked for everything people did to prepare for a

2    five-year period, that's directed to all claimants.

3    That's not limited to these people with special

4    knowledge of the sea.  It is all.

5            THE COURT:  What interrogatory is that, Mr.

6    Barr?

7            MR. BARR:  No. 21.  It's directed to all

8    claimants, which means all 900 of them, they want an

9    answer on what they did to prepare.  So the person

10   that lives in Milton and has a shop somewhere in

11   Pensacola, they want to know what they did to

12   prepare.  What does that have any bearing on?  And

13   how is it relevant if somebody just happens to own a

14   boat and their dock got taken out by one of these

15   barges?  What do their preparations have to do with

16   anything?  It wouldn't have mattered what they did.

17   The barge hit the dock.  It makes no sense.

18           And, Your Honor, if we go down this road, I

19   can guarantee you there will not be a September

20   trial because of the volume of information that's

21   going to have to be produced, and it will not be a

22   short trial because we're going to have 900 mini

23   trials about what each one of these claimants did to

24   prepare for a storm and whether or not that was

25   reasonable.

Judge Hope Cannon
June 16, 2021

Page 54

1              I don't think that's what the Court wants,

2     and I certainly don't think it's what's needed here

3     when all we're talking about is whether or not this

4     company was negligent in its failure to follow its

5     hurricane preparedness plan.  That's it.  And they

6     undoubtedly, Your Honor, did not follow the plan.  I

7     don't think that's in dispute because the boats were

8     not where they were supposed to be.

9              THE COURT:  They were supposed to be at

10    East Bay?

11             MR. BARR:  They were supposed to be in East

12    Bay.  That's not where they were.  They by

13    definition did not follow the plan.

14             MR. REMINGTON:  That is still an issue.

15    That is not something, Judge, that we're conceding

16    in this case.  This interrogatory that he points to

17    specifically references waterfront property and

18    vessels.  If someone who lives in Milton operates a

19    charter boat on Pensacola Beach, we'd like to know

20    what preparations they took to secure their vessel.

21    Now, we're willing to limit it to people with

22    vessels and waterfront properties.

23             But going right back to what Judge Collier

24    says, Judge Collier's opinion says, a defendant

25    raising the defense of force majeure has the burden

Judge Hope Cannon
June 16, 2021

Page 55

1    of showing the existence of the phenomenon and

2    clearly establishing freedom from fault.  Freedom

3    from fault is generally determined by the

4    reasonableness of the precautions taken under the

5    circumstances as known or reasonably to be

6    anticipated.

7           What Skanska knew and reasonably

8    anticipated is no different than what the Navy knew,

9    no different than waterfront property owners knew,

10   no different than vessel owners knew.  And that

11   standard that we're going to have to prove that we

12   were reasonable, it is informed by what others did,

13   just like in the Louisiana case where the Court

14   looked at what other boats did to prepare for the

15   same storm.

16          We're entitled to know -- if we're going to

17   look at was Skanska negligent in the way that it

18   prepared for this storm, we're entitled to

19   exoneration.  We've sued for exoneration.  We're

20   entitled to the information to try to prove our

21   case.  And to prove our case, we think it's relevant

22   whether or not the Navy followed its hurricane plan

23   with the same information, whether or not vessel

24   owners who are now claimants secured their vessels

25   properly or whether this storm was an act of God

Judge Hope Cannon
June 16, 2021

Page 56

1    that nobody predicted and that nobody knew was

2    coming.

3            And for that reason the Navy didn't get

4    their planes out of town.  The Navy was just as

5    surprised as anyone else.  The people at Palafox

6    Harbor that was destroyed and marinas like it, just

7    as surprised as everybody else.  The passenger ferry

8    boats in the Port of Pensacola that were destroyed

9    in Hurricane Sally, just as surprised as everybody

10   else.  Hundreds, if not thousands, of prudent people

11   familiar with the ways and vagaries of the sea

12   experienced the exact same phenomenon as Skanska.

13   And we should be entitled to inform the standard of

14   reasonableness and foreseeability of the storm by

15   bringing in evidence about what happened to other

16   people during the storm.

17           MR. BARR:  And, Your Honor, again, to

18   suggest that Skanska is held to the standard of care

19   of a dock owner that has a 15-foot Boston Whaler,

20   that doesn't make any sense.  I mean, what that

21   person did or did not do to prepare, if their boat

22   gets released, it's not going to cause havoc like 55

23   barges are.  They are at a higher standard of care

24   than any other vessel owner in this community.  That

25   shouldn't even be an issue that we have to sit here

Judge Hope Cannon
June 16, 2021

Page 57

 1    and argue about.

 2            But if you take their position, you take it

 3    to its logical conclusion, this discovery shouldn't

 4    be directed at the claimants.  I don't know if

 5    Palafox Pier is a claimant.  I don't know if the

 6    ferry boats are claimants.  He needs to issue a

 7    bunch of third-party discovery.  Let's go down that

 8    road, too, because that is where this is going.  It

 9    just doesn't make any sense to direct this to

10    claimants.

11            MR. REMINGTON:  Your Honor, I would like to

12    address the Boston Whaler issue.

13            THE COURT:  Hold on one second.  Let me let

14    Mr. Hyde speak, and then I know -- I'm sorry.

15            MR. GONZALEZ:  Mr. Gonzalez from Beggs &

16    Lane.

17            THE COURT:  And then I'll let Mr. Gonzalez.

18    He's been standing for a minute.  So, Mr. Hyde.

19            MR. HYDE:  Yes, Your Honor.  I think

20    they're using the wrong standard here, and the

21    United States is kind of being pigeonholed into

22    this -- the Navy is being pigeonholed into this

23    super entity that had all of the knowledge and

24    should have followed its hurricane preparedness plan

25    to the T.  We're talking about 80 tenant commands on

Judge Hope Cannon
June 16, 2021

1    Naval Air Station Pensacola, some of which are

2    hospitals, grocery stores.  These are mom-and-pops

3    just like any other mom-and-pop.  Whether or not

4    they boarded up their stores in time has no

5    relevance to whether or not Skanska properly moored

6    its barges.

7            What would be persuasive is if the United

8    States owned any barges and the United States'

9    barges broke loose, but we didn't have any

10   waterborne assets.  The only two waterborne assets

11   we had there were Coast Guard cutters that are

12   perfectly able to move in and out of the storm.

13   They're built for that.

14            THE COURT:  Thank you, Mr. Hyde.  Mr.

15   Gonzalez.

16            MR. GONZALEZ:  Thank you, Your Honor.  I

17   thought it would be best to address -- what we've

18   been talking about here is reasonableness, and you

19   used the term "similar circumstances."  And I think

20   what we're talking about here is standard of care.

21   Mr. Remington has talked about the Neraida case or

22   the Fischer versus Sailing Yacht Neraida.  That cite

23   is 508 F.3d 586.

24            I think it's instructive -- and that's 2007

25   out of the 11th Circuit -- to look at page 594 where

Judge Hope Cannon
June 16, 2021

Page 59

1    the Court specifically set out the appropriate

2    standard of care.  The Court says, the appropriate

3    standard of care in this regime is based upon (1)

4    general concepts of prudent seamanship and

5    reasonable care; (2) statutory and regulatory rules;

6    and (3) recognized customs and usages.

7         So for Skanska to argue that a widow who

8    owns property with a dock, and her sole use of the

9    bay is to walk out and enjoy the water, maybe pull

10   up a crab trap from time to time, sets the standard

11   of care based on seamanship makes no sense.  The

12   case goes on to talk about other persons of nautical

13   skill.  They're trying to apply a standard of care

14   of nautical skill to people who have a house so they

15   can enjoy the waterfront view.

16        Then it cites that Louisiana case in that

17   provision at 595.  It says, proper display of

18   nautical skill.  And that's the case Mr. Remington

19   cites about these other yachts.  We have not been

20   pointed to any boat owner that has sued Skanska.

21   Mr. Barr is right, that if this were about the

22   Palafox Wharf, you might be able to start talking to

23   those boat owners.  But this is a third-party

24   discovery issue.

25        If you go to this issue of the standard of

Judge Hope Cannon
June 16, 2021

Page 60

1    reasonableness that Mr. Remington is talking about,

2    the vagaries of the sea, that's seamanship.  That's

3    not owning waterfront property, and nobody in any of

4    those cases suggests it.

5            Then a suggestion has been made that

6    interrogatory No. 20 is directly related to vessels.

7    Let's read interrogatory No. 20 directed to direct

8    property damage complainants.  Describe all steps

9    taken by direct property damage claimants done in

10   connection with preparations for Hurricane Sally

11   between September 11 through 18, 2020.  Included

12   within this interrogatory is any steps taken to

13   secure individual properties, watercraft or vessels,

14   or other property, as well as specific information

15   on whether or not individual property owners

16   evacuated waterfront properties pursuant to any

17   government directive or voluntarily.

18           This is not just limited to vessel owners.

19   This is limited to everybody who has waterfront

20   property.  I think we have limited -- yeah, okay.

21   So 21, it's directed to all claimants -- in our meet

22   and confer did you agree to limit that to direct

23   property --

24           MR. BARR:  No, no.

25           MR. GONZALEZ:  Because it's directed to all

Judge Hope Cannon
June 16, 2021

Page 61

1    claimants, not just waterfront property.  Identify
2    all other tropical weather events that required you
3    to take any action to protect or secure your
4    property between July 2016 and September 1, 2020.
5    In responding, please identify the specific tropical
6    weather event, and describe with specificity the
7    actions that you took to secure your property,
8    watercraft/vessels, and whether or not you evacuated
9    a waterfront property pursuant to government
10   directive or otherwise.
11           That's not seamanship.  That's not a
12   nautical standard.  That's, did you leave your
13   house?
14           THE COURT:  So here's my initial -- and,
15   obviously, I'll do an order on it.  I want to look
16   at these cases since I just got them.  But my
17   initial inclination here is, I guess, even assuming,
18   Mr. Remington, that even if they're able to show
19   that Skanska was negligent in not following its
20   hurricane preparedness plan and you're able, as you
21   indicate, to argue that, well, we were still
22   reasonable in mooring it or whatever and look at all
23   these other people whose boats -- I still have an
24   issue that those barges are not the same as any
25   boat, whether they boarded up their property,

Page 62

1    whether they removed a jet ski.  I just don't see

2    how that is going to establish -- because arguably,

3    it could also be argued, I suppose, that if, in

4    fact, Skanska didn't follow its hurricane

5    preparedness plan that that wasn't reasonable.

6            But I also am looking at the Fischer case,

7    and the Court does say that, other persons of

8    nautical skill found no difficulty in securing their

9    vessels at the same place and under similar

10   circumstances.  This is not -- their circumstances

11   is not to me similar to Skanska's circumstances,

12   which has a hurricane preparedness plan, which had

13   22 barges, which was under construction, from what

14   they're doing, and not only that but also their

15   capabilities in terms of what Skanska can do and

16   what some of these individual claimants may or may

17   not have been able to do.

18           So, as I said, I'm not saying definitively

19   right now that I don't think that -- that I think

20   it's overly broad.  It does -- even if I were to

21   determine that you could get some of this

22   information, as an initial matter, I do think the

23   interrogatories themselves as they're drafted are

24   just overly broad.  But let me look at these cases,

25   and I'll do an order on it.  But that's sort of my

Judge Hope Cannon
June 16, 2021

Page 63

1   inclination right now just listening to the

2   arguments of the parties and knowing what I know

3   about this case.

4           If we do go down that route, you will not

5   be at trial in September, and it's definitely not

6   the sort of negligence trial that I think Judge

7   Vinson or Judge Collier was expecting.  And even in

8   the Bunge case, I think that that was an expert that

9   talked about whether or not it was reasonable to --

10  the moorings in that particular situation as well.

11  I don't think they looked -- the Court looked at

12  other -- what else was going on.  I won't cut you

13  off if you have something else you'd like to say on

14  that, Mr. Remington.

15          MR. REMINGTON:  Two things.  Your Honor,

16  you're right.  There's a thousand claimants, and you

17  can highlight one widow with a seawall.  But the

18  reality is, we don't know what vessels they had.

19          THE COURT:  But how are those vessels

20  similar to a barge?

21          MR. REMINGTON:  Your Honor, but the

22  standard for a 65-foot sailboat or a sport fisherman

23  is the same as for the barge.  If you look at the

24  Neraida case, it says exactly that.

25          THE COURT:  But they don't have a hurricane

Judge Hope Cannon
June 16, 2021

Page 64

 1    preparedness plan that they have to abide by.  It

 2    just doesn't seem to be apples and apples to me in

 3    this.

 4             MR. REMINGTON:  Your Honor, we don't know

 5    this without discovery.  We know the Navy has a

 6    hurricane preparedness plan.  We absolutely know

 7    they have one, and we absolutely know they didn't

 8    follow it as they should have in anticipation of the

 9    storm that hit.  We absolutely think that informs

10    the reasonableness of Skanska's actions.

11             MR. BARR:  We also know they don't have any

12    watercraft assets.  Nothing that happened to the

13    base shut down an entire region's economy.

14             MR. REMINGTON:  But, remember, it's the

15    conditions that we reasonably anticipated.  If their

16    plan is triggered by what conditions they anticipate

17    to come, that is relevant to identifying how our

18    plan may or may not be triggered.

19             THE COURT:  In reading, securing their

20    vessels in the same place and under similar

21    circumstances, yes.  If you had -- if any of these

22    other claimants had a barge that they moored where

23    y'all moored yours and it came apart as well, yes, I

24    would think that that would have some relevance

25    here, but that's not what we're talking about.  So,

Judge Hope Cannon
June 16, 2021

Page 65

1   again, I'll look at the cases.  I'm just reading

2   kind of along as y'all were reading.  I did look at

3   them this morning but wasn't -- had some idea about

4   how you might be using them but wasn't completely

5   sure.  Let me look at those cases, but that's kind

6   of where I'm leaning, and then I'll do an order on

7   it.  If there's anything else you want to submit,

8   you can do that, but I'll probably issue an order

9   before next Wednesday, obviously.

10          MR. REMINGTON:  One other point I would

11  make, Your Honor.  I think when Judge Vinson had his

12  initial pass at this case, we all thought it was a

13  simple case based on what happened in September.

14  We're being asked to go back five years, and that is

15  not -- that is putting tremendous burden on us, and

16  now we're being told, we don't want any discovery.

17          THE COURT:  And we will -- we'll address

18  that.  I know Ms. Guntner is ready to address a time

19  period.  I do have some concerns, obviously, with

20  some of the time periods and what was represented as

21  to what this negligence case was going to be.  You

22  know, what's good for the goose is good for the

23  gander.  But it can't be -- you can't be seeking

24  that information because they are also, you know,

25  maybe overly broad in their request.  So we'll deal

Judge Hope Cannon
June 16, 2021

1    with theirs.

2          But I just think for purposes of you

3    establishing reasonableness, it just doesn't seem to

4    me to be an accurate comparison that that's really

5    going to play into whether or not Skanska was

6    reasonable.  But, again, I will look at your cases

7    and read them more carefully and then issue an order

8    on it.  But that's just my inclination at this

9    point.  I'm sure you will be able to address why

10   their requests may or may not be reasonable, may be

11   overly broad or also may not be proportional to what

12   this negligence piece is going to be in September.

13          MR. BARR:  And, Your Honor, I think we've

14   addressed these in our requests for production, and

15   we worked out agreements on that.  But to talk about

16   what claimants did, that's wholly different than

17   what Skanska did in the past.  There have been

18   multiple storms that have threatened this area

19   during construction of this bridge, and in none of

20   those storms has the bridge been hit and everything

21   been shut down, so they've done different things.

22   So to act like that's not relevant, that doesn't

23   make any sense.

24          THE COURT:  I think some of that goes to,

25   again, the privity and knowledge, which is going to

Judge Hope Cannon
June 16, 2021

Page 67

1    be their burden, and so I do think that some of that

2    information is going to be relevant.  I just think

3    it's how much -- how far back you go, what search

4    terms.  I mean, for purposes of September you're

5    just not going to be able to scavenger every

6    document that they possibly have.  And I think we do

7    need to try to refocus and narrow what we're really

8    looking for here in terms of what we're doing in

9    September.

10            So, you know, some of that will depend

11   on -- I know I heard in the past that maybe the

12   hurricane preparedness plan had changed over the

13   course of time, the leadership changed, so some of

14   that may impact what knowledge -- what the privity

15   and knowledge was as well.  But I'm not saying that

16   that isn't relevant.  I just think we've got to be

17   able to be more focused in it if we want to go to

18   trial in September.

19            MR. BARR:  And we want to be focused, Your

20   Honor.  I'll give you a good example here.  You've

21   got -- these other storms that happened that they're

22   now saying that, look, Hurricane Sally was a

23   complete surprise to everybody in this community.

24   There's no way we could have prepared in time

25   because look what happened.  But we know in other

Judge Hope Cannon
June 16, 2021

Page 68

1   storms that didn't even threaten this area, they

2   moved their barges out of the way.  So that to me is

3   why that's relevant to the reasonableness.  When you

4   sit here and say on one hand, well, we couldn't have

5   possibly prepared.  But in things that didn't even

6   threaten us, they prepared.

7          MR. REMINGTON:  Your Honor, I'd like to

8   respond to that.  Mr. Barr throws out a

9   hypothetical.  Well, let's follow that.  Hurricane

10  Michael was a category 4 or 5 storm making a beeline

11  for the Gulf Coast.  Everybody made different

12  preparations for Hurricane Michael.  The United

13  States Navy made different preparations.

14         The reasonableness of our preparations for

15  Hurricane Michael is different than the standard of

16  reasonableness for what we knew or reasonably

17  anticipated was coming in Sally.  And that's why the

18  information from the Navy base and from other

19  claimants with vessels is relevant because if they

20  said, well, look what they did in preparation for

21  Michael and it didn't hit.  We could say, well,

22  yeah, everybody else did more, too, because they

23  were different circumstances, and people anticipated

24  a different outcome.

25         That's the reasonableness.  That's how you

Judge Hope Cannon
June 16, 2021

Page 69

1   prove exoneration.  Did you act reasonable on what

2   you knew or expected to come?  Sally, nobody

3   expected it to make a turn in the middle of the

4   night and beeline for Pensacola.

5            MR. BARR:  Your Honor, that's expert

6   testimony.  They can hire an expert to say that.

7   They can hire an expert to talk about what people

8   did or didn't do to the extent -- but that doesn't

9   require discovery from all of the claimants.  It

10  just doesn't.

11           MR. REMINGTON:  It certainly goes to

12  support the fact that if people didn't prepare for

13  Sally like they did for Michael, they were

14  surprised.

15           THE COURT:  Okay.

16           MR. HYDE:  Your Honor, Robb Hyde again, if

17  I may.  I go back to my earlier argument.  Whether

18  or not the Navy did something or didn't do something

19  neither proves nor disproves that what Skanska did

20  was negligent.  If the Navy was negligent and it

21  caused nobody any harm, then so what?  It doesn't

22  prove that Skanska was not negligent.

23           MR. REMINGTON:  But it also doesn't prove

24  that we didn't act reasonably.

25           THE COURT:  Yeah, and, again, I think, Mr.

Judge Hope Cannon
June 16, 2021

Page 70

1    Remington, I might follow that argument more if you

2    had some folks who were in similar circumstances.  I

3    just don't think that that's where you are, so I'm

4    not necessarily saying -- I think if you look just

5    at your general statements, right, the general

6    statement of the law, that might be the general

7    statement of the law.  But in application that

8    doesn't really make sense with the claimants you had

9    here and what Skanska's standard of care is, what

10   Skanska should have done, what Skanska should have

11   been operating under, what Skanska knew.

12          I don't know that what the claimants did

13   really impacts that, and I don't -- then there is

14   the other issue about whether it is proportional

15   here based on the interrogatories that you do have.

16   So, again, I'll look at the cases.  I'm just kind of

17   letting you know what my thoughts are initially.

18   That doesn't mean I'm telling you right now that

19   you're not going to get it.  That's just where I'm

20   kind of leaning based on what I'm hearing.  Once I

21   look at the cases, I'll let you know.

22          MR. REMINGTON:  Thank you, Your Honor.

23          THE COURT:  Is there another one other than

24   those?

25          MR. BARR:  Well, now we -- that took longer

Judge Hope Cannon
June 16, 2021

 1    than I thought it was going to.  It does cut across

 2    a lot of issues.  Now we have the individual

 3    interrogatories and requests to produce.  To the

 4    extent the objection deals with the preparation, I

 5    think I can just highlight this deals with that

 6    issue and your ruling on that will control that.

 7              THE COURT:  Yes.

 8              MR. BARR:  But there are nuanced issues in

 9    some of these that aren't directly on that point.

10              THE COURT:  Okay.  So which ones?

11              MR. BARR:  We can start with interrogatory

12    No. 3, which is directed to all claimants.  I'm

13    trying to remember now if in the meet and confer we

14    narrowed that to just the government, No. 3.  I

15    don't remember.

16              MR. REMINGTON:  I think we said people

17    counsel was aware of.

18              MR. BARR:  Okay.  The one that's a concern

19    to us is, identify every person you've contacted,

20    interviewed or consulted regarding the track of

21    Hurricane Sally, the weather advisories, Skanska's

22    planning or preparations.  The ones we talked about

23    specifically are the governments.  You know, all of

24    the governmental entities would have been consulting

25    with a whole host of people about Sally and the

Judge Hope Cannon
June 16, 2021

Page 72

1    weather and those types of things, and we don't see

2    the relevance to Escambia County, for example,

3    talking to some meteorologist about what Sally is

4    going to do.  That's not information that Skanska

5    was aware of or Skanska would have been reacting to,

6    so I don't see how it goes to Skanska's conduct.

7              THE COURT:  Mr. Remington.

8              MR. REMINGTON:  Two things.  First, Your

9    Honor, ordinarily we think a lot of this information

10   we'd get in a 26(a)(1) disclosure, but we have

11   received no 26(a)(1) disclosures in this case.

12   We're going to trial in September.  We've got zero

13   disclosures of known witnesses with discoverable

14   information from the other side.  So a lot of these

15   questions are trying to get the information that we

16   would ordinarily be entitled to in a 26(a)(1)

17   disclosure.

18              If they know of witnesses that have

19   information relative to the track or expected track

20   of the storm, the advisories, we believe they ought

21   to provide that information to us and identify those

22   witnesses.

23              THE COURT:  So, I mean, that sounds to me

24   to be reasonable.  I think the way the interrogatory

25   phrased may not make that necessarily clear.  I

Judge Hope Cannon
June 16, 2021

Page 73

1    didn't go back and pull -- I think y'all did a Rule

2    26(f) report early in the case.  What did y'all

3    decide about 26(a)(1) disclosures?

4          MR. BARR:  If he's going to talk about

5    initial disclosures, the only one we got from them

6    was people they were thinking about bringing to the

7    evidentiary hearing.  We haven't gotten one from

8    them either.

9          MR. REMINGTON:  We traded 26(a)(1)

10   disclosures as to the hearing only, but then we

11   answered their interrogatories and gave them all the

12   information that would have been in a 26(a)(1)

13   disclosure.

14         THE COURT:  So it seems to me, Mr.

15   Remington, can't you just phrase this interrogatory

16   No. 3 differently?  It would be the same as to

17   interrogatory No. 4 really as well.  Is that one of

18   the other ones?  Yeah.

19         MR. REMINGTON:  Yes.

20         THE COURT:  That y'all are really just

21   looking for who they possibly plan to call as

22   witnesses, who they believe have knowledge and

23   information.

24         MR. BARR:  And, Your Honor, we're happy to

25   do that.  If you limit it to counsel that we would

Judge Hope Cannon
June 16, 2021

Page 74

1    plan on as fact witnesses, the storm, we can do

2    that.  I think a separate issue is working on expert

3    disclosures.  We haven't -- there will have to be

4    expert reports.

5            THE COURT:  I was thinking not experts at

6    this point, right?

7            MR. REMINGTON:  Yes.

8            THE COURT:  That's how I read these

9    interrogatories is just looking for your fact

10   witnesses.

11           MR. BARR:  Some of them later do.  We

12   pulled that one, but some of them -- our thinking on

13   some of these when we were responding to them, some

14   of them were directed at experts.

15           THE COURT:  Okay.  So on 3 and 4, though,

16   we're limiting those to fact witnesses?

17           MR. REMINGTON:  To fact witnesses with

18   discoverable information, not just people they

19   intend to call.

20           MR. BARR:  I mean, I can answer as to the

21   people we are aware of.  Frankly, I don't know that

22   any of us are aware of anyone.  So the answer you're

23   going to get is no unless the ask really is here to

24   us to go to Escambia County and the City of

25   Pensacola and say, who did you talk to during the

Judge Hope Cannon
June 16, 2021

Page 75

1    storm about what it was doing and how it was

2    tracking?  And, again, we don't see how that's

3    relevant.

4              MR. REMINGTON:  Absolutely.  The entities

5    responsible for public safety in Sally, what they

6    knew and reasonably anticipated the weather to do

7    informs the standard of reasonableness Skanska will

8    be judged by.  And I believe the officials in

9    Escambia County will tell you they were surprised by

10   the storm; they didn't think it was going to make

11   the last-minute turn.  Everybody was surprised, Your

12   Honor.

13             MR. BARR:  What is that relevant to?  What

14   is it relevant to Escambia County?

15             MR. REMINGTON:  It goes to reasonableness

16   in preparations made by Skanska for what they knew

17   or reasonably anticipated coming.  If they

18   reasonably anticipated a rain event, that is a

19   different level of preparation than anticipating a

20   category 2 storm.

21             THE COURT:  Yeah, but what Skanska

22   reasonably anticipated and what it had prior

23   knowledge of is not dependent on what someone else

24   had prior knowledge of or privity of.  If you were

25   moving vessels, for example, during a different,

Judge Hope Cannon
June 16, 2021

Page 76

1    less severe storm, that would play a part on your

2    knowledge and privity for how you handle Sally.

3    That doesn't -- what the claimants knew doesn't

4    really necessarily impact that.  But I think if

5    you're looking for on 3 and 4 people that they

6    believe have knowledge of the claims in this case

7    and people that they intend to call as fact

8    witnesses, I think that's a reasonable request, and

9    they should answer that because you're going to need

10   to know that before you go into September.

11          MR. BARR:  No surprises.

12          THE COURT:  Yeah.  So that, I think, is

13   reasonable, Mr. Remington.  But I don't know if

14   you're looking for something else in those requests

15   or those interrogatories.

16          MR. REMINGTON:  Your Honor, we'll restate.

17   But, I mean, we do believe that what was reasonable

18   for Skanska to anticipate, okay --

19          THE COURT:  Is dependent on what --

20          MR. REMINGTON:  No, is informed by what

21   other people, sophisticated people in the same

22   region reasonably anticipated.

23          THE COURT:  So it sounds like that goes

24   back to what we spent some time arguing.  So, again,

25   I'll do an order on that, and that hopefully will

Page 77

1    also then resolve some of these interrogatories,

2    some of these other ones.  That seems to be based on

3    the same argument as to what you are able to look at

4    and include as part of your reasonableness, right?

5              MR. REMINGTON:  Correct.

6              THE COURT:  Okay.

7              MR. BARR:  Your Honor, not to beat a dead

8    horse, but the hurricane plan established what

9    Skanska was supposed to do and when they were

10    supposed to do it based upon expected wind

11    conditions.  It establishes that, not what the City

12    of Pensacola knew, not what Escambia County knew.

13    Their plan said, if you are expecting winds of this

14    level, you're supposed to do this, wind level,

15    you're supposed to do that.  And all of those

16    conditions were met.

17              MR. REMINGTON:  And I don't think the Court

18    will find any of those conditions were met.

19              THE COURT:  Neither of that, though,

20    depends on this discovery that you're looking for.

21    Whether those conditions were met or not met is not

22    going to be dependent on what these guys did or

23    knew.

24              MR. REMINGTON:  I would respectfully

25    disagree, Your Honor, because if they're going to

Judge Hope Cannon
June 16, 2021

Page 78

1    argue you should have expected, you had time to

2    expect category 2 winds and that triggered this

3    level of your hurricane preparedness plan.  Well, if

4    nobody else expected that level of winds, why was it

5    reasonable for Skanska to expect that level of

6    winds?  If the Navy didn't expect that level of

7    winds at the Pensacola pass, if the City of

8    Pensacola didn't expect that level of winds and

9    didn't evacuate the beach, which it would if it

10   expected that level of winds, that informs the

11   reasonableness of Skanska's expectation that it

12   didn't expect that level of winds.  Nobody did.

13           MR. BARR:  Your Honor, he doesn't need --

14   evacuation orders and all that, that's all public.

15   He can pull that information.  He doesn't need me to

16   go to the client and say, give me all that.  He has

17   all that.

18           MR. REMINGTON:  Why don't we get to that

19   specific request.

20           MR. BARR:  He's clearly talking about it.

21   He clearly has it.

22           THE COURT:  Let's see.  Hold on one second.

23         (Discussion off the record.)

24           THE COURT:  So that's 3 and 4.

25           MR. BARR:  Six is the next one.  Six is,

Judge Hope Cannon
June 16, 2021

Page 79

1    identify any entity, company, business or individual

2    who you know suffered an unmooring, drifting and/or

3    floating away of a barge, vessel, boat or

4    watercraft.  When we talked about this, they

5    literally want us to go out to all 900 claimants and

6    ask them, are you aware of anybody whose boat

7    floated away and then identify that boat.

8              THE COURT:  This goes -- is this part of

9    your, again, sort of your argument as to what

10   happened with other vessels bears a part into the

11   reasonableness of Skanska because if somebody else

12   lost a boat or didn't moor it properly --

13             MR. REMINGTON:  Two points it goes to.

14   Number one, in order to prove an act of God defense,

15   we have to prove that the hurricane was an act of

16   God.  Not every 11th Circuit case determines that a

17   hurricane was an act of God.  So this goes to show

18   the ferocity of the storm and the fact that we

19   believe it does constitute an act of God.  Number

20   one, it informs that.

21             Number two, if these claimants know of

22   other barges or vessels that became unmoored, we'd

23   like to know about it because we think it informs

24   the reasonableness of Skanska's activities.  And

25   we're specifically talking about barges and vessels.

Judge Hope Cannon
June 16, 2021

1    Neraida was a vessel.

2          THE COURT:  You've got barges, vessels,

3    boats, watercraft.  That could be a jet ski.  That

4    could be a host of different types of --

5          MR. REMINGTON:  Certainly.

6          THE COURT:  -- watercraft that would not be

7    anywhere near what a barge would be.  Okay.  So

8    those are the two bases for No. 6, act of God, and

9    also, again, to the reasonableness?

10         MR. REMINGTON:  Yes

11         MR. BARR:  The next ones -- I'm going to

12   skip these.  Mr. Hyde can handle these.  But 13, 15,

13   16, 17 are all directed at the United States.  No.

14   18 is one that's directed to Escambia County, the

15   Garcon Point bridge holders, and we just think that

16   that's a damages question.

17         THE COURT:  I did it, too.  I do think 18

18   is damages.  I think Judge Vinson made clear that we

19   weren't going into that at this point.  I do think

20   13 also for the United States is a damage question.

21         MR. REMINGTON:  On 9?

22         THE COURT:  Actually, I'm on not 9; 13 and

23   18.

24         MR. REMINGTON:  Excuse me.  I'm sorry.  No.

25   18 is verbatim the interrogatory that was submitted

Judge Hope Cannon
June 16, 2021

1    to us as No. 9.  We're not sure the relevance

2    either, but we were asked to answer that

3    interrogatory, and we believe we're entitled to

4    whatever they think or they know of how that would

5    be relevant in the limitation trial if they're

6    asking us the same question.  Number two, it goes to

7    the ferocity of the storm, whether or not it was an

8    act of God.  And number three, again, Your Honor, in

9    a regular 26(a)(1) disclosure, we would have been

10   entitled to damage information.

11            THE COURT:  But you know that Judge Vinson

12   parsed that out specifically, so it's a little bit

13   different situation here, and it was for the purpose

14   of trying to get this to trial sooner rather than

15   later.  So I am not inclined to allow any

16   damages-type questions.  Again, what may be relevant

17   in terms of a question to Skanska is not necessarily

18   the same as what might be relevant in terms of the

19   claimants' piece of this.

20            I guess y'all could have objected.  I don't

21   know if y'all did to that or raised that has an

22   issue.  But I guess for my purpose, I want to know

23   how you think that that's relevant other than as to

24   damages.

25            MR. REMINGTON:  We believe it's relevant,

Judge Hope Cannon
June 16, 2021

Page 82

1    act of God.  We believe, honestly, we should be

2    entitled to the information.  And we also believe

3    that it is necessary as we have accident

4    reconstructionists determine where the barges

5    started and where they ended up.  Damage to these

6    properties, these claimants' properties are relevant

7    for our reconstructionist to reconstruct the path of

8    the barges.

9            So if they can tell us where damage to

10   their property occurred, we can determine where that

11   barge traveled from and when the barge broke loose

12   and whether the barge broke loose in the height of

13   the storm and winds or whether it broke loose at

14   some other time.

15           MR. BARR:  I believe we've already agreed

16   to provide information on where -- information we

17   have on where the barges went.  This isn't directed

18   to that.  This is directed at damage.  And our

19   question to damage on Skanska was damage

20   anticipated.  There were two things that we thought

21   addressed the standard of care.  What did you

22   anticipate the effects of failing to secure all

23   these barges would be?  That certainly informs the

24   standard of care.  And then what do you know about

25   the level of damage it caused?  Because those things

Judge Hope Cannon
June 16, 2021

Page 83

```
 1   inform the standard of care.

 2            MR. REMINGTON:  The standard of care is

 3   established by the 11th Circuit.  Neraida sets out

 4   clearly what the standard of care is.  Neraida cites

 5   the Lykes case.  The Lykes case was a four-barge

 6   breakaway case in the Mississippi River in Hurricane

 7   Betsy.  So Neraida, a sailboat, is relying on a

 8   four-barge breakaway case in the Mississippi River

 9   to establish with the standard of care in the 11th

10   Circuit is.  There is not a heightened or special

11   standard of care for Skanska.  The standard of care

12   for Skanska is set up by the 11th Circuit.

13            MR. BARR:  We believe the similar

14   circumstances language covers that, and it has to be

15   a standard of similar circumstance, similar company.

16   I don't want to -- we've argued that to death.  I

17   don't want to -- I'm going to try to avoid --

18            MR. REMINGTON:  But, Your Honor, for us

19   to -- if these barges damaged different parts of

20   their fishing pier and their bridge, we'd like to

21   know where they were so we can try to reconstruct

22   what happened.

23            MR. BARR:  That's the scary part about this

24   whole thing is they don't know where their barges

25   were.
```

Judge Hope Cannon
June 16, 2021

Page 84

1              MR. REMINGTON:  Thank you for the editorial

2      comment.

3              THE COURT:  Okay.

4              MR. REMINGTON:  That's what happens in an

5      act of God.

6              THE COURT:  No. 20, is that --

7              MR. BARR:  20 and 21 I think we just beat

8      to death for 30 minutes.

9              THE COURT:  Okay.

10             MR. BARR:  That takes us to the request to

11     produce

12             THE COURT:  So a lot of these -- what I'll

13     do, because I know we're running out of time, and I

14     do have to go into another status conference.  I'll

15     let y'all if y'all want to submit something.  I just

16     want to rule on it before y'all -- probably by

17     Tuesday.  So if y'all want to submit something, you

18     really need to do it within the next couple of days.

19     I'll try to get something out on Friday because I

20     want us, if there is going to be a production, start

21     that production going so we will have made some

22     progress by Wednesday.

23             My initial inclination on when I read some

24     of these is, you know, I didn't think -- let's see

25     what I have.  Some of the questions about, you know,

Judge Hope Cannon
June 16, 2021

Page 85

1    press releases and videos, I mean, I just -- to make

2    the claimants go pull all of that information --

3            MR. REMINGTON:  Your Honor, here's the

4    thing.  All that information is in the possession of

5    Escambia County's public information officer.  They

6    can burn a disc and send it to us in a day.  We

7    would have to go either make a public information

8    request or dig through the Internet to find it.  And

9    if we made a public information request, we'd have

10   to go through our ESI protocol to process it and

11   produce it back to them.

12           This information is in the hands of

13   Escambia County in their public information office.

14   It is not burdensome.  They don't have to do any

15   searching.  They could pick up the phone and say,

16   can you provide us with a disc with all the videos

17   from the press conferences that you filmed at the

18   EOC.  They would say yes.

19           MR. BARR:  That doesn't make it relevant.

20   The fact that somebody can push a button and produce

21   it, that doesn't make it relevant.

22           MR. REMINGTON:  It's discoverable because

23   those press conferences included public officials

24   discussing the bridge.

25           THE COURT:  I know you're going to say it

Judge Hope Cannon
June 16, 2021

Page 86

1    goes to what you would have known or not known?

2         MR. REMINGTON:  Not only what we knew or

3    not known, but it could have admissions of public

4    officials about what they contend happened to the

5    bridge or didn't happen to the bridge.  I mean, they

6    were talking about the bridge at every press

7    conference.  Information about, here's what we know

8    about the bridge today or what happened.  All that

9    is discoverable in determining what caused the

10   barges to break loose.

11        THE COURT:  Okay.

12        MR. REMINGTON:  And it's not hard to

13   obtain.

14        THE COURT:  I think we skipped No. 1.  What

15   is the relevance of No. 1?

16        MR. REMINGTON:  No. 1 we limited to the

17   government municipalities.  So, again, their public

18   information officers have ready access to all this

19   information.  We don't have to scour the Internet,

20   scour social media to find this information.  City

21   of Pensacola, Escambia County, the Navy, they all

22   have public information officers that have ready

23   access to this information.

24        MR. BARR:  We don't see what's relevant

25   about -- and I don't know if they did, but if

Judge Hope Cannon
June 16, 2021

Page 87

1    Escambia County, City of Pensacola issued orders

2    related to churches, temples, synagogues, what is

3    that relevant to?  I mean, it's a fishing expedition

4    here.  They're trying to find anything they can find

5    to say, oh, what we did was okay.  That's not

6    relevant.

7            MR. REMINGTON:  The way people knew or

8    reasonably expected this storm to do informs what

9    we're required to do.  And when we're looking at

10   what people knew was going to happen or reasonably

11   expected to happen, we can look at the community and

12   say, the community didn't expect this to happen.

13   They were completely surprised.  Everybody was

14   surprised.

15           THE COURT:  Okay.  And then I think the

16   other ones, it looks like 13, 14, 15, 16 -- no, 13,

17   14 and 15 are all to the United States.  So, again,

18   because we're short on time, those requests, Mr.

19   Remington, do they really go toward what we've

20   already spent some time talking about, what the Navy

21   did you believe informs the reasonableness of what

22   Skanska did?  So I can address it all with that --

23   with an order regarding that issue?

24           MR. REMINGTON:  Yes, Your Honor, with this

25   caveat.  We agreed to limit with the Navy to the

 1    commanding officer of NAS, the air wing commander

 2    and the regional commander.

 3              THE COURT:  Okay.

 4              MR. HYDE:  Your Honor, Robb Hyde

 5    (inaudible).

 6              THE COURT:  So, Mr. Hyde, I think you may

 7    be on a cell phone.  You're kind of coming in and

 8    out a little bit.  What I was going to tell you on

 9    that is, again, if y'all will just -- if you've got

10    something, if y'all want to submit just a written

11    memo or written memorandum in support of why you're

12    objecting to the information, same thing for Mr.

13    Remington, why it's relevant, then I'll look at that

14    and issue an order.  Like I said, I'd like to try to

15    do it by Friday, so if y'all can get something to me

16    end of the day tomorrow, that would be great.

17              But is there anything else that you want to

18    say, Mr. Hyde?  I just have a little bit of a hard

19    time hearing you.

20              MR. HYDE:  I apologize, Your Honor.  I am

21    on a speakerphone.  I'll take it off right now.

22              THE COURT:  So it sounds like to me that

23    13, 14 and 15 are what we've already discussed, and

24    that is whether what the Navy did has any relevance

25    to the reasonableness or negligence of what Skanska

Judge Hope Cannon
June 16, 2021

Page 89

1    did.  I think that's the core issue of those

2    requests.  If the Court determines that it's not

3    relevant or that it's not proportional, then I don't

4    think there's another basis.  Do you have one, Mr.

5    Remington, for that information?

6            MR. REMINGTON:  Your Honor, in order to

7    prove the act of God defense, we have to prove what

8    the storm did.  We've agreed with respect to the

9    cameras we asked for to limit to 10 cameras that

10   might depict the weather that the Government could

11   select and provide us.  It included marinas.  I

12   think that's what we agreed to limit to.

13           THE COURT:  And they're still saying no to

14   that, right?

15           MR. REMINGTON:  They said no to that in one

16   request but not for the -- I believe for the dates

17   of September 11th through 16th, they objected.

18           THE COURT:  That's No. 16?

19           MR. REMINGTON:  No. 16.  They did not

20   object to No. 17, I believe.

21           MR. BARR:  16 is all claimants.  That's not

22   just the U.S.

23           THE COURT:  Yeah, 16 is not.  15 is the

24   U.S., and then 17 is the U.S.  So 17 is not part of

25   the dispute; 16 is.  And then --

Judge Hope Cannon
June 16, 2021

Page 90

 1              MR. BARR:  16 is the one where they're
 2    asking all claimants to go out and provide pictures
 3    of what they did to prepare.
 4              THE COURT:  So I think that goes to what we
 5    had talked about --
 6              MR. BARR:  It covers that issue.
 7              THE COURT:  -- the conduct of the
 8    claimants.  At the end of the day it's going to be
 9    whether the conduct of the claimants has any
10    relevance to Skanska's claims or defenses here.
11              MR. BARR:  The only thing I would add, Your
12    Honor, is that is the issue and certainly relevance
13    there, but when you start talking about
14    proportionality, I think that really comes into play
15    with something like 16 because most people were
16    taking pictures with their phones, which means
17    you're going to have to go extract all that
18    information from their phones.  They are right now
19    insisting we provide them load files under an ESI
20    protocol.  That will shut discovery down trying to
21    get all that information.
22              THE COURT:  Okay.  And then --
23              MR. REMINGTON:  Your Honor, with those we
24    agree to limit those to those people who would be
25    vessel owners or have some connection with the ways

Judge Hope Cannon
June 16, 2021

```
 1   and vagaries of the sea.
 2            THE COURT:  Okay.
 3            MR. BARR:  And I don't, frankly, understand
 4   what that means and how I would even target those
 5   people.
 6            THE COURT:  Okay.  I mean, I guess it goes
 7   to the same argument, Mr. Remington, that you've
 8   been making; that's just from the Louisiana language
 9   as to the standard of care, right?
10            MR. REMINGTON:  Correct.
11            THE COURT:  Okay.  So then --
12            MR. BARR:  23 is the next one.
13            THE COURT:  23.
14            MR. BARR:  Your Honor, we just don't see
15   what's relevant about communications from Escambia
16   County, City of Pensacola and the Coast Guard.
17   Again, their conduct is not at issue here.
18            MR. REMINGTON:  Your Honor, the Port of
19   Pensacola is maybe a mile from the Three Mile
20   Bridge.  What the weather communications were
21   between these entities and the Port of Pensacola
22   bears on what Skanska knew or reasonably should be
23   expected to know was coming in terms of weather.
24   And what orders the port put out for large vessels
25   at the port bears on the relevance of what Skanska
```

Page 92

1  did.  We know two large vessels at the port,

2  passenger ferries were destroyed and were out of

3  service for longer than the bridge.

4          THE COURT:  Okay.  24 and then 25 and 28

5  are in dispute.  28, that to me is a phase 2.

6          MR. BARR:  Your Honor, 28 is --

7          MR. REMINGTON:  We withdraw 28.

8          THE COURT:  Okay.

9          MR. BARR:  That's a turn.  Okay.  I'll take

10  that.

11          THE COURT:  Take it.  And then so 24, 25

12  I'll address.  Again, if y'all want to submit

13  anything tomorrow on those requests, and then I'll

14  just issue an order addressing all of them on

15  Friday.  Ms. Guntner, I know you still have the

16  protocol -- not the protocol but the time frame,

17  which I know is important, and we need to address

18  that.  I do need to go into this other hearing.  I'm

19  guessing that Ms. Billhimer probably is the one

20  that's going to be best to address that time frame.

21  That's who you've probably been talking to.  She's

22  not available today.

23          So if we want -- if we don't want to table

24  it until next Wednesday, which may be -- if we want

25  to start going and keep on going with it, then if

Judge Hope Cannon
June 16, 2021

1    you will just contact chambers with Ms. Billhimer

2    and let me know when you two are available, and we

3    can address that, of course, anybody else that wants

4    to participate.  And we can do that in person or on

5    the phone.  We'll just set a separate because I

6    think that's going to be a lengthy discussion.

7              MS. GUNTNER:  Yes, Your Honor.

8              THE COURT:  We can just set that separately

9    and see if we can get it on the calendar before

10   Wednesday.

11             MS. GUNTNER:  Okay.  Thank you, Your Honor.

12             THE COURT:  My clerks will work with you on

13   the timing of that.

14             MS. GUNTNER:  Okay.  And in addition to

15   that, you know, I initially started talking about

16   the ESI order and the red lines and the issues we

17   have with that red line.  I think that very much

18   goes hand in hand with what your order is going to

19   address.  So would you prefer that we kind of table

20   that discussion until after you enter your order?

21             THE COURT:  Yes, because the order may

22   streamline some of that conflict that y'all are

23   having about what you need to produce and in what

24   form you need to produce it, depending on what I

25   order on that.  So I think that was the last thing

Judge Hope Cannon
June 16, 2021

1    we were going to talk about, right?

2              MS. GUNTNER:  Yes, Your Honor.  And the

3    rest we'll just contact you with availability and

4    figure out a time that works for us to discuss the

5    issues.

6              THE COURT:  Yeah.  We can do it, like I

7    said, before Wednesday.  Then, like I said, if y'all

8    want to submit anything on the outstanding requests,

9    even including the argument that we've already had,

10   if you want to put anything in writing on that,

11   y'all can do that.  It will just come anytime

12   tomorrow because I'd like to try to issue a ruling

13   on it on Friday.

14             MR. BRANNING:  Yes, Your Honor.

15             THE COURT:  And y'all can just e-mail that

16   to me if you want to do that.  All right.  Anything

17   else then?  No?  All right.  Thank you guys.

18             (Proceedings concluded at 11:51 a.m.)

19

20

21

22

23

24

25

Judge Hope Cannon
June 16, 2021

Page 95

1                      COURT CERTIFICATE

2

3

   STATE OF FLORIDA     )

4

   COUNTY OF ESCAMBIA   )

5

6

7                I, Connie L. Morse, Stenographic Reporter,

8    certify that I was authorized to and did stenographically

9    report the foregoing proceedings, and that the transcript

10   is a true and complete record of my stenographic notes.

11

12               Dated this 21st day of June, 2021.

13

14   *Connie L. Morse*

15   _____

     CONNIE L. MORSE
16   Stenographic Reporter

17

18

19

20

21

22

23

24

25

**(**

**(1)** 59:3
**(2)** 59:5
**(3)** 59:6

**1**

**1** 16:14
18:5,18
19:7,16
20:9 61:4
86:14,15,
16
**10** 89:9
**10,000**
12:24
**10:00** 4:1
**10th** 18:5,
23
**11** 60:11
**11,000**
23:20
29:12
**11,210**
23:17
**11:51**
94:18
**11th** 47:4
48:23 52:2
58:25
79:16
83:3,9,12
89:17
**13** 80:12,
20,22
87:16
88:23
**13th** 29:4
**14** 87:16,
17 88:23
**15** 80:12
87:16,17
88:23
89:23
**15-foot**
56:19
**16** 80:13
87:16
89:18,19,
21,23,25

90:1,15
**16th** 28:23
29:3 89:17
**17** 80:13
89:20,24
**18** 60:11
80:14,17,
23,25
**1866** 47:7
**18th** 28:2

**2**

**2** 16:15
18:5,18
19:16,17,
25 28:23
44:18
49:11
75:20 78:2
92:5
**2,000**
29:12
**2,775**
23:21
**20** 60:6,7
84:6,7
**2007** 47:5
58:24
**2016** 40:8
61:4
**2020** 60:11
61:4
**21** 53:7
60:21 84:7
**21,655**
23:24
**22** 15:21
62:13
**23** 15:21,
25 91:12,
13
**24** 92:4,11
**25** 92:4,11
**26** 42:20
**26(a)(1)**
72:10,11,
16 73:3,9,
12 81:9
**26(f)** 73:2

**28** 92:4,5,
6,7

**3**

**3** 17:22
18:12 19:6
71:12,14
73:16
74:15 76:5
78:24
**30** 24:11,
13,18,24
25:6 84:8
**30(b)(6)**
27:15,19
28:10 31:1
**30th** 5:21
18:6,24
40:8

**4**

**4** 68:10
73:17
74:15 76:5
78:24
**48** 13:6
**496** 19:6
20:6 22:19

**5**

**5** 68:10
**5,300** 8:13
**508** 58:23
**55** 52:19
56:22
**57** 26:24
**586** 58:23
**594** 47:10
58:25
**595** 59:17

**6**

**6** 46:4,7
80:8
**65-foot**
63:22

**7**

**726** 6:16
11:5

**8**

**8** 47:11
**8,398**
23:25
**80** 8:14
50:5 57:25

**9**

**9** 80:21,22
81:1
**900** 41:4
46:15
53:8,22
79:5
**924** 28:15
**9th** 5:10

**A**

**a.m.** 4:1
94:18
**abide** 64:1
**able** 10:20
11:6 17:10
31:7,15
35:8 43:20
58:12
59:22
61:18,20
62:17 66:9
67:5,17
77:3
**absolutely**
64:6,7,9
75:4
**absurd**
52:18,22
**access**
9:18 10:1,
15,19,25
32:21 34:1
35:8
86:18,23
**accessing**
9:23

**accident**
82:3
**accomplish**
15:8
**accomplishe**
**d** 14:1
**accounts**
32:18
**accurate**
51:5 66:4
**accurately**
45:25
**acted**
49:12
50:21,23,
25 51:4,16
**action**
61:3
**actions**
47:2 61:7
64:10
**active**
30:16
**actively**
7:19 8:13
9:19
**activities**
79:24
**actors**
51:3
**addition**
16:5 93:14
**additional**
6:22 11:18
13:11
15:16,24
27:22
29:13 30:1
32:2 40:9
**Additionall**
**y** 32:25
**address**
5:7 8:21
35:21
41:15
57:12
58:17
65:17,18
66:9 87:22
92:12,17,
20 93:3,19

addressed
  17:15
  66:14
  82:21
addressing
  92:14
adhere
  44:11
admissions
  16:7 86:3
adventure
  43:12
advisories
  71:21
  72:20
agencies
  39:14
agreed
  8:11 24:11
  44:7 82:15
  87:25
  89:8,12
agreed-upon
  7:24 8:6
agreements
  31:10
  66:15
ahead  20:4
  24:17
  49:25
  50:17
air  50:9,
  10 58:1
  88:1
allision
  42:12
  47:12
  52:14
allow
  81:15
alternate
  32:21
Alvaro
  11:10
  14:24
amended
  16:2 29:15
amending
  15:1
amendment
  15:24 16:1

and/or
  79:2
answered
  73:11
anticipate
  64:16
  76:18
  82:22
anticipated
  29:2 46:10
  49:2,4,20
  50:22 51:2
  55:6,8
  64:15
  68:17,23
  75:6,17,
  18,22
  76:22
  82:20
anticipatin
g  75:19
anticipatio
n  28:22
  64:8
anytime
  94:11
apart
  64:23
apologize
  34:19
  88:20
apparently
  7:10 30:19
appearing
  4:19
appears
  35:9
apples
  64:2
application
  28:8 70:7
applying
  12:8
appropriate
  59:1,2
arguably
  62:2
argue  45:2
  57:1 59:7
  61:21 78:1

argued
  62:3 83:16
arguing
  39:25
  51:10
  76:24
argument
  48:1
  51:12,14
  52:3 69:17
  70:1 77:3
  79:9 91:7
  94:9
arguments
  40:3 63:2
Army  50:9
assessed
  31:18
asset  50:7
assets
  58:10
  64:12
assign  8:4
assisting
  17:9
assuming
  61:17
attach
  21:24
attachment
  22:14
attempt
  10:25
attend
  26:6
attention
  37:17
attorneys
  25:19
author
  30:15
authority
  42:8
availabilit
y  94:3
available
  6:17,21,22
  8:3 10:24
  11:12,19
  12:7,14,15
  37:1,7

  92:22 93:2
avoid  21:9
  22:12
  83:17
aware
  71:17 72:5
  74:21,22
  79:6

  ———————
         B
  ———————
backed
  32:8
background
  32:25
backup
  32:2 34:2
backups
  31:24
balance
  14:6
barge
  48:17
  53:17
  63:20,23
  64:22 79:3
  80:7
  82:11,12
barges
  48:6 52:19
  53:15
  56:23
  58:6,8,9
  61:24
  62:13 68:2
  79:22,25
  80:2 82:4,
  8,17,23
  83:19,24
  86:10
Barr  5:11
  24:7,10,
  18,22,25
  25:8,22
  26:17
  39:24
  40:5,14,15
  42:6 43:25
  44:17
  45:8,9
  46:5 49:21
  52:7,18,24

  53:6,7
  54:11
  56:17
  59:21
  60:24
  64:11
  66:13
  67:19 68:8
  69:5 70:25
  71:8,11,18
  73:4,24
  74:11,20
  75:13
  76:11 77:7
  78:13,20,
  25 80:11
  82:15
  83:13,23
  84:7,10
  85:19
  86:24
  89:21
  90:1,6,11
  91:3,12,14
  92:6,9
bases  80:8
basis
  16:15
  19:19
  50:13 89:4
Bates  15:3
bay  54:10,
  12 59:9
beach
  54:19 78:9
bearing
  53:12
bears
  79:10
  91:22,25
beat  77:7
  84:7
beeline
  68:10 69:4
Beggs
  57:15
beginning
  43:4
believed
  19:8

believes
  35:4
bench
  38:16
Bender
  10:5,12
  27:4 30:19
  31:14 32:4
  33:1
Benton
  11:10
Betsy  52:5
  83:7
better
  22:9 23:10
bifurcated
  44:4
Billhimer
  6:1 16:12,
  16,22
  17:14
  18:10
  29:23
  36:24
  92:19 93:1
Billhimer's
  15:12
Blanchard
  4:9,11
  6:12,14,15
  11:3,7,21
  12:5,13,21
  16:13,21
  31:4,16,25
  33:23
  34:21
boarded
  58:4 61:25
boat  47:21
  48:2,23
  49:8,16
  52:22
  53:14
  54:19
  56:21
  59:20,23
  61:25
  79:3,6,7,
  12
boats
  46:18

47:20,23
48:20 54:7
55:14 56:8
57:6 61:23
80:3
booting
  35:3
borne
  46:19
Boston
  56:19
  57:12
Branning
  6:10,11
  13:16,25
  14:4,15,
  18,24
  15:7,11,
  18,22
  16:5,20,23
  17:1,7
  19:18,22
  25:1,9,12,
  14 27:20,
  23 31:3
  32:10,13
  33:14,17,
  20 34:4,7,
  18,24
  35:14
  94:14
break  6:5,
  6 47:23
  86:10
breakaway
  83:6,8
bridge
  30:16,18
  41:19 48:5
  52:20
  66:19,20
  80:15
  83:20
  85:24
  86:5,6,8
  91:20 92:3
Bright
  4:20,21
broad
  62:20,24
  65:25

66:11
broke
  47:20,21
  48:17,23
  49:17 58:9
  82:11,12,
  13
bucket
  13:24
building
  41:19
  52:20
built
  58:13
bunch  42:1
  57:7
Bunge
  45:23 63:8
burden
  42:23
  45:20
  54:25
  65:15 67:1
burdenship
  42:12
burdensome
  38:19
  85:14
burn  85:6
business
  10:8 31:23
  32:16
  34:12
  41:21 79:1
button
  85:20

          C

calendar
  93:9
cameras
  89:9
Cannon  4:4
capabilitie
s  62:15
captain
  8:24
capture
  7:14 33:11

captured
  21:18
captures
  22:10
capturing
  21:21
  22:25
card  35:4
care  26:8
  41:18
  50:14
  52:13
  56:18,23
  58:20
  59:2,3,5,
  11,13 70:9
  82:21,24
  83:1,2,4,
  9,11 91:9
carefully
  66:7
carrier
  32:22,23
carrying
  48:17
catching
  24:3
categorize
  13:17
category
  49:11
  68:10
  75:20 78:2
caveat
  87:25
cell  6:9,
  18,20,25
  7:3,4 8:1,
  2,4,17,22,
  25 9:1,8,
  12,22
  10:22
  11:18,25
  12:19
  26:19
  30:4,8,25
  31:22
  32:22
  35:17
  36:11
  37:5,20

49:24 88:7
centrally
  31:17
  33:25
certified
  17:1
chambers
  93:1
chance
  26:1
charter
  54:19
check
  31:24 32:2
Christine
  16:24
churches
  87:2
Circuit
  47:5 48:24
  52:2 58:25
  79:16
  83:3,10,12
circulated
  20:19
circumstanc
e  83:15
circumstanc
es  10:13
  46:9,23
  47:16
  49:2,5
  55:5 58:19
  62:10,11
  64:21
  68:23 70:2
  83:14
cite  58:22
cites
  59:16,19
  83:4
City  74:24
  77:11 78:7
  86:20 87:1
  91:16
claim
  44:13
claimant
  42:15
  43:12 57:5

claimant's
38:18
claimants
5:13,20,24
8:11 12:20
13:11,23
16:7 23:13
25:18,22
26:4,12
39:10,18
40:22
41:4,9,10
43:1 44:9
46:15
53:2,8,23
55:24
57:4,6,10
60:9,21
61:1 62:16
63:16
64:22
66:16
68:19 69:9
70:8,12
71:12 76:3
79:5,21
85:2 89:21
90:2,8,9
claimants'
14:21 16:1
27:24
38:4,16
40:24 41:2
81:19 82:6
claims
76:6 90:10
Clark  17:6
clean
33:16
cleaned
10:18
clerk
32:17
clerks
93:12
client
78:16
Coast
50:7,9
58:11
68:11

91:16
collect
10:14
collection
6:21
collective
38:16
Collier
25:3 44:22
54:23 63:7
Collier's
45:24
46:5,6
52:17
54:24
commander
88:1,2
commanding
88:1
commands
50:6 57:25
comment
84:2
communicate
33:3
communicati
ng 30:24
33:6
communicati
on 30:22
communicati
ons 28:16
33:5,9,11
34:2
91:15,20
community
56:24
67:23
87:11,12
company's
31:12
company-
wide 13:20
compare
52:20
comparison
66:4
complainant
s 60:8
complete
49:6 67:23

completed
11:13
completely
41:21
42:18 65:4
87:13
compliance
17:9
complicated
6:25
complying
34:13
comprise
50:5
compromised
35:6
conceding
54:15
concepts
59:4
concern
20:6 23:4
28:24 29:5
71:18
concerned
30:25
concerning
15:19
17:11
26:23
concerns
27:9 28:13
65:19
concluded
47:17
94:18
conclusion
57:3
conclusions
45:25
conditions
50:22
51:23
64:15,16
77:11,16,
18,21
conduct
40:22,25
41:2,17
46:21
52:20 72:6

90:7,9
91:17
confer
5:12 40:16
42:7 43:15
45:12
60:22
71:13
conference
12:18 14:9
29:25
84:14 86:7
conferences
85:17,23
conferred
24:10
confirmed
14:6
conflict
93:22
conflicts
6:4
confusion
21:10
connection
60:10
90:25
considerati
on 38:24
consistent
20:11 38:7
constitute
79:19
constructio
n 41:18
48:5 62:13
66:19
consulted
71:20
consulting
71:24
contacted
71:19
contend
86:4
contention
47:1
contentious
40:17

continuousl
y 6:19
contract
40:9
contractor
17:4
control
71:6
conversion
11:13
convert
7:17
core 44:13
89:1
corpus
23:22
County
72:2 74:24
75:9,14
77:12
80:14
85:13
86:21 87:1
91:16
County's
85:5
course
6:14 10:7
31:23
32:16
34:12
67:13 93:3
Court's
17:11
courtroom
25:17,21
cover 28:7
covered
5:8
covers
83:14 90:6
crab 59:10
crane
48:18
created
8:12
20:16,23
21:5,14
crew 47:17
crew's
47:12

Judge Hope Cannon
June 16, 2021

5

criteria
  12:17
critical
  47:8
crucial
  30:14,21
crux  44:12
custodian
  9:10,21
  14:13,23
custodians
  8:24 9:2
  10:4 11:5
  12:2,6
  30:2 33:6
customs
  59:6
cut  39:7
  52:24
  63:12 71:1
cuts  40:19
cutters
  50:8 58:11
cutting
  36:19

          D

damage
  41:8 60:8,
  9 80:20
  81:10
  82:5,9,18,
  19,25
damaged
  83:19
damages
  44:15
  45:16,17
  80:16,18
  81:24
damages-
type  81:16
Danny
  11:11
data  6:10,
  18,25 7:4,
  5 8:1,2,5,
  17 9:4,6,
  8,13,18,23
  10:1,10,

16,19,21,
  22 11:1,19
  12:3,7,12,
  20 14:1,7
  17:10
  19:15
  22:11
  23:13
  26:20
  30:4,9
  31:17,18
  32:15,21,
  23 34:1
  35:5,17
  36:9 37:5
  51:5,6
database
  13:19 14:7
dates  22:5
  89:16
days  15:23
  26:24
  84:18
dead  77:7
deadline
  19:14
deadlines
  37:1 43:9
deal  65:25
deals
  40:21
  71:4,5
death
  83:16 84:8
decide
  24:7 73:3
decision
  47:4,5,10
defendant
  54:24
defense
  54:25
  79:14 89:7
defenses
  90:10
definitely
  22:9 63:5
definition
  52:9 54:13

definitivel
y  62:18
delay
  36:17
deleted
  23:6
Demarco
  27:19,24
depend
  67:10
dependent
  75:23
  76:19
  77:22
depending
  93:24
depends
  77:20
depict
  89:10
depo  35:23
describe
  42:24 60:8
  61:6
described
  34:5,7
  44:10
designed
  39:1
destroyed
  43:6 56:6,
  8 92:2
determinati
on  51:20
determine
  62:21
  82:4,10
determined
  46:8 55:3
determines
  79:16 89:2
determining
  86:9
device  7:7
differ
  48:21
difference
  20:20
differently
  73:16

difficulty
  47:15 62:8
dig  85:8
direct
  34:5 41:8
  47:4 57:9
  60:7,9,22
directed
  31:2 41:8,
  9 53:2,7
  57:4 60:7,
  21,25
  71:12
  74:14
  80:13,14
  82:17,18
directing
  37:19
directive
  15:20
  60:17
  61:10
directly
  45:14 60:6
  71:9
disagree
  45:22
  77:25
disagreemen
t  5:22
disc  85:6,
  16
discipline
  34:11
disciplines
  33:2,8
disclosed
  21:9
disclosure
  72:10,17
  73:13 81:9
disclosures
  72:11,13
  73:3,5,10
  74:3
discoverabl
e  72:13
  74:18
  85:22 86:9
discovered
  7:9 32:20

discovery
  5:12 17:2
  24:6 26:12
  29:15
  57:3,7
  59:24 64:5
  65:16 69:9
  77:20
  90:20
discuss
  18:9 94:4
discussion
  15:19 42:6
  78:23
  93:6,20
discussions
  17:14
  43:9,11
dismiss
  24:9
display
  59:17
disproves
  50:3 69:19
dispute
  54:7 89:25
  92:5
District
  4:3
doable
  13:4
dock  41:22
  53:14,17
  56:19 59:8
docs  24:1
documentati
on  6:17
documents
  6:22 8:10,
  13,14,18
  11:16
  13:5,18
  15:3,5
  16:17
  17:15,23,
  24 18:4,
  16,20
  19:1,4,11,
  19,20,24
  20:6 21:4,
  11,12

22:21
23:17,19,
22,23,24
29:11
35:25
39:1,20
43:8
**downloaded**
11:6 12:2
32:8
**drafted**
62:23
**drafting**
38:23
**drifting**
79:2
**due** 19:12
35:9

**E**

**e-mail**
20:24,25
21:3,15,25
22:2,7,12
23:5 94:15
**e-mails**
7:1 21:4,
22 28:15
43:6
**E-VENDOR**
13:4
**East**
54:10,11
**economy**
64:13
**editorial**
84:1
**Eduardo**
9:2 30:17
**effect**
37:12
**effects**
82:22
**electronic**
13:21 17:2
21:22 22:2
**elicit**
39:1
**embark**
43:11

**employed**
17:3
**employees**
34:9
**ended** 6:3
27:20 82:5
**enjoy**
59:9,15
**ensure**
13:22
**enter**
37:13
93:20
**entire**
21:19
64:13
**entities**
71:24 75:4
91:21
**entitled**
47:22
55:16,18,
20 56:13
72:16
81:3,10
82:2
**entity** 7:2
9:25 57:23
79:1
**EOC** 85:18
**Escambia**
72:2 74:24
75:9,14
77:12
80:14
85:5,13
86:21 87:1
91:15
**escape**
51:24
**ESI** 5:20,
24 13:19
17:9 18:13
26:17 28:5
29:8 35:23
38:1,4,20,
23 39:8,
15,21
85:10
90:19
93:16

**establish**
62:2 83:9
**established**
77:8 83:3
**establishes**
77:11
**establishin
g** 55:2
66:3
**estimate**
11:23
**evacuate**
78:9
**evacuated**
60:16 61:8
**evacuation**
78:14
**event** 61:6
75:18
**events**
61:2
**everybody**
25:21
49:12,13,
16 56:7,9
60:19
67:23
68:11,22
75:11
87:13
**everybody's**
49:16
**evidence**
47:22,24
49:7 56:15
**evidenced**
47:13
**evidentiary**
73:7
**exact** 7:2,
20 9:24
56:12
**exactly**
36:20
63:24
**example**
20:22
21:13
67:20 72:2
75:25

**Excuse**
80:24
**exist** 30:9
**existed**
21:24
**existence**
55:1
**exists**
21:3
**exonerates**
51:15
**exoneration**
45:15,16,
17,23 46:2
51:8 55:19
69:1
**expect**
78:2,5,6,
8,12 87:12
**expectation**
36:25
78:11
**expected**
46:22
69:2,3
72:19
77:10
78:1,4,10
87:8,11
91:23
**expecting**
25:18 63:7
77:13
**expedition**
87:3
**experience**
38:17
**experienced**
56:12
**expert**
43:9 63:8
69:5,6,7
74:2,4
**experts**
74:5,14
**explain**
23:2,9
36:18,20
37:2
**explore**
9:16

**expressed**
26:5
**extensive**
13:1
**extent**
7:12 41:25
69:8 71:4
**extra**
21:11
**extract**
90:17
**extracted**
7:4,21

**F**

**F-18** 50:12
**F.3d** 58:23
**face** 49:19
**facilities**
50:5
**fact** 14:16
44:9 46:4
47:14
48:17
49:12 62:4
69:12
74:1,9,16,
17 76:7
79:18
85:20
**facts**
45:24
49:12
**failing**
44:10
51:20
82:22
**failure**
54:4
**fairly**
40:15
**fall** 13:23
**familiar**
18:10
46:12,17,
20 48:25
56:11
**family**
20:16,17
21:6,9

22:8
**far** 9:23
19:20 67:3
**farmers**
41:13
**fast** 15:8
**fault** 46:8
52:15
55:2,3
**FDOT**
23:19,23
24:1,2
**ferocity**
79:18 81:7
**ferries**
92:2
**ferry** 56:7
57:6
**field**
20:16
**figure** 6:9
39:17 94:4
**file** 29:7
**files**
21:22
90:19
**filings**
44:2
**filmed**
85:17
**finality**
30:6
**finalizing**
15:23
**finding**
43:6 45:24
**findings**
46:4
**finish**
8:17 52:25
**firm** 17:3,
4 37:1
**first** 5:3
6:8,17 7:9
9:2 26:10,
11,19 27:9
30:1 45:18
72:8
**Fischer**
58:22 62:6

**fisherman**
63:22
**fishing**
83:20 87:3
**five** 11:1
41:11
42:25
65:14
**five-year**
53:2
**floated**
79:7
**floating**
79:3
**Florida**
4:4
**focused**
67:17,19
**folks** 4:7,
24 70:2
**folks'**
33:13
**follow**
49:10,21
51:21
54:4,6,13
62:4 64:8
68:9 70:1
**followed**
48:13
50:13
55:22
57:24
**following**
15:18
39:15
61:19
**force**
50:9,10
54:25
**forces**
42:13
**foreseeabil
ity** 56:14
**forget**
24:6 40:12
**format**
12:12
**found**
47:11,15
62:8

**four-barge**
83:5,8
**frame**
20:23
22:10 45:8
92:16,20
**frames**
45:9
**Francis**
11:11
**frankly**
15:11 42:1
52:18
74:21 91:3
**freedom**
46:7 55:2
**fresh**
26:17
**Friday** 8:2
11:17
12:8,11
13:3 16:3,
9,10
19:12,14
36:14,15
37:3 38:8
84:15
88:15
92:15
94:13
**full** 7:12

___

**G**

**gander**
65:23
**Garcon**
80:15
**gathered**
10:9
**GEISLER**
26:3
30:11,13
**Geisler's**
28:24
**generally**
13:6 46:8
55:3
**German**
50:10
**get all**

12:3 90:21
**gives** 34:8
**glad** 14:20
**God** 49:7
55:25
79:14,16,
17,19 80:8
81:8 82:1
84:5 89:7
**goes** 59:12
66:24
69:11 72:6
75:15
76:23
79:8,13,17
81:6 86:1
90:4 91:6
93:18
**Gonzalez**
57:15,17
58:15,16
60:25
**good-cause**
41:19
**goose**
65:22
**gotten**
23:14 73:7
**government**
4:15,19
60:17 61:9
71:14
86:17
89:10
**governmenta
l** 71:24
**governments**
46:16
71:23
**grocery**
58:2
**guarantee**
53:19
**Guard**
50:8,9
58:11
91:16
**guessing**
18:7 22:18
92:19

**guidance**
38:7
**Gulf** 68:11
**Guntner**
5:18,22,23
13:13,14
16:19
17:13,17,
20 18:8
20:4,5
22:17
23:1,16
26:10,13,
19,23
28:3,6,14
35:16,18
36:7,10,16
38:1,3,6,
11,15 39:7
40:7,11,13
65:18
92:15
93:7,11,14
94:2

___

**H**

**hammer**
34:10
**hand** 68:4
93:18
**handful**
16:17 26:5
**handle**
76:2 80:12
**hands**
85:12
**handwritten**
14:12
**happens**
53:13 84:4
**happy**
38:21
73:24
**Harbor**
56:6
**hard** 8:1
35:3 86:12
88:18
**harm** 69:21
**havoc**
56:22

headnote
47:11
hear 4:9,
12,16,22
hearing
6:20 14:2
24:7 26:8
27:10
70:20
73:7,10
88:19
92:18
height
82:12
heightened
83:10
helpful
37:16,22
helps
41:2,15
higher
56:23
highlight
63:17 71:5
Hill 8:24
27:1
hire 69:6,
7
hit 53:17
64:9 66:20
68:21
hits 8:13
hitting
22:4 36:3
hold-ups
37:9
holders
80:15
holdup
36:21
homeowner
48:19
honestly
38:12 41:8
82:1
Honorable
4:4
hope 4:4
8:15
hopefully
76:25

Hornet
50:12
horse 77:8
hospitals
58:2
host 71:25
80:4
hour 25:11
hours 13:6
house
59:14
61:13
Hundreds
56:10
hurricane
8:12 28:7,
9 30:15,17
41:1,5
44:11
48:12,13,
16 50:2
51:21 52:5
54:5 55:22
56:9 57:24
60:10
61:20
62:4,12
63:25 64:6
67:12,22
68:9,12,15
71:21 77:8
78:3
79:15,17
83:6
hurricanes
48:24
Hyde 4:14,
16 48:7
49:23,25
50:1,18
57:14,18,
19 58:14
69:16
80:12
88:4,6,18,
20
hypothetica
l 68:9

_____
        I
_____
idea 65:3
identified
20:18
28:16
40:18
identify
15:3,4
61:1,5
71:19
72:21
79:1,7
identifying
64:17
image 7:15
immediately
8:4,18
impact
49:11
67:14 76:4
impacts
70:13
importance
30:4
important
18:2 30:21
32:15
92:17
inaudible
88:5
inception
28:8
inclination
61:17 63:1
66:8 84:23
inclined
81:15
include
21:22
23:18 77:4
includes
23:22
including
14:8 15:23
20:18
22:11
32:21 94:9
inclusive
25:2

indicate
28:14
61:21
indicated
28:19
34:22
39:19
indicates
27:11
indicating
37:14
indication
35:1
individual
10:8 41:22
48:2,6,19
60:13,15
62:16 71:2
79:1
individuall
y 40:21
individuals
30:14
33:10
inform
47:3 56:13
83:1
informed
8:1 11:22
12:13
14:21
32:14 33:7
55:12
76:20
informing
46:23
informs
42:17
50:22 51:6
64:9 75:7
78:10
79:20,23
82:23
87:8,21
initial
19:10 20:9
61:14,17
62:22
65:12 73:5
84:23

initially
20:14
26:21
70:17
93:15
inland
50:10
input
15:12
inquire
47:22
insisting
90:19
instructive
58:24
intend
74:19 76:7
interest
25:25 26:5
Internet
85:8 86:19
interrogato
ries 5:16
26:25 40:6
44:16
62:23
70:15 71:3
73:11 74:9
76:15 77:1
interrogato
ry 15:16,
25 52:25
53:5 54:16
60:6,7,12
71:11
72:24
73:15,17
80:25 81:3
interviewed
15:24
71:20
introduce
16:23
investigati
ng 9:5,9
10:13,16
involve
39:12
involved
30:16

involving
  10:14
issue   5:19
  6:12 8:20
  9:22 22:22
  23:11
  27:14,15
  28:21
  29:1,4,17
  34:16
  35:9,19
  39:11
  40:7,18,
  21,23
  44:23 45:8
  46:14
  48:12,14
  54:14
  56:25
  57:6,12
  59:24,25
  61:24 65:8
  66:7 70:14
  71:6 74:2
  81:22
  87:23
  88:14 89:1
  90:6,12
  91:17
  92:14
  94:12
issued
  87:1
issues
  5:1,7,15,
  17 8:25
  16:13
  22:18 24:6
  26:11
  28:11,17,
  20 35:25
  36:19
  38:2,22
  40:16
  44:21
  45:12
  71:2,8
  93:16 94:5
item   7:9
itunes
  31:24

            J

jacket
  34:9
jet   62:1
  80:3
Johnson
  9:21 35:7
Johnson's
  27:4
  34:17,21
Joseph
  52:5
Judge   25:3
  44:3,6,19,
  22 45:24
  46:5,6
  52:16
  54:15,23,
  24 63:6,7
  65:11
  80:18
  81:11
judged
  75:8
judgment
  47:13
July   40:8
  61:4
jurisdictio
nal   24:13,
  14

            K

Kelly
  39:13
knowing
  63:2
known
  14:1,6
  18:13
  19:20
  46:10,22
  49:1,4
  50:22
  51:23 55:5
  72:13
  86:1,3

            L

label   15:4
land   50:6
Lane   57:16
language
  83:14 91:8
laptop
  9:6,7
  30:24 32:3
laptops
  10:17,19
large   19:7
  91:24 92:1
last-minute
  75:11
Late   8:11
law   26:5
  44:25
  45:25 52:7
  70:6,7
lead-up
  30:17,23
leadership
  67:13
leaning
  65:6 70:20
learned
  27:1
leave
  61:12
leaves
  10:9
left   5:5
  10:6 27:4
lengthy
  93:6
letter
  27:13
  28:19
  38:10 40:5
level
  19:7,16,17
  75:19
  77:14
  78:3,4,5,
  6,8,10,12
  82:25
liability
  39:4 51:24
liable
  51:18
lightly
  38:13
liked
  40:17
limit
  54:21
  60:22
  73:25
  87:25
  89:9,12
  90:24
limitation
  81:5
limited
  39:3 46:16
  53:3
  60:18,19,
  20 86:16
limiting
  74:16
line   36:22
  38:12
  48:17
  93:17
lines
  17:21
  93:16
listening
  63:1
lit   34:13
literally
  79:5
litigation
  15:20
  28:22
  29:2,3,19
  39:2,3,5
  43:20
live   7:11
lives
  53:10
  54:18
load   90:19
loaded
  23:24
locally
  7:3 10:9
  25:25
locked
  12:1
log   17:22,
  23 18:4
  19:11,12,
  13,15
  28:25 29:1
logged
  17:25
logical
  57:3
logistics
  25:16
long   11:24
  12:3,11
  17:3,5
  22:4
longer
  9:11 27:2
  30:9 32:6
  33:18 37:8
  70:25 92:3
looked
  17:25 40:4
  44:1 55:14
  63:11
loose
  21:22 22:2
  47:20,21,
  23 48:23
  49:17 58:9
  82:11,12,
  13 86:10
lost   9:3
  27:2 30:19
  79:12
lot   4:25
  33:9 42:4
  44:15 48:8
  71:2 72:9,
  14 84:12
Louisiana
  42:11
  47:6,11,
  17,20
  55:13
  59:16 91:8
Lykes   52:5
  83:5

**M**

maintained
  33:25
majeure
  54:25
majority
  43:7
malfunction
  35:2,9
managing
  17:8
manual
  14:8
marinas
  56:6 89:11
marine
  51:3
Marines
  50:9
mass  38:17
materials
  18:14
mattered
  53:16
Mcglynn
  9:11,14
  27:2 30:15
  31:6
Mcguire's
  41:12
meant
  43:25
media
  86:20
meet  5:11
  30:7 31:4
  40:16 42:7
  43:14
  45:11
  52:12
  60:21
  71:13
memo  88:11
memorandum
  88:11
mention
  29:21,25
mentioned
  11:2,24

messages
  8:5,6
  11:19
  27:11
  36:12,18
met  5:14
  77:16,18,
  21
meteorologi
st  72:3
method
  18:22
  20:14
  31:25
methodology
  20:12
metrics
  17:24
Michael
  68:10,12,
  15,21
  69:13
middle
  69:3
middleman
  36:20
mile  91:19
Milton
  53:10
  54:18
mind  26:17
  52:14
mini  53:22
minimal
  42:22
minimum
  16:6
minute
  57:18
minutes
  24:12,13,
  14,18
  25:4,6
  84:8
Mississippi
  83:6,8
misundersto
od  33:23
mix-up
  21:10

mix-ups
  22:12
modified
  20:15 21:5
mom-and-pop
  58:3
mom-and-
pops  58:2
moment
  29:9
months
  27:7 43:3,
  10
moor  79:12
Moore
  16:24
  17:1,4
  18:15,19,
  25 19:3,6,
  24 20:1,13
  21:8,13,19
  31:20,21
moored
  50:8 58:5
  64:22,23
mooring
  48:17
  50:14
  61:22
moorings
  63:10
morning
  4:6,21
  6:15 42:3,
  8 45:10,11
  65:3
motion
  24:9,12,19
  25:7 29:6
motions
  24:8 25:12
  42:5
moved  68:2
moving
  8:16 10:22
  75:25
MP4  7:18
  11:13
multiple
  66:18

municipalit
ies  86:17

**N**

narrow
  44:8,21,23
  67:7
narrowed
  5:14 71:14
NAS  50:5
  88:1
nature
  38:17
  42:13
nautical
  47:14
  59:12,14,
  18 61:12
  62:8
Naval  58:1
Navy  39:15
  46:16
  48:8,9
  49:9,10
  50:1,12,
  19,21 51:5
  55:8,22
  56:3,4
  57:22 64:5
  68:13,18
  69:18,20
  78:6 86:21
  87:20,25
  88:24
nearly
  27:7
necessarily
  30:24
  45:15 48:4
  70:4 72:25
  76:4 81:17
negligence
  44:10,13
  45:15,18
  47:19,22
  51:11,14,
  15 52:13
  63:6 65:21
  66:12
  88:25

negligent
  41:16
  47:18
  50:2,3,19,
  20 51:17,
  20 52:8,
  10,11 54:4
  55:17
  61:19
  69:20,22
neither
  50:2 69:19
  77:19
Neraida
  47:4,5,9
  48:22 52:4
  58:21,22
  63:24 80:1
  83:3,4,7
new  4:18
Nick  9:21
night
  23:21
  38:11 69:4
nonexistent
  42:22
normal
  31:23
  32:18
Northern
  4:3
note  17:21
  34:19
notes  5:9
  13:15
  14:12,16
  46:7
notice
  13:5 44:15
notified
  27:24
nuanced
  71:8
number
  16:18
  27:9,10
  28:15
  38:24 50:4
  79:14,19,
  21 81:6,8

## O

object
89:20
objected
81:20
89:17
objecting
88:12
objection
71:4
objections
40:19
obtain
32:24 33:4
41:4 46:2
86:13
obtained
7:3,8
23:20 36:1
occurred
82:10
occurs
21:10
October
28:19 29:4
officer
4:2 85:5
88:1
officers
86:18,22
officials
75:8 85:23
86:4
once 11:12
70:20
onerous
39:21
ones 11:24
24:2 42:4
71:10,22
73:18 77:2
80:11
87:16
open 5:5
opened
30:10
opening
9:24
34:16,22

operated
32:18
34:10
operates
54:18
operating
70:11
operator's
29:23
opinion
54:24
opposed
34:13
option
22:9
options
9:17
orders
78:14 87:1
91:24
ordinarily
72:9,16
ordinary
10:7 32:16
34:12
ought
72:20
outcome
68:24
outside
13:19 14:7
18:20,23
19:23 20:7
21:3,11,15
22:13,22,
25
outstanding
5:7,19
26:11 94:8
overboard
9:3 27:2
35:13
overly
62:20,24
65:25
66:11
overnight
7:7
owned
52:21 58:8

owner 48:2
56:19,24
59:20
owners
41:13 49:8
55:9,10,24
59:23
60:15,18
90:25
owning
60:3
owns 52:19
59:8
oyster
41:13
48:19

## P

page 46:4,
7 47:10
58:25
Palafox
56:5 57:5
59:22
paragraph
47:11
parameters
22:7
parcel
51:11
parsed
81:12
part 17:8
42:5 47:13
51:10 76:1
77:4 79:8,
10 83:23
89:24
Partially
45:4
participate
93:4
particular
28:10
63:10
particularl
y 33:5
43:2
parties
25:3 44:6

47:3 63:2
Partington
17:6
partners
26:5
parts 49:2
83:19
pass 65:12
78:7
passenger
56:7 92:2
password
9:13,14
27:3 31:9
35:10
passwords
30:10
Pat 30:15
path 33:4
82:7
Patrick
9:10
Pensacola
50:5 53:11
54:19 56:8
58:1 69:4
74:25
77:12
78:7,8
86:21 87:1
91:16,19,
21
percent
8:15
perfection
50:24
perfectly
58:12
period 9:5
53:2 65:19
periods
40:8 65:20
permissible
6:13 25:2
person
27:22
46:1,12
48:25
52:21 53:9
56:21
71:19 93:4

personal
6:3
personally
26:6
persons
47:14
59:12 62:7
perspective
48:8
persuasive
58:7
phase
44:18 92:5
phenomenon
55:1 56:12
phone 4:7,
10,14,24
6:2,9,18,
20,25 7:14
8:1,2,4,25
9:3,8,12,
22,24,25
10:9,10
11:18,25
12:20
26:19
27:1,2,4
29:24
30:4,19
31:8,10,12
32:23
34:17,21,
22 35:1,5,
10,13,17
37:5,21
49:24
85:15 88:7
93:5
phones
7:3,4,10,
11 8:22
9:1 10:7,
15 11:1,9
12:1,6
27:5,12
30:8,25
31:17,22
32:7,9,15,
17,19
33:13,15
34:3,8,15
36:11

37:20
90:16,18
**photo**
7:13,14
**photos**
6:16 7:5,
10,11,18
8:5 11:5,
8,9,11
13:1
**phrase**
73:15
**phrased**
72:25
**pick** 85:15
**picking**
27:20
**pictures**
27:11
90:2,16
**piece**
17:12
45:19
66:12
81:19
**pier** 41:13
57:5 83:20
**pigeonholed**
57:21,22
**place**
28:18
39:16,20
47:16 62:9
64:20
**placed**
30:5
**plan** 8:16
10:22
19:13,14
28:7 30:15
44:11
48:10,12,
14 49:10
51:21
54:5,6,13
55:22
57:24
61:20
62:5,12
64:1,6,16,
18 67:12

73:21 74:1
77:8,13
78:3
**planes**
56:4
**planning**
25:17 28:4
71:22
**play** 39:19
66:5 76:1
90:14
**please** 4:5
61:5
**pleasure**
48:23
**plus** 21:22
22:2,13
38:21
**pointed**
59:20
**points**
32:15
54:16
79:13
**policy**
13:20 14:8
31:21
**port** 56:8
91:18,21,
24,25 92:1
**portion**
19:7,16
**position**
16:2 40:24
41:2 46:2
57:2
**possession**
85:4
**possible**
8:8 10:3
12:22
13:2,9
15:4 16:7
**possibly**
9:17 67:6
68:5 73:21
**post** 33:21
**post-**
**september**
40:8

**potential**
23:3 33:4
**potentially**
13:3
**practice**
10:8 13:6
**precautions**
46:9 55:4
**preceding**
7:15
**predicted**
56:1
**prefer**
93:19
**preference**
26:13
**prefers**
37:22
**prep** 28:9
**preparation**
40:22 50:2
68:20 71:4
75:19
**preparation**
**s** 45:13
49:18,19
51:7 53:15
54:20
60:10
68:12,13,
14 71:22
75:16
**prepare**
31:1 41:1,
5,10,15,23
42:24
53:1,9,12,
24 55:14
56:21
69:12 90:3
**prepared**
6:12
42:15,16
55:18
67:24
68:5,6
**preparednes**
**s** 28:7
44:11
48:12,14
51:21 54:5

57:24
61:20
62:5,12
64:1,6
67:12 78:3
**preparing**
46:21
**present**
23:11
25:20
**presents**
35:19
**preservatio**
**n** 27:14
28:18 29:5
31:2
35:20,25
**preserved**
27:12
**presiding**
4:5
**press**
85:1,17,23
86:6
**presumed**
52:15
**pretty**
36:2,6
44:8
**prior** 8:12
14:12
48:15
75:22,24
**priorities**
30:4
**privilege**
16:16
17:16,22
18:4,18
19:11,12,
13,15,20
20:2 28:25
**privileged**
18:1 19:9
**privity**
45:21
48:15
66:25
67:14
75:24 76:2

**probably**
18:9 23:8
27:15
29:17 30:6
65:8 84:16
92:19,21
**problem**
34:22 35:2
39:15
**proceedings**
4:1 94:18
**process**
6:25 7:2,
17,18,19
9:9 20:9
85:10
**processing**
7:22 10:3
11:14
17:10
**produce**
11:15
13:21 71:3
84:11
85:11,20
93:23,24
**produced**
6:16 11:5
12:19
14:2,5,8,
14 15:5
17:22,25
21:17
22:20 23:7
39:18 43:8
53:21
**product**
19:9
**production**
5:16 6:10
10:25
13:18 15:2
17:10,22
18:5,12,13
19:6,21
26:25
36:17 37:5
38:25 40:6
44:17
66:14
84:20,21

productions 8:19
productive 40:16
progress 84:22
project 21:2,19 22:4,6,11, 15 23:5,6
project-specific 18:6
proper 59:17
properly 55:25 58:5 79:12
properties 54:22 60:13,16 82:6
property 46:18 54:17 55:9 59:8 60:3, 8,9,14,15, 20,23 61:1,4,7, 9,25 82:10
proportional 39:4 42:19,21 66:11 70:14 89:3
proportionality 90:14
proposal 38:8,18
proposed 38:4
proposition 47:2
propounded 52:25
protect 61:3
protected 9:13
protocol 5:24 38:4,

19,20,23, 25 39:1,9, 16,21 85:10 90:20 92:16
protocols 32:18
prove 51:7 55:11,20, 21 69:1, 22,23 79:14,15 89:7
proven 46:1
proves 50:3 69:19
provide 13:17 16:2 31:8,11 32:24 37:1,19 72:21 82:16 85:16 89:11 90:2,19
provided 9:14 13:23 15:17 16:19
provision 59:17
prudent 46:11,20 48:25 50:14 51:23 56:10 59:4
public 23:18,22 75:5 78:14 85:5,7,9, 13,23 86:3,17,22
pull 59:9 73:1 78:15 85:2
pulled 20:10

33:24 74:12
pulling 20:10,25 21:4
purpose 38:24 81:13,22
purposes 25:17 66:2 67:4
pursuant 60:16 61:9
push 85:20
pushing 7:25
put 7:7 28:18 36:13 91:24 94:10
putting 65:15

---

**Q**

queue 36:13
quickly 12:22 13:2,8
quite 7:12 12:25 30:25
quote 47:12,13, 14
quotes 47:6
quoting 47:9

---

**R**

rain 75:18
raised 26:20 27:13 81:21
raises 27:8

raising 54:25
range 18:21,24 19:24 20:8 21:11,14, 16 22:13, 23,25 28:16,17
ranges 20:2 22:5
reacting 72:5
reality 63:18
reasonable 41:3 42:17 45:2 46:24 49:3,19 51:22 52:9,10,12 53:25 55:12 59:5 61:22 62:5 63:9 66:6, 10 69:1 72:24 76:8,13,17 78:5
reasonableness 45:13 46:8,11 47:3 49:14 50:25 51:6,10 55:4 56:14 58:18 60:1 64:10 66:3 68:3,14, 16,25 75:7,15 77:4 78:11 79:11,24 80:9 87:21 88:25
reasonably 46:10,22 49:1,4,20 50:21,23 51:1,16 55:5,7 64:15

68:16
69:24
75:6,17, 18,22
76:22
87:8,10
91:22
rebuttal 24:21 25:2,5
received 32:17 38:6,11 72:11
receiving 27:16
recognized 59:6
reconstruct 82:7 83:21
reconstructionist 82:7
reconstructionists 82:4
record 23:18,23 78:23
red 38:12 93:16,17
referenced 10:23
references 54:17
referring 32:1
reflect 50:20
refocus 67:7
regard 18:16 31:5
regarding 71:20 87:23
regime 59:3
region 76:22

Judge Hope Cannon
June 16, 2021                                                                14

region's
64:13
regional
88:2
regular
81:9
regulatory
59:5
reissued
32:19
related
60:6 87:2
relative
72:19
released
56:22
releases
85:1
relevance
42:21 58:5
64:24 72:2
81:1 86:15
88:24
90:10,12
91:25
relevant
39:2
40:23,25
41:12,14,
24 42:18,
21 43:21
45:14
46:23
49:17
53:13
55:21
64:17
66:22
67:2,16
68:3,19
75:3,13,14
81:5,16,
18,23,25
82:6
85:19,21
86:24
87:3,6
88:13 89:3
91:15
relying
83:7

remainder
19:15
remaining
8:2
remains
5:15
remind
40:12
Remington
6:5,10
16:12,20,
21 37:10,
11,15,24
39:24 40:1
43:24
45:1,4,7,
22 46:6
48:21
50:15,17,
18 51:9,
13,18
52:1,4,23
54:14
57:11
58:21
59:18 60:1
61:18
63:14,15,
21 64:4,14
65:10 68:7
69:11,23
70:1,22
71:16
72:7,8
73:9,15,19
74:7,17
75:4,15
76:13,16,
20 77:5,
17,24
78:18
79:13
80:5,10,
21,24
81:25
83:2,18
84:1,4
85:3,22
86:2,12,16
87:7,19,24
88:13
89:5,6,15,

19 90:23
91:7,10,18
92:7
remotely
7:6
removed
10:10 62:1
rep 37:20
report
15:13 73:2
reported
14:11
reports
9:3 20:19
74:4
represent
10:20
representat
ive 32:14
34:25
35:23
represented
36:12
39:13
65:20
repurposed
10:10
31:18 32:9
request
13:18 15:6
19:21
23:18,23
25:3 37:11
41:7 45:7
46:19
65:25 76:8
78:19
84:10
85:8,9
89:16
requests
5:16 15:2
16:6 26:25
27:6 40:6
41:6 44:16
48:9
66:10,14
71:3 76:14
87:18 89:2
92:13 94:8

require
69:9
required
39:18 61:2
87:9
reserve
24:22,23
resigned
33:21
resolve
77:1
respect
28:9 36:11
89:8
respectfull
y 77:24
respective
33:11
respond
16:10
50:16 68:8
responding
16:5 61:5
74:13
response
16:8 27:16
28:22
responses
15:2,16
29:15
31:19 36:5
42:5
responsibil
ities 28:9
responsible
75:5
responsive
11:16
13:18
14:1,7
15:3 18:13
19:20
22:24 39:2
rest 94:3
restate
76:16
restaurant
41:12
results
5:12

review
6:23 8:3,7
10:24
12:9,12
13:5 16:15
18:18
19:25
23:13 24:2
36:13
reviewed
12:4
23:21,25
reviewers
8:4
reviewing
8:10,14
12:16
29:13
revising
15:1
RFAS 16:8
36:6
rise 4:2
River
83:6,8
road 29:18
53:18 57:8
roadmap
45:23 46:1
Rob 8:24
27:1
Robb 49:23
69:16 88:4
Robert
14:13
Robins
24:9,15
Rodgers
14:13
role 39:19
roles 28:8
Ronnie
11:10
route 63:4
Rubio 9:2
27:1 30:18
Rubio's
35:13
rule
42:12,20
73:1 84:16

rules   59:5
ruling
  71:6 94:12
running
  84:13
runs   20:21

───────

S

───────

safety
  34:9 75:5
sailboat
  63:22 83:7
Sailing
  58:22
Salamanca
  11:10
  14:24
Sally   9:4
  10:6 27:5
  30:17
  33:21
  41:5,15,24
  42:16,25
  46:22
  47:23
  48:16 50:2
  56:9 60:10
  67:22
  68:17
  69:2,13
  71:21,25
  72:3 75:5
  76:2
Sarah
  10:5,12
  30:14
  31:13 32:4
saved   9:6
  10:18
scary
  83:23
scavenger
  67:5
scheduled
  28:1
scour
  86:19,20
sea   46:13,
  17,21
  49:1,16

53:4 56:11
60:2 91:1
seamanship
  59:4,11
  60:2 61:11
search
  7:24 8:7,
  12 11:15
  12:8,25
  18:22
  20:10 67:3
searchable
  7:23
searched
  20:14 22:6
searches
  20:18
searching
  11:20
  18:21
  85:15
seated   4:5
seawall
  41:22
  52:21
  63:17
second
  9:10 20:17
  45:19
  57:13
  78:22
secure
  49:3 54:20
  60:13
  61:3,7
  82:22
secured
  55:24
securing
  47:15 62:8
  64:19
SECURITY
  4:2
seek   27:15
seeking
  65:23
sees   44:22
select
  89:11
seminal
  47:7

send   85:6
sense
  39:22
  42:18 43:1
  53:17
  56:20 57:9
  59:11
  66:23 70:8
separate
  9:6 22:2
  28:5,10
  29:1,6
  51:11,14
  74:2 93:5
separately
  93:8
September
  5:21 18:5,
  6,23 28:23
  36:3 44:7,
  20 53:19
  60:11 61:4
  63:5 65:13
  66:12
  67:4,9,18
  72:12
  76:10
  89:17
serve   16:8
  19:13
served
  16:7
server
  21:2,20,25
  22:4,6,11,
  15 23:5,6
service
  92:3
Servient
  6:18,19,24
  7:7,8,16,
  17,22,25
  8:23 9:8,
  25 10:2,23
  11:6 12:3,
  6 20:21
  37:1,6,17,
  20
serving
  26:24

session
  4:4
sets   21:21
  59:10 83:3
setting
  44:20
seven   8:22
  12:6
severe
  76:1
shape   41:2
shifts
  45:20
shipped
  7:21
shocked
  38:13
shop   53:10
short
  47:17
  53:22
  87:18
shorten
  13:7
showing
  55:1
shut   64:13
  66:21
  90:20
side
  24:11,12,
  18 72:14
significant
  37:5 38:16
  51:3
SIM   35:4
similar
  7:20 9:22
  34:9 41:20
  47:16
  48:18
  58:19
  62:9,11
  63:20
  64:20 70:2
  83:13,15
similarly
  48:2
simple
  37:18
  65:13

simply
  9:24 41:11
sit   56:25
  68:4
situated
  48:3
situation
  6:7 23:2
  63:10
  81:13
Six   78:25
Skanska
  7:10 9:11,
  12 10:6,7
  15:1 17:21
  23:20
  24:1,3
  27:3 32:13
  33:2 34:8,
  25 35:7
  36:12
  38:19
  40:25
  41:16,18
  42:17
  45:14
  46:24
  48:11,13
  50:3,13,
  20,23,24
  55:7,17
  56:12,18
  58:5 59:7,
  20 61:19
  62:4,15
  66:5,17
  69:19,22
  70:10,11
  72:4,5
  75:7,16,21
  76:18 77:9
  78:5 79:11
  81:17
  82:19
  83:11,12
  87:22
  88:25
  91:22,25
Skanska's
  10:7 29:16
  38:12 39:3
  46:2

49:17,18
51:6 62:11
64:10 70:9
71:21 72:6
78:11
79:24
90:10
**Skanska-
specific**
23:17
**ski** 62:1
80:3
**skill**
47:15
59:13,14,
18 62:8
**skip** 80:12
**skipped**
86:14
**social**
86:20
**sole** 59:8
**somebody**
27:21
36:25 37:6
53:13
79:11
85:20
**somewhat**
7:20
**sooner**
35:23
81:14
**sophisticat
ed** 76:21
**sort** 23:3
36:18
62:25 63:6
79:9
**sorties**
50:12
**sounds**
4:25 12:18
19:18
22:17,24
28:12,23
31:16 34:1
36:4 44:25
72:23
76:23
88:22

**sources**
32:2,21
**space**
25:17,21
**speak** 6:12
31:5 32:10
57:14
**speakerphon
e** 88:21
**speaking**
25:11
32:13
**special**
53:3 83:10
**specialist**
17:2
**specific**
15:6 45:7
60:14 61:5
78:19
**specificall
y** 25:24
47:1 54:17
59:1 71:23
79:25
81:12
**specificity**
61:6
**spent**
76:24
87:20
**sport**
63:22
**standard**
41:17,19
42:20
46:11,24
48:22,24
49:14
50:14,24,
25 52:13
55:11
56:13,18,
23 57:20
58:20
59:2,3,10,
13,25
61:12
63:22
68:15 70:9
75:7

82:21,24
83:1,2,4,
9,11,15
91:9
**standing**
26:15
57:18
**start** 8:7,
19 12:16
59:22
71:11
84:20
90:13
92:25
**started**
28:23 82:5
93:15
**starting**
12:8,11
43:8
**state**
45:25
**statement**
70:6,7
**statements**
70:5
**States** 4:3
39:13
57:21 58:8
68:13
80:13,20
87:17
**States'**
58:8
**Station**
58:1
**status** 5:6
6:20 12:18
14:9,21
29:25
84:14
**statutory**
59:5
**step**
16:14,15
18:5,18
19:25 20:9
45:18
**Stephens**
10:5,12
27:4 30:14

31:13 32:5
33:1
**steps**
60:8,12
**stopped**
8:10
**stored**
31:17
**stores**
58:2,4
**storm**
30:23
42:25
49:6,11
53:24
55:15,18,
25 56:14,
16 58:12
64:9 68:10
72:20 74:1
75:1,10,20
76:1 79:18
81:7 82:13
87:8 89:8
**storms**
14:12
41:11
66:18,20
67:21 68:1
**streamline**
93:22
**struggling**
48:1
**study** 42:2
**stuff**
13:12
42:13
**submit**
50:11 65:7
84:15,17
88:10
92:12 94:8
**submitted**
46:4 80:25
**subpoena**
9:17
**subsequent**
7:15
**sued** 45:16
55:19
59:20

**suffered**
79:2
**suggest**
35:22
56:18
**suggestion**
60:5
**suggests**
60:4
**super**
50:12
57:23
**superintend
ent** 30:16,
18,20
**supplement**
19:14
**supplementa
l** 15:16
36:5
**support**
47:1 52:7
69:12
88:11
**suppose**
62:3
**supposed**
11:18
54:8,9,11
77:9,10,
14,15
**surprise**
49:6 67:23
**surprised**
49:16
56:5,7,9
69:14
75:9,11
87:13,14
**surprises**
76:11
**suspect**
25:22,24
**synagogues**
87:2
**system**
7:11 20:20
**systems**
20:20

**T**

table
 39:23
 92:23
 93:19
takeaway
 44:5
takes   26:8
 84:10
target
 91:4
team   11:19
 12:16 13:8
 17:8
telling
 70:18
temples
 87:2
tenant
 50:6 57:25
term   48:3,
 4 58:19
terminated
 34:15
terms   7:24
 8:7,12
 11:15
 12:9,25
 18:6 20:10
 23:21 40:9
 62:15
 67:4,8
 81:17,18
 91:23
terrified
 43:4
testimony
 69:6
text   8:5
 11:19
 27:11
 36:12,18
texts   7:5,
 20,21
 11:14
 12:7,23
theirs
 66:1
thing

36:11
 83:24 85:4
 88:12
 90:11
 93:25
third   9:21
third-party
 57:7 59:23
thoughts
 70:17
thousand
 63:16
thousands
 56:10
threaten
 68:1,6
threatened
 66:18
three
 16:6,10
 17:23 18:3
 19:11
 43:3,10
 81:8 91:19
throws
 68:8
Thursday
 14:5
timing
 93:13
tool   34:8
torts
 38:17
total
 23:22
town   56:4
track
 71:20
 72:19
tracking
 75:2
traded
 73:9
training
 23:15
transcript
 37:18
 44:1,5,19
transfer
 9:8 10:2
 37:18

transmit
 7:6
transmitted
 8:23
trap   59:10
traveled
 82:11
treated
 34:12
tremendous
 65:15
trial
 43:3,10
 44:4,20
 53:20,22
 63:5,6
 67:18
 72:12
 81:5,14
trials
 53:23
triggered
 64:16,18
 78:2
tropical
 61:2,5
trouble
 9:23
troubling
 43:15
Tuesday
 37:6 84:17
tug   8:24
tugboat
 29:23
turn   4:13
 69:3 75:11
 92:9
turned
 32:16
 35:7,8
turning
 13:6
two   10:4
 24:8 27:7,
 10 31:13
 32:17 33:9
 34:11 49:2
 50:4,7
 58:10
 63:15 72:8

79:13,21
 80:8 81:6
 82:20 92:1
 93:2
two-step
 7:2
types   72:1
 80:4

**U**

U.S.   49:9,
 10 89:22,
 24
underlying
 21:16
 22:20
undoubtedly
 54:6
unfortunate
ly   32:17
 34:11
United   4:2
 39:12
 57:21
 58:7,8
 68:12
 80:13,20
 87:17
universe
 12:23,24
unknown
 51:23
unmoored
 79:22
unmooring
 79:2
unprepared
 49:9
unreasonabl
e   49:13
update
 6:8,20
 23:14
updated
 14:19
updating
 15:1
usages
 59:6

user   10:11
 27:5

**V**

vagaries
 46:12,17,
 21 49:1,15
 56:11 60:2
 91:1
various
 42:5 50:4
vast   43:7
vendor
 23:2,8
verbatim
 80:25
versa
 24:14
versus
 17:25
 58:22
vessel
 54:20
 55:10,23
 56:24
 60:18 79:3
 80:1 90:25
vessels
 47:15
 50:14
 54:18,22
 55:24
 60:6,13
 62:9
 63:18,19
 64:20
 68:19
 75:25
 79:10,22,
 25 80:2
 91:24 92:1
vice   24:14
videos
 85:1,16
view   23:3
 59:15
viewpoint
 29:16
Vinson
 44:3,6,19
 63:7 65:11

80:18
81:11
**virtually**
50:7
**vital** 17:8
**volume**
53:20
**voluminous**
7:5
**voluntarily**
60:17

_____
**W**
_____
**wait** 37:3,
17
**waiting**
8:9 38:9
43:7
**walk** 59:9
**watch** 26:2
**water** 59:9
**waterborne**
50:7 58:10
**watercraft**
60:13
64:12 79:4
80:3,6
**watercraft/
vessels**
61:8
**waterfront**
46:18
54:17,22
55:9 59:15
60:3,16,19
61:1,9
**ways**
46:12,17,
20 48:25
49:15
56:11
90:25
**weather**
46:23
51:4,5
61:2,6
71:21 72:1
75:6 89:10
91:20,23

**Wednesday**
37:21 65:9
84:22
92:24
93:10 94:7
**week** 5:5
8:11,16
15:19
31:15
36:24 38:6
**week's**
6:19 14:9
**West** 25:10
**Whaler**
56:19
57:12
**Wharf**
59:22
**wholly**
66:16
**widow** 59:7
63:17
**William**
10:5,12
31:14 32:4
**willing**
54:21
**wind**
77:10,14
**winds**
77:13
78:2,4,6,
7,8,10,12
82:13
**wing** 88:1
**wiped**
32:19
33:15
34:15
**withdraw**
92:7
**withheld**
16:14,17
17:15
18:1,17
19:2,19,25
20:7
**withholding**
35:10
**witness**
27:25

**witnesses**
30:22
72:13,18,
22 73:22
74:1,10,
16,17 76:8
**worked**
17:2,4
33:1 66:15
**working**
9:1 10:21
15:8 30:23
48:5 74:2
**works**
43:20 94:4
**world**
29:11 36:9
**Wow** 4:13
**writing**
94:10
**written**
88:10,11
**wrong**
57:20
**wrote**
18:12

_____
**Y**
_____
**y'all** 5:14
16:13
17:14
23:14 24:6
25:15,18,
19 26:9,11
27:18,20,
21 28:4
29:7,14
31:6 36:4
37:4 40:4
44:2,3,18,
22 45:2
64:23 65:2
73:1,2,20
81:20,21
84:15,16,
17 88:9,
10,15
92:12
93:22
94:7,11,15

**Yacht**
58:22
**yachts**
59:19

_____
**Z**
_____
**zero** 72:12