## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION – IN ADMIRALTY

| | | |
|---|---|---|
| **IN RE SKANSKA USA CIVIL** | § | |
| **SOUTHEAST INC. AND** | § | **ADMIRALTY RULE 9(H)** |
| **SKANSKA USA, INC., AS** | § | |
| **OWNERS OF THE BARGE M8030** | § | **CIVIL ACTION NO.** |
| **PRAYING FOR EXONERATION** | § | **3:20-CV-05980 – RV/MJF** |
| **FROM OR FOR LIMITATION OF** | § | |
| **LIABILITY** | § | **SENIOR DISTRICT JUDGE** |
| | § | **LACEY A. COLLIER** |
| | § | |
| | § | **MAGISTRATE JUDGE** |
| | § | **HOPE THAI CANNON** |

## ORDER

This action came before the Court for a bench trial on October 18, 2021, through October 22, 2021.  The Court heard testimony from a variety of witnesses, and a number of exhibits were introduced into evidence by the parties.  Upon consideration of the parties' stipulations of fact and law and the evidence adduced at trial, the Court makes the following findings of fact and conclusions of law:

**FINDINGS OF FACT**

## I.   The Pensacola Bay Bridge Replacement Project (the "Project")

Skanska entered into a contract with the Florida Department of Transportation in 2016 to replace the Pensacola Bay Bridge (also known as the "Three Mile Bridge").[1]

Under the contract between Skanska and FDOT, Skanska had a variety of obligations related to safety and the Project site. These included the preparation and submittal of an Incident Management Plan ("IMP"), which included "emergency preparedness and recovery plans" for events such as hurricanes and tropical storms.[2] Skanska's IMP stated, in relevant part, as follows[3]:

> **Incident Management Plan (IMP)**
> The Design-Build Firm shall prepare, submit with its proposal, implement during design and construction, and provide monthly reports on its IMP. It is the goal of the Department that travel mobility, reliability and safety will be maintained at current levels or improve during all phases of the project.
>
> The Design-Build Firm IMP shall include emergency preparedness and recovery plans as well as traffic management and evacuation due to hurricanes, tropical storms, fires, winter/ice system and other events. Suspend RRSP activities as directed by Emergency Services or Law Enforcement. Resume RRSP activities after

---

[1] 3909; SKANSKA000003909.
[2] 3909; SKANSKA000003909 at p. 5.
[3] 8896; CTRLSKA000008896 at p. 20.

clearance is given by Emergency Services or Law Enforcement.

**Emergency Preparedness and Recovery Plan**
Emergency situations can have a cataclysmic impact on the region. These events are not planned. However, preparedness plans are necessary. Examples of emergency events are hurricanes; a regional power blackout; terrorist attacks; or wide-spread fires, any of which, by the destructive nature and/or duration of the event, severely hamper or even prevent the movement of traffic, troop movement/deployment, or disable/destroy traffic management systems.

FHWA guidelines include the following recommended actions:

- Must-do advance planning
- Train and empower staff
- Establish relationships among all stakeholders
- Don't take technology for granted (particularly telecommunications)
- Invest in backup and redundancy
- Practice, practice, practice!

The evidence also demonstrated that it was "company policy" under Skanska's Environmental, Health and Safety Plan to have a hurricane preparedness plan for the Project.[4]  In compliance with its contract and with company policy,

---

[4] June 18, 2021 30(b)(6) Deposition of Thomas DeMarco ("Tom DeMarco 30(b)(6) Depo.") at 37:8-15; 56:2-57-9.

Skanska submitted one or more hurricane preparedness plans to FDOT during the life of the Project.[5]

## II.   Development of Skanska's Hurricane Preparedness Work Plans

During the course of the Project, Skanska developed various iterations of its Hurricane Preparedness Work Plans.

### a.  2016 Hurricane Plan

On October 6, 2016, Skanska submitted its hurricane plan for the project to FDOT.  In doing so, Skanska recognized its obligations to secure the project site,[6] and that its obligations also included the duty to manage its maritime assets by mooring all marine equipment on site or taken to safe harbor.[7]

### b.  2017 Hurricane Plan

On May 17, 2017, Brett H. Pielstick of Eisman & Russo, Inc, the construction engineering and inspection ("CEI") Program Director for the project, issued Skanska a "verbal warning" for the failure to provide a hurricane plan to the Coast Guard as requested 30 days prior to the start of the hurricane season as well as to FDOT for review.[8]  The Incident Management Plan meeting minutes from May 24, 2017,

---

[5] Tom DeMarco 30(b)(6) Depo., Exh. 4.
[6] 6692; CTRLSKA000006692 at p.2.
[7] 6692; CTRLSKA000006692 at p.5.
[8] 6717; CTRLSKA000006717.

indicate that emergency preparedness for hurricanes or other events required that Skanska "pull barges and put them on anchor."[9]   The minutes also reflect the USCG's understanding that the barges were to be moored "at least 1 mile away from bridge."[10]   Thereafter, on June 6, 2017, Skanska prepared and submitted another hurricane plan to FDOT.[11]   This plan defined a Tropical Storm Watch as winds of 55 to 73 mph expected within 24 to 36 hours.  It established "Condition THREE," described as "Sustained winds of 50 knots or 58 mph or greater expected within 72 hours/3 days," and set forth specific requirements for moving barges and other marine assets, including barge mounted cranes and all material barges to an anchorage in East Bay.[12]   Under this plan, the movement of barges and cranes away from the bridge, *i.e*, demobilization, was not planned for commencement until "Condition THREE" was met. In other words, under that version of Skanska's hurricane plan, movement of barges and cranes to safe harbor was not to be commenced until the Project was at Condition THREE. This plan further stated, "30 hours at a minimum needs to be dedicated to moving the material barges a (sic) crane barges to the hurricane location in the East Bay."[13]   It calculated a 30-hours

---

[9] 38910; SKANSKA_00055113.
[10] 38910; SKANSKA_00055113.
[11] 5902; CTRLSKA000005902.
[12] 5902, CTRLSKA000005902 at p. 8.
[13] 5902, CTRLSKA000005902 at p. 6.

minimum time to move a total of 40 barges to East Bay (10.6NM from the mouth of Bayou Chico) utilizing three larger tug boats and two smaller tug boats.[14]

The same plan detailed specific mooring locations, anchoring instructions, and other details, such as the requirement that "only experienced marine supervisors will approve the mooring before leaving" and that "it is preferable to test every anchor before leaving it just in case it was set incorrectly or is defective."[15]

In addition to establishing Condition THREE and defining when its marine equipment must be moved away from the Project and into safe harbor, this version of Skanska's hurricane plan required that all employees be released within 24 hours in order to secure residences and attend to families. Thus, demobilization would begin in time to allow for completion of preparations before employees were released. This hurricane plan also required that all field office personnel should become familiar with the plan and assigned duties within the plan before hurricane season arrives.

Skanska's June 2017 hurricane plan followed an exchange between Skanska and FDOT's CEI firm, Eisman & Russo.  By letter dated June 5, 2017, Eisman & Russo asked for clarity on "the condition at which time the removal of the A-Frames will occur as well as in what Condition will the barges be moved to the morning (sic)

---

[14] 5902, CTRLSKA000005902 at p. 6.
[15] 5902, CTRLSKA000005902 at p. 8.

locations in East Bay."[16]   In response, Skanska directed Eisman & Russo to Skanska's revised hurricane plan under "Condition THREE." Eisman & Russo further requested that Skanska explain how its limitation on operating cranes in winds over 30 mph would impact the "ability to remove the A-frames and anchoring of barges in east bay[.]"[17]   In response, Skanska explained that "disassembly will take place under Condition THREE, before high winds reach site."

During the 2017 hurricane season, Skanska distributed its "General Hurricane Preparedness Guidelines" to several of its employees who were (or would later be) leaders of the Project, including Project Manager Daniel Francis, Project Director Tom Fulton, and General Superintendent Pat McGlynn.[18] This document included the following[19]:

> According to experts, forecasters only have a 10% chance of accurately predicting where a storm will hit 72 hours in advance. They have a 74% chance within 24 hours. Just because your project is not in the storm's projected path does not mean that it could change course, therefore projects near but outside of the storm's predicted path need to take precautions regardless.

---

[16] 38974; SKANSKA_00057685.
[17] 38974; SKANSKA_00057685.
[18] 37984; SKANSKA_00044882.
[19] 37985; SKANSKA_00044886.

### c. 2018 Hurricane Plan

Skanska's 2018 hurricane plan provided greater detail for the 2018 hurricane season.[20]  The hurricane plan prepared by Michelle Brown and dated June 13, 2018, maintained all of the requirements from the 2017 hurricane plan pertaining to "Condition THREE." The hurricane location for barges continued to be East Bay and the minimum time to demobilize to East Bay continued to be a minimum of 30 hours (for 40 barges).

In addition to the hurricane location of East Bay, the 2018 hurricane plan added an Option B "for short term moves for short notice storms."[21] The 2018 plan further contained detailed descriptions, along with visual depictions under Option A and Option B, for the placement of marine equipment.[22]

### d. 2019 Hurricane Plan

The detail and thoroughness contained in Skanska's 2016, 2017 and 2018 hurricane plans drastically changed in 2019. In the lead-up to Hurricane Dorian in August 2019, it came to the attention of Skanska's management that it had not updated its hurricane plan for the 2019 hurricane season.  Given that hurricane

---

[20] August 6, 2021 Deposition of Sarah Stephens ("Sarah Stephens Depo."), Exh. 7
[21] Sarah Stephens Depo. at 99:5-15; Exh 7, p. 41.
[22] Sarah Stephens Depo., Exh. 7, Appendix A.

season begins each year on June 1, Skanska had been working on the Project for nearly three months without a hurricane plan for the 2019 hurricane season.[23]

Skanska began demobilizing for Hurricane Dorian on August 28, 2019, without a hurricane plan.[24]  The task of preparing the 2019 hurricane plan fell to a newly-hired  field engineer, Sarah Stephens.[25] Ms. Stephens, by her own admission, had no qualifications for drafting a hurricane preparedness plan.[26] Rather than rely on the 2018 hurricane plan (which contained detailed descriptions of multiple options for safe harbor/hurricane locations), Ms. Stephens copied large portions of another hurricane plan for a land-based Skanska project in Orlando and deleted most of the detail provided in the 2017 and 2018 plans – including Option A and Option B.[27] According to Ms. Stephens' emails and her own testimony, she prepared and finalized ("whipped up") the 2019 Hurricane Plan in the span of one day.[28]

As to the locations for placement of equipment in the event of a hurricane, Ms. Stephens changed the 2019 plan to include, at least visually, Butcherpen Cove, Bayou Chico, and an anchorage just east of Deadman's Island on the north side of Gulf Breeze (referred to herein as the "Gulf Breeze Anchorage"). The text of the

---

[23] Sarah Stephens Depo at 44:6-45:20.
[24] Sarah Stephens Depo. at 44:6-16.
[25] Sarah Stephens Depo. at 18:7-22; 24:2-25:2; 40:9-41:15; 45:16-20; 115:12-19.
[26] Sarah Stephens Depo., at 24:2-27:24.
[27] Sarah Stephens Depo. at 53:3-56:15 and 70:1-73:15.
[28] Sarah Stephens Depo. at 133:25-136:14; Exh. 14.

2019 plan, however, was not changed and continued to be described as East Bay.[29] Not only did the 2019 plan continue to describe the safe harbor as East Bay, it also failed to change the distance to the hurricane location or update the time it would take to accomplish demobilization to these much closer locations.[30] The 2019 hurricane plan was approved by Skanska's project management.[31]

### e.  2020 Hurricane Plan

For the 2020 hurricane season, Ms. Stephens continued to have responsibility for preparing Skanska's hurricane plan; she had a final, approved plan in place and submitted to FDOT by June 8, 2020 – seven days after hurricane season began.[32] Skanska's 2020 hurricane plan was virtually the same as the 2019 hurricane plan in all relevant respects except that the visual depictions in the 2020 plan no longer provided an image of a hurricane location at the Gulf Breeze Anchorage.  Like all of the plans for the prior hurricane seasons, Skanska's 2020 hurricane plan listed reviewers of the plan.[33]  Notably, one of the reviewers of the 2020 hurricane plan, Catherine Burgess, testified that she had not reviewed the plan prior to Hurricane

---

[29] Sarah Stephens Depo at 96:16-25; 185:6-14.
[30] Sarah Stephens Depo at 97:1-13; 185:10-23.
[31] Sarah Stephens Depo at 77:23–80:5; Exh. 6.
[32] Sarah Stephens Depo. at 165:11-22; 179:2-182:4; Exh. 26; Exh. 27; Exh. 27A.
[33] Sarah Stephens Depo. at 32:14-23; Exh. 2A.

Sally and was not qualified to review a hurricane plan.[34]  The 2020 hurricane plan continued to describe East Bay as the hurricane location while offering visual depictions of Bayou Chico and Butcherpen Cove – but not East Bay.[35] The 2020 hurricane plan included a chart that identified 11 cranes and 40 barges as well as the time it took to move each with five tug boats.[36]  However, at the time of Hurricane Sally, there were at least 55 barges in use at the project site – not 40.[37] Still, pursuant to the text of Skanska's 2020 hurricane plan, it would take 30 hours at a minimum to demobilize 40 barges.  The 2020 hurricane plan was reviewed and approved by Skanska's project management.[38]

On August 21, 2020, Skanska caught an error in the 2020 hurricane plan and amended it.[39]  The amended plan changed the text of the hurricane location for cranes and barges from East Bay to Butcherpen Cove to match the visual depictions of the barge locations. The text of the 2020 hurricane plan failed, however, to describe any safe harbor location in Bayou Chico.[40]  While the 2020 hurricane plan updated the hurricane location to Butcherpen Cove, the plan failed to change the distance from

---

[34] August 2, 2021 Deposition of Catherine Burgess ("Catherine Burgess Depo.") at 45:14-49:10.
[35] Sarah Stephens Depo. at 185:6-14.
[36] Sarah Stephens Depo., p. 194:8-10 and 198.
[37] Sarah Stephens Depo. at 197:8-15.
[38] Sarah Stephens Depo. at 176:9-177:4; Exh. 25.
[39] Sarah Stephens Depo. at 199:6-21; Exh. 2.
[40] Sarah Stephens Depo. at 198:21-199:1.

the project site to Butcherpen Cove; the plan described the project site as being 10.6NM from the mouth of Bayou Chico. During their depositions, Pensacola Bay Bridge Project Director, Tom Fulton, Project Executive and Construction Manager, Tom DeMarco, and General Superintendent, Rob Rodgers, all agreed this distance was an error and that it would take less time to demobilize equipment from the Bridge to East Bay than Butcherpen Cove.[41] In reality, Butcherpen Cove is less than half of the distance to East Bay and is only 4.8NM from the mouth of Bayou Chico and approximately 2NM from the center of the bridge. Mr. Fulton estimated that moving equipment from the bridge to Butcherpen Cove was "approximately a mile and a half" and agreed a move to Butcherpen Cove would take place "a lot faster" than to East Bay.[42] In addition to not updating the distance in the 2020 hurricane plan, the plan failed to take into account the shorter amount of time to demobilize barges to safe harbor in Butcherpen Cove than to East Bay. Likewise, the 2020 hurricane plan failed to adjust the 30-hour minimum (for 40 barges) from the 2017, 2018 and 2019 plans, despite the fact that Skanska was using 55 barges on the project.

---

[41] August 20, 2021 Deposition of Tom Fulton ("Tom Fulton Depo.") at 91:9-91:11; August 27, 2021 Deposition of Tom DeMarco ("Tom DeMarco Depo.") at 100:24-112:5; August 25, 2021 Deposition of Rob Rodgers ("Rob Rodgers Depo.") at 133:21-24 and 138:13-21.

[42] Tom Fulton Depo. at 90:14-17; 90:20-91:4.

Skanska's 2020 hurricane plan clearly identified its purpose:

The purpose of this plan is to summarize Skanska's operations and responsibilities regarding their response to, and recovery from a hurricane.  In general, Skanska personnel will be assigned to secure the project site, secure all marine based equipment to safe harbor, and provide clean-up/recovery support at the project site.  Also included are the duties required at the field and office building.  This document is not intended to include all activities that could take place in the event of a hurricane.  Depending on the severity of the hurricane, individuals may be assigned to provide additional support.

Additionally, the 2020 hurricane plan set forth Skanska's overall responsibilities in advance of a hurricane:

1. Secure loose materials and equipment prior to hurricane
2. Secure all marine based equipment to safe harbor
3. Engage in clean-up/recovery efforts on the job site
4. Document all activity and damage related to the storm event in order to submit to FDOT as required

The 2020 hurricane plan set forth "jobsite preparation" under four separate conditions, which included "Condition THREE," described as "[s]ustained winds of 50 knots or 58 mph or greater expected within 72 hours / 3 days."[43]   Condition THREE required Skanska to perform a number of pre-storm activities, including:

- Cease all routine activities which might interfere with securing operations.

- Commence securing and stow all gear and portable equipment.

- Make preparations for securing buildings.

- Begin packing office equipment and tools needed to stay dry or containing critical information.

---

[43] 11906, SKANSKA_0000001.

- Conduct a thorough cleaning and remove any debris from job site.
- Reinforce/remove any scaffolding.

Condition THREE also identified Skanska's obligations to manage its cranes and barges:

- The hurricane location for barges is Butcherpen Cove.   It is approximately 10.6 nautical miles from the mouth of Bayou Chico.
- 30 hours at a minimum needs to be dedicated to moving the material barges and crane barges to the hurricane location in Butcherpen Cove.  See chart below for example of breakdown.

Condition THREE also provided the following instructions:

For barge mounted cranes and material barges

- Barge mounted cranes and all material barges will be moved to Butcherpen Cove.
- See the attached drawing that shows how the crane barges and material barges will be anchored and tied off.  This drawing is for reference and is not the actual distance layout the barges should be positioned.
- The material barges shall be secured by soft line to a spud barge.  In the event that there are additional spud barges, they should be placed on the outside of the material barges.

See attached sheet showing the marine heavy weather mooring anchorage details.  All cranes onsite will use similar mooring details.

- A 30K anchor (shall have hinging fluke and long stabilizers) is attached to 50' of heavy anchor chain which is connected to a sea buoy.  The buoy is then rigged to a 2 5/8" poly soft line 75' long.  This 2 5/8" line shall be doubled to have an overall capacity of 50T against pulling.  Verify all connecting shackles.

14

- Anchors will be set with flukes toward the equipment it is holding.  The fluke angle must be set between 50 and 35 degrees to the properly set.  If these conditions are not met, the anchor will simply drag when the wind speed picks up.

- Once the buoy and line is paid out ensure that the points where the soft lines are connect to the barge are not prone to cut.

- Two (2) experience marine supervisors will approve the mooring before leaving for the storm event.  This shall be done for each of the mooring locations.

In addition to identifying a 30-hour minimum for moving material and crane barges to Butcherpen Cove, the 2020 hurricane plan also set forth individual times required to relocate the barges and cranes. The 2020 hurricane plan also included graphics identifying the positioning of the barges to be moored in Butcherpen Cove and Bayou Chico.

Captain Rob Hill testified that from past experience, Skanska has demobilized the site in in two and a half days.[44]  Other testimony suggests that, with the tugs and captains available to Skanska prior to Hurricane Sally's landfall, Skanska could have moved 40 barges to Butcherpen Cove in 30 hours.[45]

---

[44] July 29, 2021 Deposition of Rob Hill ("Rob Hill Depo.") at p. 281:9-12.
[45] Rob Hill Depo. at 213:18-214:9.

## III.   Skanska's Preparation for Tropical Storms Prior to Hurricane Sally

The evidence before the Court establishes that Skanska took a variety of efforts in advance of a number of tropical storms and hurricanes in 2017, 2018, 2019, and 2020.  Many of these storms were not, however, predicted to impact the project site.  In conditions far less threatening than in the days prior to Hurricane Sally, Skanska demobilized and secured its equipment in prior storm events.  As stated by Mr. McGlynn, Skanska secured its barges for other storms that "weren't predicted either to come this way."[46]

### a.  2017 Hurricane Season

Skanska engaged its 2017 hurricane plan and demobilized its barges and cranes for three storms during the 2017 Hurricane Season:  Hurricane Harvey, Hurricane Irma and Hurricane Nate.[47]

For Hurricane Harvey, Skanska engaged its hurricane plan and demobilized on August 25, 2017.  According to the testimony of Will Bender[48], a lead pile driver for Skanska, Skanska moved all of its barges to one of two locations away from the

---

[46] August 10, 2021 Deposition of Patrick McGlynn ("Aug. 10 Pat McGlynn Depo.") at 118:23-25.

[47] 38857; SKANSKA_00052095.

[48] August 2, 2021 Deposition of Will Bender ("Will Bender Depo.") at 45:18-50:16.

Bridge in preparation for Hurricane Harvey.[49]  Specifically, Skanska moved between five and 10 barges to a mooring site in East Bay, on the east side of the Garcon Point Bridge.  The East Bay mooring site included multiple 20,000-pound anchors on chains attached to a mooring buoy.  Skanska also moved its three crane barges, including pile driving equipment, into Bayou Chico.

Skanska did not leave any barges near the bridge during its preparations for Hurricane Harvey.  At the time Skanska engaged its 2017 hurricane plan and began to demobilize its fleet under Condition THREE, the project site was not under a watch or warning nor was it within the probable path of the storm.[50]

Hurricane Irma struck the Florida Keys as a Category 4 hurricane on Sunday, September 10, 2017, before making landfall in Marco Island, Florida, later that afternoon as a Category 3 hurricane.  Thereafter, the hurricane moved into central Florida before passing across northern Florida on Monday, September 11, 2017, as it weakened.[51]

Skanska engaged its 2017 hurricane plan and began demobilizing under Condition THREE for Hurricane Irma on September 7, 2017.[52]  At the time Skanska

---

[49] Other evidence indicates Skanska did not demobilize the barges used on the Project in preparation for Hurricane Harvey. See 38725; SKANSKA_00049935 and 38726; SKANSKA_00049936.

[50] https://www.nhc.noaa.gov/data/tcr/AL092017_Harvey.pdf.

[51] https://www.nhc.noaa.gov/data/tcr/AL112017_Irma.pdf.

[52] 12509; SKANSKA_00015660.

began to demobilize for Hurricane Irma, the project site was not under a watch or warning, and it was not within the path of a probable storm.

On October 4, 2017, Skanska initiated its 2017 hurricane plan in anticipation of Hurricane Nate. Skanska demobilized its marine fleet on October 4 and 5, 2017, and then demobilized its land operations on October 6, 2017. Skanska's decision to begin demobilizing was made when the storm system was off the coast of Nicaragua as a Tropical Depression. At the time of Skanska's decision to demobilize under Condition THREE, the project site was not within a watch or a warning but was within the probable path of a hurricane. The storm strengthened into a hurricane on October 7, 2017, before making landfall as Hurricane Nate near the mouth of the Mississippi River on October 8, 2017.[53]

On October 6, 2017, Skanska sent an email to the USCG (and other parties) in which Skanska described its efforts that began two days before to prepare for Hurricane Nate:[54]

> Skanska has relocated nine (9) crane barges, with the exception of the larger ringer cranes, into Bayou Chico alongside the bulkhead of Skanska Office Compound (Runyan Shipyard (and across the navigable channel form (sic) the office Compounds. The larger cranes, Mani 888 Ringer #1 and Mani 4100 Ringer, located in Pensacola Bay, will remain near the Gulf Breeze shoreline and anchored. All material barges have been relocated and anchored in East Bay. Currently, all marine equipment has been relocated and the remaining efforts consist of the

---

[53] https://www.nhc.noaa.gov/data/tcr/AL162017_Nate.pdf.
[54] 6216; CTRLSKA000006216.

securing material equipment on barges, the Project, and Skanska Office Compounds. All preparations will be complete as of close of business today.

On October 6, 2017, Bill Klepac, an engineer with Eisman & Russo, emailed Skanska's project manager, Daniel Francis, to confirm that, while Skanska's hurricane plan provided that all material and crane barges were to be moved to East Bay, Skanska intended to move its crane barges, with two exceptions, to Bayou Chico.   Mr. Klepac continued:[55]

> We understand that Tropical Storm Nate, which is expected to become Hurricane Nate, developed rapidly with little advance notice, resulting in a shortened duration for Skanska to fully implement its hurricane plan, and thus necessitating a deviation in plan location for the crane barges. *As such, Skanska's plan should be modified to include one or more contingent plans to allow for scenarios in which there is insufficient time to fully implement mass evacuation of material and crane barges to East Bay.*

(emphasis added).

### b. 2018 Hurricane Season

For the 2018 hurricane season, Skanska engaged its 2018 hurricane plan and demobilized its barges and cranes under Condition THREE for three storms:  (1) Subtropical Storm Alberto; (2) Tropical Storm Gordon; and (3) Hurricane Michael.[56]

---

[55] 6216; CTRLSKA000006216 at p. 2.
[56] 38857; SKANSKA_00052095.

On May 25, 2018, Skanska activated its HPP plan in anticipation of a subtropical depression that would become Tropical Storm Alberto.[57]   On that day, the subtropical depression was off the Yucatan peninsula.[58]  At the time the hurricane plan was engaged and demobilization began, the site was within the probable path of a tropical storm and was under a tropical storm watch.

On Monday, September 3, 2018, Skanska began to demobilize marine equipment to protected waters ahead of the storm system that would form into Tropical Storm Gordon.[59]   Over the course of that day, Tropical Storm Gordon crossed the Florida Keys and entered the Gulf of Mexico.[60]  According to Skanska's Storm Summary, Skanska completed its preparations on Tuesday, September 4, 2018.[61]   At the time Skanska engaged its hurricane plan and demobilized under Condition THREE for Tropical Storm Gordon, the project site was under a tropical storm warning and was on the edge of the probable path of a tropical storm.

On October 6, 2018, the National Hurricane Center began issuing advisories on what would become Hurricane Michael.  By 7:00 am CST on October 8, 2018, Skanska management met and decided to implement its hurricane plan and to start demobilization efforts at 7:00 AM CST on Monday, October, 9, 2018.

---

[57] 38726; SKANSKA00049936.
[58] https://www.nhc.noaa.gov/data/tcr/AL012018_Alberto.pdf
[59] 12521; SKANSKA_00015796.
[60] https://www.nhc.noaa.gov/data/tcr/AL072018_Gordon.pdf.
[61] 38725; SKANSKA_00049935 and 38726; SKANSKA_00049936.

At the time the decision was made to engage the hurricane plan, the project site was not under a watch or a warning but was within the 4-5 day probable path of a tropical storm.  After the decision was made to engage the hurricane plan, Skanska received a directive to cease operations and secure the Project site.[62]

The testimony of Will Bender indicates that, during the 2018 hurricane season, Skanska regularly moved its barges to the East Bay and Bayou Chico anchorages in advance of tropical storm activity.[63]  These were the same protected waters used by Skanska during storm preparation in 2017.

### c.  2019 Hurricane Season

On August 28, 2019, the storm that would become Hurricane Dorian was a tropical storm crossing south of Barbados.[64]  On Thursday, August 29, 2019, as the storm had strengthened into a hurricane upon entering the Atlantic Ocean,[65] Skanska began moving its equipment to safe harbor.  Skanska commenced these efforts in the absence of a directive from the CEI or FDOT.  In fact, Skanska did not receive notice from the CEI that FDOT ordered the project site to shut down until several days later.[66] Per the NOAA storm track projections, Hurricane Dorian never entered the

---

[62] 12516, p. 22; SKANSKA_00015727.
[63] Will Bender Depo. at 51:19-52:12; 38452; SKANSKA_00048995.
[64] https://www.nhc.noaa.gov/data/tcr/AL052019_Dorian.pdf.
[65] https://www.nhc.noaa.gov/data/tcr/AL052019_Dorian.pdf.
[66] 38452; SKANSKA_00048995.

Gulf of Mexico, and the project site was never in the cone of uncertainty or under a watch or warning.[67]

On August 28, 2019, the Governor of the State of Florida declared a State of Emergency for 26 counties within the State due to Hurricane Dorian. Skanska commenced storm preparations at that time and, on August 29, the Governor expanded the State of Emergency to include all 67 counties within the State.  On August 30, 2019, the FDOT District Construction Engineer ("DCE") issued a memo directing that all projects in District 3 (which included the project site) were to be shut down. On August 31, 2019, Skanska completed the movement of all equipment away from the project site.  Additionally, Skanska's preparations for Hurricane Dorian included the engagement of a third-party towing service to assist with the movement of the barges.

On August 31, 2019, Skanska Project Manager Rob Rodgers circulated a hurricane plan "revised to show rig placement for Dorian."[68]  This version of Skanska's plan indicated that Skanska's barges were demobilized away from the bridge to mooring locations in Butcherpen Cove (located east of the southern terminus of the Project), the Gulf Breeze Anchorage, and Bayou Chico.[69]

---

[67] 38444; SKANSKA_00048967.

[68] 38444; SKANSKA_00048967.

[69] *See* Will Bender Depo. at p. 52-55; 38445; SKANSKA_00048968.

On October 18, 2019, Skanska began storm preparation activities that included demobilizing its barges ahead of the storm that would become Tropical Storm Nestor.[70]

On October 17, 2019, the NWS issued a Tropical Storm Warning for the area of the project site for potential Tropical Storm Nestor. Skanska began storm preparation activities on October 18, 2019.[71]   Skanska's demobilization efforts began when the Project site was under a tropical storm warning and in the cone of uncertainty.

Over the course of October 18, 2019, the system became a tropical storm in the middle of the Gulf of Mexico before being downgraded the next day.[72] On October 25, 2019, the NWS issued a Tropical Storm Warning for the area of the project site for potential Tropical Storm Olga[73]. Skanska began storm preparation activities on October 25, 2019. The project site was not under a watch or warning or within the cone of uncertainty for Tropical Storm Olga at the time Skanska commenced demobilization efforts.

---

[70] 37779; SKANSKA_00043623, 38726; SKANSKA_00049936; SKANSKA_00056782.

[71] 37779; SKANSKA_00043623, 38726; SKANSKA_00049936; SKANSKA_00056782.

[72] https://web.archive.org/web/20210204185139/https://www.nhc.noaa.gov/data/tcr/AL162019_Nestor.pdf.

[73] 37800; SKANSKA_00043690; SKANSKA_00043692.

### d.  2020 Hurricane Season

On August 22, 2020, Skanska began to demobilize for the storm system that would become Hurricane Marco.[74]  On August 22, 2020, the NHC indicated a 60% probability of tropical storm force winds for the Project area due to potential Hurricane Marco.[75] Skanska began storm preparation activities on August 22, 2020. According to the NOAA projected storm track, however, the project site was not under a warning or in the cone at the time of demobilization. Skanska's demobilization efforts took place over two days.[76]

### e.  Status of Project and Skanska's Demobilization Claims.

Tom DeMarco, Project Executive and Construction Manager, testified that Skanska had available insurance coverage as well as a process through FDOT to receive payment out on claims related to lost expenses and production related to demobilizing marine assets and other activities in preparation for tropical weather systems, such as tropical storms and hurricanes.[77]

Nevertheless, Mr. DeMarco testified that Skanska began its preparations for Hurricane Sally later in the development of that storm than it had for previous

---

[74] Skanska's Second Amended Answers and Objections to First Master Set of Interrogatories, Resp. to Interrogatory 12; SKANSKA_00015929.
[75] Skanska's Second Amended Answers and Objections to First Master Set of Interrogatories, Resp. to Interrogatory 12; SKANSKA_00015929.
[76] SKANSKA_00043890.
[77] Tom DeMarco Depo. at 40:21-40:25; 41:3; 64:16-64:20.

storms.[78]    General Superintendent Patrick McGlynn testified that prior to a change in project management that preceded Hurricane Sally, Skanska had been "very active, very proactive and making the right decisions" with regard to storm preparation.[79]  Yet, Skanska's Project Leadership was facing increasing financial pressure. Leading into Hurricane Sally, "the insurers that were processing these demobilization / remobilization claims were less lenient" than in the past and Skanska's Vice President of Insurance described herself as "fighting with the adjuster" over pending demobilization claims."[80] Additionally, Skanska had fallen behind schedule on the Pensacola Bay Bridge project and had engaged in an effort to catch back up.[81]   In the summer of 2020, Skanska claimed that demobilization and remobilization for tropical weather systems had cost Skanska roughly 15.3 million dollars in costs and delays.[82]   In fact, days before Hurricane Sally's landfall, on September 11, 2020, FDOT denied Skanska's claim for reimbursement of expenses related to its preparations for Hurricane Marco due to Skanska having waived its right to additional compensation due to Skanska's failure to provide

---

[78] Tom DeMarco Depo. at 162:12-15; 162:18-24.
[79] McGlynn Depo. at 25:9-26:5.
[80] *Id*. at 163:8-163:12; 163:15-163:24.
[81] *Id*. at 99:12-99:21; 164:8-164:15; 164:18-20.
[82] Tom Fulton Depo. at 333:19-333:22; 337:9-337:14; Exhs. 50 and 50a.

timely notice.[83]  Skanska was behind schedule and failing to recoup its demobilization expenses.

## IV.    Preparation for Hurricane Sally

### a.  Thursday, September 10, 2020

The NOAA five-day tropical weather outlook for the Atlantic Basin, including the Gulf of Mexico, issued, on the afternoon of September 10, 2020, its notice of a 40-60% chance that a tropical cyclone would develop and track westward into the Gulf of Mexico and potentially threaten the Gulf Coast.

### b.  Friday, September 11, 2020

The National Hurricane Center issued Advisory 1 for Tropical Depression 19 at 4:00 (central)/5:00 (eastern) on Friday, September 11, 2020.  Advisory 1 put the project site within the cone of uncertainty for a tropical storm within the next 72 hours.  The Court finds that Advisory 1 clearly signaled that the onset of Condition THREE was likely imminent.  The forecast and observed weather at the project site from Friday, September 11, 2020 up to Sunday morning was favorable for the movement of barges and other marine equipment.

There is no evidence that Skanska performed any hurricane preparation work on Friday, September 11, 2020.  In fact, construction continued as usual and Skanska

---

[83] Tom DeMarco Depo. at 164:3-164:15; Exh. 23.

took no preparations for a potential storm.  The Court finds that, at the very least,

Skanska management should have held some manner of pre-hurricane/tropical storm

meeting that day.[84]  Instead, the evidence shows that Skanska had trouble controlling

at least one barge, Ringer 2, as early as the morning of Friday, September 11, 2020

before there were any noticeable effects on the project site by the storm system that

would become Hurricane Sally. Project Superintendent, Grant Walker, texted the

Project Executive and Construction Manager, Tom DeMarco:

> Came in this morning to ringer 2 beating up against the trophy they set
> last night.  Guaranteed it moved but survey should check.  We have to
> monitor our barges at the end of each shift and slack our spud cables.

Depo. of DeMarco at 126:22-127:4 and Exhibit 32.  Nevertheless, Mr. DeMarco

testified that it did not raise an alarm that Skanska could not secure a ringer barge in

regular weather.  *Id*. at p. 131:6-131:10 and 131:13.

### c.  Saturday, September 12, 2020

At 7:45 am on Saturday, September 12, 2020, the senior inspector for FDOT's

CEI contacted Mr. Francis "to inform that the CEI is concerned that the footers,

which are already in a 3' to 5' hole, could be inundated with stormwater and silt at

---

[84] The 2017 and 2018 Hurricane Preparedness Work Plans required such a meeting
no less than 5 days before the storm is predicted to arrive. The 2019 and 2020 Plans
prepared by Ms. Stephens and approved by Skanska management did not set a
timeframe by which such a meeting should occur.

the footer / trophy connection points due to a possible tropical storm on Monday."[85]
Skanska noted the CEI's concerns, but elected to continue with construction
activities.[86]

At 11:26 am, Robert Rodgers, Skanska's Project Manager, texted the project
leadership team, stating, "Tropical Depression 19 warrants discussion. Could be
impacted Monday morning. I'm setting up a Webex invite for 1:00pm CST."[87] This
Saturday meeting was the first meeting to discuss preparations for what would
become Hurricane Sally. Per the previously-referenced NOAA storm track
projection, at the time of that meeting, the project site was within the probable path
cone of a hurricane.

According to notes from the 1:00 pm meeting, Skanska had one tug captain
scheduled to be on site Sunday and Skanska Superintendent Nick Johnson intended
to call other tug captains to let them know they may need to be called in Sunday
"pending track of the storm."[88] Superintendent Grant Walker was assigned the task
of calling a third-party tow service as a potential backup to assist moving barges.[89]
Project Executive and Construction Manager, Tom DeMarco, testified that Mr.

---

[85] Daily Work Report, p. 149.
[86] Daily Work Report, p. 149.
[87] 30606; SKANSKA_00035970.
[88] 11971; SKANSKA_00000531.
[89] July 23, 2021 Deposition of Grant Walker ("Grant Walker Depo.") at 122:16-23;
Exh. 14.

Walker did not call the third-party tow service.[90]  When asked if there was any reason that Skanska could not have called in a third-party tow service to assist with demobilization, Project Manager, Rob Rodgers, testified that Skanska "could call anybody at any time."[91]

Later that day, at 3:09 pm, Superintendent Grant Walker texted Project Executive and Construction Manager Thomas DeMarco: "I came in to ruined spud cables, barges laid up against the footer, tools missing."[92]

According to the deposition testimony of tugboat captain Rob Hill, movement of barges to Butcherpen Cove could have commenced on Saturday, September 12, 2020.[93]   There is no evidence Skanska made any substantive preparations for Hurricane Sally on Saturday, September 12, 2020.[94]  Mr. McGlynn, Skanska's General Superintendent, confirmed that no barges or cranes had been demobilized prior to Sunday, September 13, 2020.[95]

### d.  Sunday, September 13, 2020

According to the deposition testimony of Mr. DeMarco, at 7:00 a.m. CST on Sunday, September 13, 2020, Skanska's project leadership team, including

---

[90] Tom DeMarco Depo. at 141:14-142:2.
[91] Rob Rodgers Depo. at 188:18-20; 188:23.
[92] 31137; SKANSKA_00036505.
[93] Rob Hill Depo. at p. 232:7-19.
[94] July 15, 2021 Deposition of Brad Thatch ("Brad Thatch Depo.") at p. 79.
[95] McGlynn Depo. at 19:5-12.

Mr. DeMarco, Mr. Rogers, and Thomas Fulton, (Project Director and Vice-President of Operations), collectively decided that Skanska would implement a "verbal" plan instead of the written 2020 hurricane plan.  Specifically, Skanska would forego moving the barges and cranes to the designated protected waters.  Rather, Skanska planned to moor the barges in clusters in the immediate vicinity of the bridge.[96]  The Court notes, however, that such a mooring configuration was never contemplated or described in any hurricane plan prepared by Skanska.  Project Manager, Rob Rodgers, testified that Skanska did not have a written hurricane preparedness plan that called for mooring barges at mooring piles on the east and west side of the bridge.[97]  Mr. Rodgers described these mooring piles locations as "not as safe as the other places that have been listed in the hurricane preparedness plans."[98]

After the Sunday morning meeting, Skanska began to move the barges "away from bridge."[99]  Rig 20, however, was left "between the new bridge and the fishing pier."[100]  Notwithstanding Skanska's representations in its hurricane plan that it had five tugs available, Skanska conducted its operations to demobilize its barges to

---

[96] Tom DeMarco Depo. at 119:2-6; 132:12-18; 145:5-25; 167: 6-15.
[97] Rodgers Depo. at 143:19-143:25.
[98] Id. at 144:1-3 and 144:6-8.
[99] 24676; SKANSKA_00019868.
[100] 24676; SKANSKA_00019868.

mooring spots around the bridge with only two tugs and without the assistance of a third-party tow company.[101]

When asked if Skanska had begun to demobilize its barges to Bayou Chico and Butcherpen Cove at 7:00 a.m. on Sunday whether it could have completed the task with two tugs, Project Manager, Rob Rodgers, testified:

> With two tugs, a large majority.   And if we would have made the decision to demobilize, we would have certainly got help from Portside.[102]

Mr. Rodgers agreed that there would have been enough time to complete a full demobilization of Skanska's barges to Bayou Chico and Butcherpen Cove, including Rig 20, if the decision had been made to stop working with it and to demobilize it.[103] Project Executive and Construction Manager Tom DeMarco testified to his agreement that Skanska had begun its preparations earlier in the development of past storms than it did with Hurricane Sally.[104]

Despite the decision of Skanska's leadership team to make some preparations for the storm, Skanska continued to conduct work on the Bridge, driving piles with Rig 20 as late as 2:05 pm that same day.[105]   Skanska's pile-driving work involved

---

[101] *See* Rob Rodgers Depo. at 173:7-173:14; Tom DeMarco Depo. at 141:14-142:2.
[102] Rodgers Depo. at 189:25-190:5; 190:190:10.
[103] *Id*. at 190:13-20 and 191:16-20.
[104] Tom DeMarco Depo. at 162:12-15; 162:18-24.
[105] Daily Work Report, p. 152-153.

2,223 blows to the piles being installed that day.[106]  When discussing the activities to be accomplished that day, Mr. Bender testified that the morning meeting with the Skanska team concerned (a) the weather forecast, (b) the continued driving of two piles, and (c) mooring a barge between the Bridge and the fishing pier and preparing it for 40 mph winds.[107]

The conditions attendant to Condition THREE in Skanska's 2020 hurricane plan make clear that the A-frames for a pile driving rig, such as Rig 20, take time to remove and should be "one of the first activities completed" when severe weather with greater than 58 miles per hour is expected within less than 96 hours.[108]  Project Executive and Construction Manager, Thomas DeMarco, testified that the complete removal of Rig 20's A-frame ahead of Hurricane Sally would have taken 6 to 8 hours and required Skanska to forego using the Rig to drive piles.[109]  Removal of Rig 20's A-frame, however, was not possible given that Skanska was still using it to drive piles.[110]  As Mr. McGlynn testified, Skanska ignored the hurricane plan's requirement to remove Rig 20's A-frame.  The Project Manager, Rob Rodgers, testified that Rig 20 could have been moved after the 7:00 a.m. meeting if Skanska

---

[106] CTRLSKA000004122; CTRLSKA000004123; CTRLSKA000004124.
[107] Will Bender Depo. at p. 62-63 and 83-84.
[108] Patrick McGlynn Depo. at p. 82:20-83:16.
[109] DeMarco Depo. at 123:21-124:3.
[110] Patrick McGlynn Depo., p. 99: 9-100:14.  Project Director, Tom Fulton, testified that he was aware of Skanska's decision to continue driving piles with Rig 20 on Sunday, September 13, 2020.  Fulton Depo., p. 197:5-197:14.

made the decision to stop working with Rig 20 and begin demobilizing it.[111]    Had

Rig 20's A-frame been removed, however, Mr. McGlynn testified that it would not

have fallen across the Pensacola Bay Bridge.[112]

Skanska's substantive storm preparations that day included:

- Mr. Thatch began moving barges around 7:00 am and Mr. Hill, called

  by Nick Johnson to come in because "we've decided to move some

  barges," arrived about noon.[113]

- Mr. Hill received instructions to clear barges from the bridge and to put

  two barges together, or abreast, on mooring pipe piles which had been

  in place for construction of the bridge for three years.[114]  The four

  mooring pipe piles were located on the east side of the bridge and one

  mooring pipe pile was leftover and located on the west side of the

  bridge.[115]  Barges were moved to these moorings or remained on

  location at the bridge.[116]

---

[111] Rodgers Depo. at 191:16-20.
[112] Patrick McGlynn Depo., p. 101: 9-16.
[113]  Rob Hill Depo at 266:15-267:6.
[114] Rob Hill Depo., p. 178:12-179:24.
[115] Brad Thatch Depo, p. 98:15-99:20.
[116] *Id*.

- Mr. Thatch moved five barges away from the bridge and placed them toward the Gulf Breeze side mooring.[117]  Mr. Hill moved eight or 10 barges away from the bridge.[118]

Skanska's night shift operations that evening included moving barges to moorings, securing cranes, and securing equipment "in preparation of impending severe weather."[119]  Skanska also "removed work boats from water and secured them on shore in Gulf Breeze boat ramp/work area."[120]

### e.  Monday, September 14, 2021

At 6:46 am on Monday, September 14, 2020, Skanska Superintendent Cody Oehm advised Mr. DeMarco that "A number of barges couldn't be moved off the bridge due to broken spud wires and wind too high to run the cranes."[121] Additionally, Project Manager, Rob Rodgers, testified that Skanska's mooring piles did not have "ears," meaning if the water rose high enough, mooring lines could slip over the top.[122]  In fact, according to Field Engineer Tyler Beddow, "[i]f the tide rises six to eight more feet, the lines will slide over the top of the mooring pipes."[123]

---

[117] Brad Thatch Depo. 109:23-110:6.
[118] July 30, 2021 Deposition of Nick Johnson ("Nick Johnson Depo.") at p. 124:21-25.
[119] Daily Work Report, p. 158.
[120] Daily Work Report, p. 158.
[121] SKANSKA_00036560.
[122] Rob Rodgers Depo. at 44:1-44:10.
[123] *Id*. at 44:21-45:8 and Ex. 8.

As of 8:00 am on Monday, September 14, 2021, Skanska had 55 barges within one mile of the Bridge.[124]  Some of the barges were moored on the east side of the bridge, while others were moored in close proximity to the bridge.[125]

Although no deckhands showed up to work that day[126], Mr. Hill and Mr. Thatch worked a 12- hour day each operating a tug.[127]  Superintendents of the project had to step in and perform the work of deckhands aboard the tugs.[128]  Captain Hill said "the conditions were terrible"[129] and one of his tug's superintendent deck hands, Nick Johnson, remembers the weather being terrible and that he risked his life and the lives of others trying to save the bridge.[130]

### f.  Tuesday, September 15, 2020

Before 3:00 a.m., on Tuesday, September 15, 2020, at least one of Skanska's barges had broken loose from its moorings.  Rodgers Depo. at 46:13-16.  According to weather data provided by NOAA, at this time, the closest weather station to the Pensacola Bay Bridge had not registered sustained winds in excess of 11 knots and gusts in excess of 18 knots (*id*. at 56: 13-16, 57:7-13 and 57: 24-58:10 and Exhibit

---

[124] Skanska's Answers and Objections to First Master Set of Interrogatories, Resp. to Interrogatory 19 and Ex. 1.
[125] 17274, SKANSKA_00011315.
[126] Tom DeMarco 30(b)(6) Depo. at 187:16-21.
[127] Rob Hill Depo. at 245:10-14; Brad Thatch Depo. at 80:15-81.
[128] Tom DeMarco 30(b)(6) Depo. at 187:16-21.
[129] Rob Hill Depo. at p. 285:24-286:3.
[130] Nick Johnson Depo. at 122:24-123:12; 125:21-126:7.

12), while the weather station at NAS Pensacola—far closer to the storm's eventual landfall—had not registered sustained winds in excess of 26 knots knots and gusts in excess of 37 knots. *Id*. at 59:1-9, 59:12-15, and Exhibit 13.

At the time the first barge broke free and <u>impacted</u> the Pensacola Bay Bridge on Tuesday morning, the closest weather station to the Pensacola Bay Bridge had not registered sustained winds in excess of 12 knots. DeMarco Depo. at 193:3-194:18 and 197:2-7 and Exhibit 47. At the same time, the weather station at the Pensacola Airport had not registered sustained winds in excess of 16 knots. *Id*. at 197:17 to 198:2 and Exhibit 48.

That day, Mr. Hill and Mr. Thatch reported to work to take out the tugs once again but no other crewmembers showed up; thus, superintendents from the project again had to step in and act as deckhands on the tugs.[131] Mr. Hill, operating the tug Dawson, along with Mr. Johnson, were able to rescue barge 6012, a fully loaded slide barge, and hauled it to Butcherpen Cove.[132] This was the only barge that was moved to Butcherpen Cove during Hurricane Sally.[133] Once moved to Butcherpen Cove, 6012 remained in place and did not break free again.[134]

---

131  Rob Hill Depo. at 168:21-169:12.
132  Rob Hill Depo. at 168:3-19; 173:11-22; 174:17-20.
133  Rob Hill Depo. at 173:11-22.
134  Rob Hill Depo. at 174:14-16; Tom Demarco Depo. at 169:13-22.

The tug Dawson lost a rudder during its efforts with barge 6012 but was able to return to port at 3:00 pm.[135]   Mr. Thatch, operating the tug Albert Pike with deckhands Ronnie Benton and Will Bender[136], moved barges until it got too rough and terminated the effort to move barges at 5:00 pm that day.[137]   Project Executive and Construction Manager, Tom DeMarco, testified that he was aware that Pat McGlynn operated the Albert Pike ahead of Hurricane Sally's landfall, despite his knowledge that Mr. McGlynn did not have a USCG Captains' License.   DeMarco Depo. at 203: 10-203:14 and 204:8-204:23.

According to the "Hurricane Sally Timeline"[138] prepared by FDOT's CEI, the following events took place on Tuesday, September 15, 2021:

> 6:30 a.m. - A material barge being used in the construction of the Bridge broke free from its moorings and struck the Escambia County fishing pier adjacent to the bridge.
>
> 7:00 a.m. – Skanska retrieved the material barge from fishing pier and then captured/retrieved a second barge (demo barge) that broke free from its mooring.
>
> 7:30 a.m. - As winds and seas associated with Hurricane Sally increased, a third barge equipped with a man-lift broke free. This barge struck the bridge and became lodged beneath the structure at pier 62. The impact of the barge caused visible damage to the concrete beams that support the bridge. It was at this time the crew members on-scene closed the bridge to all traffic so that a thorough damage assessment could be conducted once weather conditions improved.

---

[135] Rob Hill Depo. at 245:22-246:11.
[136] Brad Thatch Depo., p. 90: 13-17.
[137] Brad Thatch Depo. p. 90: 3-23.
[138] 29303; CTRLSKA000009192.

8:03 a.m. - The NOAA tidal station conditions were 77 degrees, wind ESE 6 knots gusts to 14 knots, pressure 1009 mb, tide at elevation 4'. The Gulf Breeze station was reporting 20 mph winds from east. Pensacola airport was reporting 18 mph winds from east.

4:00 p.m. - A fourth barge worked its way free of anchorage and floated beneath and through the bridge (around spans 95-99). It was reported by Skanska that this barge did not contact the bridge and was recovered without further incident.

6:00 p.m. - One of the disposal barges broke free and lodged under span 36. Skanska tried to retrieve the barge, but the high seas (8'-10') prevented the tug from reaching the barge safely.

10:30 p.m. - A barge carrying a crane came free and struck the bridge. The boom of the crane came to rest across the travel lanes of span 92 of the bridge.

12:00 a.m. - The two CEI Inspectors assigned to monitor the bridge and roadway since 5:00 pm left the project due to deteriorating conditions.

It was observed/reported that 6 barges total broke loose from moorings on September 15, 2020.

Ed Hudec with FDOT emailed the message below to several Skanska managers, including Mr. Fulton, on September 15, 2020 at 8:30 pm:[139]

As I'm sure you [sic] aware the bridge has been struck twice today and the fishing pier once due to Skanska barges that have broken loose of their moorings/spuds.

US 98 has been closed since early this AM due to the first barge hit. The extent of the damage is as of yet undetermined.  We need to provide answers to the State Secretary's Office and the Governor's Office as to when the bridge can be re-opened to traffic.

---

[139] 25100; SKANSKA_00021174.

As of this minute FDOT has received no assistance from the Skanska Team-to help determine the structural adequacy of the bridge. The problem arose due to Skanska's inability to properly secure barges or move them to a safe haven. The first barge that hit the bridge occurred when the local airport registered winds of 29 mph, not exactly tropical force winds.

This is totally unacceptable!

FDOT has now paid Skanska for a new bridge but due to poor management decisions on Skanska's part, has a bridge with unknown structural deficiencies.

I am asking Skanska to assist in providing answers to the extent of damage, repair procedures and most importantly the structural integrity of the damaged structure.

An expedient answer is of the utmost importance. [140]

## Wednesday, September 16, 2020

Hurricane Sally made landfall on Wednesday, September 16, 2020, at 4:45 am near Gulf Shores, Alabama. According to the "Hurricane Sally Timeline"[141] prepared by FDOT's CEI, the following events took place on that day:

4:45 a.m. - Hurricane Sally makes landfall at 4:45 am at Gulf Shores, Alabama, with maximum winds of 105 mph.

7:17 a.m. – The CEI's Senior Inspector and Senior Project Engineer arrived on the Project site to observe the conditions. He immediately observed rig 20 (a pile driving rig between the fishing pier and the newly-constructed bridge span) had impacted the new span during the night with the A-frame at span 15.

7:40 a.m. - The tide gauge was elevation 6.5 ft, winds at 41 knots and gusts to 54 knots.

---

[140] The Daily Work Report for that day confirmed that two barges came loose or broke free from their moorings and struck the bridge. Daily Work Report, p. 168.
[141] 29303; CTRLSKA000009192.

7:40 a.m. - Span 37 was observed to be missing, except for the pedestrian path. Damage was apparently caused by material barge with girders.

8:10 a.m. - The A-frame bent over the new bridge and separated from the barge and the barge and rig floated through the Escambia County fishing pier impacting two spans before moving slightly north taking out 4 spans of the pier. The rig and barge appeared to be dragging an anchor and headed northeast at the time where it stopped for the remainder of the storm.

8:28 a.m. - One of the Manitowoc 888 ringer cranes was observed to be floating freely in the Pensacola Bay headed northeast.

8:44 a.m. - CEI observed the first social media post in Pensacola that a barge had washed up in someone's back yard.

9:27 a.m. - The Manitowoc 888 ringer was observed moving north in Escambia Bay along the bluff behind the Bay Winds Condominiums at 600 Scenic Highway.  CEI notified FDOT and FDOT closed the Interstate 10 bridge over Escambia Bay.

9:33 a.m. - CEI Senior Project Engineer informed Skanska's Project Manager that the Manitowoc 888 ringer was observed moving north in Escambia Bay towards Interstate 10.

10:45 a.m. - CEI observed that a demo barge was damaging spans 22 and 23 and ultimately the west half of both spans had collapsed and the outside trophy at pier 23 was missing.

11:30 a.m. - CEI Senior Project Engineer observed the Manitowoc 888 ringer to be near the center of Escambia Bay approximately 1000 to 1500 yards south of the Interstate 10 bridge. The wind shifted from out of the south-south west to more out of the west, moving the Manitowoc 888 ringer on an easterly course.

12:10 p.m. - The Manitowoc 888 ringer was observed to have beached itself along the east side of Escambia Bay between the Interstate 10

bridge and Garcon Point. Late afternoon/early evening of September 16, 2020, Skanska was coordinating a tugboat to secure the rig.

5:44 p.m. - CEI informed that Barge M-8002 was found to have impacted/damaged the Garcon Point Bridge at the southwest corner of Garcon Point (near north abutment, west side).

### g.  Thursday, September 17, 2020

As of Thursday, September 17, 2020, 27 barges had escaped or broken loose from their moorings as a result of Hurricane Sally.[142]  A number of the barges allided with the bridge, the Pensacola Bay Fishing Pier, and other publicly and privately owned structures.

## V.   Skanska's Post-Sally Tropical Weather Preparations

Skanska's activities following Hurricane Sally call into question its claims that it was both impossible and infeasible to demobilize in accordance with Condition 3 of the written Hurricane Preparedness Work Plan in place at the time of Hurricane Sally's Landfall, which required moving its barges and cranes to the designated safe harbors of Bayou Chico and Butcherpen Cove.

More recently, Skanska fully demobilized its barges to both designated safe harbors in anticipation of the system that would become Tropical Storm Fred. Rodgers Depo. at 216:19-21.  Skanska began this effort around 10:00 am on the morning of August 13, 2021 when the system was a Tropical Depression.  *Id*. at

---

[142] 16527; SKANSKA_00009062.

218:18-219:1 and Exh. 41.  While the National Hurricane Center advisory at this time placed the project site within the Day 1-3 potential track area, it did not place the project site in any form of watch or warning.  *Id*. at 220:2-220:9 and Exh. 41. Project Manager, Rob Rodgers, testified that Skanska employed four tugs and completed the move of its barges to either Butcherpen Cove and Bayou Chico by Sunday morning, which he described as taking between "24 and 30 hours" of "work time."  *Id*. at 222: 4-7, 223: 9-17.  This evidence shows that it was more than feasible and possible for Skanska to complete a demobilization of its barges and cranes into both Bayou Chico and Butcherpen Cove.

## VI.   Skanska's Leadership Team on the Project

Three Skanska employees were vested with responsibility for storm preparation at the Pensacola Bay Bridge construction site from September 11-15, 2020:

Thomas DeMarco – Project Executive and Construction Manager

Thomas Fulton – Project Director and Vice-President of Operations

Robert Rodgers – Project Manager

The evidence reflects that Mr. DeMarco, Mr. Fulton, and Mr. Rodgers shared responsibility for making the decision to transition from construction work to

securing equipment ahead of a storm, as well as for keeping track of the monitoring or forecasting of weather conditions in advance of Hurricane Sally. [143]

Likewise, the evidence indicates that Mr. DeMarco, Mr. Rodgers and Mr. Fulton were the only Skanska employees who had the responsibility for deciding whether and when to move construction barges to safe harbor.[144]  In addition to having responsibility with respect to the decision-making process of whether to implement the hurricane preparedness plan, Mr. Fulton also had responsibility for protecting the bridge and Skanska's assets.[145]

While Mr. Rodgers testified that Skanska project management, including himself, devised the plan implemented for Hurricane Sally where barges were sent to mooring piles on the east and west side of the bridge, he further testified that he was not aware of any errors or mistakes made by deckhands, crew, or anyone in implementing that plan.  Rodgers Depo. at 225: 6-9 and 226:11-16.  Similarly, Mr. DeMarco testified that "[p]roject leadership is responsible for the project's actions," when asked if there was responsibility for the barges breaking free, whether that responsibility would rest with project leadership."  DeMarco Depo. at 233: 1-7.  Mr. DeMarco also testified that he was not blaming any of the barges having broken free on any members of his crew.  *Id*. at 232:17-22.

---

[143] Tom DeMarco 30((b)(6) Depo. at 140:23-141:6; 143:2-19; 144: 19-22.
[144] Tom DeMarco 30(b)(6) Depo. at 147:20-8.
[145] Tom DeMarco 30(b)(6) Depo. at 190:15-191:1.

**VII.    The Adequacy of Skanska's Preparation for Hurricane Sally**

The Court finds that Skanska did not reasonably prepare for TD 19/Hurricane Sally.  All of the graphical NHC forecasts from Hurricane Sally were available to the public, including Skanska.  Moreover, Tom Fulton, Skanska's Project Director and VP of Operations (who was the highest-ranking on-site executive for Skanska for the Project) texted that this was "the most accurate forecast source."[146]   Mr. Fulton added:

> And I find in my 30 years' experience in marine work in the southeast US that this is the most reliable forecast source.  I – the reason I hesitate – hesitated to say that it was the most accurate is because I'm probably not qualified to make that judgment.  I did make that statement here, but I certainly have found this to be the most reliable, and it is the – it is one of the sources that I rely heavily on for forecast data.[147]

The evidence demonstrates that Skanska had sufficient advance warning of significant, and likely damaging, effects on the project site and the barges from the storm, but failed to timely implement reasonable storm preparation efforts.

The Court's assessment is supported by the testimony of a number of Skanska's supervisors.  For example, when Skanska General Superintendent Patrick McGlynn was asked under oath if Skanska complied with its own HPP in preparing for Hurricane Sally, Mr. McGlynn testified "Absolutely not."[148]   Similarly, Project

---

[146] Sarah Stephens Depo., Exh. 39 and 39A.
[147] Tom Fulton Depo. at p. 130:10 – 133:14 and Exh. 15.
[148] Patrick  McGlynn Depo. at  p. 15: 12-20.

Manager Tom Fulton stated via a text messages on September 16 that Skanska was unprepared for the impact of Hurricane Sally.[149]   For example, Mr. Fulton texted "Prepared for 25 and got 85.  Got a Mess," (Fulton Depo. at pp. 369:10-369:16) and testified that he told others that Skanska only prepared for 25 mile-per-hour winds. *Id*. at 366:2-12.

Furthermore, Skanska's actual efforts to secure barges were unreasonable and insufficient.  Skanska had a total of fifty-five barges on location for use during construction of the Pensacola Bay Bridge.  At the time Skanska decided to move its barges, some of the barges were in Bayou Chico, but most of its barges were close to the Pensacola Bay Bridge.

At least forty-one of Skanska's fleet of fifty-five barges were moved to these pipe pilings, sea anchors or spudded barges located in the vicinity.[150]   These pipe pilings and sea anchors were not part of the Hurricane Preparedness Plan but were used by Skanska in preparation for Hurricane Sally because Skanska waited too long to move the barges to a safer location.[151]   Moreover, the Coast Guard did not approve Skanska's placement of barges at the mooring pilings and sea anchor locations during tropical storms or hurricanes. Thirty-three barges were put in place on the

---

[149]  40060; SKANSKA_00065795; *see also* 36375; SKANSKA_00041827; and 39991; SKANSKA_00065447.
[150] 17274; SKANSKA_00011315.
[151] 37865; SKANSKA_00043934.

east side of the bridge and eight barges were put in place at locations on the northwest side of the bridge.[152]   Twenty-three of Skanska's fifty-five barges were spud barges.[153]   A total of seven spud barges were located in the vicinity of existing mooring pilings or sea anchors, and other barges were attached to the spud barges with rope.   At least twenty-seven of the forty-one barges that Skanska attempted to secure broke free from their moorings and struck the Pensacola Bay Bridge, the Escambia County Fishing Pier, Garcon Point Bridge and public and private properties.[154]

Barge numbers KS1451 and KS1453 had problems with their spuds and remained at the bridge, and Barge 460007 was being taken to a mooring but did not make it because a spud dropped prematurely and so it too was left at the bridge.[155] Spud barges with working spuds were either already in place and remained (Rig 20, Barge 450020) or were taken to other locations where the spuds could be dropped into place and to which any one of the other barges without spuds could be attached with rope.[156]

---

[152] 17274; SKANSKA_00011315.

[153] 26140; SKANSKA_00025030.

[154] 17274; SKANSKA_00011315 and 16527; SKANSKA_00009062.

[155] Skanska's Second Amended Answers to Claimants' First Master Set of Interrogatories, Response to Interrogatory 11.

[156] *Id.*

Securing the barges to the mooring pilings with rope was unreasonably risky and dangerous because a rise of tide of only several feet could and likely did cause the rope to slide off of the top of the mooring pilings allowing the barges to become unsecured and left to roam the bay crashing into stationary objects. Yet, not all of the barges that broke free were secured with rope. As noted above, barges that had their spuds down also broke free. In fact, two of the four barges that struck the Pensacola Bay, KS5531 and 460007, are spud barges whose movement had nothing to do with rope or breakage of it.[157] The barges that Skanska attempted to secure with rope ahead of Hurricane Sally were not done so with reasonable care[158] or adequate supplies of lines.[159]

Mr. McGlynn, the Project General Superintendent, testified that the damaged caused by Skanska's barges was "definitely avoidable,"[160] and he hoped Skanska would have learned from Hurricane Sally "to follow work plans, to follow policy, to follow – doing it right."[161] When further asked if Skanska complied with its own Hurricane Preparedness Work Plan in preparing for Hurricane Sally, Mr. McGlynn testified, "[a]bsolutely not."[162] When asked why he was surprised to find that

---

[157] 26140; SKANSKA_00025030.
[158] McGlynn Depo. at p. 153:2-153:10.
[159] McGlynn Depo. at p. 166:23-167:1, 167:4, and 167:6-167:9.
[160] McGlynn Depo. at p. 177:20-178:5.
[161] McGlynn Depo. at p. 177:2-177:12.
[162] McGlynn Depo. at p. 19:12-19:15 and 19:20.

Skanska had not demobilized its barges prior to Sunday, September 13, Mr. McGlynn testified:

> Just for the natures of we've done it before prior to this hurricane, and it's just what we do.  It's what we – we've always done any time a hurricane, tropical storm threat; find safe harbor.[163]

Skanska had long established safe harbor locations in anticipation of tropical weather systems.  Foregoing safe harbor for mooring piles a few hundred feet from the Bridge was a failure of reasonable care that resulted in widespread destruction to the Pensacola Bay Bridge and the region.

## VIII.   Application of the Spoliation Presumptions to Findings of Fact

Of the thirteen custodians Skanska self-identified in this litigation, five[164] custodians' cell phone data was destroyed, including text messages sent and received in the days and hours immediately before Hurricane Sally's landfall.  These five custodians served crucial roles in the activities most relevant to this litigation, including (a) Skanska's decision to abandon its written hurricane preparedness work plan for an orally conveyed alternative plan[165], and (b) Skanska's implementation of

---

[163] McGlynn Depo. at p. 23:5-23:7 and 23:11-23:23.

[164] Sarah Stephens, William Bender, Nicholas Johnson, Patrick McGlynn, and Eduardo Rubio (referred to collectively as the "spoliation custodians").

[165] Ex. 1, June 18, 2021 Demarco 30(b)(6) Deposition Transcript at 132:6-25; 150:18-23.

the alternative plan. Skanska's alternative plan resulted in Skanska's barges breaking free and damaging public and private property.

Skanska waited until 7:00 a.m. on Sunday, September 13, 2020 to formulate and initiate the alternative plan. The alternative plan was thus implemented in a narrow window of time with a minimal number of Skanska's employees, which included the five spoliation custodians. Skanska's counsel, and its witnesses, have testified that text messages were used more frequently than email on the jobsite and that text messages were a more "common method of communication" than emails.[166] Skanska's destruction of these communications resulted in the loss of incomparable, contemporaneous and candid evidence of Skanska's activities throughout the minutes, hours and days prior to Hurricane Sally's landfall.

On August 23, 2021, Judge Cannon found that "Skanska acted in bad faith" in destroying cell phone data for five of its thirteen self-selected custodians and that "this is a text book case of spoliation."[167] As such, Judge Cannon imposed monetary sanctions and the application of two adverse inferences: (1) that the information that was contained in the spoliated cell phone data was relevant and favorable to claimants, and that (2) it was not these five custodians' conduct that caused the barges to go adrift. Judge Cannon noted that because this is not a jury trial, these

---

[166] Deposition of Grant Walker at 37:5-15.
[167] ECF No. 1265 at 7, 19.

inferences are subject to the trial court's discretion and determination of whether any rebuttal evidence will be allowed from Skanska.[168]   Based on the evidentiary record to date, both adverse inferences are appropriate and not subject to rebuttal by Skanska.  *See* Doc. 1265 (citing *Optowave Co., Ltd. V. Nikitin,* 2006 WL 3231422 at, *12 (M.D. Fla. Nov. 7, 2006).

### a. Presumption 1: Information that was contained in the spoliated cell phone data was relevant and favorable to Claimants.

As to the first presumption, Judge Cannon's order requires a finding of fact that for each of the five custodians whose cell phone data was destroyed, their text messages would have been relevant and favorable to Claimants' case, had they been produced.   Should any of these five witnesses provided testimony that is contradictory to the evidence or to testimony provided to other witnesses, any factual inconsistencies should be found in favor of Claimants.   In effect, it should be presumed that these communications would have provided additional evidence that Skanska failed to exhibit reasonable care in preparing for Hurricane Sally.

### i. Factual Disputes Predicated on Conflicting Testimony of Spoliation Custodians Should Be Resolved in Favor of Claimants.

In some instances, in which witnesses offered deposition testimony that was inconsistent with the evidence or with other witnesses' testimony, Claimants were

---

[168] *Id.* at 25.

unable to refresh these witnesses' recollection or impeach them with text messages because their cell phone data had been spoliated. In those instances, any factual disputes or credibility assessments should be determined in favor of Claimants.

Skanska's destruction of these cell phones denied Claimants the text messages of Nick Johnson and Will Bender—the only two Superintendents on the water Sunday, September 13, 2020 during Skanska's movement of barges to mooring pilings a few hundred feet from the bridge. This left Claimants unable to challenge Mr. Johnson's otherwise unsupported account of securing the barges that was overwhelmingly favorable to Mr. Johnson and Skanska:

> Q.      Okay. So for the barges, did you – all double or quadruple? What did you do for the barges, before Sally?
>
> A.      I mean, a lot of the stuff that I was tying up had almost eight parts in it.
>
> [ . . . ]
>
> Q.      Okay. So when the storm – when the storm hit, it was either brand new or almost brand new [lines]?
>
> A.      Yep.[169]

This testimony is contradicted by others, including Skanska General Superintendent Patrick McGlynn, who testified as follows:

> Q.      Let's break that down a little bit. Can you explain what you meant by your concern that some of the barges were not secured?

---

[169] Nick Johnson Depo. at 225:8-12; 226:21-24.

> A.        Uh, yeah.  So what I mean by that when I say secured is secured correctly with the proper barge lines, the amount of barge lines, you know, if they're tied together, two barges are tied together, the condition of the barge line, um, if that – that's what you mean.[170]

Given the conflicting testimony between Nick Johnson and Pat McGlynn, both of whom had spoliated text messages, application of the first adverse inference requires a finding that the evidence found on either witness's cell phone would have been favorable to Claimants and unfavorable to Skanska.  As such, Mr. Johnson's conclusory account—which is inconsistent with the evidence and testimony provided by other witnesses—should be disregarded.

Mr. McGlynn was the highest ranking spoliation custodian, serving as the General Superintendent on the Pensacola Bay Bridge project.  Several text messages contained on the phones that were produced indicate that Mr. McGlynn was a frank, candid communicator over text messages with colleagues.

> Q.        Okay. Let's look at the first text, the September 16th, 10:57 a.m.  You text, "Are you out there trying to do anything?  I have seen the massive fuck ups we are going to have to deal with."  So. Mr. McGlynn, can you describe what you're referring to when you're texting with Mr. Benton?
>
> A.        Just – just the situation that we were dealing with a hurricane and – and our barges no being secured –
>
> Q.        Okay.

---

[170] McGlynn Depo. at 153:2-153:10.

A.        -- correctly.  Secured correctly.[171]

The loss of Mr. McGlynn's text messages is among the most consequential evidence spoliated by Skanska.  The Court should that Mr. McGlynn's spoliated text messages would have been helpful to Claimants by providing further support to his critical account of Skanska's failures within his deposition testimony.

Eduardo Rubio was the General Superintendent for the Superstructure of the Pensacola Bay Bridge with approximately twenty years of experience as a superstructure superintendent on marine construction projects.[172]     According to Tom DeMarco, who was designated as Skanska's corporate representative on the issues of roles and responsibilities, Mr. Rubio was among the three Skanska General Superintendents whose roles and responsibility involved the application of nautical skill.[173]  Mr. Rubio testified that he communicated with his co-workers using his Skanska-provided cell phone and that he would have been more likely to text colleagues than sending an email.[174]

Mr. Rubio provided contradictory testimony as to his role in preparation for Hurricane Sally, but the unavailability of his text messages limited Claimants' ability to fully discover his precise role in Skanska's pre-landfall and post-landfall efforts.

---

[171] Aug. 10 Pat McGlynn Depo. at 173:10-173:14; 173:22-174:4.
[172] Aug. 4, 2021 Deposition of Eduardo Rubio ("Eduardo Rubio Depo."), p. 38: 5-8 and Ex. 2.
[173] DeMarco Deposition Transcript at 51:14-52:14.
[174] Aug. 4, 2021 Deposition of Eduardo Rubio at p. 51:18-52:18.

Specifically, he testified that he was not "involved in storm preparation ahead of Hurricane Sally,"[175] which is in stark contrast to the fact that Mr. Rubio was a "required attendee" for three pre-storm meetings on Saturday, September 12, 2020 (afternoon) and Sunday, September 13, 2020 (morning and afternoon) relating to Tropical Depression 19.[176]   Mr. Rubio testified that he could not recall the "specifics" of the meeting he recalled attending, nor the process of moving the barges on the same day.[177]

Similarly, Mr. Rubio testified to his involvement in the "post-Hurricane Sally damage assessment process"[178] and to his collaboration with  Field Engineer Stacie Hardy in preparing a damage summary of the eastbound span,[179] but nonetheless minimized his participation as "just riding with" others completing the assessment.[180]   In addition to his contradictory testimony, Mr. Rubio refused to provide substantive responses when asked across three pages of testimony whether Skanska upheld its responsibility to secure its marine-based equipment to safe

---

[175] Rubio Depo. at 50:9-10; 50:13.
[176] Rubio Depo. at 68: 12-69:21.
[177] Rubio Depo. at 71:20-72:25.
[178] Rubio Depo. at 86: 19-22.
[179] Rubio Depo. at 80:19-22 and 82: 6-14
[180] Rubio Depo. at 101: 1-15.

harbor,[181] and similarly demurred when asked if Skanska learned any lessons from Hurricane Sally or whether he would have done anything differently.[182]

Without Mr. Rubio's text messages, Claimants were unable to refresh his recollection or impeach him with candid, contemporaneous exchanges with co-workers as to the sequence of events, the decision to abandon Skanska's written Hurricane Plan, his involvement in storm preparation, and chis observations of the post-landfall damage.   Had Skanska not spoliated this evidence, Mr. Rubio's incoming and outgoing text messages would have provided additional evidence that Skanska failed to exhibit reasonable care in preparing for Hurricane Sally. Additionally, these communications likely would have shown that Mr. Rubio was far more involved and knowledgeable as a superstructure superintendent with two decades of experience than his deposition testimony suggests.   In applying the first presumption, all such factual disputes or inconsistencies within Mr. Rubio's testimony—or credibility assessments—should be decided in favor of Claimants.

### b. Presumption 2:  It was not the actions of the five non-managerial custodians with spoliated cell phone data that caused the barges to go adrift.

The second presumption, that it was not the actions of these five custodians that caused the barges to go adrift, goes directly toward the issue of privity and

---

[181] Rubio Depo. at 131:15-133:15.
[182] Rubio Depo. at 133: 17-134: 1 and 138: 12-21.

knowledge. Skanska argues that some preparations for Hurricane Sally might have been carried out by non-managerial employees without the privity or knowledge of Skanska's managers, Fulton, DeMarco, and Rodgers. The cell phone data for those with decision-making authority (again, DeMarco, Fulton, and Rodgers) was produced. The custodians with spoliated cell phones were lower-level employees without managerial authority, including the drafter of the Hurricane Preparedness Plan in effect during Hurricane Sally and the individuals responsible for manning tugboats and securing barges in preparation for Hurricane Sally. Applying the inference that these lower-level custodians' conduct did not cause the barges to go adrift necessarily undercuts Skanska's argument against privity and knowledge.

Judge Cannon acknowledged that Skanska "downplayed the importance of DeMarco, Fulton, and Rodgers' roles" in its summary judgment briefing and that "it appears Skanska intends to rely on the conduct of lower-level employees, such as the custodians at issue here" to dispute Skanska's privity and knowledge. Doc. No. 1265 at p. 16. In one such example, Tom DeMarco attempted to shift blame to lower-level superintendent Pat McGlynn for the barges going adrift. When asked about a situation where Grant Walker reported on the morning of September 11, 2020, "ringer 2 beating up against the trophy" because "it moved" DeMarco replied, "[t]hat was the result of Pat McGlynn's supervision."[183] Applying the second

---

[183] McGlynn Dep. at 126:9-127:11.

presumption to this testimony, this Court must find that it was not Mr. McGlynn's conduct—nor the conduct of any of the other five custodians with spoliated cell phone data—that caused the barges to go adrift.

## CONCLUSIONS OF LAW

### Jurisdiction

This Court has jurisdiction over this action pursuant to its admiralty jurisdiction as provided at 28 U.S.C. § 1333.

### The Limitation of Liability Act

Under 46 U.S.C. § 30505 ("Limitation of Liability Act" or "LLA"), a vessel owner's liability for damage caused by the vessel is limited to the value of the vessel and cargoes, so long as the owner proves that the acts and losses were "done, occasioned, or incurred, without the privity or knowledge of the owner."[184]

A court must generally engage in a two-step analysis to determine if a vessel owner is entitled to limit his or her liability under the Act.[185]  "First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the court must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness."[186]

Once the negligence or unseaworthy condition is proven, the burden shifts to the vessel owner to prove the lack of privity or knowledge.

---

[184] *Am. River Transp. Co. v. Ryan*, 579 F. 3d 820, 822 (7th Cir. 2009) (citing 46 U.S.C. § 30505(b)).

[185] *Hercules Carriers, Inc. v. State of Fla.*, 768 F.2d 1558, 1563-64 (11th Cir. 1985) (citations omitted); *Empresa Lineas Maritimas Argentinas, S.A. v. United States*, 730 F.2d 153, 155 (4th Cir. 1984).

[186] *Amer. Dredging Co.*, 81 F.3d at 129, quoting *Hercules Carriers, Inc.* 768 F.2d at 1563-64; See also, Doc. No. 1223 at 18.

## I.   Exoneration

A vessel owner is entitled to exoneration from all liability for a maritime allision *only* if the owner, vessel, and crew are free from *any contributory fault*.[187] Here, the acts of negligence asserted by Claimants include: 1) the place and manner in which Skanska secured 55 barges prior to and during Hurricane Sally (specifically the decision to moor the majority of their 55 barges at locations within hundreds of feet of the bridge and between the bridge and the fishing pier); 2) Skanska's failure to implement its written hurricane plan despite triggering weather information; 3) Skanska's failure to maintain sufficient and working equipment such that non-motorized vessels could be moved or effectively moored during the hurricane; 4) Skanska's failure to have sufficient tug boats, captains, and deckhands available to move the barges out of the vicinity of the bridge; 5) Skanska's failure to maintain a sufficient supply of mooring lines to adequately secure 55 barges; 6) Skanska's failure to have sufficient personnel to adequately secure its barges; 7) Skanska's failure to begin securing barges far enough in advance of severe winds that it could be accomplished safely, with the delay causing some efforts to be abandoned or shortchanged.

As shown herein, there is substantial evidence supporting these claims of negligence.

---

[187] *Am. Dredging Co.*, 81 F.3d at 129.

## II.    Application of the *Louisiana* Rule to this Case.

While claimants generally have the burden of proving negligence or contributory fault,[188] this is subject to burden shifting under certain common law presumptions.  Here, the *Louisiana* Rule applies.  The *Louisiana* Rule applies when a drifting vessel allides with a stationary object or property, there is a rebuttable presumption that the moving vessel is at fault for any damages.[189]

The *Louisiana* presumption operates not just against the vessel, but against all parties who participated in the management of the vessel.[190]   In the context of storms, "[t]he Eleventh Circuit has held that under the *Louisiana* Rule, a vessel owner will be held liable for an allision (1) if they had timely and accurate warnings about [an] approaching storm; and (2) they failed to use reasonable means to take proper action to guard against, prevent or mitigate the dangers posed by the hurricane."[191]

---

[188] *Hercules Carriers*, 768 F.2d at 1564.

[189] *Bunge Corp. v. Freeport Marine Repair,* 240 F.3d 919, 923, 926 (11th Cir. 2001), upholding *Bunge Corp. v. Freeport Marine Repair Inc.,* 97-CV-240, Doc. No. 85 (N.D. Fla. Sept. 14, 1999), citing *The Louisiana*, 70 U.S. 164, 173 (1865); *Stuart Cay Marina v. M/V Special Delivery,* 510 F.Supp.2d 1063, 1069, 1071, 1074 (S.D. Fl. 2007).

[190] *Bunge Corp.,* 240 F.3d at 923.

[191] *Stuart Cay Marina,* 510 F.Supp.2d at 1072, citing *Boudoin v. J. Ray McDermott & Co.*, 281 F.2d 81, 82 (5th Cir. 1960). Note: Pursuant to *Bonner v. City of Pritchard,* 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit issued prior to October 1, 1981.

Here, it is undisputed that Skanska's construction barges were drifting unmoored during the storm and allided with and damaged various stationary objects, including the Pensacola Bay Bridge, the Garcon Point Bridge, the Pensacola Bay Fishing Pier, and various private and public properties. The uncontroverted facts establish that the (rebuttable) presumption of fault applies in this case.

It is also uncontroverted that 27 of the barges being used on the Project broke loose from their moorings before, during, or after Hurricane Sally.  It is likewise uncontroverted that all 27 of the barges were unmanned at the time they broke loose from their moorings.  There is no dispute that, before, during or after Hurricane Sally, some of the 27 escaped barges allided with the Bridge and other publicly- and privately-owned property.  Thus, under the *Louisiana* Rule, Skanska is presumed to be at fault for the damage caused by those barges.

### a. Rebuttal of the Presumption of Fault under the *Louisiana* Rule.

The *Louisiana* Rule's presumption of fault is subject to rebuttal by the vessel owner.  In some circumstances, not applicable here, the presumption can be rebutted by showing that the allision was the fault of the stationary object.[192]  Applicable here, a vessel owner can rebut the presumption of liability under the *Louisiana* Rule by proving by a preponderance of evidence that it was not negligent (*i.e.*, that it satisfied

---

[192] *Bunge Corp.* 240 F.3d at 923.

the standard of prudent seamanship and ordinary care and reasonableness, as measured by the circumstances that are known prior to the event[193]), or by proving that the drifting and allisions were inevitable accidents or the result of a *vis major,* "which human skill and precaution and a proper display of nautical skill could not have prevented."[194]

### b. Skanska Cannot Prove by a Preponderance of Evidence That It Was Not Negligent.

Skanska may overcome the presumption of liability by demonstrating by a preponderance of evidence that it was not negligent. Skanska bears the burden of persuasion to establish that its storm preparations were reasonable under the circumstances.

To begin with, Skanska has presented no evidence of any contributory negligence by claimants or *third parties* in this case. The evidence Skanska has put forward, however, fails to prove by a preponderance of evidence that it was not negligent and satisfied the standard of prudent seamanship and ordinary care and reasonableness, as measured by the circumstances that are known prior to the event.

---

[193] *See Fischer v. S/Y Neraida*, 508 F. 3d 586 (11th Cir. 2007).
[194] *The Louisiana,* 70 U.S. at 173; *Bunge Corp.*, 240 at 923, 925-26; *Stuart Cay Marina*, 501 F. Supp.2d at 1069, 1071-72, 1074; *Boudoin*, 281 F.2d at 85, 88.

Skanska agreed with the State of Florida to implement a Hurricane Preparedness Work Plan that would apply to its preparations for tropical weather systems that threatened the project site. Accordingly, Skanska prepared and submitted a plan at the outset of the bridge's construction wherein Skanska acknowledged its obligation to secure its marine assets in safe harbor in anticipation for tropical weather systems, like the one that developed into Hurricane Sally.

The evidence has shown that Skanska began its preparations for the tropical system that became Hurricane Sally later in the development of that storm than it had for storms that preceded it. For numerous storms prior to and after Hurricane Sally, Skanska full demobilized its barge fleet into designated safe harbors (East Bay, Butcherpen Cove, and Bayou Chico) well before the project site fell within the National Hurricane Center's potential track area or was subject to tropical storm or hurricane warnings or watches. Often, Skanska would demobilize before the storm even entered the Gulf of Mexico.

The evidence further shows that Skanska had available avenues to recover lost costs and productivity due to storm demobilization, including from its insurers and FDOT. Given this, Skanska's decision to forego demobilizing into the designated safe harbors ahead of Hurricane Sally would seem to make little sense. However, Skanska's project leadership faced increasing financial pressure in the form of project delays, insurers proving less lenient on demobilization claims, as well as

FDOT denying a claim relating to Hurricane Marco.  The evidence shows that Skanska decided it would take a wait and see approach rather than the more proactive approach it took for past storm systems.

Red flags also appeared prior to Hurricane Sally's landfall, such as Superintendent Grant Walker's observation of a large, barge mounted crane (Ringer 2) "beating up" against an eastbound span trophy on Friday, September 11, 2020—well before adverse weather reached the project site.  Mr. Walker complained to project leadership of "ruined spud cables, barges laid up against the footer, tools missing."  Later, a superintendent reported that several barges could not be moved away from the bridge due to broken spud wires.  Skanska's hurricane plan itself contained inaccuracies, such as describing the safe harbor as East Bay instead of Butcherpen Cove as shown in maps describing barge placement.  While this was addressed prior to Hurricane Sally, Skanska left the distance unchanged to safe harbor, reflecting the distance to Butcherpen Cove to have been the same as to East Bay, when it was actually far closer.  Sarah Stephens, the author of the plan, was, according to herself, not qualified to prepare the hurricane plan.

Skanska's Project Director and Vice President of Operations characterized National Hurricane Center's forecasts as "the most accurate forecast source."  The same source should have put Skanska on notice that the project site was within the potential track area for an intensifying storm that was projected to reach the wind

thresholds set forth in its own Hurricane Preparedness Work Plan that called for full demobilization of its barges into designated safe harbors.  Skanska's inaction cost it the benefit of ideal weather all day on Friday and Saturday.  At the very least, on Friday, September 11, 2020, Skanska had enough information to put its crew on standby together with third party tow services in order to begin demobilization on short notice.   This did not happen.

Skanska's project leadership convened a conference call the afternoon of Saturday, September 12, 2020 to discuss the tropical system that would become Hurricane Sally.  The discussions included consideration of seeking additional resources, including third party towage services and additional Skanska labor.  Yet, the evidence is uncontroverted that Skanska did not begin to demobilize its barges until Sunday, September 13, 2020.  That morning, Skanska's project leadership convened a meeting wherein they decided to initiate an unwritten, verbal plan in which Skanska's barges would be moved a few hundred feet from the bridge alongside various mooring piles on the east and west sides of the bridge.  Skanska's own leadership acknowledged this location was "not as safe" as the safe harbor locations designated in the written plan.

Skanska's written Hurricane Preparedness Work Plan emphasized in multiple places of the importance of beginning demobilization with the disassembly of an "a-frame" on various crane-mounted barges, that included "Rig 20," which was situated

between the Pensacola Bay Bridge and the Escambia County Fishing Pier.  Rather than start with the disassembly of the A-frame, Skanska's project leadership instead elected to continue with production work, driving two piles that Sunday, the last of which was completed after 2:00 p.m.  As Mr. DeMarco testified, Rig 20's A-frame could have been disassembled in 6 to 8 hours, but only if the rig was not used to drive piles as Skanska had opted to continue doing.

Once Skanska began to demobilize its barges to the mooring piles on the East and West of the Bridge on Sunday morning, Skanska only had on hand a single captain to begin the process, Brad Thach.  The second captain, Rob Hill, finally showed midday.  Skanska also had only two superintendents on the water to help demobilize the barges and only one crane to lift spuds.  Skanska never did call a third party tow service to enlist its help.  This significantly reduced Skanska's capability to demobilize sooner.

The first of Skanska's barges to break free did so just before 3:00 a.m. on Tuesday, September 15, 2020—more than 24 hours before landfall.  At this point, the closest weather station to the bridge had not recorded sustained winds in excess of 11 knots, while a weather station at NAS Pensacola had not recorded sustained winds in excess of 25 knots.  The first of Skanska's barges to break free and impact the Pensacola Bay Bridge did so later on Tuesday morning when the nearest weather station had not registered winds in excess of 12 knots.  This was the first of 27 of

Skanska's barges to impact and damage public or private property. The highest ranking member of Skanska's project leadership stated that Skanska "[p]repared for 25 and got 85." The evidence indicates that Skanska's preparations were insufficient even for its expectation of 25 knot winds.

KS-6012 was among the Skanska barges that broke free well before landfall. Skanska was able to secure that barge in Butcherpen Cove where it rode out the worst of Hurricane Sally without breaking free from its mooring. This is the only Skanska barge that was moored in Butcherpen Cove—Skanska's designated safe harbor. This calls into serious question Skanska's claims that moving its barges to its own designated safe harbor would not have made a difference.

The Court finds Skanska's negligence was the sole and proximate cause of the damage to the bridges, the Pensacola Bay Fishing Pier, and other private and public properties. Because Skanska is not free from contributory fault, it is not entitled to exoneration from liability in this case.[195]

### a. *Vis Major*/Act of God Defense

---

[195] *Amer. Dredging Co.*, 81 F.3d at 129-130.

The Act of God defense is limited to those events caused by natural forces of "such inevitability and irresistibleness that man cannot cope with it, either to predict, forestall it or control it when it arrives."[196]

"[T]he burden of proving inevitable accident or Act of God rests heavily upon the vessel asserting such defense."[197] The vessel must not only show that the damage was caused by the natural event, but also that no reasonable precautions or exercise of reasonable care could have prevented such harm. *See Fischer v. S/Y Neraida*, 508 F.3d 586, 596 (11th Cir. 2007). Accordingly, the defense cannot be sustained where human negligence was a contributing cause to the accident. *See City of Chicago v. M/V Morgan*, 375 F.3d 563, 576 (7th Cir. 2004).

Where an owner has timely and accurate warnings about an approaching storm, "the issue to be determined . . . is whether they used all reasonable means and took proper action to guard against, prevent or mitigate the dangers posed by the hurricane."[198]

When a ship owner argues a *vis major* or "act of God" defense[199] (*e.g.*, arguing that the hurricane would have produced the same damage irrespective of the party's

---

[196] *In re Matteson Marine Serv., Inc.*, No. 08-cv- 4023, 2011 WL 2731340, at *9 (C.D. Ill. July 13, 2011).

[197] *Bunge Corp. v. Freeport Marine Repair, Inc.*, 240 F.3d 919, 926 (11th Cir. 2001).

[198] *Stuart Cay Marina*, 510 F. Supp. 2d at 1072.

[199] The 11th Circuit explains that this is a distinct argument that rebuts causation, even where there is negligence, by establishing a superseding cause of the accident. *Fischer*, 508 F.3d at 593, 595-96.

68

negligence), the owner must prove that it took not just one reasonable course of action among many, but *all* reasonable measures—e.g. that it took *every* reasonable and prudent precaution in preparation for the storm.[200]  That is, the Court must look to whether the hurricane would have caused the allisions even if all reasonable preparations had been made.

What the ordinarily prudent barge owner should do in advance of an impending storm "is not to be measured by what hundreds or even thousands of ordinary persons—housewives, children, laborers, salesmen, and the like—either did or ought to have done. . . he has under his command a thing which may be the instrument of further damage—here a large, cumbersome, unmanned, unwieldy craft which, once loosed before these forces, would smash all in her path. He has, therefore, a special duty to take all reasonable steps consistent with safety to this ship and her crew, to avoid or minimize the chance of harm to others."[201]

Skanska has failed to meet its burden to demonstrate that, due to the hurricane's forces, the allisions would have occurred even with the exercise of all reasonable precautionary efforts.  While Hurricane Sally was a force of nature, it was not an unanticipated one and this was a situation in which reasonable precautions could have avoided the allisions that occurred in the Pensacola Bay. The

---

[200] *Bunge Corp.*, 240 at 925-26; *Stuart Cay Marina*, 501 F. Supp.2d at 1072, 1074; *Boudoin*, 281 F.2d at 85, 88; *Fischer v. S/Y Neraida,* 508 F.3d 586, 595-96.
[201] *Boudoin*, 281 F.2d at 84-85.

measures taken to secure the construction barges in advance of the storm were not reasonable.  In fact, had Skanska followed the *reasonable precautions* set forth in its own hurricane plan, as it had during prior storms, the accidents would have been avoided. Skanska's hurricane plan required the reasonable precaution of moving all construction barges away from the project site. Instead, in advance of Hurricane Sally, Skanska attempted to moor approximately 55 barges in close proximity to the bridge and other private and public property.  In no version of any of Skanska's hurricane plans was this contemplated as a reasonable method to protect the bridge or the barges in the event of a tropical storm or hurricane.

The Court concludes that the Act of God defense is not available to Skanska under the facts at hand. Skanska had ample notice of a major storm and the opportunity to prepare for it.  A reasonable precaution would have been to moor the barges at the anchorages set forth in one or more of the various versions of Skanska's hurricane plans—Bayou Chico, Butcherpen Cove, the Gulf Breeze Anchorage, or East Bay.  Another reasonable precaution would have been to reduce the number of barges being used at any given time on the project site so as to account for the limited number and capacity of the tugboats available to move the barges in the event of a tropical storm.  Accordingly, the Act of God defense is not applicable.[202]

---

[202] The Court further concludes that Skanska was not acting *in extremis*.  *See M/V Morgan*, 375 F. 3d at 577 (finding vessel was not operating in extremis).

The Court also finds that Skanska failed to abide by the applicable standard of care, *i.e.*, prudent seamanship and ordinary care and reasonableness.  Skanska thus had the burden of proof to demonstrate that the escape of the barges was an inevitable accident or attributable to *vis major*.  As discussed below, Skanska failed to meet its burden in this regard, failing to demonstrate that, irrespective of its negligence, there was a superseding cause of the allisions (e.g. *vis major* or act of God) such that the allisions could not have been avoided even if Skanska had taken all reasonable precautions.

### III.    Knowledge and Privity

A vessel owner may limit his or her liability for a damages claim by proving that the losses were occasioned without the privity or knowledge of the owner.[203] The personal participation of a company manager in the fault or negligence that caused or contributed to the injury or damage constitutes "privity or knowledge" under the Limitation Act.[204]  When the vessel owner is a corporation, privity or knowledge means the privity or knowledge of a managing agent, officer, or supervisory employee."[205] Thus, when the vessel owner is a corporation, liability will not be limited under the Act "where the negligence is that of an executive

---

[203] 46 U.S.C. § 30505; *Am. River Transp. Co. v. Ryan*, 579 F. 3d 820, 822 (7th Cir. 2009) (citing 46 U.S.C. § 30505(b)).
[204] *Great Lakes Dredge & Dock Co. v. City of Chicago*, 3 F.3d 225, 231 (7th Cir. 1993).
[205] *Am. Dredging Co.* 81 F.3d at 130.

officer, manager, or superintendent, whose scope of authority included supervision over the phase of the business out of which the injury occurred."[206]

Thus, under the Limitation Act, there are three possible outcomes:

1)   An owner may be exonerated of all liability if the owner, vessel and crew had no fault in the accident;[207]

2)   An owner may have liability limited to the value of the vessel and its freight if the owner, vessel or crew had some fault in the accident, but the owner did not have privity and knowledge of the acts of negligence or unseaworthiness that caused the accident;[208] or

3)   An owner may be denied both exoneration and limitation of liability, and therefore be liable beyond the value of the ship, if the owner, vessel or crew had some fault, and the owner had privity and knowledge of the acts of negligence that caused the accident.[209]

In the context of a corporate vessel owner, like Skanska, the Eleventh Circuit attributes to the corporation "the privity and knowledge of 'corporate managers

---

[206] *Empresa*, 730 F.2d at 155.

[207] *Amer. Dredging Co. v. Lambert,* 81 F.3d 127, 129 (11th Cir.1996); *Tittle v. Aldacosta,* 544 F.2d 752, 755 (5th Cir.1977).

[208] 46 U.S.C. § 30505; *Amer. Dredging Co.,* 81 F.3d at 129.

[209] *Hercules Carriers, Inc. v. Claimant State of Florida,* 768 F.2d 1558, 1563 (11th Cir.1985).

vested with discretionary authority.'"[210] A corporate vessel owner, then, cannot limit its liability where "the negligence is that of an executive officer, manager, or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred."[211]  "The privity and knowledge of a managing agent, officer or supervising employee, including supervisory shoreside personnel, is attributable to the corporation."[212]   Stated otherwise, "knowledge is adjudged by what the corporation's managing agents knew or should have known with respect to the conditions or actions likely to cause the loss."[213]

The 11th Circuit has defined privity as the personal participation of the owner in some fault, or act of negligence, causing or contributing to the loss, and knowledge as some personal knowledge, *or* the means of obtaining knowledge by reasonable inquiry or inspection, of conditions likely to contribute to the accident.[214]

---

[210] *Amer. Dredging Co.,* 81 F.3d at 130; see also, *Suzuki of Orange Park, Inc.,* 86 F.3d 1065 (collecting cases).

[211] *Suzuki,* 86 F.3d at 1065 (quoting *Coryell v. Phipps*, 317 U.S. 406, 410-11 (1943).

[212] *Suzuki,* 86 F.3d at 1065 (quoting *Continental Oil Co. v. Bonanza Corp*., 706 F.2d 1365 (5th Cir. 1983) (en banc); see also, *Amer. Dredging Co*., 81 F.3d at 130.

[213] *Hellenic Inc. v. Bridgeline*, 252 F.3d 391, 394 (5th Cir. 2001);  *Carr v. PMS Fishing Corp.*, 191 F.3d 1, 4 (1st Cir. 1999) ("When a corporation owns the vessel, the test is whether culpable participation or neglect of duty can be attributed to an officer, managing agent,
supervisor, or other high-level employee of the corporation.").

[214] *Petition of M/V Sunshine II,* 808 F.2d 762, 763-64 (11th Cir. 1987); *Amer. Dredging Co*., 81 F.3d at 130*; Suzuki of Orange Park, Inc. v. Shubert*, 86 F.3d 1060, 1064 (11th Cir. 1996).

The burden is on the vessel owner "trying to limit liability to prove lack of privity or knowledge.  This burden is not met by simply proving a lack of actual knowledge, for privity and knowledge is established where the means of obtaining knowledge exist, or where reasonable inspection would have led to the requisite knowledge. Thus, while knowledge may stem from an owner's personal participation in the negligence, it also may exist where the owner could have and should have obtained the information by reasonable inquiry or inspection." [215]

As Skanska's negligence contributed to causing the damage at issue, the Court must proceed to the second step and determine whether the vessel owner had knowledge of or was in privity with the acts of negligence. [216]

The burden is on Skanska to establish *a lack of* privity or knowledge. [217] A vessel owner who fails to meet the burden of showing a lack of privity and knowledge is not entitled to limit liability under the Limitation of Liability Act.

The individuals Skanska vested with discretionary authority for preparing for storms, including Hurricane Sally, were: 1) Thomas Fulton, Skanska's Vice President of Operations and Project Director; 2) Thomas DeMarco, Skanska's Project Executive and Construction Manager; and 3) Robert Rodgers, Skanska's

---

[215] *Am. Dredging Co.* 81 F.3d at 130 (internal citations and quotations omitted); See also, *Hercules*, 769 F.2d at 1564.
[216] *Amer. Dredging Co*., 81 F.3d at 130.
[217] *Amer. Dredging Co*., 81 F.3d at 130*; see also, Doc. No. 1223 at 19.

Project Manager. The knowledge and privity of these managers is attributable to Skanska.

Skanska failed to prove that Messrs. Fulton, DeMarco, and Rogers lacked privity or knowledge. The evidence demonstrated that these individuals exerted broad supervisory control over the project, and had authority as to control when, and how, Skanska was to prepare for extreme weather events. The evidence demonstrated that these individuals were negligent in failing to appropriately prepare the project site and the barges for Hurricane Sally. Messrs. DeMarco, Fulton, and Rodgers shared responsibility for making the decision to transition from construction work to securing equipment ahead of a storm, as well as for keeping track of the monitoring or forecasting of weather conditions in advance of Hurricane Sally.

Likewise, the evidence indicates that Messrs. DeMarco, Rodgers and Fulton were the only Skanska employees who had the responsibility for deciding whether and when to move construction barges to safe harbor. In addition to having responsibility with respect to the decision-making process of whether to implement the hurricane preparedness plan, Mr. Fulton also had responsibility for protecting the bridge and Skanska's assets.

While Mr. Rodgers testified that Skanska project management, including himself, devised the plan implemented for Hurricane Sally where barges were sent to mooring piles on the east and west side of the bridge, he further testified that he

was not aware of any errors or mistakes made by deckhands, crew, or anyone in implementing that plan.  Similarly, Mr. DeMarco testified that "[p]roject leadership is responsible for the project's actions," when asked if there was responsibility for the barges breaking free, whether that responsibility would rest with project leadership" and that he was not blaming any of the barges having broken free on any members of his crew.

Because Skanska has failed to meet its burden to demonstrate a lack of privity and knowledge, its liability will not be limited to the value of the barges.

## IV.    Spoliation Presumption

On August 23, 2021, Judge Cannon found that "Skanska acted in bad faith" in destroying cell phone data for five of its thirteen self-selected custodians and that "this is a text book case of spoliation."[218]  As such, Judge Cannon imposed monetary sanctions and the application of two adverse inferences: (1) that the information that was contained in the spoliated cell phone data was relevant and favorable to claimants, and that (2) it was not these five custodians' conduct that caused the barges to go adrift.  Judge Cannon noted that because this is not a jury trial, these inferences are subject to the trial court's discretion and determination of whether any rebuttal evidence will be allowed from Skanska.[219]

---

[218] ECF No. 1265 at 7, 19.
[219] *Id.* at 25.

Based on the evidentiary record to date, both adverse inferences are appropriate and should not be subject to rebuttal by Skanska.  Judge Cannon found that Skanska spoliated the evidence in bad faith.[220]   As such, an irrebutable presumption or appropriate. C*ompass Chem. Int'l, LLC v. True North Prods.*, LLC, 2011 WL 13213914, at * 28 (N.D. Ga. Feb. 15, 2011) (emphasis added) (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 469 (S.D.N.Y. 2010), *abrogated by Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135 (2d Cir. 2012) ("[W]hen a spoliating party has acted willfully or in bad faith, a jury can be instructed that certain facts are deemed admitted and must be accepted as true.")

*    *    *

Accordingly, it is ORDERED AND ADJUDGED as follows:

A.     The relief sought in Skanska's complaints for exoneration from or limitation of liability is DENIED.

B.     Because there is no cap on liability, and the value of the barges does not need to be equitably distributed among the damage claimants,[221] the Court will dismiss this action and lift the injunction on litigation against Skanska in other forums imposed pursuant to 46 U.S.C. 30511. The

---

[220] *Id.* at 16, 17, 19, 21, 23.
[221] *See* Doc. No. 1223 at 19; Supplemental Rule F of the Supplemental Rules for Admiralty and Maritime Claims.

Savings to Suitors clause preserves a "presumption in favor of jury trials and common law remedies in the forum of the damage claimant's choice."[222]

C.    The Court will schedule such hearings and trials as may be necessary via separate order.


ORDERED on this _____ day of _____ 2021.


_____
Lacey A. Collier
Senior United States District Judge

---

[222] *Suzuki,* 86 F.3d at 1063.

## CERTIFICATE OF SERVICE

I CERTIFY that this document has been filed via CM/ECF for electronic

distribution to all counsel of record on September 21, 2021.

*/s/ E. Samuel Geisler*

E. SAMUEL GEISLER, FBN 83817
D. NICOLE GUNTNER, FBN 1028925
STEPHEN H. ECHSNER, FBN 304719
BRYAN F. AYLSTOCK, FBN 78263
Aylstock, Witkin, Kreis & Overholtz, PLLC
17 East Main Street, Second floor
Pensacola, Florida 32502
Office: (850) 202-1010
Fax: (850) 916-7449
sgeisler@awkolaw.com
nguntner@awkolaw.com
sechsner@awkolaw.com
baylstock@awkolaw.com
sallyteam@awkolaw.com

*/s/ Thomas F. Gonzalez*

THOMAS F. GONZALEZ, FL Bar #173878
CHARLES T. WIGGINS, FL Bar # 48021
Beggs & Lane, RLLP
501 Commendencia Street
Pensacola, Florida 32502
Office: (850) 432-2451
tfg@beggslane.com
jnd@beggslane.com

*/s/ Brian H. Barr*
BRIAN H. BARR, FL Bar 493041
EMMANUELLA J. PAULOS, FL Bar 99010
Levin Papantonio Rafferty Proctor
Buchanan O'Brien Barr & Mougey, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Office: (850) 435-7000
bbarr@levinlaw.com
epaulos@levinlaw.com

**Attorneys for Claimants**

*/s/ Robert Kelly*
ROBERT KELLY
SAM ESCHER
THOMAS BRIGHT
ROBB HYDE
Trial Attorneys
Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 14271
Washington, DC 20044-4271
(202) 616-4031
Sam.W.Escher@usdoj.gov
Thomas.J.Bright@usdoj.gov
Robb.Hyde@usdoj.gov
Robert.Kelly@usdoj.gov

**Attorneys for Claimant**
**UNITED STATES OF AMERICA**

The following Counsel for Claimants hereby join in the filing of these papers:

*/s/ Jeffrey Paul Gill*
JEFFREY PAUL GILL
VERNIS & BOWLING OF NW FL PA - PENSACOLA FL
315 S PALAFOX ST
PENSACOLA, FL 32502
850-433-5461
Fax: 850-432-0166
Email: jgill@florida-law.com

*/s/ Eric D. Stevenson*
ERIC D. STEVENSON
FL Bar #144495
STEVENSON KLOTZ, LLP
510 E. Zaragoza St.
Pensacola, FL  32502
(850) 444-0000
(866) 251-7888 – Facsimile
eric@stevensonklotz.com
serviceeds@stevensonklotz.com

*/s/ T. Shane Rowe*
T. SHANE ROWE
Florida Bar Number 279160
EMMANUEL, SHEPPARD & CONDON
30 South Spring Street
Pensacola, Florida  32502
Telephone: (850) 433-6581
Facsimile:  (850) 434-5856
tsr@esclaw.com
ndc@esclaw.com

*/s/ Joseph A. Zarzaur, Jr.*
JOSEPH A ZARZAUR, JR.
Florida Bar No. 96806
joe@zarzaurlaw.com
service@zarzaurlaw.com
ZARZAURLAW, P.A.
P.O. Box 12305
Pensacola, FL 32591
(850) 444-9299
(850) 696-1060- Facsimile

*/s/ Daniel M. Ewert*
DANIEL M. EWERT
Florida Bar Number 0658146
Moore, Hill & Westmoreland, P.A.
Maritime Place | Suite 100
350 West Cedar Street (32502)
Post Office Box 13290
Pensacola, Florida 32591-3290
Telephone: (850) 434-3541
dewert@mhw-law.com
kgraham@mhw-law.com