IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

IN IN RE SKANSKA USA
CIVIL SOUTHEAST INC. AND
SKANSKA USA, INC., AS
OWNERS OF THE BARGE KS          ADMIRALTY RULE 9(H)
5531 PRAYING FOR
EXONERATION FROM OR             Case No.: 3:20cv5980/LAC/HTC
LIMITATION OF LIABILITY

_____/

## ORDER AND FINAL JUDGMENT

This cause is before the Court for determination of liability following a

bench trial held from October 18 through 22, 2021.  Petitioners Skanska USA

Civil Southeast Inc., and Skanska USA, Inc. (collectively, "Skanska")

commenced this admiralty action by filing a complaint under the Limitation of

Vessel Owner's Liability Act, 46 U.S.C. § 30501 *et seq.* (the "Limitation Act").[1]

This court has original jurisdiction over admiralty and maritime cases. See U.S.

Const. art. III, § 2; 28 U.S.C. § 1333(1).

---

[1] Twenty-seven related cases have been filed in this court and have been consolidated into the instant case.  See doc. 9.

Having heard and considered all of the testimony, evidence, and arguments presented, the Court now enters the following findings of fact and conclusions of law. Under the "Louisiana Rule," which will be explained *infra*, a presumption of negligence is established over the fact that numerous barges belonging to Skanska broke loose when Hurricane Sally struck the Pensacola area, causing widespread damage. Because Skanska fails to overcome that presumption, and because Skanska cannot show that it was without knowledge or privity as to its negligence, it is the finding of the Court that Skanska is not entitled to any relief under the Limitation Act. This case is therefore due to be dismissed.

## A.    BACKGROUND FACTS

This action concerns damage caused to the Pensacola Bay Bridge and other properties in and around Pensacola Bay when Hurricane Sally struck the greater Pensacola, Florida, area on September 16, 2020. The Pensacola Bay Bridge provides a major transportation link between the cities of Pensacola and Gulf Breeze, and between Escambia and Santa Rosa counties. Skanska was under contract with the Florida Department of Transportation ("FDOT") to build

two new spans for the Bridge while demolishing the old one.   Because Skanska's construction of the bridge was carried out from the waters of Pensacola Bay, it used a fleet of barges during the project to aid in the construction and to transport workers and materials to and from the work site. Skanska was using 55 barges on the project at the time of the storm.  In advance of the hurricane, Skanska moored the large majority of its barges at mooring stations near the construction site, but 27 of these barges broke free during the storm, striking and damaging the bridge as well as waterfront properties situated along the bay.

B.    CHRONOLOGY OF EVENTS

During the afternoon of **Thursday, September 10, 2020**, the National Hurricane Center ("NHC") issued a five-day weather notice indicating that a tropical disturbance in the Atlantic Ocean was traveling west toward the Bahamas and would then cross the southern tip of Florida and proceed into the Gulf of Mexico, with a 40–60% chance that it would then develop into a tropical cyclone and potentially

threaten land areas around the Gulf Coast.  There is no indication that Skanska was

aware of this notice at the time it was issued.[2]

On **Friday September 11, 2020,** that disturbance became Tropical Depression

19,[3] and at 4:00 PM,[4] the NHC issued Advisory 1, indicating that the storm was

heading towards the greater Miami area that evening.  The advisory further indicated

that by 1:00 PM Saturday the storm would pass over the west coast of the lower

Florida peninsula, entering the Gulf of Mexico on a northwest track, and that by 1:00

AM Sunday it would strengthen into a tropical storm while over the Gulf waters.[5]

As is familiar to most anyone who has watched a televised hurricane weather

report, the NHC advisory included a "cone" showing the probable track of the storm

during the coming 3 days.[6]  A separate, larger cone extended beyond the 3 day cone,

indicating the potential path of the storm 2 more days into the future.  While the

center line within the 1–3 day cone indicated a landing site for the storm at the

---

[2] The Court was not made aware of any particular individual within the Skanska organization who was specifically responsible for monitoring weather reports and informing the company about weather alerts.

[3] A tropical depression is defined as having wind speeds up to 38 MPH.

[4] All times referred to in this Order are adjusted when necessary to reflect Central Time .

[5] A tropical storm is defined as having sustained wind speeds from 39 to 73 MPH.

[6] The cone is sometimes colloquially referred to as "the cone of uncertainty."

Louisiana/Mississippi border, the cone itself extended from eastern Louisiana, which is approximately 200 miles to the west of Pensacola Bay, to Apalachicola, Florida, approximately 160 miles to the east . Depending of course on the storm's actual path, the storm was projected to be positioned in the Gulf as a tropical storm due south of the Pensacola area by early Monday afternoon, less than 72 hours from the time of the advisory.  If the storm were to continue following the path indicated by the center line, landfall was predicted to occur at the Louisiana/Mississippi border at around 1:00 PM on Tuesday afternoon.

At the top of the NHC advisory, and indeed at the top of every subsequent NHC advisory, the following explanatory note was displayed:  "The cone contains the probable path of the storm center but does not show the size of the storm.  Hazardous conditions can occur outside of the cone."  Thus, the note indicates that, depending on the size, strength and ultimate direction of the storm, areas outside the cone may also face significant storm conditions.

As it happened, Project Manager Robert Rodgers was apparently the first member of the Skanska management team to become aware of Tropical Depression 19, which he did on **Saturday, September 12th** at around 8:00 AM when he arrived at his office and learned of the advisory.  Daniel Francis, another project manager,

evidently informed Rodgers about the tropical depression upon Rodgers' arrival, but

it is uncertain as to when Francis himself knew.  Vice President Thomas Fulton, the

director for the bridge project, stated he would have "received the normal weather

alerts" on Friday the 11th, but he also said there was no weather advisory that would

have prompted him to implement Skanska's Hurricane Preparedness Plan (which will

be described *infra*).  However, because Fulton had traveled to his home in Virginia

on that Friday afternoon as he regularly did, there is uncertainty as to whether he had

learned about Advisory 1 prior to Saturday.

To discuss the advisory, Rodgers set up a video conference call with Fulton and

several other management personnel.  The conference took place at 1:00 PM on

Saturday.  By that time, Advisories 2, 3 and 4 had been issued, which upgraded the

tropical depression to Tropical Storm Sally and updated the storm's position to the

western coast of the southern tip of Florida.  The storm was now projected to

strengthen into a hurricane by 7:00 PM on Monday the 14th.  The center line within

the 1–3 day cone remained on a path to make landfall at the Louisiana-Mississippi

border, but the easternmost edge of the 3 day cone was now just inside the

westernmost border of the Florida panhandle, essentially putting Pensacola Bay on

the outskirts of the cone.  As far as the 4-5 day cone, the Pensacola area and parts

further east were clearly within it. Along the eastern coastline of the Florida panhandle a tropical storm watch had been issued, indicating that storm conditions were possible within the next 48 hours, presumably because that area, being farther east, was that much closer to the westward traveling storm.[7]

At the meeting, which had several managerial attendees, it was decided that Skanska would begin preparations for demobilizing[8] its 55 barges and other equipment. However, concerns were expressed that there might be difficulty contacting and bringing in the needed personnel because it was the weekend – as even some of the managers lived away from the Pensacola area and had returned home. The Skanska managers determined that the two tugboat captains that Skanska evidently had on hand should be notified that they would probably need to come to work on Sunday to move the barges. A local tugboat service would also be solicited for help, although there seemed to be no certainty that the service would be available – and in fact no evidence was provided to show that attempts to solicit the tugboat service were even made.

---

[7] A tropical storm watch is issued when sustained winds between 39 and 73 MPH are expected somewhere within the specified area within 48 hours in association with the advancement of a tropical cyclone.

[8] "Demobilization" was defined at trial as the act of securing water craft and other construction equipment away from the work location.

Case No.: 3:20cv5980/LAC/HTC

There was a particular barge, identified as "Rig 20" that was actively engaged in pile driving activity at the bridge.  It was determined that Rig 20 would continue to operate, apparently due to the difficulty with halting its current operation and the fact that its present positioning at the bridge was deemed relatively safe against the expected weather conditions.

The meeting generally resulted in Skanska taking a "wait and see" approach with regard to the tropical storm, which they anticipated would produce only relatively mild conditions in Pensacola Bay.  Instead of immediately demobilizing the barges, Skanska elected to track the storm while arranging to have personnel and equipment in place should it decide to demobilize on Sunday.  To that end, the Skanska managers set another meeting for Sunday morning at 7:00 AM.

Ahead of that meeting, the NHC had issued Advisories 5 through 7A, the last of which was issued at 7:00 AM on Sunday.  Advisory 7A located Tropical Storm Sally's position in the middle of the Gulf of Mexico, and, roughly speaking, on a line due south of Tallahassee and due west of Tampa.  The storm was heading in a west-northwest direction was now projected to strengthen into a hurricane by 2:00 PM on Monday.  The center line within the 1–3 day cone was on a path to make landfall slightly west of the Louisiana-Mississippi border, but was now projected to remain

in the Gulf longer, only to turn sharply to the right and make landfall in a northern direction.  The center line continued its right turn until the storm was traveling in a northeastern direction as it crossed over inland Louisiana and Mississippi and headed into Alabama.  In effect, the center line and its surrounding cone showed the storm making a right-handed u-turn around the Florida panhandle.  Yet, the eastern edge of the 1-3 day cone was now farther west than before, approximately at the western side of Mobile Bay.  The 4-5 day cone extended just into the westernmost corner of the Florida panhandle.

Advisory 7A also posted a hurricane warning for parts of coastal Louisiana and all of the Mississippi coast, while it placed a hurricane watch along most or all of the Alabama coast.[9]  A tropical storm warning was issued for all of the Alabama coast and for the coast of the entire western panhandle of Florida, extending as far east as the Apalachicola area.[10]  The Pensacola Bay area was therefore nearly within the hurricane watch zone and definitively within the tropical storm warning zone.

---

[9]  A hurricane watch is issued when sustained winds of 74 MPH or higher are expected somewhere within the specified area within 48 hours in association with the advancement of a tropical cyclone.

[10]  A tropical storm warning is issued when sustained winds between 39 and 73 MPH are expected somewhere within the specified area within 36 hours.

Case No.: 3:20cv5980/LAC/HTC

At the Sunday meeting, it was decided that Skanska would start demobilizing the barges by securing them to pipe pilings located at various mooring stations out in the bay, generally within 500 feet feet of the bridge.[11]  As required both by its contract with the FDOT and its own corporate policy, Skanska had a Hurricane Preparedness Work Plan ("Hurricane Plan") in place for the bridge project.  The Hurricane Plan set out various procedures to be performed in order to secure the project site, with the magnitude of those protective measures dependent upon the wind speed and other characteristics of the tropical system posing a threat to the project area.  When an approaching storm posed a sufficient threat (a matter that will be discussed *infra*), the Hurricane Plan called for Skanska's barges to be demobilized at designated locations, specifically, Butcherpen Cove and Bayou Chico, both of which were nearby to the east and west, respectively, but at a greater distance than the moorings by the bridge that Skanska used.

From Sunday to Monday, the NHC's tropical storm warning continued in place for the Pensacola area, and as the 1–3 day cone started shifting eastward, Pensacola appeared to be included at the very edge of the hurricane warning zone by 1:00 PM

---

[11]  Apparently because there were not enough pipe piling stations for all of the barges, some barges used spuds, which essentially are built-in pilings that are driven into the ground from the barge itself.

on Monday (Advisory 13A), and then clearly within the zone by 4:00 PM (Advisory 14).[12]  At 10:00 AM on Monday, the Governor for the State of Florida issued a State of Emergency for the greater Pensacola area, and at 11:00 AM the storm had become Hurricane Sally, with maximum sustained winds at 90 MPH.

Locally, Skanska personnel reported that the weather on the bay was calm on Sunday, but as work resumed on Monday workers noticed the weather deteriorating with increased winds and surf.  Because Skanska did not obtain additional help from any local tugboat service, only the two tugboats in Skanska's possession were used to move the barges.  The crew began work on Sunday morning and finished moving most of the barges to the mooring stations by the following morning.  Two exceptions were a pair of manlift spud barges that could not be moved because of difficulties raising their spuds, and by the time the crew was able to try lifting the spuds with a crane barge, the weather and the surf had become too rough to attempt it.  Meanwhile, after Rig 20 had finished its pile-driving work on Sunday, it was also moved, to a location approximately 40–60 feet away from the bridge where it was demobilized with spuds and anchors.

---

[12]  A hurricane warning is issued when sustained winds of 74 MPH or higher are expected somewhere within the specified area within 36 hours.

On Tuesday, the NHC Advisories continued to place the Pensacola area squarely within the 1–3 day cone, and hurricane warnings remained in place for the entire area.  While earlier in the day the center line of the cone projected landfall in and around Mobile Bay, by the evening hours that line had shifted eastward until it was projected to hit landfall at the Florida-Alabama border.

At 3:00 AM on Tuesday morning, the first of several barges broke free from its moorings, prompting a rescue effort by Skanska.  One of the other barges that broke free struck a section of the old Pensacola Bay Bridge that had been converted into a fishing pier, while at 7:00 AM yet another barge broke free and became lodged underneath the bridge, causing visible damage to the bridge supports such that the bridge had to be closed to traffic as a precautionary measure.  Another barge broke free at 6:00 PM and also became lodged under the bridge; the Skanska crew could not secure it because the conditions in the bay were deemed too dangerous.  One of the barges that had broken free was taken to one of the anchor stations in Butcherpen Cove, where it remained moored for the duration of the storm.

There is some discrepancy as to the wind strength and storm surge on the bay at the time.  While Skanska personnel at the work site on *Monday* – when conditions were ostensibly less intense – had estimated wind speeds in the bay already at 35–40

MPH with waves from 3 to 6 feet, Skanska's own expert, Dr. Austin Dooley, calculated the "significant wave heights" on *Tuesday*, when conditions should have been worse, as being between 3.75 and 5.5 feet.[13]   Tuesday morning weather data collected from the Naval Air Station (NAS) and from the airport in Pensacola reported winds in the 15–26 MPH range with gusts near 45 MPH.  4:00 PM and 6:00 PM readouts at NAS showed winds at 27–28 MPH with gusts up to 58 MPH.

As it approached the Gulf Coast, Hurricane Sally continued to shift course to the east, and at 4:45 AM on Wednesday, September 16, it made landfall as a Category 2 hurricane near Gulf Shores, Alabama, approximately 35 miles to the west of the Pensacola Bay Bridge.   As it passed through the Pensacola area that morning, sustained winds at NAS ranged from 47 to 74 MPH with gusts as high as 92 MPH. Storm surge in the area of the bridge was measured during the storm at between 5.6 and 6.5 feet.  As provided in reports from Coastal Emergency Risks Assessment ("CERA"), the maximum significant wave height recorded at the bridge during the

---

[13]  As related by Dr. Dooley, "significant wave height" is a marine forecasting term defined as the average height of the highest one-third of the waves present in the sea state.

hurricane was 7.37 feet, while the maximum that was recorded in Butcherpen Cove was 3.18 feet.[14]

As the storm passed through, some of the barges were observed to have struck the bridge, including Rig 20 whose A-frame had separated from the barge and was bent over the top of the bridge.   Separate spans of the bridge were either in a collapsed state or simply gone from view; overall, the damage was significant enough to cause the bridge to be closed to all vehicular traffic for several months thereafter while repairs were performed.  Barges had also been taken by the wind and/or current into various parts along the coast of the bay, where they either struck other structures or ran aground, causing various property damage.  One barge in particular drifted north in the bay to the point that it threatened to strike another bridge, the Interstate 10 Escambia Bay Bridge, causing it to be shut down to traffic if only for a brief period of time.  In all, 27 of Skanska's 55 barges at the construction site were set loose by the storm.

---

[14]  Dr. Dooley explained that CERA is an agency that provides "hindcasts" in which storm data is evaluated to determine after-the-fact what wave heights were experienced at a given location during the storm.

## C.    NEGLIGENCE UNDER MARITIME LAW

In a proceeding under the Limitation Act, a vessel owner may seek both exoneration from, and limitation of, liability for maritime accidents. Accordingly, maritime torts are reviewed under a two-step analysis. First, to answer the exoneration question, the court determines what acts of negligence, if any, caused the accident. *Beiswenger Enterprises Corp. v. Carletta*, 86 F.3d 1032, 1036 (11th Cir. 1996) (citing *Hercules Carriers, Inc. v. Claimant State of Florida*, 768 F.2d 1558, 1563–64 (11th Cir. 1985)). Liability is established only where the vessel owner's negligent acts were "a contributory and proximate cause of the accident." *Hercules Carriers*, 768 F.2d at 1566 (citing *Board of Commissioners of the Port of New Orleans v. M/V Farmsum*, 574 F.2d 289, 297 (5th Cir.1978)). If the shipowner is free from any contributory fault, he is exonerated from all liability. *See American Dredging Co. v. Lambert*, 81 F.3d 127, 129 (11th Cir. 1996).

But if negligence was at least partly what produced the accident, the court proceeds to the second step, limitation of liability, and determines whether the vessel owner had knowledge of, or was in privity with, the acts of negligence. *Beiswenger Enterprises*, 86 F.3d at 1036. If the vessel owner is successful in showing a lack of privity or knowledge, he remains liable but is able to limit that liability to the value

of the vessel(s) involved in the accident.  *Id.*   In that event, the available funds are then equitably distributed among the eligible damage claimants.

Though negligence law ordinarily places the burden of proof on the injured party, the parties here agree that the "Louisiana Presumption," or the "Louisiana Rule," a well-worn legal presumption under maritime law, applies in this case.  As explained by the Eleventh Circuit:

> When a moving ship strikes and damages a stationary object, it is presumed that the moving ship is at fault. This presumption operates to shift the burden of persuasion onto the moving ship.  The presumption derives from the common-sense observation that moving vessels do not usually collide with stationary objects unless the moving vessel is mishandled in some way.  It stems also from the observation that any evidence of actual negligence, or the lack of it, is likely to be known only to the persons on board, who are in the best position to either keep damaging evidence hidden, or bring favorable evidence forward.  The presumption is universally described as "strong," and as one that places a "heavy burden" on the moving ship to overcome.  This presumption of negligence may be rebutted by showing, by a preponderance of the evidence, either that the allision[15] was the fault of the stationary object, that the moving vessel acted with reasonable care, or that the allision was an unavoidable accident.  The presumption operates not just against the ship, but against all parties who participated in the management of the vessel.

*Bunge Corp. v. Freeport Marine Repair, Inc.*, 240 F.3d 919, 923 (11th Cir. 2001).

---

[15]  An allision is defined as a collision between a moving vessel and a stationary object.

To overcome this presumption, Skanska asserts that its decision on where to secure its barges during Hurricane Sally demonstrated reasonable care. If the vessel owner is found to have acted reasonably in preparing for a storm, he will not be held liable even if the vessel eventually caused damage to other property. *Fischer v. S/Y NERAIDA*, 508 F.3d 586, 593 (11th Cir. 2007). *Fischer*, 508 F.3d at 593. Reasonable care during maritime activity is measured in the context of "prudent men familiar with the ways and vagaries of the sea." *Fischer*, 508 F.3d at 593 (quoting *In Petition of United States (Dammers & Van Der Heide Shipping & Trading (Antilles), Inc. v. Steamship Joseph Lykes)*, 425 F.2d 991, 995 (5th Cir.1970)). While the "highest degree of caution" is not required to meet the standard, the vessel owner must take all reasonable measures under the circumstances. *Fischer*, 508 F.3d at 594 (quoting *The Grace Girdler*, 74 U.S. (7 Wall.) 196, 202, 19 L. Ed. 113 (1868)). "Applied to the context of hurricane preparations, reasonable care amounts to whether the owner 'use[d] all reasonable means and took proper action to guard against, prevent or mitigate the dangers posed by the hurricane.'" *Id.* (quoting *Stuart Cay Marina v. M/V SPECIAL DELIVERY*, 510 F. Supp. 2d 1063, 1072 (S.D. Fla. 2007)). The vessel owner's preparations should reflect a reasonable awareness of the severity of the threat presented by an impending storm. *Petition of United States*, 425 F.2d

at 996; *In re Signal Int'l, LLC*, 579 F.3d 478, 493 (5th Cir. 2009). Especially where, as here, the vessel is a "large cumbersome, unmanned, unwieldy craft which, once loosed before these forces, would smash all in her path," the owner has a particular duty of care to avoid or minimize the increased harm the vessel could cause if set loose in the water. *Boudoin v. J. Ray McDermott & Co.*, 281 F.2d 81, 84–85 (5th Cir. 1960). "Liability, if it exists, must turn on whether the barge causing the damage ought ever to have been in that predicament." *Id.* at 82.


D.    VIABILITY OF BUTCHERPEN COVE

In attempting to show the reasonableness of its conduct in light of Hurricane Sally's approach, Skanska contends that forsaking the opportunity to take its barges to Butcherpen Cove, a designated location for storm safety, was of no consequence because the barges would have fared no better there. If this were the case, Skanska might be on its way to establishing that its actions were reasonable, for if Butcherpen Cove or any other feasible location were not a more protective spot for its barges, one could hardly blame a company for failing to remedy a problem when no such remedy existed. But this is not the case.

As an initial matter, the Court notes that during trial, and indeed through much of this litigation, there have been frequent comparisons between Skanska's preparations for Hurricane Sally and the preparations that are provided for in the Hurricane Plan.  It bears repeating that the Hurricane Plan is a creature of contract, created pursuant to Skanska's construction contract with the Florida Department of Transportation.  Thus, while failure to abide by the Plan might violate the terms of that contract, it does not of its own force establish negligent conduct, which is the concern of this litigation.  Conversely, compliance with the terms of the Plan does not automatically constitute reasonable, prudent behavior.

That said, the fundamental goal of the Hurricane Plan is obviously the mitigation of damage during a hurricane, and so while Skanska and the FDOT might have been chiefly concerned with their own interests in the drafting of the Plan, it is fair to assume that those interests in large part would coincide with the interests underpinning this cause of action.  As well, Skanska indicates that it regularly implements hurricane plans for its projects as a matter of policy, and so it would therefore have an appreciable level of experience drafting effective plans.[16]  As the

---

[16] The Court makes these remarks knowing that Skanska's current Hurricane Plan contains several mistakes and inconsistencies, as Claimants point out, and knowing also that the later modifications to the Plan were drafted by a Skanska employee who had little knowledge of the subject matter.

Plan was understandably the product of maritime experience and expert analysis, the Court considers it influential in determining whether Skanska acted reasonably during the events in question.

Skanska's Hurricane Plan identified Butcherpen Cove as its "hurricane location for barges" and called for the barges to be relocated there when the approach of a tropical system posed a sufficient threat to the job site – specifically, under "Condition Three" where sustained winds of 58 MPH or greater were expected within 72 hours.[17]

---

[17] While seemingly the Hurricane Plan also provided that barges could be taken to Bayou Chico, it remains somewhat confusing, even after trial, as to how available that location was. During testimony, references were made to there being limited or no space available at the bayou at the time of the storm, but there were also indications that Skanska already had placed some of its barges there. There is also uncertainty as to the terms by which Skanska could make use of Bayou Chico; though a "Runyon's Slip" was mentioned as a space within the bayou that Skanska apparently had on reserve, it is unclear how many barges it could accommodate. Additionally, previous versions of the much-revised Hurricane Plan also identified "Gulf Breeze Anchorage" and "East Bay" as locations that could be used to safely moor barges during tropical storms, but these locations were abandoned in the drafting of the most current Plan, at least partly because they were farther from the project site and therefore required longer travel time. Nonetheless, as the parties primarily focus on Butcherpen Cove, the Court will do so as well.

However, the Court notes Skanska's assertion that the anchorage at Butcherpen Cove would not have been quite enough to accommodate all the barges that were on hand at the project site at the time (their exact number not being certain, but approximated at 40). The Court does not see that this problem should act as a disincentive to use Butcherpen Cove in the first instance. Whatever excess that might have existed would have been slight, and with a modicum of resourcefulness Skanska should have been able to locate a suitable site for them, if nowhere else at one of the locations previously designated by the Hurricane Plan. But, if no such location were feasible, this would only implicate negligence at the executive level, for it was recognized that the Hurricane Plan assumed a total of 40 barges in its specifications but 55 were in use at the time of Hurricane Sally, without any apparent effort to account for the difference.

Skanska nevertheless argues that Butcherpen Cove is not a "safe harbor" for storms and adds that there is no "safe harbor" throughout the Pensacola Bay area. But Skanska states so without defining what a "safe harbor" is or how protective a location must be in order to so qualify.[18]   On this basis alone, one would have to wonder why, as a matter of company policy, Skanska would designate a "hurricane location for barges" in its Hurricane Plan when that location is largely ineffective for its stated purpose.

Regardless, the Court finds that Butcherpen Cove provided substantially more storm protection than the pilings next to the bridge that Skanska used.  As pointed out through expert testimony, Butcherpen Cove benefitted from having a land mass, the Santa Rosa peninsula, nearby to its south and east.   Because the storm was approaching from the south, and because of its counterclockwise rotation, the cove was much less prone to "fetch" than other areas of the bay.  According to expert witnesses, "fetch" is defined as the distance across water that wind can blow unimpeded; the greater the fetch, the greater the wind and wave forces become. Moreover, the shoreline of the peninsula contained bluffs that better shielded the cove

---

[18] Skanska asserts that Captain DiNapoli, one of Claimants' expert witnesses, even testified that there were no "safe harbors" in and around Pensacola Bay, but in actuality DiNapoli stated that "safe harbor," while a commonly used expression, is not a well-defined term.

from wind, especially at water level where the wind could cause greater wave heights.[19]

By contrast, testimony showed that the pilings near the bridge used by Skanska were basically positioned in the open waters of Pensacola Bay, where the fetch was much greater, as was the exposure to storm surge from the Gulf.[20]  Skanska executives and experts both acknowledged during testimony that Butcherpen Cove would have less wave effects than at the bridge site.  And, the proof is in the outcome. As previously stated, the significant wave height at the bridge area was assessed as high as 7.37 feet, while Butcherpen Cove only registered as high as 3.18 feet, less than half the amount.[21]  In fact, as was demonstrated during trial, there were several areas closer to the coastline of the bay (including Bayou Chico) that experienced significantly less wave heights than the piling stations  at the bridge, which raises the inference that the bridge site was one of the worst options available.

---

[19]  Even Skanska's marine expert, Keith Dean, conceded that Butcherpen Cove provided an "element of protection" because of the protection the peninsula would provide.

[20]  Mr. Dean also acknowledged that use of the pilings in the middle of the bay would leave the barges vulnerable to long fetch and shifting winds.

[21]  While not definitive proof, it is still noteworthy that the one barge that was taken to Butcherpen Cove remained safely secured there throughout the storm.

It is also worth noting that the piling stations at the bridge were not identified under any version of the Hurricane Plan as a possible place of refuge from a tropical storm.  Skanska executives recognized as much, as they referred to their decision to use the piling stations as the product of a "verbal plan" that they devised in their meetings during the weekend before the storm – instead of following the directives of the Hurricane Plan.  As the piling stations evidently were not designed not for anything resembling a safe harbor, the "verbal plan" had little to recommend it in the face of an approaching tropical system.  It is therefore clear to the Court that Butcherpen Cove was a far superior location for the barges, and the failure to utilize it, absent any other excuse, constitutes negligence.

E.      SKANSKA'S PREPARATION FOR HURRICANE SALLY

Skanska's main argument is that Hurricane Sally's near-direct strike upon the Pensacola area and the bridge project came as a complete surprise.  Skanska asserts that mooring the barges near the bridge instead of at Butcherpen Cove was a reasonable move because relatively mild weather was predicted for the local area at the time they made their decision.

It is somewhat difficult to pinpoint exactly how and when Skanska officials made their decision.  As previously mentioned, they ended their meeting on the Saturday morning before the storm without an apparent decision on how Skanska would prepare.  Instead, they elected to alert needed personnel but otherwise to "wait and see" how the storm would proceed.  Armed with this information, Claimants make the case that, because Skanska was slow to decide – or simply did not take the storm seriously enough – by the time it reached its decision on Sunday, it was too late to safely tow the barges to Butcherpen Cove (though apparently there was sufficient time to demobilize them at the piling stations near the bridge).[22]  Skanska rejects that assertion, claiming that there was still sufficient time on Sunday to tow the barges to Butcherpen Cove if they had so chosen; they simply chose otherwise based on weather forecasts at the time.  Then, during the workday on Monday, Skanska officials saw that conditions on the water had deteriorated, that the threat from Hurricane Sally had greatly increased, and that then it was indeed too late to move the barges elsewhere.

---

[22]   Other factors have been suggested as possibly playing a role in Skanska's decision-making, such as difficulty assembling personnel and equipment, concern about deadlines within the project, the fact that Rig 20 was actively engaged in pile driving and allegedly could only be moved after completion, issues between Skanska and FDOT regarding the hurricane before Sally, and perhaps most troublingly, the fact that it was the weekend.

Ultimately, it is of little difference to the Court whether Skanska's decision was the result of corporate inaction or the product of deliberate decision-making. If a company is forced into an imprudent decision because its own delay removed the other option(s) from the table, that is grounds for negligence, but so is it if that company makes a timely, considered decision that is nevertheless imprudent. In either event, the core of this Court's inquiry remains the same: whether the decision to demobilize the barges near the bridge was reasonable. Since Skanska insists that its decision was a timely and considered one, the Court will assume that to be the case for the purpose of its argument.

Skanska's decision grew out of its meetings at 1:00 PM on Saturday and at 7:00 AM on Sunday. As described earlier, at the time of the Saturday meeting, then Tropical Storm Sally was projected by the NHC to become a hurricane by 7:00 PM on Monday, and the Pensacola area was positioned at the edge of the 1–3 day cone. At the time of the Sunday meeting, Sally was due to become a hurricane by 2:00 PM on Monday. While the 1–3 day cone had shifted slightly west such that the edge of the cone was over Mobile Bay, a hurricane watch was issued, which nearly extended into the Pensacola coast, and a tropical storm warning was issued for the entire Pensacola coastline and beyond to the east. In fact, as is shown by the entirety of the

NHC advisories from Friday afternoon to Wednesday morning when Hurricane Sally made landfall, the Pensacola Bay area was at all times either in the cone of the storm's predicted path or was under a watch or warning for tropical storm winds or greater.

On this basis alone, the Court would reject Skanska's argument that it was caught off guard by the fact that Hurricane Sally strongly impacted Pensacola.  While Pensacola may not have been the most likely recipient of a direct strike during the time Skanska made its decision, the threat of tropical force winds remained a distinct possibility.  It is difficult to accept Skanska's expression of surprise over the turn of events when at the time the Pensacola Bay area was under a tropical storm warning and a hurricane watch.

Moreover, Skanska's Hurricane Plan directed that the barges be relocated to Butcherpen Cove in the very situation presented by Hurricane Sally.  The Hurricane Plan itemized four different "Conditions" under which certain actions were necessary to protect against possible storm damage.  As is relevant here, Condition Three called for Skanska's barges to be demobilized to Butcherpen Cove in the event that "[s]ustained winds of . . . 58 mph or greater [are] expected within 72 hours/3days."  The Plan also set out an array of mechanical preparations to be made, including the

dismantling of Rig 20, and it specified that at least 30 hours were required to move the barges to Butcherpen Cove. As Skanska executives essentially conceded at trial, Condition Three was triggered as early as Friday afternoon. Since the wind speeds and time frame of even a tropical storm watch are encompassed by Condition Three, Condition Three was in place – or should have been – for the purposes of Skanska's decision-making.

Skanska nevertheless opposes this finding, claiming that tropical storm winds or greater were not "expected" for the Pensacola area as that term is used in Condition Three of the Hurricane Plan, as quoted above. Skanska suggests that "expected" means that it must have been "more likely than not" that the project site would receive the 58 MPH winds necessary to trigger Condition Three. Skanska places far too much stock in the term "expected," and it does so without pointing to any evidence that the term was inserted into the Hurricane Plan with the intention that it denote a "more likely than not" standard of measure.[23] Moreover, if the implication is true that Skanska would require a greater than 50% likelihood of tropical storm winds before Condition Three is triggered – indeed if even a 49% likelihood were

_____

[23] As is familiar in the law, "more likely than not" is the equivalent of the legal standard of proof known as the "preponderance of the evidence," which in mathematical terms relates to a 51% probability that a proposition is proven.

insufficient to cause it to take the sensible protective measures outlined in the Hurricane Plan – then Skanska's position is far out of step with acceptable standards of reasonableness.

But perhaps the greater point Skanska attempts to make is that the odds that Pensacola would receive 58 MPH winds or greater from Hurricane Sally were simply too insignificant to cause Skanska to execute the Hurricane Plan. Here, Skanska refers to wind speed probability tables issued by the NHC which set out in percentage form the chances that various areas in the path of the storm were likely to receive tropical storm winds at various times during Sally's approach. As is most relevant here, the 10:00 AM Saturday report from the NHC identified NAS Pensacola as being 16% likely to receive winds of 58 MPH or greater within 72 hours, and the 4:00 AM Sunday report gave NAS Pensacola a 9% probability.[24] These probabilities essentially provide that 1 in every 6 storms (Saturday's report) or 1 in every 11 storms (Sunday's report) in Sally's position would result in wind conditions sufficient

---

[24] Perhaps partly due to difficulties with time zone differentials, the NHC probability tables used in Skanska's brief do not coincide with the ones used at trial and referenced by the Court. The Court selected what would have been the latest available reports at the times that Skanska had its Saturday and Sunday meetings to determine its course of action. As well, while Skanska's brief references the probability listing for the city of Pensacola, at trial (as part of Skanska's cross-examination of Claimants' expert, Richard Henning) Skanska used the listing for NAS Pensacola. The Court references the listing for NAS Pensacola because its positioning along the coast of Pensacola Bay, represents a closer analog to the location of the Pensacola Bay Bridge.

enough under Condition Three to cause the transport of Skanska's barges to Butcherpen Cove.  The Court  does not view these odds as so remote that a company with a fleet of barges the size of Skanska's should consider itself safe from the storm, nor that the company should be waylaid with surprise when the storm arrives.[25]

As Claimants' expert Richard Henning stated, there has been movement within the NHC towards discontinuing these probability reports, one of the main reasons being that individuals tend to misconstrue them by minimizing the threat the storm poses.  Emblematic of this problem is the fact that, in the two probability reports cited above, numerous locations along the Gulf Coast were evaluated, including cities such as Mobile, Gulfport, Stennis, New Orleans, Cameron, and Keesler Airbase, many of which were more centrally located within Sally's cone of uncertainty, but *none* of which were listed as more than 50% likely to receive 58 MPH winds.  Thus, the implication is that under Skanska's "more likely than not" argument, none of these areas would have invoked Condition Three during the relevant time frames, therefore creating the untenable position that Skanska would never have to have taken its barges to safe harbor regardless of what locale it was working in, and without regard

---

[25]   The particulars of how the saying, "hope for the best, prepare for the worst," came up during trial are not worth reciting, but it did.  Suffice it to say that, while the particular odds posed by Sally in the NHC reports might indeed provide encouragement to hope for the best, doubtlessly they are also grounds to prepare for the worst.

to the fact that Hurricane Sally was essentially 100% likely to make landfall *somewhere* along this section of the Gulf Coast.

Accordingly, the Court rejects 1) Skanska's interpretation of the term "expected" as used in its own Hurricane Plan; 2) Skanska's assessment that Hurricane Sally must have been "more likely than not" to strike Pensacola Bay in order for Condition Three to be implemented; and 3) Skanska's position that the NHC probability tables otherwise demonstrated that Sally posed too slight a threat to the project site to cause Skanska to take protective action.

Skanska also cites to other weather forecasting sources to support its contention that it acted reasonably in demobilizing its barges next to the bridge site. Skanska states that its main source of weather information was the local office of the National Weather Service ("NWS"), which for Pensacola is the Mobile, Alabama, office.  While Skanska executives testified that they were in the practice of consulting the NHC advisories to get the "big picture" of the status of the storm, they would rely on the NWS Mobile office for marine zone text forecasts regarding the wind and sea conditions in Pensacola Bay.

Thus, Skanska found the local marine zone forecasts more important because of the greater detail they provided regarding local wind and water conditions, yet it can hardly be said, as Skanska seems to suggest, that these forecasts somehow nullified or contradicted the information provided in the NHC advisories.[26] Nevertheless, Skanska asserts that it reasonably relied on the NWS reports, which never forecasted winds greater than 28 MPH or waves in excess of 2 feet until later on Monday, by which time it was too late to move its barges. However, Skanska misconstrues the nature of the forecasts.

For instance, the NWS forecast that issued on 11:20 AM on Saturday (the latest report in advance of Skanska's Saturday meeting) provided the following forecast for Monday night:

> Tropical storm conditions possible. East winds 13 to 18 knots diminishing to 10 to 15 knots. Waves 1 to 2 feet. Showers and slight chance of thunderstorms.

---

[26] Skanska notes the statement included in the NHC advisories that one should consult the local NWS reports "for storm information specific to your area" and concludes that the local NWS reports are therefore a superior source for hurricane tracking. But the Court does not read this NHC statement as signifying that the NWS marine forecasts are superior in this regard. Rather, the statement indicates that the local marine forecasts provide more exacting information regarding the storm's impact on their specific localities, including inland areas, but they do not provide competing information on where the storm is headed. Whereas Skanska seems to label the NHC advisories as providing only "the big picture," perhaps as a way of relegating them to obscurity, the Court finds both agencies to work in tandem, with the NHC providing information regarding the track and intensity of the storm, and the NWS detailing the specific effects the storm would have on a given local area.

In fact, the "Tropical storm conditions possible" statement was repeated in the forecast for each forthcoming day and night from Sunday night through Wednesday, even as the report predicted relatively mild winds and waves during those time periods. As well, the 5:11 AM Sunday NWS report (in advance of Skanska's Sunday meeting) predicted similarly mild winds and waves, but also with the proviso that tropical storm conditions were possible and, at the top of the report in capital letters, a notice that a tropical storm warning was in effect..

The implication is clear: unless the Pensacola Bay area was impacted by Sally, the area would only experience the milder wind and wave conditions described in the forecast. It is, as Claimants' expert Mr. Henning described, a binary forecast in which the milder conditions were predicted to prevail, but only if the storm did not invade the area. Skanska would rather view the NWS forecast for mild wind and wave conditions as essentially ruling out the possibility of tropical force winds, but that is clearly not the case, for surely if it were, the NWS report would have provided some detail or explanation as to why or how such an important variation from the NHC advisories was determined to be the case. Therefore, the Court finds that the NWS forecasts did nothing to counter what was presented in the NHC advisories concerning the possible impact from the Tropical Storm Sally.

Less availing still is Skanska's stated reliance on local weather updates provided by Alan Archer, a local meteorologist on retainer to Skanska.[27]   Skanska cites Archer's forecast from 5:00 AM Saturday for the statement, "I believe Pensacola should not receive any significant impact" from the storm.   Not only does this conclusion fail to convey any true level of certainty, it comes shortly after another remark from Archer that "computer models are all over the place with this depression."   The Court gathers little from Archer's prediction that could have reasonably swayed Skanska into thinking it did not need to implement its Hurricane Plan and move its barges to Butcherpen Cove.[28]

As a reference point for its finding, the Court takes note of the holding in another case from this district, *Hatt 65, L.L.C. v. Kreitzberg*, No.

---

[27]   Though the company providing these weather updates is identified as "Continental Weather Corp.," the company appears to be more colloquially known by the name of its President, Alan Archer.  Little detail is provided about the company or Mr. Archer.

[28]   One final agency involved in weather forecasting was introduced at trial and deserves mention.  The United States Coast Guard ("USCG") consults with the National Oceanic and Atmospheric Administration ("NOAA") and other agencies in order to gather information about weather events, and then the Captain of the Port issues Marine Safety Information Bulletins ("MSIB's") as necessary to provide direction to maritime operators in their locality, which in this case is the Mobile sector of the USCG.  As Captain LaDonn Allen, commanding officer for the Mobile sector, testified, a "Port Status Whiskey" advisory was issued for the Pensacola area on the Friday before the storm, meaning that gale force winds (39-73 mph) were predicted within 72 hours. Subsequently through the weekend, Port Statuses Xray, Yankee and Zulu were issued, calling for gale force winds within 48, 24 and 12 hours, respectively.  The advisories provided instruction regarding the preparation of marine vessels, especially heavier ones, in advance of the storm.  The issuance of these port status advisories was therefore generally consistent with the NHC advisories.

3:06CV332-MCR/EMT, 2009 WL 3163220 (N.D. Fla. Sept. 30, 2009), *aff'd sub nom.*

*Hatt 65, LLC v. Kreitzberg*, 658 F.3d 1243 (11th Cir. 2011), and *aff'd sub nom. Hatt*

*65, LLC v. Kreitzberg*, No. 09-15467, 2011 WL 2565196 (11th Cir. June 29, 2011).

*Hatt* involved a large sailboat which in anticipation of Hurricane Dennis was tied to

a concrete mooring outside the mouth of Hoffman Bayou which, like Butcherpen

Cove, is located along the northern coast of the Santa Rosa peninsula in the Pensacola

Bay area.  As Hurricane Dennis approached from the Gulf, it was expected to make

landfall over Mobile Bay, approximately 50 miles to the west.  Upon the advice of

local experts, the vessel was anchored and tied off on moorings in a manner that

provided maximal protection from the anticipated winds that, due to the counter-

clockwise spin of the hurricane, would come from the east and south, where extra

protection would be provided by the Santa Rosa landmass.  However, during the last

hours of its approach, the hurricane unexpectedly shifted course, so much so that it

did not make landfall to the west of the bayou but eight miles to the east.  This

brought winds from the western side of the hurricane's eyewall over the area, and

more importantly changed the wind direction so that it came in from the north and

northwest.  While the vessel had been positioned to withstand wind and waves from

the south and east, the opposite was now true, and because of this directional change,

the vessel was subject to significantly greater fetch, which increased the wind speed and water surge even further.  The vessel broke loose, drifted into the bayou and caused damage to another vessel.

In finding that the vessel owner had acted reasonably and therefore overcame the Louisiana presumption, the court emphasized:

> While this was a reasonable spot in which to moor the [vessel] when the hurricane was expected to make landfall to the west . . . it proved to be the worst possible spot for the unanticipated actual storm path.

*Id.* at *9.

This Court finds value in the *Hatt* case because it serves as a good example of how unusual or surprising circumstances can overcome reasonable preparations, but also based on how it is distinguished from the instant case.  In *Hatt*, what was thought to be a superior location to moor the vessel was employed; in the instant case the superior location was rejected as unnecessary.  In *Hatt*, the surprise brought by the turn of the storm converted the superior location into "the worst possible spot." Presumably, under the same circumstances, reasonable mariners would do the same thing as the vessel owner did in *Hatt*.  The same cannot be said for Skanska.  Its only surprise was that its unreasonable choice to discount – or even ignore – the clear warnings of an approaching tropical storm turned out to have harsh consequences.

In a manner of speaking, the vessel owner in *Hatt* was tricked by the storm despite

his best efforts; with Skanska, its executives tried to get by with doing less, and that

gambit backfired.[29]


F.     THE *VIS MAJOR* ARGUMENT

Skanska also claims that the presumption of fault under the Louisiana Rule is

rebutted by the fact that, despite its reasonable efforts, Hurricane Sally was an

inevitable force that caused the breakaway of its barges.  A drifting vessel is not liable

for damages brought about by "'an inevitable accident, or a *vis major*, which human

skill and precaution could not have prevented.'"  *Bunge Corp. v. Freeport Marine*

---

[29]  Finally, the Court takes note of the negligence formula famously set out by Judge Learned Hand.  Usually expressed as B< PL, the formula determines that negligence is established when the burden of taking adequate precautions (B) is less than the gravity of the injury (L) discounted by the probability that the injury will occur (P).  *See, e.g., Friedenberg v. Sch. Bd. of Palm Beach Cty.*, 911 F.3d 1084, 1098 (11th Cir. 2018); *In re City of New York*, 522 F.3d 279, 284 (2d Cir. 2008); *Mesman v. Crane Pro Servs.*, 512 F.3d 352, 354 (7th Cir. 2008); *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947) (J. Hand opinion); *see also Boudoin, supra*.  Thus, the effort or cost is weighed against not only the probability that damage will occur, but also against the amount of damage that will be caused if it does occur.
   Skanska's burden (B) in taking the ready-made precaution in towing its barges to Butcherpen Cove was relatively small.  It was, after all, a procedure Skanska was used to and one that was written into its own Hurricane Plan.  The substantial probability (P) that Hurricane Sally would affect the Pensacola area has been established.  But, as has been alluded to a few times during this opinion, the gravity of the damage (L) that would (and indeed did) result from the barges being set loose in the open bay during the storm was great.  As the Hand formula makes clear, the gravity of harm should not be overlooked when assessing whether the failure to take precautions was negligent, and in this case, that level of harm was quite substantial.

*Repair, Inc.*, 240 F.3d 919, 926 (11th Cir. 2001) (quoting *The Louisiana*, 70 U.S. at 173). Thus, "a hurricane that causes unexpected and unforeseeable devastation with unprecedented wind velocity, tidal rise, and upriver tidal surge, is a classic case of an 'Act of God,'" or *vis major*. *Skandia Ins. Co., Ltd. v. Star Shipping AS*, 173 F. Supp. 2d 1228, 1239–40 (S.D. Ala. 2001), *aff'd*, 31 Fed. App'x 201 (11th Cir. 2001). It is the vessel owner's burden to prove the defense of a *vis major* accident. *Bunge Corp.*, 240 F.3d at 926.

The vessel owner must show that the damages would have occurred in any event, regardless of what preventative measures were taken. *Fischer v. S/Y NERAIDA*, 508 F.3d 586, 596 (11th Cir. 2007). "This defense sensibly requires a showing that all reasonable measures would have been futile." *Id.*. A vessel owner who was negligent may yet be entitled to the defense "[i]f the act of God would have produced the same damage irrespective of the party's negligence." *Id.* (quoting *Warrior & Gulf Navigation Co. v. United States*, 864 F.2d 1550, 1553 (11th Cir.1989). Conversely, if the vessel owner's negligence is found to be a contributing cause of the accident, the defense is unavailable. *Skandia*, 173 F. Supp. 2d at 1240–41.

In this case, Skanska's own negligence in its failure to take reasonable precautions prevents it from successfully proving a *vis major* defense. As was earlier discussed in detail, Skanska had available an offsite location for its barges, Butcherpen Cove, that would have been significantly more protective, and Skanska's attempts to convince the Court that Butcherpen Cove would not have kept the boats secure are unavailing. Skanska received ample warning about Hurricane Sally's approach, and thus its negligence is – at the least – a contributing factor to the damages caused by its barges. Skanska therefore fails to show that Hurricane Sally constituted a *vis major* force that inevitably caused the damages brought by the escape of its barges no matter what precautions it might have taken.

## G.    LIMITATION OF LIABILITY

Having denied Skanska's claim for exoneration of liability under the Limitation Act, the Court turns to the second step of the claim, limitation of liability, to determine whether Skanska is able to limit its liability to the value of the vessels involved in the allisions. *See Beiswenger Enterprises*, 86 F.3d at 1036. Here, Skanska must be able to demonstrate that it had no knowledge of the acts of negligence or was not in privity with them. *Id.* The burden of proof is on Skanska

to show it lacked knowledge or privity. *See Coryell v. Phipps*, 317 U.S. 406, 409, 63 S.Ct. 291, 293, 87 L.Ed. 363 (1943); *Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp.*, 768 F.2d 1558, 1564 (11th Cir. 1985). "[K]nowledge is not only what the shipowner knows but what he is charged with discovering in order to apprise himself of conditions likely to produce or contribute to a loss. *Hercules Carriers,* 768 F.2d at 1564 (citing *Avera v. Florida Towing Corp.*, 322 F.2d 155, 166 (5th Cir.1963)). In the case of a corporate vessel owner, "privity or knowledge" means the privity or knowledge of a managing agent, officer or supervising employee. *Id.; see also Am. Dredging Co. v. Lambert*, 81 F.3d 127, 130 (11th Cir. 1996); *In re Signal Int'l, LLC*, 579 F.3d 478, 496 (5th Cir. 2009) ("A corporation is charged with the knowledge of any of its managing agents who have authority over the sphere of activities in question.").

Here, Skanska's claim of lack of privity or knowledge is perfunctory, based apparently on its claim that negligence did not lie with the decisions Skanska made with regard to the hurricane and that therefore any negligence that would have occurred was at the hands of the crew that carried out its orders. But, as has been seen, Skanska was indeed found negligent, and that negligence sprung wholly from executive decision-making that resulted in the failure to take reasonable measures to

protect its barges from the impending storm.  Because Skanska obviously cannot establish any lack of privity or knowledge, it is unable to limit its liability to the value of its barges under the Limitation Act.[30]

Accordingly, it is **ORDERED:**

1.     The Court finds in favor of Claimants and against Petitioners Skanska USA Civil Southeast Inc., and Skanska USA, Inc., who shall take nothing on their Complaint.

2.     Petitioners' Complaint for Exoneration from or Limitation of Liability is accordingly **DISMISSED**; the Court's previously ordered injunction staying all state court proceedings related to the instant action (Doc. 6) is hereby **DISSOLVED**; and **FINAL JUDGMENT** is entered accordingly.

3.     A copy of this Order and Final Judgment shall be entered in all of the consolidated cases.

**ORDERED** on this 29th day of December, 2021.

s/*L. A. Collier*
_____
Lacey A. Collier
Senior United States District Judge

---

[30] As a final consideration, the Court takes note of the proffered testimony of Captain Roger Towne, an independent tugboat operator, and Commander Timothy Kinsella at NAS Pensacola, and finds that the testimony they would have provided would not have had an effect on the Court's decision.

Case No.: 3:20cv5980/LAC/HTC